IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| IMPLICIT, LLC, | § § | |
| *Plaintiff*, | § § | CIVIL ACTION NO. 6:17-cv-182-JRG |
| v. | § § | (LEAD CASE) |
| HUAWEI TECHNOLOGIES USA, INC., et al. | § § § | JURY TRIAL DEMANDED |
| *Defendants.* | § § | |

# **IMPLICIT, LLC'S OPENING CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

I. THE PARTIES ........................................................................................................... 1

    A. Plaintiff Implicit, LLC ................................................................................... 1

    B. Defendant Palo Alto Networks, Inc. .............................................................. 1

II. BACKGROUND OF THE PATENTED TECHNOLOGY ....................................... 2

    A. The Demultiplexing Patents ........................................................................... 2

    B. The '740 Patent .............................................................................................. 4

    C. Prior Litigation ............................................................................................... 4

III. LEGAL PRINCIPLES OF CLAIM CONSTRUCTION ........................................... 5

IV. IMPLICIT'S PROPOSED CONSTRUCTION OF CLAIM TERMS ....................... 5

    A. The Demultiplexing Patents ........................................................................... 5

        1. "message" ........................................................................................... 5

        2. "process/processing . . . packets" ....................................................... 7

        3. "state information" ............................................................................. 9

        4. "key [value]" ................................................................................... 10

        5. "removing [an / the resulting] outermost header" ........................... 12

    B. The '740 Patent ............................................................................................ 13

        1. "resource" ........................................................................................ 13

V. CONCLUSION ........................................................................................................ 15

# **TABLE OF AUTHORITIES**
**CASES**

*Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318 (Fed. Cir. 2013) ........................ 10

*GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304 (Fed. Cir. 2014) ............................ 6

*Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362 (Fed. Cir. 2014) ...................................... 5

*Implicit L.L.C. v. F5 Networks, Inc.*, No. 3:14-cv-2856-SI, 2015 U.S. Dist. LEXIS 60197 (N.D. Cal. May 6, 2015) ................................................................................................. 5

*Implicit Networks, Inc. v. F5 Networks, Inc.*, No. 3:10-cv-3365-SI, 2012 U.S. Dist. LEXIS 27238 (N.D. Cal. Feb. 29, 2012) ....................................................................................... 4

*Implicit, LLC v. Trend Micro, Inc.*, No. 6:16-cv-080-JRG (E.D. Tex.), D.I. 115 ................... 4-6, 8

*Liebel-Flarshein Co. v. Medrad, Inc.*, 385 F.3d 898 (Fed. Cir. 2004) ........................................... 7

*On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133 (Fed. Cir. 2004) ............................................................................................................................. 11

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) .................................. 8, 10, 14

*Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998) ......................... 6

*Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362 (Fed. Cir. 2012) ........................... 5-6

Pursuant to the Court's Second Amended Docket Control Order [D.I. 72] and Patent Rule 4-5(a), Plaintiff Implicit, LLC ("Implicit") respectfully submits this Opening Claim Construction Brief.

## I.     THE PARTIES

### A.     Plaintiff Implicit, LLC

In the late 1990's, Edward Balassanian, sole named inventor of the patents-in-suit, set out to solve problems that he saw with network processing in the industry.  He founded BeComm Corp. in order to attempt to commercialize his inventions, include those claimed in the patents-in-suit.  BeComm saw initial success, including entering into co-development deals with Intel Corp. and others, as well as multimillion dollar offers from Silicon Valley venture capital.  In the end, infringers like Palo Alto Networks, Inc. ("PAN") were able to take BeComm's technology faster than it could develop its own products to exploit Balassanian's inventions.  BeComm was restructured into Implicit Networks, Inc. (of which Balassanian was President and CEO) in order to seek compensation from companies like PAN that impermissibly used its patented technology.  Implicit Networks, Inc. later assigned the patents-in-suit to Plaintiff Implicit (of which Balassanian is Manager), which continues to seek adequate compensation for the use of its patented technology.

### B.     Defendant Palo Alto Networks, Inc.

PAN is a network and enterprise security company founded in 2005.  It employs over 4,500 employees worldwide, and its most recent reports indicate annual revenues over $1.7 Billion, and gross profit over $1.2 Billion.  PAN is publically traded as New York Stock Exchange (PANW) with a market cap of over $14 Billion.

## II. BACKGROUND OF THE PATENTED TECHNOLOGY

Implicit alleges that Defendant Palo Alto Networks, Inc. ("PAN") infringes various claims of four United States patents: United States Patent Nos. 8,694,683 (the "'683 patent") (attached hereto as Exhibit 1); 9,270,790 (the "'790 patent") (attached hereto as Exhibit 2); 9,591,104 (the "'104 patent") (attached hereto as Exhibit 3); and 9,325,740 (the "'740 patent") (attached hereto as Exhibit 4) (collectively, the "patents-in-suit") by making, using, selling and importing the inventions described therein.  The patents-in-suit belong to two patent families, as discussed below.

### A. The Demultiplexing Patents

The '683 patent, '790 patent, and '104 patent share a common specification, and are referred to herein as the "Demultiplexing Patents."  The claims of the Demultiplexing Patents can be generally described as relating to processing messages, comprised of packets, flowing through a network.  "A message is a collection of data that is related in some way, such as [a] stream of video or audio data or an email message." '683 patent, 2:49-51.  Messages are fragmented into smaller digitized pieces called "packets" for transport across a network. *Id.* at 2:42-44.  Each message packet can include different layers in different data formats. *Id.* at 1:24-44.  In essence, each layer in the packet serves as a container for the data embedded within it.

Each packet includes at least one header, and data.  The header sets out certain information relevant to at least one network layer; the remaining portion of the packet consists of data.  This data may comprise a header of the next layer of the packet and data for that layer, and so forth.  Multiple headers may be nested within one another, ultimately containing the actual data (usually, but not always, application data) the packet is intended to transmit.  In this way, each header is like an envelope with address and other information written on it (the header);

inside each envelope may be another envelope with additional header data, until the ultimate data is inside in the innermost envelope. These different layers are often associated with different layers of a network model that includes various protocols arranged in a network stack (*e.g.*, an Ethernet physical layer, an IP network layer, and a TCP transport layer).

The following diagram illustrates the nesting of HTTP data within a TCP header, all of which is nested within an IP header, and then an Ethernet header:



http://www.cs.unc.edu/~jbs/projects/aw/book/chapters/background/internet/.[1] In the computer, these headers, and then the final data block, are stored in a single sequence, such as for example: <header1><header2><header3><data>.

As a packet travels through the network, each component will use its respective header to determine what to do next with the packet. For example, using the above diagram, the Ethernet component will examine the Ethernet header (<header1>) and decide how to process the remainder of the packet (*i.e.*, the IP header plus its data, or <header2><header3><data>). Then IP will examine the IP header (<header2>) and decide how to process the TCP header plus its data (<header3><data>). Finally, TCP will examine the TCP header (*i.e.*, <header3>) and decide how to process the final data block (<data>). Conversely, when a computer wishes to send a

---

[1] Note that the types of headers shown in this diagram are exemplary, and not every packet will necessarily have, for example, a TCP header.

3

piece of data (<data>) via the TCP/IP stack is in the above, it will first add a TCP header to the front of the data portion (<**header3**><data>), then an IP header (<**header2**><header3><data>), and finally an Ethernet header (<**header1**><header2><header3><data>).

The Demultiplexing Patents are directed to how to process packets without pre-determining the processing path. This is referred to in the Demultiplexing Patents as "dynamic" processing.

### B. The '740 Patent

The claims '740 patent can be generally described as relating to the generation and deployment of resources to a client machine at the direction of a server machine, based on a request by the client machine.

For example, a client may request a certain resource from a server. The server receives that request and produces the resource to the client computer. In doing so, the server forwards the request for the resource to an external network that contains the resource, receives the resource from that network, and performs a transformation operation on the resource. Finally, the server sends the transformed resource to the client computer.

### C. Prior Litigation

Most recently, this Court construed claims of three of the four patents-in-suit (the '104 patent had not yet issued). *See* Claim Construction Memorandum Opinion and Order, *Implicit, LLC v. Trend Micro, Inc.*, No. 6:16-cv-080-JRG (E.D. Tex.), D.I. 115 (the "*Trend* Markman Order"). The patent-in-suit and/or earlier patents to which they claim priority were also construed earlier in *Implicit Networks, Inc. v. F5 Networks, Inc.*, No. 3:10-cv-3365-SI, 2012 U.S. Dist. LEXIS 27238 (N.D. Cal. Feb. 29, 2012) ("F5 Networks I") and *Implicit L.L.C. v. F5*

*Networks, Inc.*, No. 3:14-cv-2856-SI, 2015 U.S. Dist. LEXIS 60197 (N.D. Cal. May 6, 2015) ("F5 Networks II").

## III. LEGAL PRINCIPLES OF CLAIM CONSTRUCTION

The Court is well versed in the principles of claim construction, as can be seen for example in its summary of those principles in the *Trend* Markman Order at 9-12. Implicit addresses relevant areas of claim construction law with respect to individual claims to which they pertain below.

## IV. IMPLICIT'S PROPOSED CONSTRUCTION OF CLAIM TERMS

### A. The Demultiplexing Patents

1. *"message"*

| Term to Be Construed | Implicit's Construction | PAN's Construction |
|---|---|---|
| "message"<br><br>'683 patent claims 1, 24, 25<br>'790 patent claims 1, 8, 13, 15<br>'104 patent claims 1, 10, 16 | "a collection of data that is related in some way, such as a stream of video or audio data or an email message" | "a collection of application data that is related in some way, such as a stream of video or audio data or an email message" |

The parties' only dispute on this term is whether the "collection of data" that both sides agree constitutes a "message" must be "application data." Because the Demultiplexing Patents make no such distinction, and because so limiting this construction would deny the patentee his right to act as his own lexicographer, the Court should adopt Implicit's construction.

It is settled law that a patentee may "act[] as his own lexicographer" by "set[ting] out a definition" of a claim term. *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)). When he does so, the claim term is not given its plain and ordinary meaning, but instead the definition provided by the patentee. *See id.* To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to

5

define the term." *GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (quoting *Thorner*, 669 F.3d at 1365). The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998).

Here, these requirements are clearly met. In the first paragraph of the detailed description of the inventions of the Demultiplexing Patents, the patentee unambiguously defines "message" in a standalone, parenthetical sentence: "(A message is a collection of data that is related in some way, such as [a] stream of video or audio data or an email message.)"[2] Exhibit 1 at 2:49-51. By using the phrase "[a] message is . . .," the patentee clearly, deliberately, and precisely expressed an intent to inform the reader what a message is. Notwithstanding any argument regarding the plain and ordinary meaning of "message," the Court should construe this term consistent with binding case law allowing the patentee to act as his own lexicographer and provide his own claim term definitions, as well as this Court's prior construction of the term. *See Trend* Markman Order at 12.

Even if the Court were persuaded to look to the plain and ordinary meaning of "message," however—and it should not—nothing in the Demultiplexing Patents favors PAN's construction. In fact, the word "application" appears ***nowhere*** in the Demultiplexing Patents' specification, except where referring to a patent application.[3] *See* Exhibit 1 at 1:7-14, 3:63. Indeed, PAN appears to have plucked this word from the ether and inserted it into its proposed claim construction, presumably to serve some noninfringement argument. The Court should

---

[2] Neither party objects to the correction of the typographical error in this sentence, in which the patentee inadvertently omitted the word "a" before "stream."

[3] "Application" does appears in the claims of the Demultiplexing patents, but only in the context of the "application layer," "application layer protocols," "application-level protocols," and "application-level routines"—never relating to the meaning or content of a "message." *See* Exhibit 1, claims 12, 15, 26, 27; Exhibit 2, claims 3, 4, 10, 18, 19; Exhibit 3, claims 3, 13.

deny PAN's invitation to import this limitation into the clear lexicographic definition of "message"—an improper use of claim construction even when a description of the limitation appears in the specification. *Liebel-Flarshein Co. v. Medrad, Inc.*, 385 F.3d 898, 904-05 (Fed. Cir. 2004).

Finally, to the extent PAN would argue that a message must comprise "application data" because each of the terms in the exemplary "such as" clause of the agreed portion of the parties' constructions are application data, it asks too much. Each of the exemplary items ("a stream of video or audio data or an email message") following "such as"—which is used to introduce examples, *see* https://www.merriam-webster.com/dictionary/such%20as—is clearly a "collection of data that is related in some way," just as the patentee intended. As PAN would apparently argue it, however, it would appropriate to import into the patentee's lexicographic definition of "message" *any* phrase that describes these three examples. This cannot be. For example, it would not be appropriate to construe "message" to mean "a collection of *audio/visual or email* data that is related in some way, such as a stream of video or audio data or an email message." Allowing PAN to import "application data" into this term would subvert the patentee's right to define the term as his own lexicographer—after all, if the patentee intended to limit "message" to application data, he would have done so his lexicographic statement in the specification. The Court should deny PAN's invitation to important a limitation into the construction of "message" simply because it happens to fit the three exemplary items listed in the lexicographic definition.

2. *"process/processing . . . packets"*

| Term to Be Construed | Implicit's Construction | PAN's Construction |
|---|---|---|
| "process/processing . . . packets"<br><br>'683 patent claims 1, 24<br>'790 patent claims 1, 8, 15<br>'104 patent claims 1, 3, 10, 16 | "apply/applying one or more routines to packets" | "apply/applying one or more conversion routines to a packet" |

7

The parties' only dispute on this term is whether the "routines" that both sides agree must be applied to packets must be "conversion routines." As with the previous term, PAN seeks to improperly import a limitation from the specification into a claim term that is not so limited. Because the routines applied to packets are not necessarily all conversion routines, the Court should adopt Implicit's construction.

Because the patentee claimed "conversion routines" when he intended to limit the type of routines discussed, "routines" should not be limited to only conversion routines. As this Court correctly found in the *Trend* Markman Order, while independent claim 10 of the '683 patent refers specifically to "conversion routines," all other independent claims of the '683 patent require only "routines." "That the term 'conversion routines' was used in Claim 10—and simply 'routines' in the other claims—strongly suggests that the patentee did not intent to limit all the routines to 'conversion routines.'" *Trend* Markman Order at 21 (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*) as noting that the use of the term "steel baffles" "strongly implies that the term 'baffles' does not inherently mean objects made of steel"). In fact, this Court found that "[e]ven if all described routines are conversion routines, that alone is not sufficient to inject such a limitation into the claims." *Id.* at 22 (citing, *inter alia*, *Phillips*, 415 F.3d at 1323, as explaining that the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment").

Indeed, the Court need not rely solely on the distinction between "conversion routines" and "routines" in the claims—there are numerous examples of non-conversion routines in the Demultiplexing Patents. Claim 6 of the '683 patent, in fact, requires that "the sequence of routines include[] a routine that is executable to process the packets ***without converting*** a format

8

of the packets" (emphasis added). For example, the Demultiplexing Patents specifically address the use of both compression and encryption routines—neither of which are conversion routines. *See* Exhibit 1 at 1:24-44. To require all "routines" of the Demultiplexing Patents to be conversion routines would exclude these routines discussed in the specification, would leave claim 6 without meaning, and would fail to give weight to the patentee's decision to unambiguously specify "conversion routines" when that was intended. For all these reasons, the Court should adopt Implicit's construction.

3. *"state information"*

| Term to Be Construed | Implicit's Construction | PAN's Construction |
|---|---|---|
| "state information"<br><br>'104 patent claims 1, 10, 16 | plain and ordinary meaning | "information specific to a software routine for a specific message that is not information related to an overall path" |

PAN seeks a complex and multi-part construction for "state information," a term that is clear on its face—"state information" is information regarding the state of the computer. Because the Demultiplexing Patents do not support the limitations PAN seeks to import into this term, the Court should decline further construction.

PAN's construction deviates from the plain and ordinary meaning of "state information" in at least two ways. First, the "state information" of the claims need not be specific to one software routine for one message. For example, the Demultiplexing Patents make clear that "the conversion routine**s**" (plural) "may need to retain state information." Exhibit 1 at 3:1-2. Furthermore, claim 11 of the '683 patent requires that "one or more of the sessions specify state information ***for one or more*** of the conversion routines" (emphasis added). Similarly, while the specification does state that, in the preferred embodiment, this state information may need to be retained "between the receipt of one packet of a message and the next packet of that message,"

9

*id.* at 3:2-4, nowhere does it require that the state information *may not* be retained between messages, or between software routines. Even if, *arguendo*, the preferred embodiment did use state information for one software routine for one message, those limitations may not be read into the claims. *See Phillips v. AWH Corp.*, 415 F.3d at 1314, 1323.

Second, the Demultiplexing Patents do not require that "state information" not be related to an overall path. For example, as above, claim 11 of the '683 patent requires the use of "state information *for one or more* of the conversion routines" (emphasis added)—routines that are included in the overall path. Although it is unclear what distinction PAN seeks to make between state information for *one or more* conversion routines (which must be permitted as claimed) as opposed to state information "related to an overall path," nothing in the Demultiplexing Patents supports such an additional limitation.

Because "state information" means no more than information about the state of the computer, the Court need not construe this term further.

4. *"key [value]"*

| Term to Be Construed | Implicit's Construction | PAN's Construction |
|---|---|---|
| "key [value]"<br><br>'790 patent claims 1, 2, 15, 16<br>'104 patent claims 1, 10, 16 | plain and ordinary meaning | "information that identifies the session of a protocol"<br><br>And, the "key [value]" must be determined in recited sequence of the claim |

As with the previous term, PAN seeks an unnecessarily complex construction for "key [value]"—but this term needs no construction. The Court should decline to construe this term as PAN suggests because that construction would exclude a preferred embodiment of the inventions. *See Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the

10

claim is rarely, if ever, correct.") (quoting *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004)).

At the outset, PAN confuses different uses of "key" in the specification. PAN's construction, for example, appears to be derived from '683 patent at 6:28-29: "A target key identifies the session associated with the protocol that converts the packet to the target label." But this is not the only way in which the specification uses "key." As can be seen in Figure 5 of the '683 patent, this "target key" from col. 6 ll. 28-29 is the TargetKey in map **507**. *See* Exhibit 1 at 6:23-29 (discussing "target key" as above in the context of "map structure **507**"). Later in the same column, though, the specification states that "[t]he key identifies the state information for a session of a protocol." Exhibit 1 at 6:64-65. This time, the "key" referred to at col. 6 ll. 64-65 is the Key listed under Binding **510** in Figure 5 of the '683 patent. *See* Exhibit 1 at 6:61-65 (discussing "key" as above in the context of "binding structure **510**"). Later, discussing Figure 6 of the '683 patent, another "key" is used—this time referring to the pKey that appears under session **601**. *See* Exhibit 1 at 7:2-6. This term should not be construed based on just one portion of the specification, when other portions are inconsistent with PAN's proposed construction.

Next, PAN argues that the "key [value]" must be determined in the recited sequence of the claim. No such limitation exists in the Demultiplexing Patents, and it is unclear which portion of this ordering PAN deems important. However, to the extent PAN argues that the key must be determined before the path is created, it is incorrect. Figure 8 of the '683 patent shows the "demux routine." Exhibit 1 at 8:38. In the preferred embodiment, it is in this routine that "[t]he get key routine *creates the key* for the session associated with the message." *Id.* at 9:3-8. But importantly, in the preferred embodiment this routine may be executed whether or not a path already exists: "[t]he demux routine *extends a path*, creating one *if necessary*." *Id.* at 8:40-41.

11

The Court should decline to construe "key [value]" in a way that is inconsistent with its usage in Demultiplexing Patents' description of a preferred embodiment.

5. *"removing [an / the resulting] outermost header"*

| Term to Be Construed | Implicit's Construction | PAN's Construction |
|---|---|---|
| "removing [an / the resulting] outermost header"<br><br>'683 patent claim 24 | "advancing the reference past the header information" | plain and ordinary meaning |

Construction of this term is necessary to avoid jury confusion. Specifically, "removing," as used in this term, does not mean the same thing to a lay person as it does to a person of ordinary skill in the art, as can be clearly seen in the Demultiplexing Patents. While a lay juror might believe "removing" a header requires somehow physically separating the header from the remaining information and discarding it, this is not the case.

As discussed above, packets include a piece of data with one or more headers in front of it, for example <header1><header2><header3><data>. This packet resides in a computer's memory, where it can be accessed by any program or process that needs to read any part of it. Importantly, the computer knows where each header sits in memory—its memory address. Thus, in order to read, for example, <header2>, it is not necessary for the computer to actually separate and discard <header1>—instead, it can simply look to where it knows <header2> resides. The computer does this by moving (or advancing) a "pointer" or "reference" to a specific location in memory—*e.g.*, by advancing the reference from the memory address at which <header1> resides to the memory address at which <header2> resides.

The Demuliplexing Patents make clear that the patented inventions allow for this advancing of references, as opposed to requiring that each header be discarded before moving on to the next header:

12

> Also, a reference to a single copy of the message can be passed to each conversion routine or demuxkey routine. These routines can ***advance the reference past the header information for the protocol so that the reference is positioned at the next header***. After the demux process, the reference can be reset to point to the first header for processing by the conversion routines in sequence.

Exhibit 1 at 14:10-16 (emphasis added). Importantly, the Demultiplexing Patents specify that after reading any number of "next header[s]," "the reference can be reset to point to the first header"—meaning that that first header is not "removed" in the lay understanding of the word—*i.e.*, it is not separated or discarded from the rest of the packet or message.

### B. The '740 Patent

1. *"resource"*

| Term to Be Construed | Implicit's Construction | PAN's Construction |
|---|---|---|
| "resource"<br><br>'740 patent claims 1, 9–11, 13, 19, 20 | plain and ordinary meaning | "data object containing code that: (1) is an application, (2) is an applet, or (3) can be used to build an application or applet" |

The term "resource" is used the Demuliplexing Patents to mean simply something that can be accessed or drawn upon—its plain and ordinary meaning. Because PAN's proposed construction seeks to limit the meaning of "resource" beyond what was intended, the Court should decline to construe this term beyond its plain and ordinary meaning.

At the outset, read most broadly, Implicit does not entirely disagree that PAN's proposed construction is consistent with the way in which "resource" is used in the claims of the '740 patent, along with other terms. Each independent claim of the '740 patent (claims 1, 19, and 20) requires that "the resource includes source code." Under the parties' stipulated constructions of "source code" and "application," anything that includes source code either "(1) is an application, (2) is an applet, or (3) can be used to build an application or applet." Thus, a "resource [that] includes source code" would necessarily meet PAN's construction for "resource." The question

13

for the Court in construing this term is: must every "resource" be a "resource [that] includes source code"? Implicit submits that the answer is no.

The specification of the '740 patent uses the term "resource" more broadly than the phrase "resource that includes source code." For example, the specification is replete with discussion of "local resources" that may be used to verify or compile source code. *See* Exhibit 4 at 2:32-36, 4:21-23, 4:54-57. But compilers are programs that have already been compiled from source code into machine code, and rarely "include source code" themselves. A compiler is not a "resource that includes source code," but it is a "resource."

As another example, the '740 patent uses "resource" differently again when it discusses a computer having "the resources to store the entire application in memory at once." *Id.* at 3:54-57. Here, the "resource" in question is the amount of memory available to a computer. This "resource" contains no code at all, let alone source code. Later, the '740 patent refers to "system resources such as JO devices." *Id.* at 5:47-50. These "devices" are not applications or applets, and do not themselves contain code.

Because the '740 patent does not limit its discussion of "resources" to "resource[s] [that] include[] source code," and because the patentee clearly claimed a "resource that includes source code" when that is what he intended (*i.e.*, each time "resource" appears in the independent claims), the Court should not adopt such a limiting construction of "resource." *See Phillips*, 415 F.3d at 1314 (Fed. Cir. 2005) (*en banc*) (the use of the term "steel baffles" "strongly implies that the term 'baffles' does not inherently mean objects made of steel"); *id.* at 1323 (the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment").

## V. CONCLUSION

For the foregoing reasons, Implicit respectfully requests that the Court enter the claim constructions it proposes, and for such other or additional relief as the Court deems just and proper.

Dated: January 9, 2018

Respectfully Submitted,

By: /s/ William E. Davis, III
William E. Davis, III
Texas State Bar No. 24047416
THE DAVIS FIRM P.C.
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Telephone: (903) 230-9090
Facsimile: (903) 230-9661
E-mail: bdavis@bdavisfirm.com

Benjamin L. Singer
Evan N. Budaj
James Hopenfeld
Adam S. Cashman
Walter C. Pfeffer
SINGER / BEA LLP
601 Montgomery Street, Suite 1950
San Francisco, CA 94111
Telephone: (415) 500-6080
Facsimile: (415) 500-6080
bsinger@singerbea.com
ebudaj@singerbea.com
jhopenfeld@singerbea.com
acashman@singerbea.com
wpfeffer@singerbea.com

*Counsel for Plaintiff*
*Implicit, LLC*

CERTIFICATE OF SERVICE

      The undersigned certifies that the foregoing document is being filed electronically in compliance with Local Rule CV-5(a).  As such, this document is being served on all counsel who are deemed to have consented to electronic service.  Local Rule CV-5(a)(3)(V).  Pursuant to Federal Rule of Civil Procedure 5(d) and Local Rule CV-5(d) and (e), any counsel of record not deemed to have consented to electronic service will be served with a true and correct copy of the foregoing by email on this 9th day of January 2018.

                                      /s/ William E. Davis, III
                                      William E. Davis, III