IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| IMPLICIT, LLC, | § | |
| | § | |
| *Plaintiff*, | § | CIVIL ACTION NO. 6:17-cv-182-JRG |
| | § | (LEAD CASE) |
| v. | § | |
| | § | |
| HUAWEI TECHNOLOGIES USA, INC., et al. | § | JURY TRIAL DEMANDED |
| | § | |
| | § | |
| *Defendants.* | § | |

### IMPLICIT, LLC'S REPLY CLAIM CONSTRUCTION BRIEF

Implicit hereby submits this Reply Claim Construction Brief in support of its Opening

Claim Construction Brief [D.I. 76] ("Opening Br."), and in response to Palo Alto Networks,

Inc.'s ("PAN's") Responsive Claim Construction Brief [D.I. 78] (PAN's "Response Br.").

## I.      THE DEMULTIPLEXING PATENTS

### A.      "message"

PAN does not dispute that the patentee "act[ed] as his own lexicographer" and "set out a

definition" of "message" in the Demultiplexing Patents.  *See* Response Br. at 3; *Golden Bridge*

*Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014).  When a patentee provides an

express definition, and his intent to do so appears "with reasonable clarity, deliberateness, and

precision," his definition controls and the term is not given its plain and ordinary meaning, nor is

the specification examined to determine whether his definition is "correct."  *See id.*; *Renishaw*

*PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998).  Here, the patentee

unambiguously defines the term "message": "(*A message is* a collection of data that is related in

some way, such as [a] stream of video or audio data or an email message.)" '683 patent at 2:49–

51 (emphasis added).  This ends the inquiry, and the term should be construed as such.

Recognizing the breadth of the patentee's definition, however, PAN seeks to amend and

narrow it.  But even if the Court were to consider PAN's further arguments—and it should not—

they still do not support PAN's proposed construction.  PAN couches its argument as one

regarding the ambiguity of the patentee's definition itself—*i.e.*, that if the patentee's definition

does not have "reasonable clarity deliberateness, and precision," the law on lexicographical

statements does not apply.  *See* Response at 3.  But that is not the law.  Instead, to find a

lexicographical statement, the law requires that the patentee's *intent to provide a definition* must

appear "with reasonable clarity, deliberateness, and precision."  *See Renishaw*, 158 F.3d at 1249.

PAN does not—and cannot—argue that the patentee did not show the requisite clarity, or that his

intent to provide an express definition is anything but unambiguous.  And PAN does not provide any authority for the proposition that courts can rewrite a clear definition in a patent for any reason, much less an alleged "ambiguity."

Furthermore, PAN's argument that the patentee's definition itself is somehow ambiguous is not credible.  First, the parties dispute whether the scope of the patentee's definition is limited to application data.  But there is simply no ambiguity as to whether the words explicitly used by the patentee are limited to application data—they are not.  That PAN asks the Court to insert new words into that definition to "address this ambiguity" is itself proof of the definition's clarity on that point.

Next, PAN argues that Implicit's construction would "make the examples" (i.e., "[a] stream of video or audio data or an email message") "irrelevant."  Response at 4.  Not so.  In fact, Implicit's proposed construction includes these examples.  But PAN cannot argue that any characteristic it can devise that is shared by all three examples must necessarily be part of any construction of "message."  Indeed, as a matter of plain English, the use of an exemplary list, introduced by "such as," does not limit the scope of the broader category preceding it.

Finally, PAN goes so far as to reach to the specification to support its argument— precisely what the case law teaches is improper when the patentee makes a clear lexicographical statement.  PAN does not—and cannot—point to a single case holding that if a party does not like a patentee's express definition, it may look to the specification in an attempt to show that definition is incorrect.  Regardless, PAN's arguments here lack merit.  For example, as both parties agree, the packets that make up a message will include not only payload data, but also headers.  *See* Response at 1–2.  PAN cannot argue that the packet headers constitute "application data"—they certainly are not "of interest to the users of the claimed invention," which PAN

argues defines "application data." *See id.* at 3.  Thus PAN's argument results in a "message" that would both include and exclude non-application data—a logical absurdity.

### B.       "process/processing . . . packets"

As with the term "message," PAN seeks to improperly import limitations into the claims.

In view of PAN's argument in its brief, the parties' dispute about this claim term may be resolved.  Specifically, the parties agree that "not [] *all* of the routines applied to a packet must be conversion routines," but rather that "'one or more' conversion routines must be applied" in addition to, potentially, other non-conversion routines.  Response at 6; *see id.* at 6–7 ("applying routines *other than* conversion routines is consistent with PAN's proposal, as long as at least one – *i.e.*, 'one or more' – conversion routines are also applied.").

PAN's proposed construction ("apply/applying one or more conversion routines to a packet") implies that *only* conversion routines may be applied when "processing . . . packets." But that is inconsistent with PAN's Response and the parties' agreement.  Consistent with the parties' apparent agreement, Implicit would agree to a construction of "apply/applying one or more routines to a packet, where at least one such routine is a conversion routine."

### C.       "state information"

> 1. *The prosecution history of the '857 patent does not support PAN's argument of disclaimer with respect to the '104 patent.*

PAN's proposed claim construction is imported from the Northern District of California's construction of "state information" in the claims of a patent not asserted here.  The Northern District of California court had based its claim construction on a "prosecution disclaimer" in the reexamination of the non-asserted patent.  Because that "prosecution disclaimer" does not and cannot apply to the claims at issue here, PAN's proposed construction not only lacks basis in the intrinsic record, it is *inconsistent* with that record.

PAN improperly applies the law of prosecution history disclaimer to a situation in which no disclaimer was made.  First, prosecution history disclaimer must be clear and unmistakable. *See Mass. Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1119 (Fed. Cir. 2016); *01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012).  Second, prosecution history disclaimer generally only applies if the claim limitation is the same in the construed claim.  *See Regents of Univ. of Minn. V. AGA Med. Corp.*, 717 F.3d 929, 943 (Fed. Cir. 2013) ("In general, a prosecution disclaimer will only apply to a subsequent patent if that patent contains the same claim limitation as its predecessor."); *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1305 (Fed. Cir. 2001).  Here, there was no disclaimer.

The "disclaimer" PAN cites omits several key facts.  First, and most important, the patent at issue was different, as was the claim limitation at issue.  In the claims of the '857 patent, "state information" was modified by additional, more specific claim language (*e.g.*, "storing state information ***relating to the processing of the component with the packet for use when processing the next packet of the message***," '857 patent claim 1).  To the extent anything was disclaimed in the prosecution statement PAN cites, it was consistent with the modified, narrowing claim language.  That language does not exist in the claims at issue, in which there is no similar narrowing of "state information" and which is not necessary to avoid prior art.

Furthermore, to the extent PAN argues that the '857 disclaimer was "directed to the scope of the invention as a whole," it is incorrect.  *See* Response at 9.  In fact, the disclaimer was made in remarks accompanying a claim amendment, and appear under the header "[r]ejection of claims 1–25" in which the patentee discusses the PTO's rejection of those claims as being anticipated by one specific piece of prior art.  *See* Response at Exh. D [D.I. 78-4], at 9–10.  Thus, these comments were not "directed to the scope of the invention as a whole," and prosecution

history disclaimer does not apply.  *See AGA Med. Corp.*, 717 F.3d at 943 n.8 ("The sole

exception is when the disclaimer is directed to the scope of the invention as a whole, not a

particular claim."); *see also Shire Pharms.*, 839 F.3d at 1122 (no disclaimer where statement was

made in context of amendment of a claim having different language than the asserted claim).

In addition, PAN misreads the language of the disclaimer, and argues for a disclaimer far

broader than what was actually disclaimed in the '857 patent prosecution.  In the '857 case, the

disclaimer was designed to disclaim only state information that relates to the state of an entire

(computing) machine.  (Indeed, this is clear from the rest of the amendment omitted by PAN.)

The disclaimer then cites the specification for an example of "state information" that would not

fall into that other category.  PAN would read the disclaimer to disclaim everything but that

example—much more than the 'state information for an entire machine' that the patentee

intended to disclaim.  If there were a disclaimer at all—and the Court should not find one, in

view of the different claim language and context of the entire prosecution history, *see Shire*

*Pharms.*, 839 F.3d at 1120—it would be much more limited in scope than PAN suggests.

2.   *State information need not be "specific to a software routine."*

Even if, *arguendo*, the state information may not be information related to an overall

path, PAN does not and cannot show that the record supports the further limitation that it must be

specific to one software routine.  For example, although the specification states that "the

conversion system maintains state information as an instance or session of the conversion

routine," it does not prohibit the accessing of that information by other conversion routines.

Similarly, PAN's citation to the '163 reexamination also does not support its argument: even if

state information "for a specific component is stored on a component-by-component basis" or if

the system "stores state information related to each component in a system," how state

information is stored does not address whether other components may be permitted to access this

data.  The Court should not adopt PAN's attempt to limit state information to only one routine.

> 3.  *State information need not be "for a specific message."*

PAN cannot show that the record supports this additional limitation.  First, PAN's sole citation to the specification is inapposite.  While the specification states that "[t]he conversion system routes all packets for a message through the same session of each conversion routine so that the same state or instance information can be used by all packets of the message," '683 patent at 3:1–9, nowhere does it say that this information must be used by ***only one*** message.

The same is true of PAN's citation to the prosecution history of the related '857 patent. There, the patentee said, "[w]hen processing multiple messages, each instantiation of a conversion routine has its own state information."  Response at 9.  But PAN does not show that "each instantiation of a conversion routine" may only process one message, nor that it may not access other state information.

Finally, including this limitation would render superfluous claim language of the '104 patent.  For example, in claim 1, the patentee claims that "the path is usable to store state information ***associated with the message***."  If state information was required to be for one message only, it would necessarily be associated with that message.  This limitation should not be adopted, thereby rendering this claim language superfluous.  *See Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) (citing *Philips* as "reinforce[ing] the importance of construing claim terms in light of the surrounding claim language, such that words in a claim are not rendered superfluous"); *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (setting forth the well-established rule that "claims are interpreted with an eye toward giving effect to all terms in the claim").

**D.     "key [value]"**

PAN ignores the plain and ordinary meaning of a "key [value]" in computer

programming and instead seeks an overly narrow construction that applies to just one way the term is used in the Demultiplexing Patents.  It appears nonetheless that at least some of the disputes regarding this claim term can be resolved.

In computer programming, a "key" is a piece of information that can be used to look up another piece of information (sometimes referred to as a "value").  For example, in a table of employee information, the "key" for each employee would be, for example, her employee number or social security number.  With this basic understanding of computer terminology, the various uses of "key" in the specification are consistent.  For example, in discussing Figure 5, the specification states that "[a] target key identifies the session associated with the protocol that converts the packet to the target label."  '683 patent at 6:28-29.

Thus, whatever information comprises the target key (which need not be information that, itself, identifies the session of a protocol) is used to look up the session associated with the protocol.  Similarly, a key may also "identif[y] the *state information* for a session of a protocol."  '683 patent at 6:64-65.  Here again, while the key itself does not contain the state information, it is used to look up the state information for a session of a protocol.  This is consistent with the use of this terms in the claims where, for example, the key value may "include[] an IP address and a port address."  '790 patent, claim 1.  The key itself may not necessarily identify a session associated with a protocol, but it is used by the invention to determine the session of a protocol.

In fact, it appears the parties agree on this point: PAN argues that its "proposal does not limit the 'key [value]' to *only* identifying the session of a protocol, nor does it limit *how* the key value identifies the session of a protocol." Response at 13.  Implicit's objection to PAN's construction, then, is that it seems to imply what data *comprises* the "key [value]," as opposed to the purpose to which that information is put.  Thus, Implicit would agree to the clarification that

7

a "key [value]" is "information that can be used to identify the session of a protocol."

Regarding the sequence of steps, PAN seeks a limitation of the claim term itself that is unnecessary given the claim language.  For example, PAN argues that "a 'key value' must first be 'determined' before it is possible to 'identify, **using the key value**, a sequence of two or more routines." Response at 15.  Implicit does not dispute this fact—of course any value, including a key value, must exist before it can be used.  Thus, Implicit would agree that the "key [value]" must be determined/identified before it can be used by the claimed invention.

E.       **"removing [an / the resulting] outermost header"**

PAN ignores realities of computer programming in order to arrive at a result that is inconsistent with the way in which headers and data are passed between layers in any conventional networking stack.  Its proposed claim construction of plain meaning would allow it to argue to the jury that the header must actually be physically removed, an absurdity under any reasonable understanding of the field of the invention. The Court should construe this term in order to resolve any confusion that might result from the jury's reading of "removing" without considering the technical realities of network processing.

PAN is correct that, from the point of view of the layer currently viewing the packet, any previous packet headers are no longer relevant.  However, as the specification makes clear, those previous packet headers do still exist in memory.  Thus PAN's proposed construction would exclude the preferred embodiment of the invention from the claims.  Such constructions are to be avoided absent compelling circumstances. *See Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct.") (quoting *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004)).

To continue the example used by both parties, consider the exemplary packet,

8

<header1><header2><header3><data>.  The first layer to process this packet will be given a memory pointer pointing to the memory address where <header1> is stored.  By convention in computer programming, this layer will not attempt to look "behind" (i.e., in lower-numbered memory addresses, or to the left of in the exemplary packet as written above) <header1>.  Instead, it will view the contents of <header1>, process the packet accordingly, and then pass to the next layer a pointer pointing to <header2>.  Just like the first layer, this second layer will not look "behind" the pointer given to it—i.e., it will only see <header2><header3><data>.  But importantly, <header1> was not actually removed from the computer's memory—it is simply ignored by this second layer because that layer was given a pointer to the memory address where <header2> begins.  As far as this second layer is concerned, then, <header2> *is in fact* the "outermost header."  But from the perspective of an outside observer, or the computer memory itself, <header1> still exists—it is simply not relevant to this second layer and thus not used by it.  For this reason, it would be improper to permit the jury to believe that the header must actually be deleted or removed from memory in the operation of the patented inventions.

This explanation is also consistent with PAN's extrinsic evidence.  By passing a pointer to <header2>, it is true that, from the perspective of the second layer, "[n]one of the headers for layers below [2] are passed up to layer [2]."  Response at 17.  But these headers have not actually been deleted from memory—they are simply ignored by the second layer.

While this method of removing headers—advancing a pointer past the header information[1]—is the only one used in any conventional network processing stack, for the purposes of this claim construction dispute only, Implicit does not disagree with PAN's

---

[1] While PAN feigns ignorance as to the meaning of "reference," it is well known to one or ordinary skill in the art that "reference" and "pointer" are essentially interchangeable—that is, a pointer is a numerical value that *references* a specifically location in memory whose address is that of the pointer's value.  Implicit would agree to use "pointer" instead of "reference" to the extent this resolved PAN's objection.

argument that nothing in the claims or specification explicitly prohibit the actual deletion of headers.  Thus, Implicit would agree to a construction of this term of "either (1) stripping off or deleting a header; or (2) advancing a pointer past the header information."

## II.    THE '740 PATENT

### F.    "resource"

PAN entirely ignores the primary issue Implicit identifies regarding this claim term.  The parties appear to agree that a "resource that includes source code" either "(1) is an application, (2) is an applet, or (3) can be used to build an application or applet."  But PAN does not—and cannot—support its argument that "resource," standing alone, must also carry the same meaning.

In fact, PAN's proposed construction of "resource" would render the claim language "includes source code" superfluous.  *See Digital-Vending Servs. Int'l*, 672 F.3d at 1275 (citing *Philips* as "reinforce[ing] the importance of construing claim terms in light of the surrounding claim language, such that words in a claim are not rendered superfluous"); *Bicon*, 441 F.3d at 950 (setting forth the well-established rule that "claims are interpreted with an eye toward giving effect to all terms in the claim").  If all "resources" must include source code, as PAN argues, the patentee would have no need to explicitly claim that a resource "includes source code."

Indeed, PAN's arguments on this term are circular and do not address Implicit's position. For example, PAN dismisses Implicit's citations to "examples of 'resources' disclosed in the specification that do not have source code" as "*not* relevant to the way the term is used in the claims." Response at 20.  In a way, this is true—*i.e.*, each claim using "resource" requires that "the resource includes source code," and thus these examples would not be relevant to the claim phrase "resource [that] includes source code."  But that is precisely the point—if it is that the resource "includes source code" that compels the construction PAN seeks, then the construction of "resource" standing alone should not carry the same meaning.

10

Dated: February 2, 2018

Respectfully Submitted,

By:  /s/ Benjamin L. Singer
William E. Davis, III
Texas State Bar No. 24047416
THE DAVIS FIRM P.C.
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Telephone: (903) 230-9090
Facsimile: (903) 230-9661
E-mail: bdavis@bdavisfirm.com

Benjamin L. Singer
Evan N. Budaj
James Hopenfeld
Adam S. Cashman
Walter C. Pfeffer
SINGER / BEA LLP
601 Montgomery Street, Suite 1950
San Francisco, CA 94111
Telephone: (415) 500-6080
Facsimile: (415) 500-6080
bsinger@singerbea.com
ebudaj@singerbea.com
jhopenfeld@singerbea.com
acashman@singerbea.com
wpfeffer@singerbea.com
***Counsel for Plaintiff***
***Implicit, LLC***

11

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document is being filed electronically in compliance with Local Rule CV-5(a).  As such, this document is being served on all counsel who are deemed to have consented to electronic service.  Local Rule CV-5(a)(3)(V).  Pursuant to Federal Rule of Civil Procedure 5(d) and Local Rule CV-5(d) and (e), any counsel of record not deemed to have consented to electronic service will be served with a true and correct copy of the foregoing by email on this 2nd day of February, 2018.

/s/ Benjamin L. Singer
Benjamin L. Singer

12