```
 1                IN THE UNITED STATES DISTRICT COURT

 2                FOR THE EASTERN DISTRICT OF TEXAS

 3                         MARSHALL DIVISION

 4   IMPLICIT, LLC                )(

 5   PLAINTIFF                    )(

 6                                )(    CIVIL DOCKET NO.

 7                                )(    6:17-CV-182-JRG

 8   VS.                          )(    MARSHALL, TEXAS

 9                                )(

10   PALO ALTO NETWORKS, INC.     )(    FEBRUARY 23, 2018

11   DEFENDANT                    )(    1:27 P.M.

12                  CLAIM CONSTRUCTION HEARING

13           BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

14                  UNITED STATES DISTRICT JUDGE

15   APPEARANCES:

16   FOR THE PLAINTIFF: (See Attorney Attendance Sheet docketed
                        in minutes of this hearing.)
17

18   FOR THE DEFENDANT: (See Attorney Attendance Sheet docketed
                        in minutes of this hearing.)
19

20   COURT REPORTER:      Shelly Holmes, CSR-TCRR
                          Official Court Reporter
21                        United States District Court
                          Eastern District of Texas
22                        Marshall Division
                          100 E. Houston
23                        Marshall, Texas  75670
                          (903) 923-7464
24

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
```

1                          I N D E X

2

3    February 23, 2018

4                                             Page

5         Appearances                         1

6         Hearing                             3

7         Court Reporter's Certificate        77

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              COURT SECURITY OFFICER:  All rise.

 2              THE COURT:  Be seated, please.

 3              All right.  This is the time set for argument

 4   regarding claim construction in the Implicit versus Huawei

 5   matter.  This is Civil Case No. 6:17-CV-182.

 6              Let me call for announcements at this time.

 7              What says the Plaintiff, Implicit LLC?

 8              MR. DAVIS:  Good afternoon, Your Honor.  Bo Davis

 9   on behalf of the Plaintiff, Implicit.  With me this

10   afternoon is Mr. James Hopenfeld, Mr. Benjamin Singer, and

11   Mr. Evan Budaj from the Singer Bea firm out of San

12   Francisco, and we're ready to proceed.

13              THE COURT:  All right.  What's the announcement

14   from Defendant, Huawei?

15              MS. SMITH:  Good afternoon, Your Honor.  Melissa

16   Smith on behalf of Palo Alto.  I'm joined by my lead

17   counsel, Mr. Matt Gaudet.

18              MR. GAUDET:  Good afternoon, Your Honor.

19              MS. SMITH:  His partner, Mr. David Dotson.

20              MR. DOTSON:  Good afternoon.

21              MS. SMITH:  As well as our client representative,

22   Mr. George Simion.  And, Your Honor, Palo Alto is ready to

23   proceed.

24              THE COURT:  All right.  Thank you, Ms. Smith.

25              All right.  Counsel, I want to thank you for your
```

1  continuing efforts to meet and confer, which has resulted in

2  a narrowing of the remaining disputed terms for argument and

3  consideration by the Court today.  By my count, we have

4  three remaining terms in dispute that I'm prepared to hear

5  argument on, and it's my intention to hear argument first on

6  "message," then on "state information," and third and last

7  on "removing the outermost header."

8          We'll take them in that order.  Given that I expect

9  there will be more than one counsel from each side

10  presenting argument today, let me ask all of you, when you

11  go to the podium to make your arguments on each new term, if

12  you would simply just announce who you are into the record

13  so we'll have a clear understanding on who presented

14  argument for each side on each term.

15          We'll do these on a term-by-term basis.  We'll

16  begin, as I said, with message.  And I'll hear argument

17  first from the Plaintiff.

18          MR. BUDAJ:  Good afternoon, Your Honor.  Evan Budaj

19  of Singer Bea on behalf of Plaintiff, Implicit.

20          THE COURT:  Good afternoon, counsel.  Go ahead.

21          MR. BUDAJ:  Thank you, Your Honor.

22          The first term, as Your Honor noted, is "message."

23  And you can see on the screen now this term is in

24  independent claims in all three of the asserted

25  demultiplexing family of patents.  You can see Implicit's

1  position -- proposed construction as well as Defendant's

2  position.

3        The most important note here, Your Honor, is that

4  Implicit's position is verbatim the definition given by

5  the patentee, and we see that here in the detailed

6  description.  The patentee says in a stand-alone

7  parenthetical sentence:  A message is a collection of data

8  that is related in some way, such as a stream of video or

9  audio data or an email message.

10        As Your Honor well knows, there are two

11  circumstances in which we depart from the plain and ordinary

12  meaning of a claim term, and one of those two is at issue

13  here.  That's when the patentee provides his own

14  lexicographic definition of the term.

15        The patentee here has clearly set forth a

16  definition of the disputed claim term, and he's clearly

17  expressed an intent to define that term by telling the

18  reader what a message is.

19        Neither of those two points are in dispute.  What

20  appears to be in dispute between the parties is whether this

21  lexicography appears, quote, with reasonable clarity,

22  deliberateness, and precision, end quote.  That's from

23  Renishaw 158 F.3d at 1249.

24        Now, when the patentee provides an express

25  definition like this, when a patent application (sic) has

1   elected to be a lexicographer, the definition selected by

2   the patent applicant controls.

3        Now, this, I think, is one of the most important

4   points here.  When the patentee provides a definition, that

5   controls over what the plain and ordinary meaning is.  It

6   controls over what certain portions of the specification

7   might say.  The Federal Circuit has said that the patentee

8   is allowed to be his own lexicographer, and when he does so,

9   we give the term the definition that he provides.

10        Palo Alto Networks makes a couple arguments here,

11   and these are the main disputes that we've identified in the

12   briefing, regarding whether, in fact, the patentee has done

13   this.  Palo Alto Networks also cites to a lot of the

14   specification, and, again, the law is that that is just not

15   relevant when the patentee has acted as his own

16   lexicographer.

17        So Palo Alto first says that the patentee's intent

18   to act as a lexicographer is not clear, and the definition

19   that he ascribes is not clear.  And -- and, Your Honor,

20   Implicit would submit that the intention here is very clear.

21   The fact that there's a stand-alone sentence that tells us

22   what a message is is very clear.

23        More importantly, Your Honor, the Defendant has

24   attempted to assert this ambiguity where there is none.  On

25   its face, this definition is clear, a message is a

1  collection of data that is related in some way.  There is no

2  ambiguity here as to whether, in fact, it must be related in

3  some particular way.  And Palo Alto Networks has -- has sort

4  of pulled that, we would argue, out of nowhere in an attempt

5  to further narrow and limit the construction of this claim

6  term.

7         THE COURT:  Well, it's clear given what's been

8  proposed by both sides that really the difference in the

9  proposed constructions is that Defendants inserted the word

10 application before data, but other than that, the proposed

11 constructions are basically the same.

12        MR. BUDAJ:  Yeah.

13        THE COURT:  This is, I assume, what you're

14 referring to when you're talking about an ambiguity as to

15 the type of data?

16        MR. BUDAJ:  That's correct, Your Honor.

17        Palo Alto Networks argues that there is an

18 ambiguity in this construction, the one that appears on the

19 screen, which is the definition from the patent and

20 Implicit's proposal.

21        So Palo Alto Networks argues that there's an

22 ambiguity here as to whether the collection of data must be

23 a collection of application data.  And, Your Honor, Implicit

24 would submit that, in fact, there is no ambiguity here.

25 Palo Alto Networks would like the claim to be narrower, of

1   course, and they are making the argument that it should be

2   just a collection of application data, but -- but the

3   Defendant's desire to have a narrower claim is not an

4   ambiguity.

5        THE COURT:  Well, is there -- is there another

6   argument to make on this point other than, as you say, there

7   is no ambiguity because I suspect the other side is going to

8   tell me there is an ambiguity.

9        MR. BUDAJ:  Yes.  Your Honor, the reason they're

10  going to tell you there's an ambiguity is primarily based on

11  this "such as" clause that's the second clause of the

12  definition, and -- and we can talk about that for a moment.

13       The important thing here is such as, I think, is a

14  plain and ordinary English phrase that is used to introduce

15  a series of examples.  Palo Alto Networks would have that

16  "such as" clause limit the statement that comes before it,

17  that somehow the collection of data that is related in some

18  way is limited by this "such as" clause.  That the "such as"

19  clause tells you this is the only way in which this data can

20  be related.

21       THE COURT:  So, in other words, if I understand

22  you, your side of the coin would be effectively arguing

23  "such as" means, in effect, "for example"?

24       MR. BUDAJ:  That's correct, Your Honor.

25       THE COURT:  And you believe the other side is going

1   to argue "such as" means "being -- being a stream," in other

2   words, limited to that one example?

3           MR. BUDAJ:  Your Honor, I don't think that --

4   obviously, we'll see what they argue.  I don't believe that

5   Palo Alto is going to argue that those are the only

6   possibilities.

7           THE COURT:  Okay.

8           MR. BUDAJ:  What they're going to argue is that if

9   you look at a stream of video data and a stream of audio

10  data and an email message, Palo Alto Networks is going to

11  argue that you can look at those three examples, you can

12  take any characteristic that is common between all three of

13  those examples, and that it's appropriate to limit the type

14  of data in the first part of the definition based on those

15  characteristics.

16          THE COURT:  All right.

17          MR. BUDAJ:  And Implicit's position is that's not

18  proper.

19          THE COURT:  Let me ask you another question.  Palo

20  Alto seems to argue that they believe that you are, in fact,

21  alleging that handshake packets -- packets can be a message.

22  Are you arguing that, and if you are arguing that, is that a

23  fact question, or is that a fact -- is that a question for

24  claim construction?

25          MR. BUDAJ:  I am not aware presently of anywhere in

1   this case, certainly not in our infringement contentions as

2   I can remember them standing here today, where we've

3   asserted that a handshake packet is part of a message.

4           THE COURT:  Okay.

5           MR. BUDAJ:  That -- that -- I believe they're

6   referring to a dispute that came up in the TrendMicro case.

7   In the TrendMicro case, the parties had stipulated to this

8   construction.

9           THE COURT:  Right.

10          MR. BUDAJ:  And it appeared that there was a

11  potential dispute as to the scope.

12          THE COURT:  Well, if that's not a problem in this

13  case, I'll cross -- cross it off my list of concerns.

14          MR. BUDAJ:  I believe it's not, and -- and for what

15  it's worth, Your Honor, Palo Alto has not identified to us

16  any non-infringement position based on our infringement

17  contentions that would -- where this would make a

18  difference.

19          THE COURT:  All right.  What else do you have for

20  me on this term?

21          MR. BUDAJ:  The final point I have, Your Honor, is

22  sort of as we were just talking about.  I think the other

23  argument that Palo Alto Networks has is that this -- the

24  patentee's lexicographic statement makes the example somehow

25  irrelevant, and -- and I think, again, just looking at the

1    definition, this just goes back to what does it mean to be

2    an example?

3           These three items, a stream of video data, a stream

4    of audio data, an email message, are, in fact, three

5    examples of data that is related in some way.  It fits

6    perfectly.  Implicit's proposed construction still includes

7    those examples.  Those are perfectly fine examples to give.

8    It's just not the case that any characteristic that those

9    three examples share should properly be inserted as a

10   narrowing limitation into the definition that the patentee

11   gave.

12          Because the patentee acted as his own

13   lexicographer, there is nothing in the specification we need

14   to look at.  The Federal Circuit case law is clear that he

15   gets to do that and that we are obligated to give the word

16   the meaning that he ascribes.

17          THE COURT:  All right.  Thank you, counsel.

18          Let me hear a response from Palo Alto.

19          MR. GAUDET:  Thank you.  Good afternoon, Your

20   Honor.  Matt Gaudet --

21          THE COURT:  Good afternoon.

22          MR. GAUDET:  -- on behalf of Palo Alto Networks.

23          THE COURT:  Please proceed.

24          MR. GAUDET:  Thank you, Your Honor.

25          There is at least one agreement, which is that this

1  is a case about lexicography.  This is -- this is not a

2  plain meaning term which means we have to live in the

3  specification, and I think the dispute is how much of the

4  specification can we live in?

5        I think I just heard the phrase that under the law,

6  the rest of the specification is irrelevant if there is an

7  express definition, and I can tell you, we have not seen any

8  such law that would suggest that.  All the law that we've

9  seen says exactly the opposite, and we will get to that,

10  Your Honor.

11        But before we do get to that, there are just a

12  couple of background points that really go to this issue

13  sort of, in effect, why does this matter?

14        And the first one is we have another -- we have

15  another agreement, which is that messages are comprised of

16  packets.  This is just a quote from the Plaintiff's brief --

17  opening brief, messages are fragmented into smaller

18  digitized pieces called packets.  Everybody agrees to that.

19  It's actually not part of that one sentence, but it

20  nonetheless is certainly a defining characteristic of what a

21  message is.

22        Now, that matters because of this issue about

23  the -- the handshake.  And I'll lay this out, and then I'll

24  address the comment that he just made about the extent to

25  which they are or are not accusing the handshake.

1          But this ultimately comes back to the construction

2   that the parties agree to in this case of the sequence of

3   routines that the Court found in the -- in the TrendMicro

4   case, which is that you have to do the configuration --

5   sorry, you cannot do configuration prior to receiving a

6   first packet of the message.  And as the Court put it, so

7   it's got to be after the receipt of the first packet of the

8   message.

9          Well, that means there's a key moment in time here

10  of when did you receive the first packet of the message?

11  And to figure that out as a matter of law, just to know what

12  the claim scope is, you have to know is this -- what makes

13  it a first part of a message or not?  Can this just be a

14  line-drawing exercise where a packet is part of a message if

15  the Plaintiff says so and draws a circle around it?

16          And what they did after -- after -- after the Court

17  ruled against the Plaintiffs in the TrendMicro case is they

18  turned to this sentence from the specification, and the

19  parties there, I think, had stipulated that the message is

20  just this collection of data.  And they said related in some

21  way means that the application data is part of the same

22  message as the handshake data.

23          And what that does is that makes the first packet

24  be the handshake packet, and you've moved way back in time

25  and completely changed the teeth or taken the teeth out of

1    it in some ways the Court's construction of you can't do

2    pre-configuration before -- until after you've received that

3    first message.

4          And so that's what it's about.  And the dispute is

5    it's not whether or not a handshake packet by itself could

6    be a message.  It's whether or not handshake data is a

7    different message than application data.  And as a practical

8    matter, in the -- in the specification, it's clear, it's

9    always going to be -- it's always application data, but our

10   issue is they're trying to mix and match the two, and that's

11   certainly what they did in the TrendMicro case.  That's our

12   read of what they're doing in the infringement contentions

13   here.  The TCP/IP handshake is in their infringement

14   contentions.

15         If he wants to stand up and disclaim that and say

16   absolutely, positively not, we will never accuse you of

17   infringement based on a message that is -- that a single

18   message having both application data and handshake data,

19   that would probably moot this issue, but that's -- I didn't

20   hear him express something nearly that clear, and maybe

21   he'll do that on the fly, and that will take this issue off

22   the table.  But that's an issue --

23         THE COURT:  It sounded pretty clear to me.  But I

24   didn't hear forever and ever language that you'd like to

25   hear.

1          MR. GAUDET:  And, Your Honor, to be a little more

2    specific, what we were concerned about is he didn't address

3    the combination.  He didn't address the --

4          THE COURT:  All right.

5          MR. GAUDET:  -- idea --

6          THE COURT:  Okay.

7          MR. GAUDET:  -- that you need both application and

8    handshake.

9          And so that's the background here.  So I -- what I

10   did --

11         THE COURT:  Let's -- let's get to the argument that

12   I heard from Plaintiff about whether this is an example or

13   whether it's not.

14         MR. GAUDET:  Well, and that's actually not entirely

15   our argument, Your Honor.  It's not -- it's not just is this

16   language exemplary or not.  It's -- it's that,

17   fundamentally, the law is not that you only look at one

18   sentence, and you ignore the rest of the specification.

19   There are no cases that say that.  You look at the entirety

20   of the specification.  Certainly that one sentence is very

21   important, but --

22         THE COURT:  Where is it in the entirety of the

23   specification that gives support to your notion that this

24   should be application data?

25         MR. GAUDET:  Right.

1          THE COURT:  I mean, it's not in the claim language,

2    that's clear.

3          MR. GAUDET:  Absolutely.  The -- it is -- the

4    notion that it cannot be a combination of application data

5    and the handshake data is in the sentences immediately

6    before that sentence and the sentences immediately after

7    that sentence.

8          This example, Your Honor, that's up on the screen

9    explains that, you know, many different messages will be

10   coming into the sentence, which means you'll have a TCP

11   connection, and when that TCP connection is established,

12   it's agnostic as to what flows over it.

13         The whole point of the invention is that a number

14   of different messages come over, and yet it says the --

15   the -- the patent is supposed to treat all of the packets of

16   a message the same, and it -- and it uses the same

17   conversion sequences or processing sequences, and it treats

18   packets of different messages differently.

19         Well, if you're including handshake data with

20   application data, you almost have this VIN diagram where

21   you've included a connection with a bunch of different

22   messages so you're actually not treating all the packets the

23   same, and you're also treating some part of -- of each

24   message -- each different message the same.  It just -- it

25   all breaks down.

1          And the purpose is that -- the purpose of the

2     invention was so that the format of a given message that

3     came from a source gets -- gets converted -- each packet

4     gets converted the same way.

5          If you're talking about a connection message, that

6     has nothing to do -- it ends.  It doesn't get converted in

7     terms of formats the same way the application does.

8     Connection is established.  It's completely agnostic as to

9     what goes over it.  Its packets aren't treated the same way

10    as application data would be.  The whole -- the sentences

11    immediately before and immediately after this express

12    definition they refer become nonsensical if you imagine a

13    scenario where a message can be both application data and

14    handshake data.

15         And, Your Honor, so this is what -- this is what

16    they point to is, you know, the highlighted language.  You

17    simply look at the highlighted language not based on

18    something far away in the specification but based on the

19    rest of that paragraph.  And they haven't even tried to

20    defend it.  They haven't even tried to argue how this could

21    actually makes sense.

22         THE COURT:  Well, the argument I've heard is that

23    there's no need to look beyond this because this is an

24    unequivocal statement, and I assume you're going to tell me

25    you don't view it as an unequivocal statement, and,

1   therefore, there is justification to look beyond it and

2   elsewhere in the specification.

3           MR. GAUDET:  And, Your Honor, two points.  First,

4   yes, it's not -- it's not unequivocal in the sense of that

5   is related in some way than such as a stream of video or

6   audio data.  Well, their view -- their view is that it would

7   be -- let's use an example a stream of audio.  Okay.  Their

8   view is that the message isn't just a stream of audio.  The

9   message can be a handshake plus a stream of audio.  In other

10  words, they're not even being faithful to that very example

11  in what they're saying.

12          So in their interpretation, this -- this is related

13  in some way, it's so amorphous that it can come up with any

14  packet on the network in effect, and that's certainly not

15  a -- A, it's not a clear definition, and then the second

16  point I'm going to make is the case law doesn't say that if

17  there's an express definition, you have to have some burden

18  to go beyond that.

19          The case law says even in the case of lexicography,

20  it's always look at the entire specification, figure out

21  what the inventor is trying to -- trying to -- actually, I

22  want to -- I want to take just a moment on that point,

23  because in their reply brief, Your Honor, I put -- I

24  highlighted the language that they -- that they put up here,

25  and in particular, it's sort of picking up towards the end

1   of the third line of the highlight where they say, nor is

2   the specification examined to determine whether his

3   definition is, quote, correct.

4         So I read that, and it struck me as odd because I

5   had never heard such a -- a legal canon before.  And it

6   appears he's quoting something -- that they are quoting

7   something here.

8         Your Honor, the Golden Bridge Tech case says

9   nothing of the sort.  It doesn't even address a situation

10  where the Court found there was lexicography.  It actually

11  deals with a case that the patentholder in a previous case

12  had stipulated to a construction, taken that construction,

13  presented it to the Patent Office, the patent in re-exam,

14  the Patent Office relied on it as a stipulated construction,

15  and the Court said it's a prosecution disclaimer.  It has

16  nothing to do with this proposition of law.

17        THE COURT:  Well, not -- not considering the Golden

18  Bridge Tech case but considering the Renishaw case are you

19  telling me that opposing counsel has made a material

20  misrepresentation as to what that case says?

21        MR. GAUDET:  Your Honor, I -- I want to tread very

22  lightly with accusations like that.  I cannot understand

23  what they were possibly citing when they had that -- that

24  correct -- he may have a good answer in the reply, and I

25  don't mean to -- I don't want to turn up the volume so to

1  speak, but I don't know where he was coming from, Your

2  Honor.

3          THE COURT:  Well --

4          MR. GAUDET:  And I will talk about the Renishaw

5  case now.

6          The Renishaw case, there is no lexicography finding

7  there.  They certainly --

8          THE COURT:  You're either turning up the volume, or

9  you're not, and I'm trying to determine what you're doing.

10          MR. GAUDET:  Yeah, Your Honor, the law is not as

11  they're representing it.

12          THE COURT:  Okay.

13          MR. GAUDET:  And those cases do not stand for that

14  proposition.  And I don't -- I don't -- it may have been an

15  innocent mistake, and I suppose that's where --

16          THE COURT:  I'm not asking you to opine on intent.

17  I'm asking you to opine on accuracy.

18          MR. GAUDET:  It is inaccurate, Your Honor.

19          THE COURT:  Okay.

20          MR. GAUDET:  And materially inaccurate.

21          THE COURT:  Then let's go forward.

22          MR. GAUDET:  The Renishaw case, Your Honor, again,

23  there was no finding of lexicography there.  There was

24  certainly no deep dive into the question of if there's a

25  sentence that says something, you look at the rest of the

1  specification.

2  It's -- the Renishaw case is one of the standard

3  cases -- I know it's often in your Markman orders -- that

4  sets out the, you know, exceptions from plain meaning, but

5  it doesn't at all get into this question of do you look at

6  one sentence and then stop reading the specification?

7  And it actually says the opposite.  It says,

8  ultimately, the interpretation, you have to determine and

9  confirm with a full understanding of what the investors

10  actually invented and intended to envelop with the claim.

11  Then the rest of the cases they cited.  The Thorner

12  case, this is now in their opening brief, there is no

13  finding of lexicography in that case.  There's certainly not

14  this nuance analysis of if there is a sentence, do you look

15  at the rest of the specification?

16  And, in fact, in that case, it -- it cited another

17  Federal Circuit case as an example of lexicography, and

18  there it said the -- that other case said the solubilizers

19  suitable according to the invention are defined below.  Now,

20  the lexicography was based on a large portion of the

21  specification.

22  The GE Lighting Solutions case they cite, same

23  thing, quote, there is no lexicography or disavowal here.

24  And the final case they cited, I read them all --

25  all -- the final case they cited on the issue of

1    lexicography was the Leibel-Flarsheim case, and that case,

2    Your Honor, is -- again, it was one of the original claim --

3    it's one of the often cited claim construction cases, and it

4    talks about lexicography as being on one side of the line,

5    sometimes a very hard line of are you importing a limitation

6    from the specification, or are you construing the claims in

7    light of the specification?

8           And so it references a clear lexicograph --

9    lexicographic definition, and it says, you know, again, the

10   problem is to interpret claims in view of the specification

11   without it necessarily importing limitations from the

12   specification into the claims.

13          And so certainly that sentence is important, but we

14   don't have to meet some burden to go outside of the

15   sentence.  The question is simply, what did the inventor

16   mean to define this term as, and if --

17          THE COURT:  So getting back to the agreement that

18   you announced at the beginning of your argument that this is

19   about lexicography --

20          MR. GAUDET:  Yes, Your Honor.

21          THE COURT:  -- getting back to that.  Where there

22   is an explicit definition provided, are you telling me that

23   there is no threshold to get over to go outside of that

24   explicit definition, or are you telling me there is a

25   threshold to get over, but in your case, you believe you've

1    been able to get over that threshold?

2           MR. GAUDET:  Your Honor --

3           THE COURT:  I hear you saying there is no

4    threshold, that it's no different than any other situation

5    where you have an explicit definition provided.

6           MR. GAUDET:  Your Honor, I believe from the cases

7    that we've just gone through, the answer is that there is no

8    special threshold.  The question would simply be, looking at

9    the entirety of the specification, what is the inventor

10   trying to say the word means?

11          Now, in that inquiry, I mean, that sentence will

12   have -- by its very nature it will have a lot of weight.

13   But if you look at that sentence and say, wait a minute,

14   that can't be exactly right because that will be

15   nonsensical.  In view of the sentence right before it and

16   the sentence right after it, it must actually -- you know,

17   we just have to tweak it a little bit, but the touchstone

18   that the Courts always came back to is what -- what was

19   disclosed in the specification as the invention, and you

20   have an often a huge head start if there's a sentence like

21   this.

22          But -- but there's no -- there's no special showing

23   beyond let's just be sure that's actually what the inventor

24   meant, and the point is here it couldn't be something that

25   would render it nonsensical.

1          THE COURT:  So you're not -- you're not saying that

2     where there's an explicit definition that there's got to be

3     some apparent ambiguity or as you put it nonsensicalness to

4     go beyond that definition into the entirety of the specific

5     for additional guidance?  You're saying you go throughout

6     the entire specification notwithstanding the fact that

7     there's an apparent explicit definition embedded in there?

8          MR. GAUDET:  Your Honor, that -- that is what I

9     gather from all of the cases.

10          THE COURT:  So if the sentences before were not

11     nonsensical, or to avoid the double negative, if they were

12     scenical, that would not prevent you from going there or

13     elsewhere in the specification to further clarify or define

14     the sentence that is identified as the explicit definition?

15          MR. GAUDET:  Your Honor, I believe that's correct.

16     And in that example --

17          THE COURT:  So it's open season on importing

18     additional terms or limitations?

19          MR. GAUDET:  I want to be careful about that,

20     because in the -- you would always look at the

21     specification, but in the event that the sentence -- and you

22     would -- you would expect typically the -- the sentences

23     leading up to would be perfectly consistent, and you --

24     there'd be -- there'd be no reason to do any other than

25     what's right there in that sentence, but you would always

1  review the entire specification to figure out what did he

2  actually mean.

3         And, here, it's likely that -- that he never even

4  would have thought about, I would guess, this possibility.

5  In other words, the issue isn't necessarily the words on

6  the -- on their face.  I read the words on the face, and I

7  thought, of course, he's talking about application data.

8         The issue -- it became a legal issue when they

9  started saying the scope of this claim would literally cover

10 something that is both application data and -- and -- and

11 handshake data.

12        And to come back to the language again here,

13 their -- their example that we think they're -- they're

14 trying to capture, it -- it itself doesn't seem to be

15 consistent with this.  In other words, this looks to me like

16 if you're talking about a stream of video, the message is

17 the content of the video.  Their position is, no, the

18 message could be the content of the video plus some

19 additional connection packet that we draw a red circle

20 around.

21        And the point is, no, that's not -- that doesn't

22 seem to be what this sentence is actually saying, and

23 particularly, as you then look at the surrounding sentence,

24 that doesn't seem to be -- that's not what he meant -- it

25 couldn't have been because it would render the whole -- the

1   whole disclosure there nonsensical.

2         And, again, we're not -- and I think -- I think it

3   is -- I agree that -- that, you know, if you're talking

4   about finding a preferred embodiment somewhere at the other

5   end of the specification, it's unlikely that would tell you

6   what he really meant.

7         And so it's just -- by the very process of -- of

8   consulting the entire specification, you would tend to give

9   the most weight to the -- to the sentence, and then, you

10  know, the stuff right around it and whatever else.  But I've

11  not seen anything to suggest there's any special threshold,

12  and the cases that I went through seem the say the opposite.

13  So that -- that's our point.

14        THE COURT:  So the extension of that is that where

15  there's an apparent explicit definition, you're really in no

16  different posture than if there's not a definition provided

17  in the specification at all?  You're just left with looking

18  at the whole specification from A to Z regardless of whether

19  there's something that can be construed as an explicit

20  definition or not embedded in there, that's what I hear you

21  saying.

22        MR. GAUDET:  And, Your Honor, the -- the

23  Leibel-Flarsheim case, I believe that's what the

24  Leibel-Flarsheim case says, that -- that lexicography in the

25  example of when you either expressly or implicitly, without

1    an express definition, have said this is what the term

2    means.

3              THE COURT:  Uh-huh.

4              MR. GAUDET:  And that the other example would be

5    disclaimer.  But I believe that that is what follows from

6    Leibel-Flarsheim, Your Honor.

7              THE COURT:  All right.

8              MR. GAUDET:  And just a couple other points here.

9    And it doesn't appear there's even a dispute about the fact

10   that you can't square up that reading -- the Plaintiff's

11   reading with the rest of the specification, but the --

12   the -- in terms -- this -- in terms of where we got the word

13   application from -- and to be clear, we're not wedded to the

14   word application.  It could be -- I think our -- our

15   objective here is it's not a combination of application data

16   plus --

17             THE COURT:  Any limitation will do?

18             MR. GAUDET:  Your Honor, whether we're talking

19   about user content, exactly.

20             Everything in the specification is talking about

21   messages that are being displayed.  This is user content

22   that eventually gets -- gets put up.

23             Their opening brief made the observation that --

24   that headers -- ultimate multiple headers are nested within

25   one another, usually but not always having application data,

1    the packets is intended to transmit.  The point is most

2    packets in networks are application data.  That's just how

3    you sort of think about them.

4         We submitted a definition that just showed that the

5    application layer is how you refer to, you know, the

6    layer -- in fact, that's how it defines messages in the OSI

7    is messages are at the application layer.  So this -- it

8    felt like, if you will, the most natural way of describing

9    the invention.

10        And the last point here, Implicit made the argument

11   that -- that our definition would preclude headers.  In

12   other words, if you -- if it's just application data,

13   application data is a payload and a packet, and you'll have

14   some headers, and that's not what we're trying to do.

15        So if we need to modify this to say a collection of

16   packets carrying application data, that -- that would be

17   fine.  That's -- I mean, the substance is not to try to

18   eliminate -- eliminate that.

19             THE COURT:  All right.  Duly noted.

20             MR. GAUDET:  Thank you.

21             THE COURT:  Let me hear a follow-up from Plaintiff.

22             MR. BUDAJ:  Thank you, Your Honor.

23             Listening to Defendant's presentation, it was a

24   little surprising.  I'm concerned we're talking about two

25   different Federal Circuits.

1          Renishaw -- and, again, the citation is here,

2   158 F.3d at 1249 -- clearly says -- and I'm actually going

3   to -- I realize there's an ellipses here.  I'd like to just

4   read the entire two sentences here.

5          THE COURT:  Why don't you put it on the document

6   camera --

7          MR. BUDAJ:  Oh, sure.

8          THE COURT:  -- so I can see it?

9          MR. BUDAJ:  Thank you, Your Honor.

10          So if you look down -- and I apologize, I was not

11   aware I was going to be putting this on the ELMO, but where

12   the -- where the pen is there at the bottom, it says --

13   oh -- the other -- oh, there we go.

14          The other clear point provided by these two canons

15   covers the situation in which a patent applicant has elected

16   to be a lexicographer by providing an explicit definition in

17   the specification for a claim term.  In such a case, the

18   definition selected by the patent applicant controls.

19          And, Your Honor, this is consistent with the rest

20   of the law that we cite.  Defendant is correct that some of

21   those cases are not based on a holding of lexicography being

22   found, but all of those cases are cases in which the Federal

23   Circuit discusses the law on lexicography and, you know, in

24   whatever manner it needs to be done but relating to the case

25   at bar.

1          If I could please have the slide show back.  Thank

2    you so much.

3          So I do think that's the first important point.

4          The second point to make about the law that I think

5    is very important, the case -- the Leibel-Flarsheim case

6    that counsel seemed to rely on heavily talked about this

7    tension between finding lexicography and whether you're just

8    looking to the specification to determine what a term means

9    as you normally would in terms of figuring out what plain

10   and ordinary meaning is.

11         That tension, Your Honor, is absolutely not when

12   there is a single sentence that is a clear, explicit

13   lexicographic statement.  That tension exists when -- and I

14   think it was in maybe that case or one of the other cases

15   that counsel pointed to -- when, for example, you have a

16   whole paragraph, and you say, well, it sort of seems like

17   this paragraph might be trying to set out of lexicographic

18   statement, but maybe this paragraph is just the

19   specification.  Maybe we're just looking for the plain and

20   ordinary meaning.  That's when you have that tension.

21         When you don't have that tension, as Renishaw says,

22   is when the patent applicant has elected to be a

23   lexicographer by providing an explicit definition.  And when

24   he does, that definition controls.

25         So the questions you were asking, Your Honor, of --

1   of the Defendant, I believe, and Implicit's position --

2   pardon me --

3          THE COURT:  Uh-huh.

4          MR. BUDAJ:  -- is that when there is an explicit

5   definition and an explicit act of lexicography and when, you

6   know, the -- as I mentioned before, the patentee clearly

7   sets forth a definition of the disputed claim term, when the

8   patentee clearly expresses an intent to define the term, and

9   when the lexicography appears with reasonable clarity,

10  deliberateness, and precision, that absolutely controls.

11         The point of this whole case law, Your Honor, is

12  that a patentee is permitted to use a word in -- in whatever

13  way he chooses, even if it's not the standard definition.

14         THE COURT:  As long as they make it clear that's

15  the way they're using it.

16         MR. BUDAJ:  That's exactly right, Your Honor.

17         And -- and, in fact, I'll point -- Renishaw cites

18  to two cases.  Renishaw is where the quote about reasonable

19  clarity, deliberateness, and precision comes from.  And it

20  cites to a case when it makes that statement.  That case is

21  in re: Paulsen 30 F.3d 1475, and the pin cite is 1480.  This

22  is Federal Circuit 1994.

23         Although an inventor is indeed free to define the

24  specific terms used to describe his or her invention, this

25  must be done with reasonable clarity, deliberateness, and

1    precision.  Where an inventor chooses to be his own

2    lexicographer and to give terms uncommon meanings, he must

3    set out his uncommon definition in some manner within the

4    patent disclosure so as to give one of ordinary skill in the

5    art notice of the change.

6           So the point here, Your Honor, is a patentee is

7    allowed to give a term like "message" his own meaning even

8    if perhaps a network engineer would say that's not what

9    message means to me.  We allow the patentee to do that as

10   long as he's given reasonable notice to the public of what

11   it is that he means by message.  And that's exactly what

12   happened here.

13          Moving on from the law, I want to address sort

14   of the -- the merits -- or the substance of PAN's argument.

15   What this really comes down to, Your Honor, is Defendant

16   doesn't like how broad the patentee defined message.  And so

17   they point to this definition and try to figure out what are

18   the ways that we can limit this.

19          One interesting point, I believe counsel said

20   somehow that the examples wouldn't -- wouldn't apply under

21   our definition.  I think -- I mean, on its face, that's

22   already what it says.  That's a little odd argument to me.

23          But even more particularly, a message is a

24   collection of data that is related in some way.  A stream of

25   video data is a message.  That's a collection of data that's

1    related in some way.  A stream of video data plus some other

2    data that relates to that video data is also a collection of

3    data that's related in some way.

4         These are not exclusive.  All three of these

5    examples are, in fact, messages.  But those are not the only

6    examples.  And that's Implicit's point here.  But those

7    examples are not limiting.  They're just examples.

8         You know, again, Defendants said these are all

9    content for the end user.  They said something about it all

10   being displayed on the screen, which actually audio data

11   wouldn't be displayed on the screen, but according to PAN,

12   it sounds to me like, and this is the point I made

13   originally, Your Honor, they believe that any characteristic

14   we can decide applies to all three of these things is

15   appropriate to import into the first part where we're

16   actually defining the term.

17        And -- and that -- that's just not a proper use of

18   the claim construction, and certainly not when there's a

19   clear lexicographic statement, as there is here.

20        Two points I want to very quickly address --

21        THE COURT:  Let's make it quickly.  We need to move

22   on.

23        MR. BUDAJ:  Of course, Your Honor.

24        The first one is it seemed like counsel was

25   implying that we were sort of not being clear about this,

1    but in Trend, in the Trend case, both sides' experts agreed

2    that the handshake patent was, quote, related in some way to

3    the rest of the message that carried the application data.

4    So this was a -- a live issue there.  This wasn't just sort

5    of an inventive dispute.

6            I also wanted to make sure I was clear about what I

7    said.  Again, it may be the case that Palo Alto believes

8    there's a non-infringement position here.  We haven't seen

9    that.  They haven't told us about that non-infringement

10   position.  They may believe that our infringement

11   contentions say something about that.

12           I can't stand here today and tell you that our

13   position would never be that the application data would make

14   a difference or not.  Obviously, we are not at the point

15   where we have -- where we're past the point of being allowed

16   to amend our infringement contentions.  Discovery is still

17   ongoing.  So, you know, that would be helpful, and I

18   apologize that I can't be that helpful.  We can't make that

19   sort of commitment here today.

20           But, you know, the -- that point I don't think

21   is -- is relevant to whether this is the proper construction

22   or not.

23           THE COURT:  All right.  Thank you for your

24   argument.

25           Let's move on to the next term.

1          Now, ordinarily, I would next take up "process" or

2    "processing packets."  My understanding is the parties have

3    reached an agreement to a proper construction of that term;

4    is that correct?

5          MR. BUDAJ:  That's correct, Your Honor.

6          THE COURT:  And can we clarify for the record

7    exactly what the agreed upon construction between the

8    parties should be?

9          I think it's worth taking a moment to get this

10   clear.  I've had parties tell me they agree we have an

11   agreement, and then they disagree about what agreement is,

12   so...

13         MR. BUDAJ:  Yeah, Your Honor, Defendant's counsel

14   has come over to show me the same document that I was just

15   looking for that they found just a moment earlier.

16         This is Docket Entry 93-1.  This is Exhibit A to

17   the second amended joint claim construction chart that was

18   filed yesterday.

19         THE COURT:  Why don't you read me the agreed

20   construction?

21         MR. BUDAJ:  The agreed construction is:

22   Apply/applying one or more routines to a packet, comma,

23   where at least one such routine is a conversion routine.

24         THE COURT:  All right.  So this is basically what

25   you proposed as an alternative construction?  The Plaintiff

1    proposed as an alternative construction?

2         MR. BUDAJ:  That's correct, Your Honor.

3         THE COURT:  Okay.  And that's the agreement from

4    the Defendant's side, as well?

5         MR. GAUDET:  Yes, it is, Your Honor.

6         THE COURT:  Okay.

7         MR. GAUDET:  Thank you.

8         THE COURT:  That clarifies that.

9         Now let's go on to state information, and let me

10   hear argument on this term, and we'll start again with

11   Plaintiff.

12        MR. HOPENFELD:  Good afternoon, Your Honor.  Good

13   afternoon, members of the Court.  Good afternoon, counsel.

14        I'm James Hopenfeld for Plaintiff, Implicit.

15        THE COURT:  All right.  Proceed.

16        MR. GAUDET:  We just heard a dispute about

17   lexicography.  What is lexicography?

18        This claim construction dispute about state

19   information -- if we could put the parties' positions up

20   there.  Yeah, thank you.

21        Here we have a dispute as to whether or not the

22   plain and ordinary meaning applies.  Now, as Your Honor has

23   pointed out in several of your claim construction opinions,

24   there's really two situations when the plain and ordinary

25   meaning doesn't apply.

1          One is when the patent or the patentee has chosen

2      to be his own lexicographer, either explicitly or

3      implicitly.  We just had a discussion about that.

4              THE COURT:  But we don't have that here.

5              MR. HOPENFELD:  We do not have that here.

6          All right.  Now, PAN has contended that there are

7      portions of the patent specification that -- that are

8      consistent with its proposed claim construction, but nowhere

9      have they argued that the patentee chose to be his own

10     lexicographer, and, indeed, they can't because they chose

11     one portion of the patent specification that supports their

12     definition, and we provided other portions of the

13     specification that makes it clear that state information has

14     been used in a broader context.  So we don't have that first

15     sentence -- first way we can go away from plain meaning, and

16     we can set that aside.

17         There is a second way that a Court can find that

18     the plain meaning does not apply, and that is when there is

19     a clear and unmistakable disclaimer in the prosecution

20     history of the relevant patent.  This is where the fight

21     ostensively is.  It's a little misleading, and here's why.

22         The patent claim here -- these are all the '104

23     patent -- when you see this term state information.

24             THE COURT:  We're talking about the prosecution

25     history from the '857?

1          MR. HOPENFELD:  Yes.  However, the '857 is not the

2    '104 patent.

3          THE COURT:  And I understand, but they are related.

4          MR. HOPENFELD:  They are related, but as I'm going

5    to explain, the claim limitations are different.  And let

6    me -- let me just step through what clear and unmistakable

7    disclaimer is here.

8          So the state information in the '104 patent is the

9    term where we have to look for a disclaimer.  This patent

10   was allowed on a first Office Action allowance.  So there

11   was no prosecution history disclaimer in the prosecution

12   history of the '104 patent.

13         So now we have the issue, can we rely on a

14   prosecution disclaimer -- an alleged prosecution disclaimer

15   in another patent simply because that patent is related?

16   And interestingly enough, the very case law that PAN cites

17   in support of their position makes clear that you can't do

18   that in an important situation.

19         There's only two cases cited by PAN for the

20   proposition that you can look outside the patent-in-suit to

21   a related patent for this notion that a disclaimer in that

22   other prosecution history can apply.

23         One of those cases, the AGA case, makes clear, and

24   this is -- I believe it was Judge Dyk's opinion, but my

25   remember could be wrong -- makes clear that that particular

1    holding that when they looked to the prosecution history of

2    the related patent, it was a situation where the claim

3    language was identical or substantially identical.

4            And, in fact, if you look at that -- if you look at

5    that case, it was a divisional application, and the claim

6    term that was discussed in the divisional application where

7    they found a disclaimer was substantially identical to the

8    claim term in the patent-in-suit.

9            And if you look at the Ormco case, it was even

10   worse than that because there -- the prosecution disclaimer

11   that was found for the related patent others, once again, it

12   was for a term that was substantially identical.  I think in

13   that case, it might have been evenly expressly identical,

14   but it doesn't matter.

15           Do we have that here, Your Honor, because if we're

16   not there, there can be no prosecution history disclaimer.

17   There would have to be the same language.

18           Now, what PAN is arguing is that, yeah, there's the

19   same -- same language, it's state information.  But that's

20   not correct, and that's why I want to step through the

21   claims to show you and in addition step through a little bit

22   of the prosecution history including some of the prosecution

23   history that wasn't in the brief because I think this will

24   really make the picture very clear.

25           THE COURT:  Mr. Hopenfeld, if you would slow down a

1  little bit, I could follow you a little bit easier.

2          MR. HOPENFELD:  Oh, I'm sorry.  I apologize.

3          THE COURT:  Not a problem.

4          MR. HOPENFELD:  All right.  What I'm going to do

5  now is I'm going to get Claim 1 -- somebody kick me if I

6  talk too fast -- Claim 1 of the '104 patent up here on the

7  screen.  Let's see if I can do that.

8          I just want to make sure the Court can see this.

9  Can everybody see Claim 1 there?

10         THE COURT:  We're not going to answer any

11 questions.  Just look at the screen, and if you're satisfied

12 with it, go ahead.  If you're not, readjust it.

13         MR. HOPENFELD:  All right.

14         THE COURT:  This is not questions and answers.

15         MR. HOPENFELD:  Sorry, Your Honor.

16         THE COURT:  That's all right.

17         MR. HOPENFELD:  Okay.  If you look in the one,

18 two -- you'll see there's a limitation that starts create a

19 path.  And you'll see that that claim limitation has a

20 wherein clause.  Wherein the path is useable to store state

21 information associated with the message.  So you can see in

22 the patent-in-suit -- if Your Honor needs a moment to see

23 that.

24         THE COURT:  Go ahead.

25         MR. HOPENFELD:  You can see that the only thing

1  that's required in state information in this claim is that

2  it be associated with the message and the fact that it's

3  going to be stored.  There is no further use of state

4  information or any qualification as to how state information

5  is used in this claim.

6          Now I'm going to take -- I'm going to look at the

7  other patents, but before we do that, what I want to do is

8  I want to put up the claim construction order that Judge

9  Illston gave us.

10         THE COURT:  In the F5 Networks case?

11         MR. HOPENFELD:  Yes.  And that's Exhibit C to Palo

12  Alto Networks's opposition.  And I'm going to be -- use this

13  up here.

14         Okay.  Now, this is part of Judge Illston's

15  decision construing the term "state information" for the

16  purposes of the '857 patent.  And what's missing from Palo

17  Alto -- Alto Networks's brief is this statement here.  This

18  is consistent -- this construction is consistent with the

19  way state information is actually used in the claims and

20  consistent with other language in the claims, and it's that

21  other language that is operative here.

22         So let's take a look at that other -- other

23  language.  Let's start with the '857 patent which Judge

24  Illston was construing here.

25         Your Honor, I apologize, but yet again, I have to

 1   put up another piece of paper.

 2          All right.  Now, here, I have Claim 1 up, and

 3   you'll see that there's a claim limitation at the very end,

 4   storing state information relating to the processing of the

 5   component with the packet for use when processing the next

 6   packet of the -- of the message.

 7          Now, what you see there is that the state

 8   information has to relate to the processing of the

 9   component.  It's been specifically limited.

10          Okay.  That means that that state information,

11   as -- as the Court was addressing there, must be tied to a

12   specific component in the patent.

13          THE COURT:  Hang on just a minute.  What we've got

14   is a different patent with the same specification and

15   different claim language, correct?

16          MR. HOPENFELD:  Yes.

17          THE COURT:  So how is it a common specification

18   applied to different claim language should inform me as to a

19   proper construction of the claim language in this patent?

20          MR. HOPENFELD:  Well, Your Honor, it is that this

21   should not inform you as to whether there's a prosecution

22   disclaimer because the claim language was different.

23          The issue here is whether there is a prosecution

24   disclaimer.  That's the only way we could avoid the plain

25   meaning in the '104 patent.

1          Okay.  And what -- what you see here in the '857

2   claim --

3          THE COURT:  But you're arguing for plain and

4   ordinary meaning?

5          MR. HOPENFELD:  Yeah, we're arguing for it.

6          THE COURT:  Okay.

7          MR. HOPENFELD:  So we're saying that there cannot

8   be a disclaimer there because the claim language is

9   different.  State information is further quali -- qualified

10  here.  But it's actually even worse than this because I want

11  to show you --

12         THE COURT:  I don't think there's any dispute that

13  we have a common specification between the '104 and the

14  '857, but we have different claim language.  I think

15  everybody agrees with that.

16         MR. HOPENFELD:  Okay.  Well, what Palo Alto

17  Networks has argued is that the claim limitation is the

18  same, and we are -- we're -- what I'm just trying to help

19  Your Honor see is that the claim limitation is not the same

20  in the '857 patent nor is it the same in the '163 patent

21  where they also try to rely on a prosecution disclaimer.

22  They're essentially trying to import a prosecution

23  disclaimer from one patent into the other.

24         THE COURT:  Well, what I'd like to hear you talk to

25  me about is given that the '104 is a descendent of the '857

1    and given that there's a common specification, why should or

2    why should not the prosecution history of the '857 apply to

3    the '104?

4         MR. HOPENFELD:  The '857 prosecution should not

5    apply to the '104 because, number one, the claim language

6    with respect to state information is different.  And, number

7    two, the disclaimer was made in the context -- which I was

8    about to show Your Honor -- of a specific amendment to the

9    claims to distinguish prior art, okay.

10         So in this particular case, there was -- when the

11   state information disclaimer that they relied on was made --

12   they -- they quote an Office Action that occurred, I

13   believe, in 2009.  But the Office Action that they provided

14   the Court that was evidence of disclaimer and that Judge

15   Illston relied on, okay, that prosecution history disclaimer

16   was made with respect to a certain prior -- with certain

17   prior art reference, and there was claim language that was

18   amended at that very time that makes it clear -- let me go

19   back to Judge Illston's opinion here for just a second so

20   you can see what's going on here.

21         Here is Judge Illston's opinion, and like this

22   case, there were two issues, but only one of them was really

23   litigated because there was already an agreement by the

24   parties that the information for state information was

25   limited to a specification message for a component for a

1    specific message.

2            The reason why there was agreement is because of

3    the prosecution history for '857 and the claims that were at

4    issue there.  So let me show you what the claims were at the

5    time that the statement that was made here, which is --

6    which PAN alleges is a statement about the invention,

7    let's -- let's see what happened in that claim amendment.

8            Just one more moment, Your Honor.

9            Now, this was not included -- and I have additional

10   copies if anybody needs this.

11           So here is the claim amendment that was actually

12   made at the time of the information -- here's the claim --

13   here's the claim language that was -- that was being amended

14   at the time, okay.

15           And what you'll see here is that there was state

16   information associated with the message.  But this claim

17   language was amended to say that it was associated with each

18   of the plurality of messages and that further there was

19   already limitations in the claim saying that the state

20   information is associated with the identifier and provided

21   the received state information and received packet to the

22   identified component for processing the received packet.

23           And we don't have to go into that.  All you need to

24   understand is that this is not like the use of state

25   information in the '104 patent where they said state

1  information stored, that's it.  It had to be for a plurality

2  of messages.

3          Okay.  So this disclaimer -- and the reason why

4  there was even partial agreement before Judge Illston is

5  because these claims were narrower with respect to state

6  information.

7          Now, there's something I want to emphasize here

8  because I want to make sure -- I'll make -- make sure I'm

9  not going too fast.

10          Let's go back again to the law of prosecution

11  disclaimer.  For a prosecution disclaimer to apply where

12  you're not relying on the file history of another patent, it

13  has to be identical claim language, and what this is showing

14  you is, it is not identical claim language.  So there cannot

15  be a prosecution history disclaimer.

16          And if you look at the '163 patent, you'll see the

17  same thing.  You'll see that state information is used in a

18  completely different context.  So there cannot be -- there

19  cannot be a prosecution history disclaimer.

20          THE COURT:  Well, let me ask this question.

21  Let's -- let's get beyond prosecution history estoppel here.

22          Don't the claims here recite state information

23  associated with the message, and if so, isn't that context

24  consistent with what the Defendants have proposed as opposed

25  to your plain and ordinary meaning?

1          MR. HOPENFELD:  No.

2          THE COURT:  Why not?

3          MR. HOPENFELD:  So here the claim language says

4    that it -- there must be an association with a message.

5    Okay.  So an association with the message means as long as

6    there's state -- there's state information, it can be any

7    kind of state information associated with the message.

8          What they're arguing is, is that because of the

9    disclaimer, that it can't be any state information.  It has

10   to be state information that is specific to a particular

11   component, and it can't be related to the patent.  That's

12   right in their -- if you go back -- can we go back to their

13   contention?

14         Okay.  So what they're saying is that state

15   information has to be for a specific message.

16         All right.  Now, we saw in the claim language just

17   amended that when they made the disclaimer that they were

18   making, okay, they were talking about the completely

19   different claims.  And the disclaimer in the -- which

20   happened in the '163 patent prosecution that has to do with

21   relation to an overall patent, again, the claim language was

22   different.

23         And I commend Your Honor to take a look again at

24   the cases cited in their own brief, and particularly the

25   AGA case, and you will see in there the Federal Circuit

1    saying we are applying this prosecution history disclaimer

2    from the one patent to the other because of this continuity

3    in claim language that simply doesn't exist here.

4         Now, why is this important?  And may I have

5    permission to just briefly go to the easel?

6         THE COURT:  Yes.

7         MR. HOPENFELD:  All right.  So there was an

8    original patent application way back, I think, in 1999.

9    That patent application led to the '163 patent.  This is one

10   of the patents that Judge Illston construed.  And then there

11   were a series of additional continuation applications which

12   are applications that are based on the same patent

13   specification.

14        THE COURT:  And opposing counsel, if you need to

15   relocate so you can see this, please feel free to.

16        MR. HOPENFELD:  Oh, I'm sorry.  I apologize.

17        THE COURT:  Go ahead.

18        MR. HOPENFELD:  One of those applications ended up

19   issuing as the '857.  I think that one was a continuation

20   off of a continuation, but I don't remember for sure.

21        The patents-in-suit here is the one most recently

22   issued, the '104.  Okay.  Now, it's very common in the

23   course of -- as Your Honor knows to file an application and

24   to file several patents off of the same application.  You go

25   to the Patent Office, and you say, I want certain claims.

1    The Patent Office gives you those claims.  And you say, I

2    maybe want some broader claims and maybe some broader claims

3    later than that, all right.

4         And so maybe you say to -- to the Patent Office for

5    the particular -- of these particular claims that I'm

6    prosecuting here, which could be different from these claims

7    and these claims, for these particular claims, I'm making a

8    particular statement.  We're not claiming this.  I'm -- I

9    can avoid the prior art because we have all these

10   limitations as to how state information is used.

11        THE COURT:  If you're going to argue, go back to

12   the podium.  If you're going to continue to draw, stay at

13   the easel.

14        MR. HOPENFELD:  Sorry.

15        THE COURT:  Continue.

16        MR. HOPENFELD:  All right.  I do want -- I do want

17   to make a point.

18        THE COURT:  That's fine.

19        MR. HOPENFELD:  Okay.  So that's what the patentee

20   did here.  There was -- there were disclaimers or at least

21   alleged disclaimers that Judge Illston found here and here

22   relating to narrower claim language because state

23   information was used in a particular way that had to limit

24   it in those claims.

25        In this particular case, we don't distinguish the

1  prior art based on how we're using state information.  State

2  information is used in a broader context.  It merely must be

3  associated.  As a matter of fact, if you look at the '163

4  patent, it says the state information has to be related to

5  something, and, in fact, as the '857 issues, it also says

6  related, which is narrower than associated.

7          So anything that's made here in these disclaimers

8  has no bearing whatsoever on the prosecution history of the

9  '104 patent.  It has no bearing on the claim interpretation

10 of the '104 patent because it -- it violates the Federal

11 Circuit rule that says when you have a disclaimer, you have

12 to have -- if you're going to apply another prosecution

13 history, the claims have to have some substantial identity.

14         And it also goes against what Judge Illston says.

15 Judge Illston said, my claim construction in this case is

16 specifically premised on not only the claim language of

17 state information but the other claim language in these

18 particular claims.

19         And what I'm asking Your Honor to recognize and

20 what I'm asking everybody to do that I think will get us the

21 best answer, the one most likely to be upheld by the Federal

22 Circuit, is to go take a look at that and say, hey, that's

23 different.

24         Now, they have the burden to show that the

25 prosecution history disclaimer is clear and unmistakable,

1   okay.  There cannot be a clear and unmistakable disclaimer

2   when your disclaimer relates to subject matter that has been

3   narrowed by other claim limitations and is just not the same

4   as the use of the term in this particular -- in this

5   particular case.

6           THE COURT:  All right.  Let's shift gears a minute.

7   You've made your argument as to why you believe the -- a --

8   what you view as a narrower construction proposed by the

9   Defendant should not apply based on prosecution history

10  estoppel and Judge Illston's opinion, these other related

11  patents.  I understand all that.

12          Let's go at it from a different direction.  What

13  evidence can you affirmatively show me that supports your

14  argument that state information does not need more than the

15  information about the state of the computer?  Can you

16  affirmatively give me evidence that supports plain and

17  ordinary -- plain and ordinary meaning rather than give me

18  all the reasons why I shouldn't accept what the Defendants

19  are proposing?

20          MR. HOPENFELD:  Your Honor, I think the best answer

21  to that is to look at how state information is used in the

22  patent specification, okay.  And in the patent

23  specification, it's used in several context, okay.

24          And the key thing to look at in the patent is that

25  state -- it could be any kind of state information.  State

1  information can be used, for example, in a particular

2  application, for example, the TCP protocol where you

3  commonly use state applic -- state information within the

4  TCP protocol.

5       But the patent also makes clear that the state

6  information be stored for purposes of using in many

7  different applications and include -- and it says

8  specifically plural applications.

9       So the state information can relate to anything,

10  and the only question is how you as the designer of your

11  system -- and, remember, you're allowed to design your

12  system any way you want.  But what the patent says is just

13  use this state information.  You can either use it in one

14  particular application or one particular session.  You can

15  use it in all the sessions.  It can -- it can be any kind of

16  state information you want.  All state information does

17  essentially is what the computer use to keep track of its

18  state.

19       So it's -- it's a design choice.  The specification

20  leaves it as a design choice to the person practicing the

21  invention how to use the state information.

22       THE COURT:  All right.

23       MR. HOPENFELD:  They're telling you that that state

24  information choice has been made for you.  It hasn't.

25       THE COURT:  All right.  I understand your argument.

1    Do you have anything else?

2             MR. HOPENFELD:  No thanks.  No, Your Honor.

3             THE COURT:  Let me hear a response from Defendant.

4             MR. DOTSON:  Would you mind leaving me a copy of

5    the --

6             MR. HOPENFELD:  Sure.

7             THE COURT:  All right, counsel.

8             MR. DOTSON:  Your Honor, David Dotson with Duane

9    Morris for Palo Alto Networks.

10            THE COURT:  Proceed.

11            MR. DOTSON:  So we've got two different disputes

12   here with state information, whether it's specific to a

13   software routine for a specific message and then the

14   separate issue of whether it's information related to an

15   overall path.

16            We've seen Judge Illston's construction already,

17   and I think that a couple of points on Judge Illston's

18   construction.

19            First of all, it's the exact same construction that

20   PAN has proposed, but I think with respect to some of the

21   arguments that Implicit made, one of the things that they

22   mentioned was that Judge Illston said in her order that her

23   construction is consistent with the claim language.  Well,

24   that's just claim construction.  Of course, it's consistent

25   with the claim language.

1          She didn't say that she was tying her construction

2    to some broader phrase within the claim language.  She just

3    said here's where what state infor -- information means, and

4    it's consistent with the claim language.

5          THE COURT:  In other words, that construction could

6    be consistent with the claim language in those claims, but

7    that doesn't mean it can't also be consistent with the claim

8    language in these claims?

9          MR. DOTSON:  That's correct, Your Honor.

10          THE COURT:  All right.  I understand.

11          MR. DOTSON:  Now, of course, as -- as Your Honor

12    pointed out, it is -- it is related patents, same

13    specification, but there's been a lot of argument about

14    whether there is identical claim language.

15          Obviously, these are continuation patents.  They

16    don't have the same claim language.  The identical claim

17    term is being construed here as was being construed before

18    Judge Illston.  So what Implicit is doing is saying let's

19    draw this circle around what claim language has to be

20    identical, and let's make it as broad as we need to make it

21    so we can point to a difference in the claim language and

22    say, well, this is -- this is -- this requires a different

23    construction here.

24          That's not how this works.  It's the same term,

25    same specification, related patents, so it should be

1  construed the same way.

2         And you can see this here on Slide 21, Your Honor,

3  the -- the term being construed right there at the top of

4  that box is state information.  And Implicit's agreement

5  with the first aspect of PAN's construction is highlighted,

6  information specific to a component for a specific message.

7         And, of course, as Your Honor mentioned, now we're

8  broadening this way out.  Now we're saying it's information

9  about a computer, something as broad as whether a computer

10 is on or off.  That's got nothing to do with these claims,

11 and it's got nothing to do with the specification.

12        With respect to these disclaimers, the '857 patent,

13 as Plaintiff mentioned, there was a rejection and then there

14 was an amendment.  Now Plaintiff has focused on this

15 component language in the '857 claims that is not in the

16 '104 claims.

17        If we could switch to the projector, please.

18        This is the prosecution history -- this is the

19 prosecution history that Plaintiff just provided.  You can

20 see here this component concept was in the claims.  So it's

21 not a situation where the applicant was hinging their entire

22 argument in the prosecution history on this component

23 concept.  It was already in the claims, and you already had

24 a prior art rejection with that language in the claims.

25        If I could have the slides back, please.

1          Instead, what you do have is a very broad

2    description of what is state information?  Again, talking

3    about state information, not any broader phrase within the

4    patents.  And you have here the applicant saying this term

5    state, as used in the present application, here is what it's

6    not, it's not operational state of a machine, which is

7    exactly what Implicit is telling us it is.  But what it is,

8    is the identification of an instance or session of a

9    conversion routine, and we know that when processing

10   multiple message -- messages, each instantiation of a

11   conversion routine has its own state information.

12          This is the patentee explaining what state

13   information is.  It's not tied to some broad claim phrase as

14   Implicit would have you believe.

15          That is a clear and unmistakable disclaimer.

16          And this argument, again, about, well, the claims

17   in the '857 patent, they were narrower, so this construction

18   shouldn't apply here to the '104 patent.  Well, that may be

19   the case.  Perhaps the applicant didn't need to maker a

20   broad disclaimer, but the fact of the matter is the

21   applicant made a broad disclaimer.  They described state

22   information and said here's what state information is.  They

23   didn't say state information with a component, blah, blah,

24   blah, that's what this is.  They said, state information,

25   here's what it means.

1          And the fact that they made such a broad

2     disclaimer, whether they needed to or not, is irrelevant.

3     We've got to take the applicant at their word, and if they

4     went too far, that's not the public's problem.  We're

5     entitled to look at what the applicant said and rely on

6     that.

7          THE COURT:  What else?

8          MR. DOTSON:  This -- the -- the second issue, Your

9     Honor, is whether state information can be information

10    related to an overall path.

11         Again, we know from the '857 patent disclaimer,

12    each instantiation of a conversion routine has its own state

13    information.  You know, we're not talking about a path.  You

14    think of a path as like an airplane, and you think of these

15    routines as passengers.  The airplane can have its own state

16    information.  Each passenger can have their own state

17    information.  What we're saying here is this is not about

18    the state of -- of the airplane.  It's about the state of

19    the passengers.

20         And that was made more clear in the prosecution

21    history of the '163 patent where there was a prior art

22    rejection or Mosberger.  That prior art relied on state

23    information dealing with a thread that processed an entire

24    pathway.

25         The applicant said, well, wait a minute, Mosberger

1    doesn't anticipate what we're doing because we don't deal

2    with state information about the entire pathway.  State

3    information is not information related to an overall path.

4    That's what the applicant said.

5           And the claim language, again, does not dictate a

6    different result here because the word path is not even used

7    in these claims at all, and there's no hook in the claims to

8    say, well, this -- this -- not information related to a path

9    is tied to some claim limitation.  That's not what was

10   happening here.  Again, you had the applicant just making

11   broad statements about what state information was or was

12   not.

13          I think that's all I have for you for now, Your

14   Honor.

15          THE COURT:  All right.  Mr. Hopenfeld, do you have

16   a brief rebuttal?

17          MR. HOPENFELD:  I do have a very brief rebuttal,

18   Your Honor.

19          And if you would be so kind to put your highlighted

20   version of Exhibit D back up on the screen, please.

21          MR. DOTSON:  I'm sorry?

22          MR. HOPENFELD:  You had high -- Exhibit D

23   highlighted.  I think it was the previous slide.  Yeah, that

24   slide.  Thank you.

25          I just want to take a brief look here because

1   this -- again, this is the portion of the '857 prosecution

2   history that Judge Illston relied on to find a disclaimer

3   actually on the issue of path because there was agreement by

4   the parties that in that particular claim that was at issue

5   in this particular case, that the state information had to

6   be specific to a particular application.

7            Now, the first highlighted piece I think is

8   important.  The term state as used in the present

9   application, so what the patentee is saying here, this

10  disclaimer applies to the present application.  The present

11  application was the first in the string -- I mean, was --

12  was before the '104 in the string.  In this particular case,

13  it was here.

14           Okay.  And in that particular application, as I

15  showed Your Honor, there were different claim limitations as

16  to how state information was actually going to be used by

17  that claim.

18           So when the patent application said, hey, here

19  we're not talking about the operational state of the

20  machine, they couldn't have been talking about the

21  operational state of the machine because those other claim

22  limitations would have been inconsistent with that.

23           We don't have that in the '104 patent because we

24  don't have those additional claim limitations.  That's why

25  this statement makes absolute zero sense in the context of

1   the '104.

2          And the same is true with their statement in the

3   '163 patent prosecution because you look at that, it says,

4   the state information has to be related, and, in fact, in

5   this patent, it ended up having that same related language,

6   which is much more specific.

7          What they're really telling you is, oh, you made a

8   patent disclaimer with respect to certain claims in this

9   patent and this patent and that, therefore, you weren't

10  entitled to go get different claims.  We're going to stick

11  you with the kind of claim language that's used here.

12         That defeats the whole purpose of continuation

13  practice.  The whole purpose of continuation practice is,

14  hey, Patent Office, I will make a disclaimer for the

15  purposes of the specification application, I'll take these

16  claims, and then I'll go argue to the Patent Office, I want

17  to make a different set of claims.  Maybe they're going to

18  distinguish the prior art in a different way.

19         They're saying that patent applicants don't have

20  the flexibility to do that anymore, that when they make

21  disclaimers to the Patent Office, they can't say, hey, this

22  applies this patent application.  We're going to stick it to

23  everything you say, even if the claim language is completely

24  different.

25         The way state information is used in the '104

1    patent-in-suit is totally different than the way it's used

2    in the '857 and the way it's used in the '163.  So how can

3    we possible apply a prosecution history disclaimer?  It

4    makes no sense.

5           THE COURT:  Well, if you take the opposite end of

6    that argument, then the prosecution history on any of the

7    predecessor patents has no application at all, and it's only

8    on the latest and most current iteration.

9           MR. HOPENFELD:  Not quite, Your Honor.

10          THE COURT:  That's what your argument seems to be

11   if you turn it on its head.

12          MR. HOPENFELD:  No, because our argument doesn't go

13   that far.

14          There can be situations where you can make

15   disclaimers that relevant to the later application when the

16   claim language is identical.  And that's why I commend Your

17   Honor to look at the two cases they cite where if you

18   look -- for example, the first case, the AGA case, it was a

19   divisional application.  The claim limitation was used in

20   almost the identical way in the two patents.

21          THE COURT:  I'll -- I'll look at the cases,

22   counsel.  You don't need to -- if you're going to -- if

23   you're going to tell me exactly what they say, I don't need

24   to go look at them.  Let's try not to do both.  I'll read

25   the cases.

1          MR. HOPENFELD:  Okay.

2          THE COURT:  What else do you have?

3          MR. HOPENFELD:  I have nothing further, Your Honor.

4          THE COURT:  Okay.  Thank you.

5          Mr. Dotson, do you have anything else on this?

6          MR. DOTSON:  No, Your Honor.

7          THE COURT:  All right.  The next term we would have

8    argued, "key," appears to have been agreed to.  And as we

9    did before, let me ask the parties to recite that agreement

10   into the record so that we can have it clear.

11         MR. BUDAJ:  Your Honor, the agreement should be --

12   and I'll let PAN's counsel confirm this -- it looks like

13   starting on Page 15 of the same document, Docket Entry 93-1:

14   Information that can be used to identify the session of a

15   protocol.  That's the portion that's in quotes.  And then

16   there's a further note that the parties agreed to regarding

17   that construction that is:  As used in the '104 patent, the

18   determine/determining operation/step is performed before the

19   identify/identifying operation/step.

20         THE COURT:  Does Defendant concur?

21         MR. GAUDET:  We concur, Your Honor.  Thank you.

22         THE COURT:  Okay.  Thank you.

23         Then let's move on to "removing the resulting

24   outermost header" from the '683 patent.

25         Let me hear argument on this.  And, again, we'll

1   start with the Plaintiff.

2          MR. HOPENFELD:  Thank you, Your Honor.  James

3   Hopenfeld once again.  If we can put the parties' positions

4   up, please.

5          THE COURT:  So this time, the Defendant wants plain

6   and ordinary meaning, and you want a specific construction

7   as opposed to what we just had?

8          MR. HOPENFELD:  I'm going to qualify that, Your

9   Honor.

10          THE COURT:  Okay.

11          MR. HOPENFELD:  This is really a dispute as to what

12   the plain and ordinary meaning is.

13          We are not arguing that the Court should not apply

14   the plain and ordinary meaning.  And I can understand how

15   Your Honor might have gotten that impression, especially

16   looking at our opening brief and the way we presented the

17   claim construction issue, and, quite frankly, I regret that,

18   I don't think we should have done it that way.

19          What we were really arguing is that if there's a

20   plain meaning here, it shouldn't exclude the notion of

21   advancing a pointer past the header of the information.

22          So let me be very clear, we are not asking the

23   Court to find a narrower definition of the plain meaning.

24   What we're trying to do here is say, Your Honor, if we take

25   this word "removing the outermost header" and we go and put

1    it in front of the jury, Palo Alto Networks is going to get

2    up and say, oh, the plain meaning of this removing means

3    that moving a pointer is not removing.

4           And what we're saying is that that term, the plain

5    meaning of that term, does cover moving a pointer or

6    advancing a pointer past the header information.

7           THE COURT:  All right.

8           MR. HOPENFELD:  And to try to help the Court, we,

9    in the reply brief, make it clear, look, if you want to go

10   ahead and actually physically remove the header

11   information -- as I'm going to explain nobody ever does

12   that -- but if you want to go ahead and physically remove

13   it, that's fine.  That's within the claim scope.

14          What we're saying simply is that the claim scope

15   does not exclude advancing a pointer past the header.

16          THE COURT:  And tell me why that's the case.

17          MR. HOPENFELD:  Okay.  I'm going to show you as a

18   practical matter exactly what happens in the computer, but

19   before I do that, I want to take a very quick step through

20   the evidence that we need to look at to do this.

21          Palo Alto Networks does not rely on anything other

22   than extrinsic evidence here.  So we don't have patent

23   specification.  We don't have prosecution history.  They

24   have extrinsic evidence.  So what I want to do is simply

25   talk about how this invention actually works.

1          Your Honor, I'm going to ask you -- and everybody

2    hopefully can see -- to imagine that this ruler is a packet

3    of information, okay.  And in each packet, there are a

4    series of headers, okay, and the headers basically specify

5    information that is useful to how the packet will be

6    processed along the chain of processing commands --

7          THE COURT:  I understand --

8          MR. HOPENFELD:  -- which Your Honor is familiar

9    with.

10         THE COURT:  -- I understand the difference between

11   removing the header and bypassing the header and bypassing

12   the header and pointing to the next one with a pointer --

13         MR. HOPENFELD:  Okay.

14         THE COURT:  -- if that's what you're going to show

15   me.

16         MR. HOPENFELD:  What I'm going to show you is also

17   why that is -- moving it is actually removing it, how the

18   computer see its.

19         So what happens is, let's say what the computer

20   does is it says, okay, a packet has come into the system.

21   What's the first thing I do?

22         The first thing I have to do is look for the

23   header, and that's where it does is -- it finds this

24   reference point because the computer doesn't have a pair of

25   eyes that can actually look at the letter like we do.

1      So it need -- it's sort of like a blind man who's

2  walking around in the room.  Oh, well, how am I going to

3  find out what the header is?  Ah, the reference pointer.  So

4  it looks for this reference pointer, and then it reads

5  whatever is on one side or the other.  In this particular

6  example, it would be to the left.  It's going to read the

7  header information to the left, okay.

8      Now, once it reads that, the computer will say,

9  okay, I'm going to send this thing for processing now.  Once

10 it sends it for processing, it might say, okay, we've

11 processed that particular header, and it will move the

12 reference pointer down, okay.

13     This is in the parlance of the technical world --

14 the computer world, removing the header, even though this

15 information is still technically there.  The computer can't

16 see it because the computer is like that blind man.  He's

17 just looking for this reference pointer, and he's only going

18 to look and see what's here.

19     What we're saying is this consistent with the

20 removing the header because that's how the machine works.

21 It simply moves this thing down, and even though this data

22 may still be there, the computer can't see it:  Whether you

23 call it removing, stripping off, whatever it is, people use

24 many different words -- ways to do this in the art.  It

25 comes down to the same thing.

1              So as long as we can get up in front of the jury

2      and say, Your Honor, this process is removing the header,

3      which is exactly how everyone skilled in the art would

4      understand it, we're going to be fine.

5              That's all I have to say, Your Honor.

6              THE COURT:  All right.  Let me hear from the

7      Defendants.

8              MR. DOTSON:  Your Honor, David Dotson for Palo Alto

9      Networks again.

10             This -- as Your Honor alluded to, it's interesting

11     being on the other side of a plain and ordinary meaning

12     argument, primarily representing Defendants, but --

13             THE COURT:  Well, let me ask you this, if I give

14     you what you ask for and construe this as the plain and

15     ordinary meaning, does that prevent Plaintiff from arguing

16     under a plain and ordinary meaning construction what I just

17     heard --

18             MR. DOTSON:  Yes.

19             THE COURT:  -- and showing -- showing his ruler to

20     the jury or whatever he wants to do as far as demonstratives

21     go?

22             MR. DOTSON:  It would, Your Honor.

23             THE COURT:  Tell me why.

24             MR. DOTSON:  It would.  Well, I mean, first of all,

25     removing is a simple term.  Everybody understands it, the

1  jury understands it, stripping off, deleting.

2         There is no evidence in the specification or in the

3  record of any other plain meaning.  They're trying to create

4  this complicated concept and inject it into the word

5  removing with no support for doing that.

6         We can look at the specification at the portion

7  they point to, and this is just a paragraph at the end of

8  the specification where we're saying, well, we've described

9  this invention, but here are some other embodiments.  This

10  is in no way limiting, so on and so forth.  Same language we

11  see at the end of every patent specification, and then

12  you've got a discussion of references.  Nowhere in there

13  does it say that that is removing.  It's not there.

14         So there's no evidence that this concept they're

15  trying to inject into this word removing should be so

16  injected.

17         And it's interesting, Implicit obviously

18  understands what removing says, because in their reply

19  brief, they actually said that removing should include not

20  removing.  They're saying it'd be improper to permit the

21  jury to believe that the header must actually be deleted or

22  removed.  How counterintuitive -- it doesn't get much more

23  counterintuitive than that.

24         THE COURT:  Well, I'll say this, I appreciate at

25  this stage the parties being candid with me about what the

1   real problem is.  Otherwise or in different circumstances, I

2   can imagine other parties who would both show up and say we

3   agree to the plain and ordinary meaning, and then I wouldn't

4   hear about this fight until it got time to present the

5   evidence to the jury.

6          I'd much rather hear about it now and hear the

7   arguments and make a thoughtful, reasoned decision than be

8   surprised about it later in the proceedings.

9          So whichever way this goes, the Court much prefers

10  to have it teed up now than to hide behind plain and

11  ordinary meaning and jump out at a later date, which is much

12  less appropriate, and spring this dispute on the Court.

13         So whichever way this falls, you both have done

14  this the right way.

15         Let's go ahead with the argument.

16         MR. DOTSON:  Thank you, Your Honor.

17         Again, there's no reason to depart from the plain

18  and ordinary meaning here.  We've talked a lot about

19  lexicography today.  Nobody contends that there's a

20  lexicographic definition.

21         There is no disclaimer that Implicit has argued.

22  And, in fact, as Implicit just acknowledged, they talk about

23  it can't be removing or deleting because nobody would ever

24  do that, but then at the same time, they turn around and

25  propose a compromise that includes striping off or deleting.

1          And to me, this is perhaps the most compelling

2   point here is just look at the plain language of the claim.

3   And this is just a matter of grammar and common sense.  The

4   claim requires removing an outermost header of a given

5   packet using a routine, and then we're going to remove the

6   resulting outermost header of that packet using a different

7   routine.

8          You can't have a resulting outermost header unless

9   you've removed the first outermost header.  It just doesn't

10  make any sense.

11         And, again, at best, this language that Implicit

12  relies on is an alternative embodiment at best.

13         But we know from the case law that a patentee can

14  draft claims to cover different embodiments.  Claim 24 of

15  the '683 patent is the only claim at issue that has removing

16  a header.  That language was chosen with a purpose.  And we

17  know from other claim language that the patentee knew how to

18  use the term reference if they wanted to but did not do so

19  here.

20         And with respect to the extrinsic record, we've

21  seen a lot of attorney argument.  We just saw a

22  demonstration with rulers and Post-it notes, but all of that

23  was unsupported in the record.  There's no extrinsic

24  evidence.  There's no -- nothing to indicate that -- that

25  this interpretation -- this story that Implicit is telling

1  about reference pointers is -- is the way one of ordinary

2  skill in the art would read these claims.

3       The only extrinsic evidence we have is the

4  Tanenbaum Networking textbook that PAN provided, where in

5  fact, Mr. Tanenbaum talks about stripping off headers as we

6  process for packets as we're receiving them, exactly what

7  the claims are doing, receiving the packets and processing

8  them.  Moving from one layer to another, we're going to

9  strip off the headers we don't need.

10      That's all I have, Your Honor.

11      THE COURT:  All right.  Mr. Hopenfeld, do you have

12  anything further?

13      MR. HOPENFELD:  Just a couple things, Your Honor.

14  It won't take long.

15      THE COURT:  Well, let me ask you a question.

16      MR. HOPENFELD:  Yes.

17      THE COURT:  Both sides are telling me that the

18  appropriate construction here is the plain and ordinary

19  meaning.

20      Then you're going a step further and telling me

21  plain and ordinary meaning should be construed to include

22  moving the pointer as opposed to actually removing the

23  outermost header.  And I've seen your demonstrative.  I've

24  heard your argument.

25      Respond to Mr. Dotson's last argument for me in

```
 1   that he's telling it's a nice demonstrative, but where is

 2   the extrinsic evidence?  Where is the support for the

 3   argument that it should be this way, and this way is

 4   consistent with the plain and ordinary meaning of removing.

 5   Address that for me.

 6           MR. HOPENFELD:  The answer -- Your Honor, the

 7   answer is the specification itself.  And it's the very

 8   passage that they quoted, all right.

 9           So what we have in here is a statement in the

10   specification that makes clear that you can be moving the

11   reference, right, that that is something that is

12   contemplated in the art, all right.

13           Now, the term "remove" is not necessarily used

14   there.  Why?  Because the term "remove" is broader than

15   that.

16           Now, we don't need the extrinsic evidence here

17   because we have the patent telling us this is a way to do

18   it, okay, this is how we're going to do it.

19           And what they are asking you to do is read this

20   claim in such a way that it would exclude this embodiment.

21   Whether it's an alternative embodiment or not doesn't really

22   matter.  I actually don't read this as being part of an

23   alternative embodiment.

24           THE COURT:  Give me a column and line reference --

25           MR. HOPENFELD:  Yes.
```

 1          THE COURT:  -- rather than just pointing to the

 2  specification.

 3          MR. HOPENFELD:  Column 14, Line 10 through 14.  And

 4  would you like me read it into the record, Your Honor?

 5          THE COURT:  No, that's not necessary.

 6          MR. HOPENFELD:  So, Your Honor, once again, if you

 7  were to accept PAN's claim construction, it could not read

 8  on an embodiment like this.  When you use a broad language

 9  like remove, that would -- there's nothing that indicates

10  that remove would somehow be limited to any one particular

11  embodiment in this claim.

12          As matter of fact, the intent was -- the way I read

13  the claim, the intent is to make it broader.  You can do it

14  this way; you can do it anyway.  It doesn't matter as long

15  as you remove the header.  As long as the computer knows,

16  hey, go to the next one.

17          THE COURT:  Is there additional support for your

18  position other than the reference to Column 14, Lines 10

19  through 14?

20          MR. HOPENFELD:  Your answer -- the answer to that

21  is, Your Honor, no.

22          THE COURT:  All right.  Now, what else do you have

23  for me?

24          MR. HOPENFELD:  The only other argument that I just

25  wanted to make clear is they made the argument that there

1   would be no outermost header, and that's not true.

2          In the example that I showed you, when the

3   reference is moved down like this, okay, when the -- what

4   the computer sees now is that this is the new outermost

5   header.  Every time the processing step is taken, there is a

6   new outermost header.  So we're not inconsistent with that

7   argument, Your Honor.

8          THE COURT:  All right.

9          MR. HOPENFELD:  That's all I have.

10          THE COURT:  All right.  Thank you.

11          If there's not anything further, the last term,

12   which is also agreed to, is "resource."  And I'd like to

13   confirm in the record the parties' agreement as to the

14   construction of resource that they've agreed to, as we've

15   done before.

16          MR. BUDAJ:  Yes, Your Honor, Evan Budaj for

17   Plaintiff, Implicit.

18          The agreed construction between the parties of

19   "resource" -- counsel, this is Page 24 of the same paper,

20   Docket Entry 93-1 -- a data object containing code, comma,

21   where that code, colon, one, is an application, two, is an

22   applet, or, three, can be used to build an application or

23   applet.

24          THE COURT:  All right.  Does Defendant concur with

25   that?

1          MR. GAUDET:  We concur, Your Honor.  Thank you.

2          THE COURT:  All right.  Thank you.

3          Counsel, that appears to be -- those appear to be

4  the disputed terms for argument this afternoon.

5          These matters are under submission.  I will

6  consider your arguments in light of the briefing and the

7  authorities cited and try to get you some written guidance

8  by way of a claim construction opinion as soon as possible.

9          I am confident by the presence of Mr. Davis and

10  Ms. Smith, who are very experienced local counsel in this

11  district and before this Court, that both sides understand

12  the Court's practice, which I'll hold you to in this case,

13  which is to require that within 30 days of the issuance of

14  my claim construction order, that you submit the case to

15  active and serious mediation efforts.

16          Having the benefit of the constructions from the

17  Court, you're then in a position, in my view, to make the

18  most accurate and knowing assessment of your overall

19  standing in the case, and that should inform your mediation

20  efforts.

21          So I will -- I'll hold you to that practice in this

22  case, as well.

23          As I say, these matters are under submission, and

24  that will conclude presentation for claim construction this

25  afternoon.

1          Unless there are questions from either side, the

2     Court stands in recess.

3          COURT SECURITY OFFICER:  All rise.

4          (Hearing concluded.)

1                              CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    _/S/ Shelly Holmes_____          __3/2/18___
     SHELLY HOLMES, CSR-TCRR                   Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/18

12

13

14

15

16

17

18

19

20

21

22

23

24

25