**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| IMPLICIT, LLC | |
| Plaintiff, | Case No. 6:17-cv-0182-JRG |
| vs. | LEAD CASE |
| HUAWEI TECHNOLOGIES USA, INC., | |
| Defendant. | |
| vs. | Case No. 6:17-cv-0336-JRG |
| PALO ALTO NETWORKS, INC., | CONSOLIDATED CASE |
| Defendant | |

**DEFENDANT PALO ALTO NETWORKS, INC.'S OPPOSITION TO IMPLICIT, LLC'S**
**MOTION FOR SUMMARY JUDGMENT OF NO INVALIDITY IN VIEW OF**
**DECASPER 1 AND DECASPER 5**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................1

II.  PUBLIC AVAILABILITY .....................................................................................1

    A.  The Legal Standard ................................................................................ 1

    B.  The Record Evidence Precludes Summary Judgment ........................... 2

        1.  Public Availability in Libraries.................................................. 2

            a.  Dr. Hsieh-Yee's Declaration............................................3

            b.  Dr. Hsieh-Yee's Testimony .............................................4

        2.  Public Dissemination ................................................................. 6

            a.  Mr. Decasper's Testimony...............................................7

            b.  Dr. Russ's Testimony......................................................8

            c.  Implicit's Dr. Almeroth's Testimony ..............................9

III.  Motivation To Combine.......................................................................................10

    A.  The Legal Standard .............................................................................. 10

    B.  Decasper 1 and Decasper 5 as a Single Prior Art Reference ............... 12

    C.  Motivation to Combine ........................................................................ 13

        1.  The References Themselves ..................................................... 13

        2.  The Testimony of Mr. Decasper .............................................. 15

        3.  Dr. Russ's Testimony.............................................................. 17

DM2\9176099.2

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Blue Calypso*, 815 F.3d at 1348 (quoting *Kyocera Wireless Corp. v. Int'l Trade
    Comm'n*, 545 F.3d 1340, 1350 (Fed. Cir. 2008)) ................................................. 2-3

*Dexcom, Inc. v. Agamatrix, Inc.*, No. CV 16-05947 SJO, 2018 U.S. Dist. LEXIS
    117108 (C.D. Cal. Feb. 5, 2018) ................................................................................7

*GoPro, Inc. v. Contour IP Holding LLC*, No. 2017-1894 (Fed. Cir. Jul. 27, 2018)................... 1-2

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 167 L. Ed. 2d 705
    (2007) ..................................................................................................... 11-12

*Paice LLC v. Ford Motor Co.*, 681 F. App'x 904 (Fed. Cir. 2017)..............................................14

*Paice LLC v. Ford Motor Co.*, 681 Fed. Appx. 904 (Fed. Cir. 2017) .............................. 10, 14-15

*Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324 (Fed. Cir. 2009)............................ 11-12

*Randall Mfg. v. Rea*, 733 F.3d 1355 (Fed. Cir. 2013) ...................................................................11

*Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995 (Fed. Cir. 2016) ...........................................11

**Regulatory Cases**

*Ericsson Inc. v. Intellectual Ventures I LLC*, IPR2014-00527, Paper 41, Final
    Written Decision (PTAB May 18, 2015)........................................................................... 6-7

**Rules**

Fed. R. Civ. P. 56(a) ....................................................................................................................10

L.R. CV-56(a) ..................................................................................................................................1

## I.      INTRODUCTION

Implicit's motion for summary judgment should be denied because there is evidence in the record both that Decasper 5 was publicly available on library shelves, and that it was publicly disseminated at an IEEE conference.  Implicit takes an improperly strict view of the legal standard governing the former (one that would preclude industry journals like those published by the IEEE from ever qualifying as prior art), and completely ignores the latter.

There is likewise evidence in the record supporting a motivation to combine Decasper 1 and Decasper 5.  Implicit cherry picks evidence in the record, ignores other evidence, and focuses on a single sentence in Dr. Russ's report in an attempt gloss over the underlying factual issues that should be considered by the jury.

Implicit's Motion for Partial Summary Judgment does not contain the required "Statement of Undisputed Material Facts" (L.R. CV-56(a)), but as set forth below, there are many factual disputes underlying the issues on which Implicit moves.  Accordingly, Implicit's Motion should be denied.

## II.     PUBLIC AVAILABILITY

### A.      The Legal Standard

The Federal Circuit recently noted that it "ha[s] interpreted § 102 broadly, finding that even relatively obscure documents qualify as prior art so long as the relevant public has a means of accessing them."  *GoPro, Inc. v. Contour IP Holding LLC*, No. 2017-1894, at *6 (Fed. Cir. Jul. 27, 2018) (citing *Jazz Pharm., Inc. v. Amneal Pharm., LLC*, 895 F.3d 1347, 1354-60 (Fed. Cir. 2018)).  By way of example, it has determined that "a single cataloged thesis in a university library was 'sufficient[ly] accessible to those interested in the art exercising reasonable diligence.'"  *Id.*

DM2\9176099.2

(citing *In re Hall*, 781 F.2d 897, 900 (Fed. Cir. 1986)).  With respect to accessibility, the Federal

Circuit stated:

> we explained that "[a]ccessibility goes to the issue of whether interested members of the relevant public could obtain the information if they wanted to" and "[i]f accessibility is proved, there is no requirement to show that particular members of the public actually received the information."  *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1569 (Fed. Cir. 1988).  Accordingly, "[a] reference will be considered publicly accessible if it was 'disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it.'" *Blue Calypso*, 815 F.3d at 1348 (quoting *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1350 (Fed. Cir. 2008)).

*Id.*

## B.      The Record Evidence Precludes Summary Judgment

Decasper 5 was published in the Proceedings of IEEE InfoCom '98.  There is abundant

evidence in the record both of public availability of Decasper 5 on library shelves, and public

dissemination of Decasper 5 at the IEEE InfoCom '98 conference at which the paper was

presented.

### 1.      Public Availability in Libraries

PAN's Dr. Russ relied on the declaration of Dr. Ingrid Hsieh-Yee to inform his opinion

that Decasper 5 was publicly available on library shelves.  It appears that Implicit does not take

issue with Dr. Hsieh-Yee's opinion regarding the dates by which Decasper 5 was made available

to the public; rather, Implicit takes issue with whether Decasper 5 was "sufficiently indexed or

cataloged."[1]  Implicit Mot. at 4 (citing *Blue Calypso*, 815 F.3d at 1348).  Implicit's position appears

to be that to be "sufficiently indexed or cataloged," an individual article within a larger publication

---

[1] Implicit references a "critical date to qualify as invalidating prior art," but does not state what it believes that date is.  Implicit Mot. at 3.

must be individually indexed and cataloged, but *Blue Calypso* does not support such a proposition, and Implicit has cited no other authority in support of such a proposition.

### a.      Dr. Hsieh-Yee's Declaration

Dr. Hsieh-Yee explained in her declaration that the IEEE InfoCom '98 proceedings were publicly available at the Library of Congress and the U.C. Davis Library.  Ex. 1, Hsieh-Yee Decl. at ¶ 21, 26, 31, 33.  She explained in detail how the MARC record for IEEE InfoCom '98—which helps the public understand what materials are publicly accessible in libraries (*id.* at ¶ 14)—indexed the IEEE InfoCom '98 proceedings into the "Computer networks" class, having subjects "Computer networks, Data transmission systems, and Telecommunication."  *Id.* at ¶ 24. Accordingly, "persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence" could locate the Decasper 5 article within IEEE InfoCom '98 publication. *Blue Calypso*, 815 F.3d at 1348.

Dr. Hsieh-Yee is a Professor in the Department of Library and Information Science at the Catholic University of America, has been a professor for more than 25 years, and holds a Ph.D. in Library and Information Studies.  Ex. 1, Hsieh-Yee Decl. at ¶ 7.  Her declaration is evidence that MARC records "became the national standard for sharing bibliographic data in the United States by 1971 and the international standard by 1973."  *Id* at ¶ 9.  Implicit's remarkable position that the MARC records used by the Library of Congress are insufficient to index and catalog publications would turn the industry on its head, and would eliminate as a source of prior art an untold number of articles and publications sitting on library shelves.

The IEEE is a well-known, reputable, and prolific organization for electrical and electronics engineers.  The IEEE InfoCom conference is a large annual conference dedicated to networking.  Indeed, Implicit's Dr. Almeroth testified that it "it pretty much covers the waterfront on networking."  Ex. 2, Almeroth Depo. at 349:23-350:4.  Likewise, Mr. Decasper testified that

3

InfoCom was "the second most significant networking conference."  Ex. 3, Decasper Depo. at

83:17-20.)  One of ordinary skill in the art—which Implicit's Dr. Almeroth stated would have

experience in the field of "network communication" (Ex. 2, Almeroth Depo. at 362:19-

363:10)—looking for information on networking would unquestionably be motivated to search the

IEEE InfoCom proceedings, which were classified by the subject matter "Computer networks,

Data transmission systems, and Telecommunication."  Ex. 1, Hsieh-Yee Decl. at ¶24.

### b.    Dr. Hsieh-Yee's Testimony

Implicit quotes testimony from Dr. Hsieh-Yee's deposition to support its argument that

"the Library of Congress would not have cataloged Decasper 5 because it appeared in a journal."

Implicit Mot. at 4.  Consistent with her declaration described above, Dr. Hsieh-Yee's testimony is

that the IEEE InfoCom publication—which includes the Decasper 5 article—is cataloged and

indexed by the Library of Congress.  Indeed, Dr. Hsieh-Yee confirmed, "The D-A-N article is part

of this volume . . . .  The volume was received by the Library of Congress on April 10, 1998, and

following standard library procedure, usually within a week it will be put in the reading room for

user access.  That's established."  Ex. 4, Hsieh-Yee Depo. at 68:14-23.

Dr. Hsieh-Yee also explained that it would be "very easy" for someone searching for

Decasper 5 to find IEEE InfoCom '98 publication:

> Q. I want IEEE INFOCOM '98. How would I find it?
>
> A. Oh. That part is very easy. You would go to the library system, online catalog,
> you search for this, the name of the conference, and it will come up.

*Id.* at 69:19-24.  She further testified that libraries catalog information such that people who have

an interest in the subject matter can find it:

> Q.  Now you say people who have an interest. Are these people who already know
> about the existence of the document?

A.  It can vary.  And the system, information system, is designed so that people who knows a document exists and want to have that document, they can find that. In our field it's called -- it's referred to as a known item search, meaning you come in, you know something is there, so you're looking for that item.

Another way is called a subject search, and that is the person can come in and say I'm very interested in this topic, I wonder what the library has, and our system will support that, too, through the subject headings and through classification numbers.

Ex. 4, Hsieh-Yee Depo. at 19:14-20:4.  She also confirmed not only that subject matter searches are possible, but that they are in fact easier for scientific and technical areas (as is at issue here) than other areas, and that library catalogers go through extensive training to make sure the subject matter is cataloged properly:

Q.   But what if you're just doing a subject search?  Are some subject searches harder than other subject searches?

A.   We try very hard to make it easy, so in the systems we have many ways to do it.  But many are through subject headings and subject classification number.  What we do is we use subject classification number to collocate, so materials on the same subject will be grouped together, that way we make it easier for somebody doing a subject search to then have a smaller group of material to review.

Q.   Would it be fair to say that for some things it's easier to do a subject search than other things?

A.   I suppose, yeah.

So, for example, in the science and technology area it's usually easier because their topic tends to be very specific.  But in the humanities, in the social sciences, in the art, in performing arts, then it tend to be more multifaceted and that takes a little bit more time. But ultimately catalogers are going through a lot of training in order to be helpful in doing subject analysis.

*Id.* at 20:18-21:17.  Implicit's position would nullify IEEE proceedings publications from ever being available as prior art because each article within the publication is not indexed separately. It is not surprising that Implicit could find no support for this position.  And again, the *only* evidence on this point is the evidence provided by PAN, and it is more than sufficient to create a dispute of material fact.

## 2.      Public Dissemination

Even setting aside the sufficiency of the cataloging and indexing of the libraries, there is an additional, independent basis to in the record to at least create a material dispute of fact as to the public availability of Decasper 5.   Decasper 5 was published in the IEEE InfoCom '98 Proceedings, which proceedings were held March 29 – April 2, 1998 in San Francisco, CA.  Ex. 5, Decasper 5 at DEFS_IMPL_060952.  As a threshold issue, the IEEE InfoCom '98 Proceedings publication bears a 1998 copyright date on its face, which is reproduced below:

**Proceedings IEEE INFOCOM'98 The Conference on Computer Communications**

Abstracting is permitted with credit to the source.  Libraries are permitted to photocopy beyond the limit of U.S. copyright law, for private use of patrons, those articles in this volume that carry a code at the bottom of the first page, provided the per-copy fee indicated in the code is paid through the Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923.  For other copying, reprint, or republication permission, write to the IEEE Copyrights Manager, IEEE Operations Center, 445 Hoes Lane, Piscataway, NJ 08855-1331.  All rights reserved.  Copyright © 1998 by The Institute of Electrical and Electronics Engineers, Inc.

IEEE Catalog Number:      98CH36169 (softbound)
                                           98CB36169 (casebound)

ISBN      Softbound: 0-7803-4383-2
                Casebound: 0-7803-4384-0
                Microfiche: 0-7803-4385-9
                CD-Rom:   0-7803-4386-7

ISSN      0743-166X

*Id.* at DEFS_IMPL_060953.   Likewise, the Decasper 5 article within the IEEE InfoCom '98 proceedings bears the below IEEE copyright notice:

0-7803-4383-2/98/$10.00 © 1998 IEEE.

*Id.* at DEFS_IMPL_060980; *see also* Ex. 1, Hsieh-Yee Decl. at ¶ 20.

As the PTAB has recognized, "IEEE is a well-known, reputable compiler and publisher of scientific and technical publications."  *Ericsson Inc. v. Intellectual Ventures I LLC*, IPR2014-00527, Paper 41, Final Written Decision, at 11 (PTAB May 18, 2015) (Ex. 10).  Indeed, the PTAB has taken Official Notice "that members in the scientific and technical communities who both

DM2\9176099.2

publish and engage in research rely on the information published on the copyright line of IEEE publications." *Id.*; *see also id.* at 10-11 ("We accept the publication information on the IEEE copyright line . . . as evidence of its date of publication and public accessibility."). *See also Dexcom, Inc. v. Agamatrix, Inc.*, No. CV 16-05947 SJO (ASx), 2018 WL 3342927, at *12 (C.D. Cal. Feb. 2, 2018) ("Published documents are able to rely on the date of copyright registration to establish public availability, absent a showing that would indicate otherwise."). Thus, copyright information in the IEEE InfoCom '98 publication itself is evidence of its public availability and accessibility.

The testimony of Dr. Russ, Implicit's Dr. Almeroth, and Mr. Decasper likewise support a finding that Decasper 5 was publicly disseminated when it was made available to attendees of the IEEE InfoCom '98 conference at which it was presented.

### a.     Mr. Decasper's Testimony

Mr. Decasper testified that the Decasper 5 paper was written for IEEE InfoComm, which is "similar to SIGCOMM." Ex. 3, Decasper Depo. at 81:18-21.  He had previously testified in his deposition regarding the Decasper 1 reference being presented at a conference called SIGCOMM, and testified that the papers are handed out at these types of conferences.[2] *Id.* at 22:20-23:4; 26:15-23.  He also testified that the Decasper 5 paper "**was in the proceedings of the conference**, **just like** the route[sic], **Exhibit 2 [Decasper 1], was in the proceedings of SIGCOMM**." *Id.* at 82:3-5 (emphasis added).[3]  The "proceedings of the conference" is the collection of papers that are

---

[2]  Implicit does not contest the public availability of the Decasper 1 reference in its Motion.

[3]  To the extent Implicit insinuates that Mr. Decasper testified he only presented the Decasper 5 paper orally, that is incorrect.  Mr. Decasper was not directly asked about the Decasper 5 paper being distributed to attendees, but nonetheless did testify that Decasper 5 was in the proceedings of the conference.

7

presented at the conference and provided to attendees, hence the title of publication containing Decasper 5: "Proceedings, IEEE InfoCom '98, The Conference on Computer Communications." Ex. 5, at DEFS-IMPL_060952.  Mr. Decasper also confirmed that Decapser 5 was peer reviewed. Ex. 3, Decasper Depo. at 84:1-3.  And he testified that InfoComm was "the second most significant networking conference" and that there were "at least 100" people in attendance during his presentation.  *Id.* at 83:17-22.  Thus, Mr. Decasper's testimony provides evidence that Decaspser 5 was publicly disseminated at the IEEE InfoComm '98 conference.

### b.      Dr. Russ's Testimony

Dr. Russ, when asked about Decasper 5 during his deposition, likewise stated that in his experience—having attended many such conferences himself—Decasper 5 would have been distributed to the attendees of the IEEE InfoComm conference, that he would have found it "surprising" if the papers were not handed out, and that he would have been "very disappointed" if the paper were not handed out.  Ex. 6, Russ Depo. at 222:1-9.  Dr. Russ also stated that it would be "extremely unusual" for papers not to be disseminated to conference attendees.  *Id.* at 222:20-24.

More specifically, Dr. Russ explained in his report: "I am familiar with and have personally attended many conferences like the ACM SIGCOMM Conference.  In my experience the papers presented at those conferences are provided to the attendees."  Ex. 7, Russ at ¶ 78.  During his deposition, Dr. Russ explained of this opinion:

> Those two sentences are equally true by the time you go down to read paragraph 79. I did not see the need to restate the obvious when I went to paragraph 79. It is clear in my mind that when you attend a conference, you're handed paper or CD copies of the proceeding—of the proceedings of the conference. It's clear in my mind that conference papers are publicly available on at least the first day of the conference. They're actually publicly available the date the check-in for the conference begins, but that is at least the first day of the conference.

8

And that opinion in paragraph 78 is not confined to the ACM SIGCOMM '98 Conference. I said, papers presented at those conference. I say, many conferences like the ACM SIGCOMM Conference. So at least in my mind that opinion is clear and is equally relevant to paragraph 79.

Ex. 6, Russ Depo. at 221:5-22.   This is consistent with Mr. Decasper's testimony that ACM

SIGCOMM and IEEE InfoComm are similar conferences.   *See* Ex. 3, Decasper Depo. at 81:18-

21, 83:17-22.  Upon further examination by Implicit's lawyer, Dr. Russ reiterated:

I'm testifying that it's been my experience that when you attend a conference, you're handed a copy of proceedings when you register for the conference and that if I attended a conference that published proceedings and was not handed a copy of the proceedings the moment I checked in, I would find it very surprising and I would be very disappointed.

Ex. 6, Russ Depo. at 222:1-9.[4]

### c.      Implicit's Dr. Almeroth's Testimony

Implicit's Dr. Almeroth had a paper accepted to the same IEEE InfoCom '98 conference

at which Mr. Decasper presented Decasper 5.   He testified that he and/or one of his students

presented that paper at IEEE InfoCom '98:

Q. And you've -- it looks like you've presented at IEEE Infocom several times? Is that right?

A. Not to quibble too much, we've submitted papers, had them accepted, and typically my students will have presented. The earlier papers—the earliest papers at Infocom for when I was a student, then I did the presentations.

Q. So let's look at entry number 5.[5]

A. Okay.

---

[4] Dr. Russ testified: "I'm relying on both my personal experiences with how conferences work and on the declaration of Dr. Hsieh-Yee." Ex. 6, Russ Depo. at 220:1-3.

[5] Entry number 5 in the "Conference Papers with Proceedings" section of Dr. Almeroth's CV is a paper entitled "Scalable Delivery of Web Pages Using Cyclic Best-Effort (UDP) Multicast," published in "IEEE INFOCOM, San Francisco, California, USA, June 1998."  Ex. 8, Almeroth Report at Exhibit 1, CV at § II(B), Entry 5.

Q. Is that one of the earlier papers for which you did the presentation?

A. Very likely I did.  Sitting here now, I – I don't remember if I did.

Q. And that was in 1998, it looks like?

A. I think that's right.

Ex. 2, Almeroth Depo. at 350:19-351:8.  When asked whether the papers presented at IEEE InfoCom would have been made available to attendees, Dr. Almeroth testified: "[f]or Infocom, I can't think of an instance where they weren't."  *Id.* at 351:19-25.

Thus, the testimony of Dr. Russ, Dr. Almeroth, and Mr. Decasper all support a finding that Decasper 5 was disseminated at the IEEE InfoCom conference that took place from March 29-April 2, 1998, regardless of when it was made available on library shelves, and regardless of how it was cataloged or indexed.

Accordingly, there is ample evidence in the record that Decasper 5 was publicly available, either on the shelves at libraries or disseminated at the IEEE InfoCom '98 conference where it was presented.  Thus, there is, at a minimum, a "genuine dispute" as to the facts, and Implicit's request for summary judgment should be denied.  FED. R. CIV. P. 56(a).

## III.     Motivation To Combine

### A.       The Legal Standard

The Federal Circuit has held that "[m]otivation to combine prior art references is a question of fact."  *Paice LLC v. Ford Motor Co.*, 681 F. App'x 904, 917 (Fed. Cir. 2017) (citing *Merck & Cie v. Gnosis S.p.A.*, 808 F.3d 829, 833 (Fed. Cir. 2015)).  "To determine whether there was an apparent reason to combine the known elements in the way a patent claims, it will often be necessary to look to interrelated teachings of multiple patents; to the effects of demands known to the design community or present in the marketplace; and to the background knowledge possessed by a person having ordinary skill in the art."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 401

(2007).  This analysis does not require "seek[ing] out precise teachings directed to the challenged claim's specific subject matter, for a court can consider the inferences and creative steps a person of ordinary skill in the art would employ."  *Id.* at 401.  For example, the Court stated that "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."  *Id.* at 417.  "For the technique's use to be obvious, the skilled artisan need only be able to recognize, based on her background knowledge, its potential to improve the device and be able to apply the technique."  *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1003 (Fed. Cir. 2016).

Thus, "[i]n *KSR*, the Supreme Court criticized a rigid approach to determining obviousness based on the disclosures of individual prior-art references, with little recourse to the knowledge, creativity, and common sense that an ordinarily skilled artisan would have brought to bear when considering combinations or modifications."  *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (citing *KSR*, 550 U.S. at 415-22).  Moreover, "the Supreme Court instructed that factfinders may use common sense in addition to record evidence" when evaluating motivation to combine.  *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009) (citing *KSR*, 550 U.S. at 419).

Moreover, the references themselves can provide the requisite evidence or reasons to combine; there is not even a requirement of expert testimony on this issue.  For example, in *KSR*, the Supreme Court reached a conclusion that the references would have been combined *as a matter of law* (thus satisfying the strongest evidentiary showing, entitling the *defendant* to summary judgment) based on the references themselves and the undisputed level of ordinary skill in the art—and even though opposing expert testimony attempted to create an issue of fact:

> Where, as here, the content of the prior art, the scope of the patent claim, and the
> level of ordinary skill in the art are not in material dispute, and the obviousness of
> the claim is apparent in light of these factors, summary judgment is appropriate.
> Nothing in the declarations proffered by Teleflex prevented the District Court from
> reaching the careful conclusions underlying its order for summary judgment in this
> case.

550 U.S. at 427.  *See also Perfect Web*, 587 F.3d at 1329 ("We therefore hold that while an analysis

of obviousness always depends on evidence that supports the required *Graham* factual findings, it

also may include recourse to logic, judgment, and common sense available to the person of

ordinary skill that do not necessarily require explication in any reference or expert opinion.").

This record creates an issue of fast that the references would be combined based on the

references themselves, the testimony of the authors, and the testimony of Implicit's expert.  As set

forth below, each of these is an independent basis to deny Implicit's motion.

**B.      Decasper 1 and Decasper 5 as a Single Prior Art Reference**

As an initial matter, Implicit argues that PAN "attempts to combine Decasper 1 and

Decasper 5 into a single anticipatory prior art reference."  Implicit Mot. at 5.  Implicit misinterprets

Dr. Russ's report.  In Paragraph 80 of his report, Dr. Russ notes that the two references are "treated

as a single, unified disclosure" given their close relation (consistent with Mr. Decasper's own

testimony as set forth below), and opines that "to the extent the Decasper references are not

considered a single, unified disclosure, it would have been obvious to a POSITA to combine their

teachings." Ex. 7, Russ Report at ¶¶ 80-82.  Subsequently, Dr. Russ's invalidity analysis concludes

that the asserted claims "are invalid as being obvious in view of the Decasper family of references,

collectively referred to as "Decasper."  *See, e.g.*, Ex. 7, Russ Report at ¶ 104.  In other words, Dr.

Russ does not set forth an anticipation analysis for the Decasper references, and his invalidity

analysis is that the combination of Decasper 1 with Decasper 5 pursuant to 35 U.S.C. § 103

(obviousness) invalidates each asserted claim.

12

### C.      Motivation to Combine

There is ample evidenced from which a jury could conclude that there exists a motivation to combine the Decasper references ("Decasper 1" and "Decasper 5"), based on (1) the references themselves; (2) the testimony of one of the authors; and (3) the expert testimony of PAN's Dr. Russ.  Any of these three would be sufficient to create a fact question.  Taken together, Implicit's request for summary judgment must be denied.

### 1.      The References Themselves

The evidence starts with the references themselves.  The references shared two common authors (Daniel Decasper, the first named author on both, and Bernhard Plattner); originated from work in the same laboratories (Washington University and Computer Engineering and Networks Laboratory ETH); were published in the same timeframe (1998); were directed to the same subject matter addressing the same problems; and shared overlapping disclosures, including the use of many of the same components.  Indeed, as set forth below, Mr. Decasper himself testified that the references could be thought of as a single project (though they had separate deliverables).  This alone is sufficient evidence to create a question of fact as to whether the references would have been combined.

More specifically, Decasper 1 is authored by Dan Decasper, Zubin Dittia, Guru Parulkar, and Bernhard Plattner, and it is entitled "Router Plugins, A Software Architecture for Next Generation Routers."  Ex. 9, Decasper 1 at DEFS_IMPL_060992.  As its title implies, Decasper 1 discloses the use of so-called "router plugins" for processing network packets.  *Id.* at DEFS_IMPL_060992.  Decasper 5 is authored by Dan Decasper and Bernhard Plattner, and it is entitled "DAN: Distributed Code Caching for Active Networks."   Ex. 5, Decasper 5 at DEFS_IMPL_060980.  As its title implies, Decasper 5 relates to active networking and discloses an "Active Network Node (ANN)" that processes network packets, but also has the ability to

13

download the necessary code for processing the packet from a code server after receiving the packet.  *Id.* at DEFS_IMPL_060980, DEFS_IMPL_060982.  Both Decasper 1 and Decasper 5 were presented at conferences in 1998, the SIGCOMM '98 conference (September 2 – September 4, 1998) for Decasper 1, and the IEEE InfoCom '98 conference (March 29 – April 2, 1998) for Decasper 5.   Ex. 9, Decasper 1 at DEFS_IMPL_060990; Ex. 5, Decasper 5 at DEFS_IMPL_060952.

The disclosures of Decasper 1 and Decasper 5 are overlapping and the two share components.  Indeed, Implicit's Dr. Almeroth admits in his report that Decasper 1 and Decasper 5 share many of the same components: "… Decasper 5 anticipated that the ANPE software architecture would share components (e.g., IPv4/IPv6 core and the AIU) with the EISR of Decasper 1…." Ex. 8, Almeroth Report at ¶ 126.  An AIU is not a standard component or term of art (Ex. 2, Almeroth Depo. at 525:21-23), but is one of the components taught in the Decasper references—in other words, both references use the same set of unconventional terms.  Ex. 9, Decasper 1 at DEFS_IMPL_060995 (the AIU "implements a packet classifier and builds the glue between the flows and plugin instances").

The Federal Circuit recently upheld the PTAB's determination of adequate motivation to combine articles sharing a single common author and relating to the same work in *Paice LLC v. Ford Motor Co.*, 681 F. App'x 904, 917 (Fed. Cir. 2017).  In *Paice,* the appellant argued "the Board did not establish a motivation to combine the Bumby references—five articles sharing one common author—which Paice views as a series of disparate references relating to various different aspects of hybrid vehicle design." *Id.* at 917.  The Court disagreed, noting "[t]he Board found that 'the Bumby references document, chronologically, the evolution of a hybrid vehicle project undertaken by Professor James Bumby and his team.' [citation omitted]  This finding was

14

supported by a later-published thesis by Philip Masding—an author on two of the Bumby references—which 'brings together the five Bumby references in a single compilation and summarizes the efforts' of Dr. Bumby and his team." *Id.*

### 2.    The Testimony of Mr. Decasper

Mr. Decasper himself testified that "you could sort of think of these as one project," that "the second one was leveraging some of the work that was done on the first," and that the two "share[] a lot of . . . components."  Ex. 3, Decasper Depo. at 10:6-25, 237:10-238:4; Ex. 6, Russ Depo. at 174:7-12.

Implicit presents quotes from Mr. Decasper's deposition in an attempt to argue that Decasper 1 and Decasper 5 are unrelated and therefore would not have been combined by a POSITA.  Even if Implicit's characterizations were accepted, it would simply create a fact issue for the jury to decide, *i.e.*, which part of Mr. Decasper's testimony to credit.  But digging deeper, even the passages cited by Implicit do not support its position, especially in view of the surrounding testimony.

More specifically, Implicit argues that "Mr. Decasper himself confirmed in writing, and then testified under oath, those references in question were at least 'partly orthogonal' and employ 'fundamentally different model[s.]'"  Implicit Mot. at 6 (citing Decasper Deposition at 237:7-238:4).  As a threshold issue, during this portion of his deposition, Mr. Decasper was discussing his thesis, which is not one of the publications at issue in Dr. Russ's report. Ex. 2, Almeroth Depo. at 527:24-528:13.  Even then, Mr. Decasper went on to testify that what he meant by "partly orthogonal" is that in the router plugins case of Decasper 1, "there is not administration action needed to get the code onto the device" and that "while the active network piece [e.g., of Decasper 5] shares a lot of the other components of the router plugins, this one, it doesn't, right.  It has – it has a basically fundamentally different model. . . . it's inspecting packets and then, based on what

it sees, it automatically goes and fetches code and has that executed on those packets if it's not already present."  Ex. 3, Decasper Depo. at 237:18-238:4.

Read in context, Mr. Decasper explains that the active networking piece of Decasper 5 "shares a lot of … components with" the router plugins system disclosed in Decasper 1, but it is "partly orthogonal" in terms its ability to "automatically go[] and fetch[] code," and that capability for fetching code is, of course, "fundamentally different" than Decasper 1's use of pre-stored code. *Id.*  That difference in capabilities—Decasper 5 adds a capability that Decasper 1 did not have—is precisely why a POSITA would have been motivated to combine Decasper 5 with Decasper 1; to include the ability to automatically fetch necessary code and make the system of Decasper 1 more flexible.  Of course, if there are no differences in the disclosures of two prior art references, there would be no need to combine them to begin with.

As set forth below, Mr. Decasper provided additional testimony that Decasper 1 and Decasper 5 are in fact related, that the active networking concept of Decasper 5 was added to the router plugins concepts of Decasper 1, and that the two shared components.

> Q. . . . Did the router plug-ins references that are attached to the subpoena relate to a single project that you undertook?
>
> A  . . . So the work we've done on this sort of started in -- trying to get my dates right -- in '96.  And **one of the first things that came out of it was the router plug-ins**, on paper, **and then we continued** on that **and sort of added the active networking part** of it.
>
> And so it sounds like **you could sort of think of these as one project**, but you could also sort of think of it as two projects, right.  Because they produce individual deliverables, so we could argue they have value individually.  But, **so the second one was leveraging some of the work that was done on the first**.

Ex. 3, Decasper Depo. at 10:6-25 (emphasis added).  Then, Mr. Decasper explained that the difference between Decasper 1's router plugin architecture (exhibit 2 in Mr. Decasper's deposition) and his subsequent active networking work (exhibit 6 in Mr. Decasper's deposition is

Decasper 5) is that in Decasper 1, the plugins had to be present by the time the packet arrives, while in active networking disclosure of Decasper 5, "the code . . . is automatically loaded at the time the packet shows up":

> Q.  I think you were saying **Exhibit 2 had particular characteristics associated with when the plug-in had to be loaded into the kernel**.
>
> A.  **Right.**
>
> Q.  Okay. So explain to me why that was.
>
> MS. ACHARYA: Objection. Form.
>
> THE WITNESS: For the system to work, right, **the plug-in needs to be present by the time the packet arrives**. Right. That's really the only restriction. That means you can start up the system today, and install the plug-in a week from now, as long as -- it's just that the traffic that will show up between now and a week from now, the plug-in wouldn't operate on.
>
> BY MR. DINOVO:
>
> Q.  Right. But you were differentiating, I think, Exhibit 2 from some future generation of your work.
>
> A.  Right. So, **in Exhibit** 5, 4, 3, I guess all of them maybe, **6**, and then the stuff I brought along, so 8 and 9, certainly 7, **the code can be -- is automatically loaded at the time the packet shows up** on the system.
>
> Q.  Automatically loaded from where?
>
> A.  From a code server.
>
> Q.  And the difference is that it had to be manually loaded with Exhibit 2?
>
> A.  Correct.

*Id.* at 95:5-96:12.   This again highlights the simple motivation to combine the teachings of Decasper 1 and Decasper 5:  Decasper 5 disclosed a more flexible and dynamic way to process packets since it could automatically load the necessary code instead of being restricted to pre-loaded code as in Decasper 1.

### 3.        Dr. Russ's Testimony

PAN's Dr. Russ addressed the questions of undue experimentation and predictable results. Dr. Russ testified in his deposition that his report shows that the combination of Decasper 1 and Decasper 5 requires only an "incremental extension" given the close relationship between the disclosures, as discussed above and confirmed by Mr. Decasper himself.  For example, Dr. Russ testified that some of the modifications necessary to combine Decasper 1 and Decasper 5 require only "very incremental extension to the existing data structure . . . .  It's the same concept," and that "[i]t's a very minor incremental extension to Decasper one."  Ex. 6, Russ Depo. at 215:6-13; 216:4-10.  *See also id.* at 210:2-12, 211:10-212:13, 212:15-213:21.

Implicit improperly collapses Dr. Russ's entire analysis of the Decasper references into a single sentence of a single paragraph of his report and attempts to confine the record to that lone sentence.  Implicit Mot. at 6-7 (quoting Russ Report at ¶ 82).  Setting aside the factual record above, Dr. Russ's report explains that the Decasper references are treated as a unified disclosure, consistent with Mr. Decasper's testimony—which would satisfy an even higher standard than merely a motivation to combine.  Ex. 7, Russ Report at ¶80.  Dr. Russ explains that the Decasper references have common authorship and were written in the same time period.  *Id.* at ¶82.  He explains that they describe the same research and development efforts.  *Id.* at ¶ 80.  And he explains that they describe overlapping solutions to the same problems, and were drawn to solving the same set of problems in the same field of art.  *Id.* at ¶ 82.  Dr. Russ goes on to explain that Decasper 1 address the problem of identifying routines (e.g., plugins) required for processing packets, and how Decasper 5 likewise relates to the same problem of identifying code needed for packet processing, but can do so by fetching the needed code at runtime.  *Id.* at ¶¶ 122-125.  He then explains how the code for processing packets loaded at runtime in Decasper 5 is stored so that it can be used in the future, which is akin to how Decasper 1 operates (with pre-loaded code).  *Id.* at

¶¶ 132-133, 137.  All of these disclosures in Dr. Russ's report weigh on the motivation of one of ordinary skill in the art to combine Decasper 1 and Decasper 5, and provide yet another independent basis to deny Implicit's motion.

Dated:  September 4, 2018

**COUNSEL FOR DEFENDANT
PALO ALTO NETWORKS, INC.**

*/s/ Melissa R. Smith*
Louis Norwood Jameson
Matthew Christopher Gaudet
David C. Dotson
John R Gibson
Alice Snedeker
**DUANE MORRIS LLP**
1075 Peachtree Street, NE
Suite 2000
Atlanta, GA 30309-3929
404/253-6915
Fax: 404/253-6901
Email: wjameson@duanemorris.com
Email: mcgaudet@duanemorris.com
Email: dcdotson@duanemorris.com
Email: jrgibson@duanemorris.com
Email: aesnedeker@duanemorris.com

Melissa R. Smith
Texas Bar No. 24001351
melissa@gillamsmithlaw.com
Allen Franklin Gardner
allen@gillamsmithlaw.com
**GILLAM & SMITH, LLP**
303 South Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 4, 2018, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

<u><em>/s/ Melissa R. Smith</em></u>