# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | |
|---|---|
| IMPLICIT, LLC<br><br>    Plaintiff,<br><br>vs.<br><br>HUAWEI TECHNOLOGIES USA, INC.,<br><br>    Defendant. | Case No. 6:17-cv-0182-JRG<br>LEAD CASE |
| vs.<br><br>PALO ALTO NETWORKS, INC.,<br><br>    Defendant | Case No. 6:17-cv-0336-JRG<br>CONSOLIDATED CASE |

**DEFENDANT PALO ALTO NETWORKS, INC.'S REPLY
IN SUPPORT OF ITS MOTION TO EXCLUDE PLAINTIFF IMPLICIT, LLC'S
DAMAGES-RELATED TESTIMONY FROM
DR. KEITH UGONE AND DR. KEVIN ALMEROTH
UNDER FEDERAL RULE OF EVIDENCE 702 AND *DAUBERT* [DKT. NO. 203]**

Implicit's attorneys' inability to accurately or consistently characterize its experts' damages theories—while simultaneously admitting that Dr. Ugone's "starting royalty base … is off"—confirms that, if allowed to be presented to the jury, these methodologically unsound opinions will mislead and hinder, not help, the jury "reliably implement the substantive statutory requirement of apportionment of royalty damages to the invention's value."[1]

### A. The ███████████ Associated with Unaccused Services and Support Cannot be Included in the Royalty Base

There can be no dispute as to whether services and support are accused of infringement; they are not. Dr. Almeroth did not do an element-by-element infringement analysis for these offerings (if he had, there would be a motion to strike because they were not in the infringement contentions). Dr. Ugone himself rejected the idea that calling technical support—a key aspect of the support service—could be implicated by Implicit's infringement read. Ex. 20 at 276:14-22. Nor can Implicit sweep in these revenues as convoyed sales by alleging they "have a sufficient technical linkage" to the accused appliances. Dkt. 218 at 5. *Everything* in a telecommunications system has a "technical linkage," but that is not the standard for including convoyed sales in a royalty *base*. Indeed, the term "convoyed sales" was relegated to a single sentence in a chart in an appendix discussing *GP* Factor 6, which is a qualitative factor regarding the royalty rate. For his part, Dr. Almeroth did not consider the various features and functions of the support and subscription services in rendering his ███████ apportionment range. *Compare* Dkt. 203, Ex. 3 ¶¶ 307-342 *with id.* Ex. 5 ¶¶ 331-355. These revenues must be excluded from the royalty base.[2]

---

[1] *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

[2] *Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003) (affirming holding that patentee "could not include sales of non-patented items in the royalty base but could demonstrate that those sales were relevant in determining a reasonable royalty"); *Sloan Valve Co. v. Zurn Indus., Inc.*, 33 F. Supp. 3d 984, 997 (N.D. Ill. 2014) ("Zurn contends that although the *Georgia-Pacific* factors apply qualitatively—meaning that experts analyze whether each factor supports a higher or lower royalty rate—they do not apply quantitatively to add a specific figure to the royalty base. The Court agrees."); *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co Ltd.*, 1993 WL 1510657, at *23 (D. Mass. Apr. 27, 1993) ("As a legal matter, convoyed sales are a factor to be considered

### B.      Implicit's Experts Methodologically Unsound Apportionment

<u>The Failure to Apportion Out Hardware</u>. Implicit's experts made no attempt to objectively value any hardware in the NGFWs, whether by looking at costs, comparing with process of competitor products, or otherwise. With respect to the methodology its experts did use, Implicit admits that its experts did not account for differences within the accused products that are unrelated to the patents-in-suit and, therefore, did not conduct a product-by-product apportionment analysis. Dkt. 218, at 7-8. This admission is itself sufficient to grant PAN's Motion.[3] Implicit also concedes that "throughput and pricing are not perfectly correlated," and that Dr. Ugone's "starting royalty base … is off," but argues the examples provided by PAN are "two small outliers," and that "does not mean that "PAN's alternative approach is a good one." Dkt. 218, at 8.[4] As a threshold matter, it is Implicit's, not PAN's, burden to come forward with reliable evidence that apportions "between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative."[5] The larger point is that this price differential between these different hardware products must be the result of something else *other than* PAN-OS and App-ID, because ▅▅▅▅▅▅▅▅▅ in every one of these products. That is the point to which Implicit has no answer, but Implicit's experts neither identify nor apportion out that something else. Even then, there is no circumstance under which Dr. Ugone could reliably use Dr. Almeroth's theory—*i.e.*, that as throughput and performance increases so too does the use of the allegedly infringing "App-ID architecture"—as a proxy for a proper economic apportionment, because the data shows no correlation at all. More specifically, Implicit's reference to PAN's use of a ▅▅▅▅▅▅▅

---

in determining a reasonable royalty. They … do not create a separate sum on which the royalty is calculated.").
[3] *See*, *e.g.*, *VirnetX*, 767 F.3d at 1328 (excluding expert that "did not even attempt to subtract any other unpatented elements from the base, which therefore included various features indisputably not claimed").
[4] These were just ***examples*** demonstrating the infirmities in Implicit's flawed approach to apportionment. There are other facts confirming that "throughput and pricing are not perfectly correlated." *See*, *e.g.*, Dkt. 203, at 5 n. 5.
[5] *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1310 (Fed. Cir. 2018).

████████████████████████████████████

██████████████████████ to compare its products its competitors (Dkt. 218, at 7) confirms there is *absolutely no correlation* across the NGFW product, as shown below and in Appendix A.

| Accused NGFW | Firewall Throughput (Gbps) | Average Selling Price | Price-Per-Gbps-Throughput |
|---|---|---|---|
| PA-200 | 0.1 | ███ | ████ |
| PA-220 | 0.5 | ███ | ████ |
| PA-220R | 0.5 | ██ | ████ |
| PA-3050 | 4 | ████ | ████ |
| PA-3060 | 4 | ████ | ████ |
| PA-5280 | 68 | ████ | ███ |
| PA-7080 | 200 | ████ | ███ |

Implicit could have dealt with these realities in any number of ways—e.g., by attempting to identify and then apportion out the unclaimed other features that account for the massive price difference—but chose not to do so in a transparent attempt to maximize its proposed royalty base. Any way you look at it, Implicit's experts' failure to conduct a proper apportionment analysis renders their proposed damages-related testimony unsound and prejudicially misleading.

Apportioning Aspects of PAN-OS Other than App-ID, and Unaccused Aspects of App-ID. Implicit ignores the facts and arguments set forth by PAN, instead just summarizing Dr. Almeroth's hollow analysis. As set forth in PAN's opening brief—and essentially conceded by Implicit—there are numerous unaccused technologies within PAN-OS that are not App-ID, and there are numerous unaccused technologies within App-ID itself. Dr. Almeroth neither identified any of these things nor accounted for them—nor did he use any math at all to come up with his plucked-from-thin-air "technical importance" percentage. A summary of Dr. Almeroth's methodologically unsound analysis is not a response to the specific arguments made by PAN. PAN showed, *inter alia*, that the patents do not disclose encryption/ decryption techniques, which are necessary ████████████████ coming across the firewall; that Implicit's theory is limited to the *routing* of packets between routines, not the actual routines themselves (*e.g.*, decryption, policy-based decisions, determination of whether a file is benign or malicious, etc.),

3

or the ability to automate such decisions; that the patents do not disclose anything relating to security; and that there is substantial proprietary and patented technology in App-ID and PAN-OS that is not disclosed in Implicit's patents. Dkt. 203, at 9-11. Implicit's experts proceed as if Implicit invented all of App-ID, even though none of the relevant words relating to layer 7, or application layer, or content inspection appear in the patents, and even though Dr. Almeroth conceded that he did not accuse *anything* in the "Application Identification" box of the PAN-OS packet flow of meeting elements (and so the patents cannot cover *all*—or even most—of App-ID). *Id.* at 10-11. Implicit cannot answer these arguments for the first time in its sur-reply.

### C. Dr. Ugone's Royalty Analysis

Implicit contends that PAN "wrongly characterizes Dr. Ugone's opinion as a 'running royalty.'" Dkt. 218, at 12. Although he labels it a lump-sum, Dr. Ugone's opinion has all of the hallmarks of a running royalty analysis (and all of the benefits to a plaintiff) without any of the supporting evidence necessary to establish that PAN would ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[6] Implicit cannot exempt itself from the rigors required for a running royalty simply by extending it through patent expiration and then saying ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[7]

Given that *all* of the evidence points away from Dr. Ugone's proposed methodology, it is not surprising that even Implicit cannot even characterize his analysis consistently. Implicit first contends that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and "[t]hat is the analysis Dr. Ugone undertook." Dkt. 218, at 12. But there is no evidence to support that—no one testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[6] *Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*, 2018 WL 2149736, at *6 (E.D. Tex. May 10, 2018).
[7] *See Lucent Techns., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1326 (Fed. Cir. 2009) ("Significant differences exist between a running royalty license and a lump-sum license.").

████ Confirming this, Dr. Ugone testified that he lacked even the most basic information necessary to complete such an analysis even for his chosen subset: he did not ████ ████. *See* Dkt. 203, at 12-13.[8] Implicit thus contradicts itself one paragraph later, when it argues that Dr. Ugone ████ ████ Dkt. 218, at 12. While this is a more accurate representation of how Dr. Ugone actually derived the implied royalty rates from this subset of ████ it is ***precisely*** why his analysis must be excluded as methodologically unsound: whereas Dr. Ugone contends that—████ ████,[9] Dr. Ugone applies ████ ████ the December 2019 expiration date of the patents-in-suit. This is not a fact dispute for cross-examination—it is a basic methodological error that renders the entirety of Dr. Ugone's royalty analysis misleading and prejudicial.[10]

**D.   The** ████

If introduced, PAN cannot put the genie back into the bottle through vigorous cross-examination; instead, this agreement will skew the damages horizon for the jury, resulting in PAN being unfairly prejudiced.

<u>Technical Comparability</u>. PAN's technical experts ***did not*** opine that the relevant field for

---

[8] Some of ████. *See* Dkt. 203, at 12 (████
[9] Dr. Ugone admitted he did not investigate what the "impacted revenues" include (Dkt. 203, at 12), and there is no evidence that these revenues included service and support revenue. Moreover, ████ ████.
[10] Implicit justifies the use of the ████ ████)." Dkt. 218 at 13. This assumes that the patents-in-suit disclose operation of a "next-generation firewall," as opposed to a stateful or legacy firewall. But Implicit has repeatedly stated that the inventions described in the specification relate to "stateful, flow-based processing," and that "flow-based network processing, *e.g.*, stateful firewalls" are the hallmark of infringement. *See* Ex. 21 at ¶ 36; Ex. 22. Dr. Ugone's conclusion makes no sense given Dr. Almeroth's opinion that the patents-in-suit "had additional technical relevance ████ ████." Ex. 23 ¶ 408.

5

determining technical comparability was "computer networking," as Implicit alleges. Dkt. 218, at 15.[11] PAN's Dr. Schmidt's opinion was instead that ▮▮▮▮ (Ex. 24 ¶ 417), whereas

> Neither the claims nor the specification of the [patents-in-suit] even purport to address issues relating to network security, firewalls, blocking or allowing traffic, establishing or enforcing security policies/rules, or VPN tunneling. The extent of any technical comparability appears to be limited to the ability of both the Demux Patents and ▮ ▮▮▮ to understand and process network traffic in some manner. … [T]hat relationship is insufficient to make ▮ ▮▮ ▮▮ and the [patents-in-suit] technically comparable. … [S]uch a broad categorization would include many tens of thousands of patents.

*Id.* ¶ 419. Implicit even admits that under its broad theory of comparability, nearly 1% of patents ***ever issued in the United States*** would fall within its scope of comparability. Dkt. 218, at 15. This type of superficial comparability is routinely rejected. Dkt. 203 n. 22 (collecting cases).

<u>Economic Comparability.</u> Dr. Ugone explicitly—and repeatedly—referenced the ▮▮▮▮ as "an indicator of value (and benchmark)," thus demonstrating the prejudice to PAN were this agreement permitted into evidence.[12] Dr. Ugone did acknowledge that ▮▮▮ and PAN were competitors, the agreement ▮▮▮▮, and that ▮▮▮▮. But mentioning these key differences does not establish economic comparability, and Dr. Ugone did not address—let alone seem to know—that the agreement granted PAN ▮▮▮▮▮▮. *See* Dkt. 203, at 13, 20. Dr. Ugone's failure to even acknowledge the existence of these significant aspects of the agreement—not just his failure to discuss how PAN accounted for them—renders his economic comparability misleadingly deficient.

---

[11] The evidence cited by Implicit merely says that in defining a POSITA, PAN's experts opined that such a person would have been "familiar with computer networking by way of experience and schooling." Dkt. 218 Ex. P ¶ 50.

[12] *See* Dkt. 203 Ex. 1 ¶¶ 14 ("[T]he ▮▮▮▮ would have provided an indicator of value (and benchmark) ▮▮▮▮, 122 (same) & App. 1 thereto.

| | |
|---|---|
| Dated: September 8, 2018 | ***COUNSEL FOR DEFENDANT PALO ALTO NETWORKS, INC.*** |
| | |
| | */s/ Melissa R. Smith* |
| | Louis Norwood Jameson |
| | Matthew Christopher Gaudet |
| | David C. Dotson |
| | John R Gibson |
| | Alice Snedeker |
| | **DUANE MORRIS LLP** |
| | 1075 Peachtree Street, NE, Suite 2000 |
| | Atlanta, GA 30309-3929 |
| | 404/253-6915 |
| | Fax: 404/253-6901 |
| | Email: wjameson@duanemorris.com |
| | Email: mcgaudet@duanemorris.com |
| | Email: dcdotson@duanemorris.com |
| | Email: jrgibson@duanemorris.com |
| | Email: aesnedeker@duanemorris.com |
| | |
| | Melissa R. Smith |
| | Texas Bar No. 24001351 |
| | melissa@gillamsmithlaw.com |
| | Allen Franklin Gardner |
| | allen@gillamsmithlaw.com |
| | **GILLAM & SMITH, LLP** |
| | 303 South Washington Avenue |
| | Marshall, Texas 75670 |
| | Telephone: (903) 934-8450 |
| | Facsimile: (903) 934-9257 |



## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2018, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

*/s/ Melissa R. Smith*

## APPENDIX A

| Accused NGFW[1] | Firewall Throughput (Gpbs)[2] | Average Selling Price[3] | Price-Per-Gbps-Throughput[4] |
|---|---|---|---|
| PA-200 | 0.1 | ■ | ■ |
| PA-500 | 0.25 | ■ | ■ |
| PA-220 | 0.5 | ■ | ■ |
| PA-220R | 0.5 | ■ | ■ |
| PA-2020 | 0.5 | ■ | ■ |
| PA-820 | 0.94 | ■ | ■ |
| PA-2050 | 1 | ■ | ■ |
| PA-4020 | 1 | ■ | ■ |
| PA-850 | 2 | ■ | ■ |
| PA-3020 | 2 | ■ | ■ |
| PA-3050 | 4 | ■ | ■ |
| PA-3060 | 4 | ■ | ■ |
| PA-3220 | 5 | -- | ■ |
| PA-5020 | 5 | ■ | ■ |
| PA-3250 | 6 | -- | ■ |
| PA-3260 | 9 | -- | ■ |
| PA-4050 | 10 | ■ | ■ |
| PA-4060 | 10 | ■ | ■ |
| PA-5050 | 10 | ■ | ■ |
| PA-5220 | 18 | ■ | ■ |
| PA-5060 | 20 | ■ | ■ |
| PA-5250 | 39 | ■ | ■ |
| PA-5260 | 68 | ■ | ■ |
| PA-5280 | 68 | ■ | ■ |
| PA-7050 | 120 | ■ | ■ |
| PA-7080 | 200 | ■ | ■ |

---

[1] Sorted by increased throughput
[2] Dkt. 203 Ex. 1, at Ugone Ex. 6 (1 gigabit per second (Gbps) equals 1000 megabits per second (Mbps))
[3] Dkt. 203 Ex. 1, at Ugone Ex. 16
[4] Calculated by Average Selling Price / Firewall Throughput = Price-per-Gbps-Throughput