| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE EASTERN DISTRICT OF TEXAS |
| 3 | TYLER DIVISION |

| | | |
|---|---|---|
| 4 | IMPLICIT, LLC | ) ( |
| 5 | | ) (   CIVIL DOCKET NO. |
| 6 | | ) (   6:17-CV-182-JRG |
| 7 | VS. | ) (   MARSHALL, TEXAS |
| 8 | | ) ( |
| 9 | HUAWEI TECHNOLOGIES USA, | ) (   OCTOBER 3, 2018 |
| 10 | INC. | ) (   9:04 A.M. |

11                     PRE-TRIAL HEARING

12      BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP

13                 UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   FOR THE PLAINTIFF: (See Attorney Attendance Sheet docketed
                        in minutes of this hearing.)
17

18   FOR THE DEFENDANT: (See Attorney Attendance Sheet docketed
                        in minutes of this hearing.)
19

20   COURT REPORTER:    Shelly Holmes, CSR, TCRR
                        Official Reporter
21                      United States District Court
                        Eastern District of Texas
22                      Marshall Division
                        100 E. Houston Street
23                      Marshall, Texas  75670
                        (903) 923-7464

24

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)

1                          I N D E X

2

3  October 3, 2018

4                                                    Page

5      Appearances                                    1

6      Hearing                                        3

7      Court Reporter's Certificate                 208

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              COURT SECURITY OFFICER:  All rise.

 2              THE COURT:  Be seated, please.

 3              This is a continuation of pending pre-trial matters

 4    in the Implicit versus Palo Alto Networks case.  This is

 5    Civil Action 6:17-CV-182.

 6              Let me call for announcements.

 7              What says the Plaintiff?

 8              MR. DAVIS:  Good morning, Your Honor.  Bo Davis, Ed

 9    Chin, Ben Singer, Deb Coleman, Christian Hurt --

10              MR. HURT:  Good morning.

11              MR. DAVIS:  -- on behalf of Plaintiff.  We're ready

12    to proceed.

13              THE COURT:  All right.  What's the announcement

14    from Palo Alto?

15              MR. GILLAM:  Good morning, Your Honor.  Gil Gillam

16    on behalf of Palo Alto Networks.  Going around the table

17    here, we have Woody Jameson, Matt Gaudet, Alice Snedeker,

18    David Dotson, and John Gibson.  Also with us today for the

19    client is George Simeon seated back here.  We're ready to

20    proceed, Your Honor.

21              THE COURT:  All right.  Thank you.

22              All right.  It looks like to me the next item of a

23    pending pre-trial dispute we need to take up is the motion

24    to strike Dr. Ugone's reliance on late-produced documents

25    and undisclosed theories.  This is Docket No. 172.
```

1          Let me just say this.  I know there's been an email

2    come in overnight, and I know there has been some narrowing.

3    I don't see that any particular motion or item has been

4    completely disposed of.  If and when we take up a matter

5    where there has been some narrowing, I'll just rely on

6    counsel to call that to the Court's attention at the

7    beginning, and then we'll proceed through the remainder of

8    the still pending and live argument.

9          But let's proceed with the motion to strike

10   Dr. Ugone, and I'll hear from the moving Defendant on this.

11         MR. GIBSON:  Thank you, Your Honor.  John Gibson on

12   behalf of Palo Alto Networks.

13         May I approach, Your Honor?

14         THE COURT:  You may.

15         MR. GIBSON:  Your Honor, on behalf of Palo Alto

16   Networks, there were basically four issues that were to be

17   addressed by this motion.

18         Last evening, per the email to your office, this

19   morning, the parties have reached an agreement to withdraw

20   two portions of the motion.  Those relate to the use of

21   impacted revenues and the inclusion of convoyed sales in the

22   royalty base.  Those issues are being withdrawn from this

23   motion without prejudice to raising the arguments on similar

24   issues with respect to the motion -- the Daubert motion of

25   Dr. Ugone.

1          THE COURT:  And my reading of the email is that

2    those areas of agreement are limited to the specific motions

3    to which they're attached, and they don't otherwise impact

4    other pending motions.

5          MR. GIBSON:  That is correct, Your Honor.

6          THE COURT:  All right.  Well, let's talk about

7    what's left here, Mr. Gibson.

8          MR. GIBSON:  Yes, Your Honor.  So the first issue

9    relates to Implicit's and Dr. Ugone's reliance upon

10   documents related to Implicit's financial condition in 2015

11   to explain away the 2015 Google license and other portfolio

12   license and sale offers around that time period.

13          This relates to both the Be Labs, CBC promissory

14   and security notes and also Implicit's adverse financial --

15   quote, unquote, adverse financial condition in 2015.  So

16   we'll take that issue up first.

17          THE COURT:  Am I correct, these were produced still

18   within the discovery period, or is it your position they

19   were not produced until after discovery closed?

20          MR. GIBSON:  No -- no, Your Honor.  The Be Labs/CBC

21   promissory notes were produced on the evening of June 25th,

22   2018, per a timeline, which I'm happy to present, as well,

23   which if I may approach?

24          THE COURT:  You may.

25          MR. GIBSON:  So, Your Honor, per this timeline,

1    what you'll see is that between 2007 and 2012, Implicit

2    Networks executed 18 license agreements.

3           In February of 2014, Be Labs, which is an unrelated

4    company, frankly, that we were unaware of until these

5    documents were produced, executed a promissory note with a

6    company called CBC.  That promissory note was for

7    $1.5 million.

8           As a condition of that promissory note, Be Labs

9    caused various companies that were controlled by

10   Mr. Balassanian to issue security agreements.

11          Those companies included Strings, which we were not

12   aware of before; Implicit, LLC, the Plaintiff here; Implicit

13   Networks, which is the prior owner of the patents-in-suit;

14   Vital Juice Company, a company we were unaware of prior to

15   this; and Pom Pom, Inc., another company we were unaware of

16   prior to this.

17          In April 2014, that's the hypothetical negotiation,

18   Your Honor, when Implicit said that we would have paid

19   $94 million in a lump-sum royalty.

20          In December of 2014, Be Labs increased the

21   promissory note to $1.7 million.

22          In February of 2015, they extended the maturity

23   date of that loan to March 2015.  There was another

24   extension in March of 2015, another extension in April of

25   2015.

1          In June of 2015, we've got Implicit executing the

2     portfolio license with Google and making several

3     portfolio-wide licenses to companies for that same

4     $500,000.00 amount.

5          In December of 2015, Be Labs executed a waiver of

6     default and extended the maturity date of the loan to

7     January of 2016.  That loan was then extended again in

8     January -- I'm sorry, in February of 2016 to January of

9     2017.

10          Then we've got Implicit's licenses -- the Plaintiff

11     here licenses with NEC and Nokia.

12          In January of 2017, Be Labs again extended the

13     maturity date of the loan to September 30th, 2017.

14          Following that year in 2017, Implicit, the

15     Plaintiff here, settled with Ericsson and settled with

16     Huawei.

17          Late in December of 2017, Implicit settled with

18     TrendMicro.  The pre-trial order in that case, Your Honor,

19     is on public docket.  The Google license is on that exhibit

20     list for both parties.  There is nothing about the Be Labs

21     or CBC documents on that pre-trial exhibit list.

22          So during the course of discovery and when we

23     deposed Mr. Balassanian on June 6th, we had no idea and no

24     understanding of the existence of these Be Labs or CBC

25     documents or the security interest that Implicit had granted

1  to CBC with respect to the patents-in-suit.

2          So we asked Mr. Balassanian various questions.

3          If you can switch back.  Thank you.

4          Before I get to that, one point, I think, is -- is

5  really important here.  These documents were produced on

6  June 25th, 2018.  As Your Honor noted, that is within the

7  discovery period.  The discovery period closed on July 2nd.

8  I will note, however, that for purposes of this case, the

9  fact discovery period had been extended several times.

10         When we deposed Mr. Balassanian on June 5th and

11 June 6th, 2018, the operative docket control order had

12 discovery closing on June 25th.  We deposed Mr. Balassanian

13 June 5th and 6th, and then two weeks later the parties

14 entered the fourth amended docket control order which moved

15 the discovery period to close on July 2nd.

16         On June 25th, the evening before Mr. O'Malley's

17 deposition, which was the -- his counsel for Implicit, the

18 Resolution Strategies counsel, that evening Implicit

19 produced these documents.  Implicit produced them.  They

20 were not produced on behalf of Resolution Strategies, so we

21 had no reason to ask Mr. O'Malley questions about these

22 documents.  Then finally discovery closed on July 2nd.

23         So to Your Honor's question, these documents were

24 produced within the fact discovery period, but they were

25 produced three weeks after Mr. Balassanian's deposition and

1   basically without any notice as to their relevance.

2       THE COURT:  So why when you got them at that point

3   in time did you not come to the Court and say discovery

4   closes in three weeks, these weren't produced when we

5   deposed these people earlier, we'd like some relief, we'd

6   like either another extension, or we'd like authority to go

7   back and re-depose, or we'd like to do something?  But

8   rather than come to the Court promptly after the production

9   within the discovery deadline, that didn't happen, and now

10  we hear -- now we're here on the eve of trial, and you're

11  requesting that they be struck altogether and that the

12  expert's report relying on them be struck altogether.

13      Why should -- why should I reward somebody who

14  waits until the 11th hour and doesn't come to the Court

15  promptly upon receipt of the documents, notwithstanding the

16  fact that you may have had a good argument then?  It's a

17  whole lot easier to fix things early than it is to fix

18  things late.  So tell me -- tell me why I should reward the

19  approach that you've for whatever reason undertaken in this

20  regard.

21      MR. GIBSON:  Certainly, Your Honor.  There was no

22  intention to -- to lie in wait or to -- to wait

23  unnecessarily.

24      We actually had no idea that these documents were

25  frankly relevant to anything in this case.  We had served a

1    damages interrogatory response or damages interrogatory

2    contention back in January of 2018.  Plaintiff responded in

3    February of 2018.  And that is attached as Exhibit 1 to

4    Docket 172.

5        And --

6        THE COURT:  Well, you knew when you got them that

7    you hadn't had them when you deposed the people they relate

8    to.

9        MR. GIBSON:  That is correct, Your Honor.  But

10   there was no indication in the damages interrogatory

11   response that Mr. Balassanian's other companies or -- were

12   relevant to any issue in dispute.  And so there was no issue

13   for us to address, so to speak.

14       It wasn't, in fact, until we got Dr. Ugone's expert

15   report that we learned that Implicit was taking a position

16   that due to its financial condition and the financial

17   condition of both Mr. Balassanian individually and all his

18   other companies that there was a -- a live dispute, so to

19   speak.

20       THE COURT:  Tell me why this issue can't fairly be

21   dealt with through vigorous cross-examination, as opposed to

22   an absolute striking of the complained about documents, as

23   well as the expert's reliance on them.

24       MR. GIBSON:  Your Honor, unfortunately, we don't

25   have the information to -- to effectively cross-examine

1  Mr. Balassanian.

2       So Plaintiff did not produce any information

3  regarding its personal finances -- I'm sorry, the finances

4  of Implicit during any period, but especially during this

5  2013 to 2015 time period.  Mr. Balassanian has not produced

6  any information regarding his own finances, and obviously

7  there's not been a production of information regarding the

8  financial --

9       THE COURT:  Slow down just a little bit,

10  Mr. Gibson, please.

11       MR. GIBSON:  Sorry, sir -- Your Honor.

12       And certainly there have not been any production of

13  documents related to Mr. Balassanian's other companies, such

14  as Strings, Implicit Networks, Vital Juice, Pom Pom.

15       We are unable to effectively cross-examine

16  Mr. Balassanian regarding his financial condition during

17  this time period because we had no basis upon which we would

18  be able to argue anything contrary to what he says on the

19  stand.  So without these documents, we are really -- without

20  further discovery deposition of Mr. Balassanian, these

21  underlying documents, we really are stuck.

22       THE COURT:  Well, I think it's worth noting you

23  didn't ask for leave to take a late deposition.  You asked

24  to strike the expert's report and to strike the documents.

25  That's all you asked the Court to do.  That's all that's in

1   the motion before the Court, correct?

2          MR. GIBSON:  Yes, Your Honor.

3          THE COURT:  All right.  Let me hear a response from

4   Plaintiff.

5          And I'm going to remind everybody, given the number

6   of counsel present who are going to participate, let's make

7   sure everybody introduces themselves when they go to the

8   podium to begin with, just to keep the record straight, as

9   we did earlier.

10          Go ahead, Mr. Hurt.

11          MR. HURT:  Yes, Your Honor.  Christian Hurt for

12   the -- for the Plaintiff.

13          There's a few things I'd like to hand up if -- if I

14   may approach?

15          THE COURT:  You may approach.

16          MR. HURT:  I'd like to start where the Court left

17   off, which was what was the relief requested.

18          THE COURT:  All right.

19          MR. HURT:  The first time -- not only did Palo Alto

20   Networks not seek leave for a late deposition or ask for

21   these documents in a motion to compel, they never approached

22   Implicit about additional deposition time with any witness

23   in this case or for additional documents relating to any of

24   the financial condition issues that are complained about

25   now.

1          And as the Court noted, this document was

2    disclosed, the CBC documents, during the fact discovery

3    period in June 25th, a week before fact discovery closed.

4    But more than that, and let me start the PowerPoint -- more

5    than that, Your Honor, Palo Alto Networks knew of -- knew of

6    the loan agreement with CBC and Implicit by 2017 in this

7    case.

8          Mr. Balassanian was deposed in the Trend case and

9    was asked about the CBC agreement that he has with Implicit

10   in 2016.  And that deposition transcript was produced to PAN

11   in 2017 of this year.  And the CBC agreement with Implicit

12   was actually recorded at the Patent Office and is publicly

13   available for PAN to have downloaded.  And all of the CBC

14   documents, in addition to that, were produced during the

15   fact discovery period.

16         And so the first time -- and this is the testimony

17   from the prior Trend case on the screen.  And the first time

18   PAN raised an issue about this with us was in this motion to

19   strike Dr. Ugone's report.  We were never asked to put up

20   Mr. Balassanian for another deposition.  We were never asked

21   to produce additional documents.  There was no indication

22   that this would be an issue, and so this is the testimony,

23   Your Honor, from the Trend case that PAN has had since 2017

24   that describes that there is a security interest in the

25   patents in this case through CBC Partners and that it was a

 1  collateralized loan obligation.

 2         So Palo Alto Networks had this -- this document

 3  about -- over a year ago.

 4         And then the additional CBC-related documents were

 5  produced during the fact discovery period, but there was at

 6  least this testimony.  And as I mentioned earlier, this

 7  particular document is publicly available.

 8         In addition to that, Palo Alto Networks was able to

 9  question and did question Mr. Balassanian about his

10  financial condition and various lawsuits, and -- and the

11  cost of going forward and what his financial situation was

12  at the time on June 6th.

13         Now, if PAN believed additional deposition

14  testimony was needed, it could have -- on June 25th, it

15  could have raised that issue with Implicit but never did.

16         And importantly, on June 26th, and this is in

17  the -- the PowerPoint, Palo Alto Networks deposed

18  Mr. O'Malley of Resolution Strategies, and this specific

19  loan agreement came up and Mr. O'Malley testified that

20  Mr. Balassanian was in dire straits.  That was the reason

21  for these offers.  He was in a terrible financial condition.

22  He was worried about his assets being foreclosed.  That was

23  on June 26th.

24         And at that time, surely Palo Alto Networks could

25  have approached us if they really believed that there was an

1   issue about a notice with the CBC documents and

2   Mr. Balassanian's financial condition.  They never did.

3        And so for that reason we would respectfully

4   request that this part of the motion be denied, and, in

5   particular, in addition to that, the $500,000.00 offer that

6   was made to Palo Alto Networks, this is the information to

7   help explain the context of the -- of Mr. Balassanian's

8   condition at the time of that offer.

9        And so if this information is out, Palo Alto

10  Networks will be able to argue, since that offer is in, that

11  there was a $500,000.00 offer made to Palo Alto Networks,

12  and we effectively are going to be unable to respond to that

13  because the relief requested in this motion is not just

14  Dr. Ugone's report gets struck but that Mr. Balassanian

15  cannot talk about any of this stuff at trial.

16       And we believe that that's a pretty draconian

17  sanction, given that this was produced during discovery,

18  given that Palo Alto Networks had an opportunity to seek

19  further discovery on this, and decided not to.  There was

20  actually -- even if you take the relevant date that is

21  Dr. Ugone's report that issued in July, they still had over

22  a month before Mr. Bakewell's report was even served in this

23  case and could have asked us then, hey, Dr. Ugone relies on

24  a whole bunch of stuff.  We didn't think that was relevant.

25  Can we take another deposition of Mr. Balassanian?  Can you

1  give us all of these documents?  They never did that.

2       Instead, on the dispositive motion deadline, they

3  decided to move to strike this material and try and

4  hamstring a major point in our response to the $500,000.00

5  offer.

6       THE COURT:  All right, Mr. Hurt.  Thank you.

7       MR. HURT:  Thank you.

8       THE COURT:  Mr. Gibson, I'll give you about 30

9  seconds, but I don't need much follow-up.  I think I've

10  heard plenty of argument on this, and we do have a lot of

11  ground to cover today, but go ahead.

12       MR. GIBSON:  Thank you, Your Honor.  I would just

13  note that we obviously did not think about how Plaintiff

14  intended to use these documents until we got Dr. Ugone's

15  expert report which there was maybe a day or two before our

16  dispositive motion deadline was there, so that's why we --

17  we proceeded as we did.

18       But to the extent that these documents are allowed

19  in, we would very much seek to have a -- a short follow-on

20  deposition of Mr. Balassanian so that we may properly

21  question him regarding his financial condition, the

22  financial condition of Implicit, and his related companies,

23  and would seek the documents that Plaintiff says are

24  relevant.

25       In fact, I note that to the extent that Plaintiff

1   thought these documents were relevant in June of 2016, they

2   should have been produced early on within the discovery

3   period.  There is -- these documents have always been within

4   Implicit and Mr. Balassanian's possession, custody, and

5   control.  Their -- their argument that these facts developed

6   during the course of discovery, I think, is -- is false

7   because this timeline of events occurred from 2014 all the

8   way to 2017.

9          In fact, we don't even know if Be Labs has actually

10  paid back this promissory note to this day because they've

11  not produced documents to that effect.

12         But I understand Your Honor's concern.  But to make

13  sure that we are able to effectively cross-examine

14  Mr. Balassanian and given the short time period before

15  the -- before the trial, we would seek a short two-hour

16  deposition of Mr. Balassanian to go over these issues with

17  him so that they may be fully fleshed out for the jury.

18         THE COURT:  So, in other words, Mr. Gibson, instead

19  of coming to the Court early and seeking a two-hour

20  deposition that could have fixed this and not created

21  problems, you waited.  You swung for the fence, so to speak,

22  and asked for the entirety of if to be struck, and then now

23  you're telling me, oh, and if we don't get that, we'd like a

24  two-hour deposition.

25         Do you understand how much better it would have

1  been had you come to the Court when these were produced and

2  asked for a short deposition then as opposed to not doing

3  anything until pre-trial, filing a motion to strike, and

4  then as kind of a Plan B, if we don't get our motion to

5  strike granted, then and only then asking for a two hour

6  deposition?  Do you understand how that comes across to the

7  Court as -- I won't -- I won't call it gamesmanship, but I

8  will say it's very inefficient.  And it -- and it creates

9  problems because of the inefficiency.  That's at a minimum.

10 You understand?

11       MR. GIBSON:  Yes, Your Honor.

12       THE COURT:  Let me say this.  The motion to strike

13 is denied.  There's not a motion before me as to leave to

14 take a short deposition.

15       I'll direct that you and opposing counsel talk

16 about that today.  Things are often better solved when the

17 parties talk to each other and try to work things out.  If

18 you can't before you leave here today, I'll let you discuss

19 that possibility with me further.

20       But the motion before the Court is denied.

21       MR. GIBSON:  Thank you.

22       THE COURT:  The documents were produced within the

23 timeline -- within the discovery deadline.  The Defendant

24 did not seek any relief.  There are other documents related

25 to Mr. Balassanian's financial information and position and

1   posture that you did have.  The Court's persuaded that the

2   Defendant has acted, if not intentionally, dilatory, at

3   least, in a very inefficient and problematic way.  And at

4   the end of the day, I'm persuaded that vigorous

5   cross-examination prevents the Defendant from being unduly

6   prejudiced here.  So for those reasons, your motion is

7   denied.

8           MR. GIBSON:  Thank you, Your Honor.

9           THE COURT:  Okay.

10          MR. GIBSON:  May I -- sorry.

11          THE COURT:  You have something else?

12          MR. GIBSON:  Just with respect to the second

13  portion of the -- the motion to strike Dr. Ugone with

14  respect to the indirect infringement theories that Dr. Ugone

15  relied upon.

16          THE COURT:  That's denied, as well.

17          MR. GIBSON:  Yes, sir.  Thank you.

18          THE COURT:  Let's go to the motion to exclude

19  damages-related testimony of Dr. Ugone and Dr. Almeroth.

20  This is Document 203.

21          And I'll hear from the moving Defendant on this.

22          Whenever you're ready, counsel.

23          MR. JAMESON:  Good morning.  Woody Jameson for Palo

24  Alto Networks.  May I approach?

25          THE COURT:  You may.

1          MR. JAMESON:  Your Honor, this is PAN's Daubert

2    motion with respect to portions of Dr. Almeroth's

3    apportionment analysis and then Dr. Ugone's expert report.

4          And where I would like to begin, Your Honor, is

5    some context for this motion.

6          What Dr. Ugone would like to do is take the stand

7    and tell the jury that in 2014, PAN would have paid Implicit

8    $94 million for a non-exclusive license to two patents, and

9    that's it.

10          And our client would have gone to that hypothetical

11    negotiation with knowledge that in 2011, Citrix had paid

12    $1.35 million for a portfolio-wide license to three

13    families, 17 patents, on a worldwide basis.

14          That our competitor Cisco in 2011 paid $2.95

15    million for a portfolio-wide license to three families of

16    patents on a worldwide basis.

17          And then under the book of wisdom, our client would

18    have known that Google, F5, NEC, Ericsson, and other

19    companies had paid somewhere between zero dollars and $1.2

20    million for portfolio-wide licenses on a worldwide basis.

21          And, Your Honor, I recognize -- this first slide,

22    this is potential cross-examination at trial.  But I put

23    this up there because you got to ask yourself:  How is it

24    possible that our client would be willing to pay $94 million

25    in this setting?  How do you get there?  And it's how you

1  get there that is through a number of methodological

2  machinations and extrapolations that simply do not withstand

3  scrutiny under Daubert.

4          And I want to overview for you Implicit's damages

5  model.  And we got problems with each -- where each step in

6  the process.

7          The first is what Implicit is including in the

8  royalty base.  They begin with a $7.8 billion royalty base

9  that is every bit of revenue that our client has ever made

10  from the sale of the accused products, plus projected sales

11  from the time of trial through the expiration of the patents

12  in 2019.

13          They've included $2 billion for 100 percent of the

14  sales of unaccused support revenue, and they've also

15  included -- included in the royalty base $2.9 billion of

16  unaccused subscription software services that are basically

17  downloadable additional software that customers of ours can

18  buy.

19          The time period.  You've got actual sales through

20  June of 2018, and then you've got projected sales through

21  December of 2019.

22          They take this $7.8 billion royalty base, and they

23  do an apportionment factor.  And this is where Dr. Almeroth

24  comes in.  He does a technical apportionment, and he

25  basically says that the value that I'm going to attribute to

1    all three buckets is 67 percent to 75 percent of accused

2    revenue.  And he applies that apportionment factor equally

3    to both accused revenues, to unaccused support services,

4    unaccused subscription revenues.  Same apportionment for all

5    three buckets.

6            He then applies a royalty rate of 2.5 percent that

7    comes from some of the agreements that I've just referenced

8    to come up with total damages of $94 million.

9            Your Honor, there are some fundamental flaws with

10   the royalty base.  And it goes to the support and

11   subscription revenues that they are attempting to include in

12   the royalty base.

13           And I think the law is pretty clear that

14   non-accused products do not belong in the royalty base.  If

15   you're going to look at -- if you're going to look at the --

16   the value of non-accused products in the context of a

17   reasonable royalty analysis, where you typically would see

18   that would be in Georgia -- Georgia-Pacific Factor 6 when

19   you're looking at convoyed sales, how does that potentially

20   influence the royalty rate?  But not in the royalty base.

21           And that's what the cases that we cite in our brief

22   stand for.  And even in their sur-reply brief, Implicit

23   admits that, quote, cases such as Micro Chem stand for the

24   generic proposition that non-patented items should not be

25   included in the royalty base -- non-patented items should

1    not be included in the royalty base.

2         Here's where things go haywire with respect to the

3    royalty base.  There is a disconnect between Dr. Ugone on

4    the one hand and Dr. Almeroth on the other as to what is

5    accused and what is not accused.  Dr. Ugone, with respect to

6    the support services, states:  I further understand from

7    Dr. Almeroth that the use of support services cause the NGFW

8    to operate in a manner that infringes the claims of the

9    patents-in-suit.

10         THE COURT:  Let me stop you and ask for a point of

11   clarification.  With regard to your reference to non-accused

12   products in the base, are you talking about convoyed sales

13   there or are you not?

14         MR. JAMESON:  I am talking about convoyed sales.

15         THE COURT:  Wasn't the issue of convoyed sales

16   withdrawn as a part of the agreement overnight?

17         MR. JAMESON:  No, that was -- that was -- that was

18   the exact reservation of rights that we wanted to deal with

19   this in this Daubert motion.

20         THE COURT:  All right.

21         MR. JAMESON:  With respect to subscription

22   services, Dr. Ugone makes the same statement, that he

23   understands that the use of the subscription systems causes

24   the -- the NGF [sic] products to operate in a manner that

25   infringes the claims of the patents-in-suit.

1          And then he cites to Dr. Almeroth's report, Pages

2    59 through 62 in Paragraph 354, and you go and you look at

3    those portions of his report, and Dr. Almeroth never gave

4    such an opinion.

5          We're going to get his fall-back theory on convoyed

6    sales in a minute, but when you go to the portions of

7    Dr. Almeroth's report where he discusses support services

8    and subscription services, it's in a section titled in his

9    report:  Accounting For Functionality Not Implicated By the

10   Implicit Patents.  That's the section of his report.  This

11   functionality is not implicated by the patents.

12         But here's what he says at Paragraph 354:

13   Furthermore, I note threat prevention, URL Filtering,

14   WildFire, and GlobalProtect -- and, Your Honor, that's the

15   subscription services, those four pieces of software.  And

16   support -- support is the -- the other 2 billion in revenue.

17   He states:  Each rely on, depend on, and/or improve on the

18   functionality and/or usage rate of the patented 7 -- the

19   patented layer-7 inspection architecture of the NGFWs,

20   specifically the App-ID engine and the CD -- the CTD engine.

21         Okay.  That's what he -- that's the sum and

22   substance of what he says about this stuff.  Nowhere in

23   Dr. Almeroth's report does he do an infringement analysis of

24   support and subscription services.  That simply does not

25   exist.

1            And so Dr. Ugone's including this stuff in the base

2    because he says:  I understand it to be accused of

3    infringement.  But Dr. Almeroth doesn't say that.

4            So then we get to -- and, Your Honor, I want to --

5    I want to go to the ELMO if I can, please -- because I want

6    to point out -- because this is a very -- this is a very

7    important point.  I want to point out what Implicit says

8    about this in briefing, and this is in their response brief

9    at Page 5 -- on Page 5.

10           They make the argument:  PAN seeks to exclude

11   Dr. Ugone's opinion solely on the basis that support and

12   subscriptions are supposedly unaccused.

13           They then go on to say:  Whether those services

14   infringe is ultimately a factual issue for a jury, but it's

15   not a Rule 702 issue.

16           And, Your Honor, I respectfully disagree with that.

17   I mean, either support and subscription services are accused

18   or they're not.  It's not for the jury to determine whether

19   or not something is accused.  They have to put us on notice

20   of that.  That should have been in their infringement

21   contentions.  It should be in Dr. Almeroth's report.  I am

22   accusing support services of infringing this patent.  I am

23   accusing subscription services of infringing this patent.

24   He has not done that.

25           And then we go to their sur-reply, and, Your Honor,

1    I just want to call this out for your attention.  It's in

2    the section under -- it's at A, Support and Services, Page

3    1, and then it continues on to Page 2, but I've read this

4    section of their brief over and over again, and I --

5    honestly, I have no idea what they're saying.  They're

6    talking in circles is what I think they're doing.

7           But they -- they begin by saying:  Instead, cases

8    such as Micro Chem stand for the generic proposition that

9    non-patented items should be included -- should not be

10   included in a royalty base, which we agree with.  If you're

11   not accusing something of infringement, it shouldn't be in

12   the royalty base.

13          Here, neither Dr. Almeroth nor Dr. Ugone opined

14   that non-patented items should be included in the royalty

15   base.  Well, they actually are.  I mean, that's not what

16   Dr. Almeroth says.

17          So they appear to be taking the position here that

18   subscription services and support services infringe the

19   patent.  And -- and just let me fast forward to something --

20   fast forward to something, Your Honor, I'll get to in a

21   minute.  Support services, that's -- that's technical

22   support.  It's -- it's calling somebody on the phone going I

23   need help with the product that I just bought from you.

24   It's -- it's -- it's having access to a website.  It's --

25   it's if something goes wrong, how do I get it fixed?  That

1   can't infringe this patent.

2          That may be a convoyed sales, but that can't

3   infringe this patent.  And that's why Dr. Almeroth never

4   offers the opinion that it infringes this patent.

5          And certainly URL filtering and malware, software

6   downloads, they don't -- that doesn't infringe this patent.

7   They've never made that allegation.  But here they appear to

8   be saying that it does.

9          And then if you go on, they continue to -- to kind

10  of go back and forth on this issue.  But I -- I raise that

11  because when I've read their briefing, I'm actually confused

12  as to what they're trying to say.

13         Can we go back to the PowerPoint, please?

14         Now, importantly, Dr. Ugone actually offers a

15  fall-back position.  This is in his report.  This is under

16  his Georgia-Pacific Factor 6 analysis.  And he says here in

17  this last bullet:  In addition, in the event that the

18  trier-of-fact were to demonstrate that PAN's subscription

19  and/or support revenues associated with NGFW hardware

20  devices -- sales do not infringe the patents-in-suit.

21         So if the trier-of-fact determines that they do not

22  infringe the patent-in-suit, such revenues would represent

23  significant convoyed sales, further maintaining upward

24  pressure on the to-be-negotiated royalty payment.

25         Okay.  So he appears to be saying if the

1    trier-of-fact determines that these products don't infringe,

2    I guess he's going to take those out of the royalty base,

3    and he's now going to do a GP qualitative analysis for

4    convoyed sales, and that somehow or another is going to

5    result in upward pressure on the amount that we would have

6    agreed to have paid.

7           Okay.  Your Honor, we don't have a problem with

8    Dr. Ugone trying to make an argument that subscription

9    services and support may have some qualitative impact on the

10   royalty rate under GP Factor 6.  But right now it appears

11   that they're trying to have it both ways.  And if you

12   haven't accused something of infringement, then how -- how

13   does it go into the base?  And we're talking about $4.9

14   billion.

15          THE COURT:  Didn't the Plaintiff's interrogatory

16   responses identify these convoyed sales as a part of their

17   basis for damages?

18          MR. JAMESON:  And, Your Honor, that's a great

19   question.

20          THE COURT:  I mean, you're telling me this was a

21   surprise and they didn't disclose it and they didn't accuse

22   it.

23          MR. JAMESON:  That's your -- that's my next slide.

24   Perfect timing.

25          This is their interrogatory response.  The evidence

1  supporting the royalty rate minimums for each patent family

2  includes, importantly, the evidence supporting the royalty

3  rate, not the evidence supporting the royalty base.

4  Substantial convoyed sales and derivative sales -- and they

5  proceed to go through and discuss support and subscription

6  services.

7          THE COURT:  Could you have made that slide any

8  smaller?

9          MR. JAMESON:  I'm sorry, Your Honor.  Who did that?

10 John?

11         THE COURT:  Go ahead.

12         MR. JAMESON:  In their opposition briefs, they cite

13 cases saying that there are certain circumstances where

14 convoyed sales might be included in a royalty base.

15         Magistrate Judge Love, he discusses those

16 circumstances, and he makes clear that if you're going to

17 try to go down that road, real prejudice could result from

18 this appearing to be an entire market value analysis and

19 that there is a likelihood of prejudicial impact that a

20 large royalty base may have on the jury.

21         And, Your Honor, I would submit that that's what we

22 have here.  They're trying to get $7.8 billion into a

23 royalty base, 4.9 billion of which is not accused.  And so

24 in this decision, Judge Love says:  If you're going to try

25 to go down that road, you need to provide a clear

1    explanation of how convoyed sales are tied to the accused

2    products.  That hasn't happened.  The way that they are --

3    they're not tied to the accused products.

4         Right now, Dr. Ugone is taking the position that

5    they are accused products, okay?  So he hasn't done that

6    function analysis.  And then he next says -- Judge Love next

7    says that the value within the royalty base attributable --

8    it needs to be a clear explanation as to the value within

9    the royalty base attributable to accused products versus the

10   convoyed sales.  And that's actually going to get to the

11   apportionment issue, okay?

12        And so what we have is Dr. Ugone, he treats these

13   two services as accused.  He's made no effort to explain if

14   they're unaccused, why they belong in the base.  He makes

15   clear that if they don't infringe, perhaps they're relevant

16   to the royalty rate under GP Factor 6.

17        And then with respect to attributable -- the value

18   attributable to the accused products versus convoyed sales,

19   he has done nothing with respect to an apportionment

20   analysis that would show how subscription and support

21   services should be entreated -- should be treated.

22        Instead, what he has done is he has said:  The same

23   apportionment analysis should apply for both accused

24   products and non-accused products.

25        And I'm going to get to that in a minute when we

1   look at the apportionment issue.

2          So bottom line is, I don't think the case law

3   supports what they're doing.  I think that there's a

4   disconnect between Dr. Ugone and Dr. Almeroth, and -- and

5   subscription and support services do not belong in this

6   royalty base.

7          THE COURT:  If there is such a disconnect between

8   the experts, why isn't that an appropriate thing to raise on

9   cross-examination?

10         MR. JAMESON:  Your Honor, this is such a

11  prejudicial methodological flaw, that the idea -- the idea

12  that they're going to be able to hand wave -- and that's

13  what they're doing here.  I mean, if you read their brief,

14  this is hand waving.  They're trying to get a $94 million --

15  they're trying to get a $94 million number in front of the

16  jury that -- that -- I mean, honestly, Your Honor, it comes

17  out of thin air.

18         And -- and the idea that you -- the idea that they

19  should be allowed to add $4.9 billion into a royalty base

20  when it's not being accused and they've not done the

21  homework, the legwork, the -- the economic analysis, the

22  rigor that the Federal Circuit requires to do that,

23  that's -- that's -- that is so prejudicial to us that --

24  that -- I mean, in my personal opinion, that is -- that's

25  what Daubert is for.  That's what the gate -- the gatekeeper

1  role is for.  And that's just not a cross-examination issue.

2       THE COURT:  Well, it's a high burden to ask the

3  Court to take away a party's evidence and take it away from

4  the jury.  The 7th Amendment means what I read it to mean,

5  that should not be the first option.  That should be the

6  last option when there really is no other way to cure it.

7       And so my question is -- and I guess you've

8  answered it -- in your view, there's no other way to cure

9  this.  But if it is so much thin air and if it is so much

10 hand waving, do you not have any confidence that a jury with

11 an able advocate is can be shown that it's so much thin air

12 and hand waving, and isn't that a reasonable remedy or

13 relief to the problem you're concerned about?  You're

14 telling me that this is -- this is -- there's no substance

15 here, but you can't show the jury there's no substance here.

16      MR. JAMESON:  Well, you're -- you're challenging me

17 as to whether or not I'm a good enough advocate to -- to

18 expose --

19      THE COURT:  I'm not assuming -- I'm not assuming

20 this is going to be your witness.

21      MR. JAMESON:  Okay.  Well, it -- it -- it may or it

22 may not be my witness, and I actually do have a little bit

23 of confidence in myself, but -- but the flip side is there

24 becomes a point where it's too much, and -- and -- and I

25 think the Federal Circuit would be looking at this, and they

1    would be going as a legal matter, you're not allowed to put

2    something in a royalty base that's not being accused of

3    infringement without having done an incredibly detailed

4    analysis to support how that can go into the royalty base,

5    and they haven't done it here.

6         And -- and the fact that there is a fall-back

7    position, which is Dr. Ugone can look at this through his

8    royalty rate.  It's not like they don't have a remedy, Your

9    Honor, because they do.

10        He can -- he can talk about how it may influence

11   his royalty rate.  It just doesn't belong in the base.

12        Absent questions, I'll move on to apportionment.

13        THE COURT:  Why don't you move on to apportionment?

14        MR. JAMESON:  Your Honor, big picture, because when

15   you read our briefs, there's all kinds of -- of what are

16   they accusing versus what they're not accusing, so I just

17   wanted to use this demonstrative to kind of focus the

18   analysis.

19        With respect to NGFW's hardware, the only thing

20   that fits within the scope of the claims is this yellow box

21   here, data plane.  And that comes from the elements, a

22   processor and a memory storing instructions.

23        Implicit has admitted that processors and a

24   memory -- memory storing instructions are conventional

25   elements under the law.  No value with respect to the --

1   the -- the patented contribution to the technology that

2   we're trying to -- that we're trying to figure out what it's

3   worth.

4          Implicit has acknowledged that everything in the

5   control plane box got nothing to do with the claims.  And

6   then these blue boxes here, these are additional hardware

7   features that you will find in NGFW's -- depending on which

8   products in the marketplace, has nothing to do with the

9   patent claims.

10         So with respect to the hardware, there's no value

11  proposition when it comes to damages.  The value proposition

12  with respect to these patents is when we get to PAN-OS.

13  What's the value in PAN-OS?  And in this far left box under

14  the User-ID and control column, this is all the software

15  technology that we offered to consumers.  None of that is

16  being accused of infringement.

17         We then get to the networking box -- again,

18  additional technology that we're offering to customers not

19  being accused of infringement.

20         And then we have the software applications, malware

21  and virtual systems, re -- redundant availability of our

22  systems, not being accused of infringement.

23         We finally get to App-ID, which you heard about

24  last week.  We get to App-ID and whatever App-ID is.  We

25  thought it meant one thing, but apparently it now, arguably,

1    could mean something else.

2          But within App-ID, Dr. Almeroth, in his expert

3    report, Paragraph 189, he identified seven software routines

4    that infringe the claims.  They have now withdrawn two of

5    those, the two egress routines, egress tunnelling and egress

6    encapsulation.  They're now out of the case.

7          So we're now down to something about five software

8    routines that infringe this patent.  And what is it about

9    these routines?  It's this red box.  It is dynamic packet

10   routing between five software routines.  It's the dynamic

11   routing of packets between these routines that arguably

12   infringes these patents.

13         And to be crystal clear, it's not the routines

14   themselves.  They did not invent TCP reassembly -- a TC --

15   part of a TCP -- you got the TCP protocol, and then we've

16   got this thing called TCP reassembly.  They didn't invent

17   that.  That's one of the routines that they're accusing of

18   infringement.

19         They certainly didn't invent decryption and then --

20   and re-encryption of SSL traffic.  Okay?  That's the

21   software routine, but they didn't invent that.

22         Again, it's the dynamic packet routing between the

23   routines that's the scope of this invention.  And so if

24   you're going to accuse an NGFW, a next generation firewall,

25   the entire appliance as the smallest salable patent

1   practicing unit, we have a substantial apportionment issue

2   that needs to be undertaken.

3          Dr. Almeroth is the one that purportedly did this

4   apportionment analysis.  And bottom line, as he says, that

5   67 to 75 percent of value of every dollar earned from the

6   NGFW support services and subscription services, that same

7   apportionment factor should apply to every single one of

8   these buckets, okay?  So he does not do a separate

9   apportionment analysis for support services or subscription

10  services.  He says:  It's one-stop shopping.  Same analysis

11  applies to all three.

12         And his basis for that at Paragraph 355 of his

13  respect is:  My opinion that the technical importance

14  expressed as a percentage of PAN's infringement to their

15  NGFWs as a whole falls within a range from 67 percent to 75

16  percent.

17         And, Your Honor, you can read his report.  There's

18  no math.  That -- that number, he -- he does what I would

19  call the bare minimum of a qualitative analysis, and he

20  basically says -- and here's his punch line:  This patent is

21  really important to your product, therefore, I'm going to

22  value from a technical perspective its contribution to your

23  product at somewhere between 67 and 75 percent.

24         How he got there, we have no idea.  It is pulled

25  out of thin air.  He doesn't say hardware is worth certain

1   percentage, software is worth another percentage.  It is

2   just a number.  It's a number that we cannot cross-examine.

3         And to understand the issue that I have with the

4   jury is this is how he characterizes the value of the

5   patent.  The importance of the patented layer-7 inspection

6   architecture accounts for virtually all of the technical

7   importance of the NGFWs.

8         Your Honor, they didn't invent layer-7 and the OSI

9   stack, and there's not a -- there's not a word of layer-7 in

10  this patent.  There's not a mention of the OSI stack in this

11  patent.  This is nothing but a characterization in order to

12  come up with the biggest apportionment number you possibly

13  can.  And you compare that with the real scope of the

14  claims.  Dynamic routing of packets among five select

15  software routines.

16        How do we cross-examine that at trial?  His

17  apportionment analysis, it doesn't in any mathematical way

18  account for the non-patented hardware features, which is

19  almost everything in the -- in fact, I think it's everything

20  in the device.  He doesn't eliminate non-accused software

21  functionality that's in the PAN-OS, the graphic I just

22  showed you.

23        And then as I'm going to show you in a minute, even

24  when we drill down into App-ID, there's a bunch of stuff in

25  App-ID that's not being accused of infringement that he

1  doesn't account for in an apportionment analysis at all

2  because he said in his deposition:  When it comes to App-ID,

3  we're taking 100 percent credit for that.

4         And then of critical importance, nowhere in his

5  report does he say how the 67 to 75 percent technical

6  importance factor applies equally to accused NGFWs and

7  unaccused support and subscription services.

8         The point is, Your Honor, if you're going to try to

9  include all this stuff in a base, you can do different

10 apportionment analysis for different accused products.

11 They're using the same apportionment analysis for all three,

12 and that is a methodological flaw.

13        Okay.  With respect to the NGFW, here's what we

14 know.  Our products -- and this is according to Dr. Ugone --

15 our products range in price from $416.00 to over $78,000.00.

16 What they are accusing of infringement, a piece of PAN-OS.

17 Your Honor, it is identical in every single product.

18 There's not a more robust version of PAN-OS in our more

19 expensive products.  It's the exact same software in every

20 single product.

21        But we have products that range in price by over

22 $78,000.00 in different -- difference.  And so the question

23 becomes:  How do you account for that in an apportionment

24 analysis?

25        And the last bullet here, the only way -- the only

1    way that as our products get more robust with throughput,

2    which is an issue that I'm sure Implicit is going to talk to

3    you about, the only way that our products get more robust

4    with the amount of data that they can process, it is by

5    definition, it's through the additional of more robust

6    technology and hardware features in the product.  And they

7    don't account for that in any way, shape, or form in their

8    apportionment analysis.

9         It's not because there's a more robust PAN-OS that

10   they're accusing of infringement.

11        And if you look at -- I believe it's at -- it's at

12   Page 8 of our brief, and we're not saying they had to do

13   this analysis, but this was just an example.  At Page 8 of

14   our opening brief, we showed the cost of two -- two of our

15   products.  One of them cost to manufacture was something

16   like, I can't remember, $300.00, $400.00.  The other one,

17   the cost of manufacture was like 13, $14,000.00.

18        The cheaper product had like 210 components in it.

19   The more expensive version had 700 and something components

20   in it.  500 additional hardware components in that product.

21        Okay.  Not a single one of those are being accused

22   of infringement or have anything to do with this patent.

23   Well, an apportionment analysis would require that you deal

24   with that in some form or fashion.

25        And simply put, they haven't.

1          Then we get to some of our more expensive products,

2   and there's features -- more ruggedized hardware,

3   front-to-back cooling, 10-gig ports, hot swappable power

4   supplies.  We have a bunch of non-accused processors and

5   memory.  This is the more robust technology.  They haven't

6   told us how to apportion that out.

7          The point is with respect to hardware, they've done

8   no math at all as to how to apportion that out of the case.

9          I hit on this with respect to the PAN-OS.  There

10  are tons of functionality and features that have nothing to

11  do with this case that are not apportioned out of -- of the

12  products in their analysis.

13         I wanted to focus on App-ID because at some level,

14  this is almost -- this is almost the easiest -- this is

15  almost the easiest piece of this, and I want to get to the

16  punch line.

17         THE COURT:  Well, let's get there because we've got

18  a lot to cover today.

19         MR. JAMESON:  I know.  Your Honor, this is --

20         THE COURT:  I'm not going to let you go on all day,

21  Mr. Jameson.

22         MR. JAMESON:  I understand.  This is -- I know.

23  This is a critically important motion for us.

24         THE COURT:  Finish up.  Every motion is critically

25  important.  Go ahead.

1          MR. JAMESON:  Dr. Almeroth takes 100 percent credit

2    for all of App-ID.  And this is the Q&A.  It's at Page 21 of

3    our PowerPoint.  He takes 100 percent of credit for it in

4    his apportionment analysis.

5          You turn back to App-ID and the five routines that

6    they're accusing of infringement in this case, none of them

7    appear in this green box, none of them.  It's impossible to

8    take 100 percent credit on an apportionment analysis for

9    App-ID when I can point to a green box at Slide 20 that

10   nothing that they're accusing of infringement in this case

11   is in that box.

12         And then there's tons of functionality in this

13   PAN-OS that they're not identifying.  That just cannot be

14   the right answer.

15         So -- and then, finally, on the subscription and

16   support revenue piece of this, Dr. Almeroth does no

17   analysis -- zero analysis at all as to whether his

18   apportionment analysis should apply to support and

19   subscription services, but Dr. Ugone accepts at face value

20   that -- that apportionment analysis should apply to

21   subscription services and support revenue.  There's no

22   opinion at all from Dr. Almeroth on this.  His opinion is

23   about NGFW.

24         Dr. Ugone just accepts it, and he goes:  I'm going

25   to apply that same apportionment analysis to support and

1   subscription services.

2         These next slides just explain a little bit about

3   what these various support services are and -- and what the

4   subscription services are, so I'm going to skip through

5   those.

6         Your Honor, on the royalty rate, this is the

7   third -- this is the third problem, okay?  Dr. Ugone says

8   that we -- we would agree to a royalty rate of 2.5 percent.

9   And he selects certain of their license agreements.  And

10  I've got them here in front of you, Citrix, Cisco, NEC,

11  Ericsson and Huawei and TrendMicro.

12        And basically what he did is he said:  Here's the

13  amount that they paid.  Here is what I understand to be the

14  amount of revenue that was at issue in the case as of the

15  time that we reached an agreement.

16        He took that amount, he divided it by the amount

17  that they paid, and came up with an implied royalty rate.

18  And said:  Okay, with those implied royalty rates, I can use

19  those to determine what -- what PAN would have agreed to at

20  a hypothetical negotiation, 2.5 percent.

21        Here's the problem with that analysis.  In every

22  single one of these agreements, every single one of these

23  companies, first of all, they agreed to a worldwide patent

24  license across multiple patent families.  Not just the two

25  patents at issue in this case, but they agreed, for the

amount that they paid, for complete peace through the
expiration of the patents in 2019.

And so with respect to Citrix, Cisco, NEC,
Ericsson, Huawei, and TrendMicro, these companies continue
to sell products that were accused of infringing in the case
for years that he doesn't account for in coming up with his
implied royalty rate.

And the best example is perhaps Cisco.  He says
that according to Mr. Balassanian, Mr. Balassanian's lawyer
told him that the amount of revenue that was at issue in the
Cisco matter was a hundred million dollars.  Your Honor,
they were accusing routers and switches of Cisco of
infringing.

Cisco had eight and a half years of sales between
the time they executed that agreement and the expiration of
this patent.  That's billions of dollars in sales that
Dr. Ugone does not take into account in coming up with this
implied royalty rate.

THE COURT:  All grist for the cross-examination
mill, counsel.  Why does it rise to the level of striking
the expert's opinion?

MR. JAMESON:  Because, Your Honor, at some point,
too much is too much.  And you've got -- you've got a
fundamentally flawed royalty base, you've got a fund -- a
fundamentally flawed apportionment analysis, and you've got

```
 1   a fundamentally flawed royalty rate.  And the idea that
 2   you're just allowed to do that in that combination and get
 3   away with it, and it's up to us to fix all this in front of
 4   a jury that doesn't understand the nuances of all these
 5   issues, I respectfully submit that that is what rises to the
 6   level of a Daubert issue.
 7             THE COURT:  What else?
 8             MR. JAMESON:  The final thing that we had, and --
 9   and the truth is, I'll leave it to you as to how you want to
10   deal with this.  Included in our Daubert motion is whether
11   or not the PAN/Juniper license agreement should be excluded.
12   And we included it in this motion because it's a combination
13   of what Dr. Almeroth says from a technical perspective and
14   then what Dr. Ugone said from a -- from an economic
15   perspective.  But in a nutshell, PAN and Juniper got
16   involved in some of the most heated litigation you could
17   ever get involved in.  They were competitors --
18             THE COURT:  I've read all the briefing on this.
19             MR. JAMESON:  Okay.  If you don't want to hear
20   anything further on it, then I'll -- I'll --
21             THE COURT:  I know it's in here.  I know what the
22   arguments are.  If you have something you think is
23   particularly salient you want to point out, go ahead and do
24   so, but I don't need a complete marching through from
25   beginning to end.
```

1          MR. JAMESON:  Okay.  Your Honor, I think the most

2    important point is they haven't done the technical and

3    economic analysis that they would need to do to -- to bring

4    this into evidence.  Dr. Ugone does not rely on the

5    PAN/Juniper agreement affirmatively.  Instead, it is a --

6    quote, it's a data point.  It's almost like a reasonableness

7    check.  It's not part of his affirmative opinion.

8          And the whole reason why they want this agreement

9    to come into evidence is to say to the jury:  PAN paid $175

10   million to resolve litigation with Juniper in 2014.  Our $94

11   million number, that's reasonable because -- because PAN's

12   willing to pay that kind of money to resolve disputes.

13   That's the whole purpose of this agreement trying to come

14   into evidence, and -- and, Your Honor, that's what Rule 403

15   is all about.

16          The prejudice to let that agreement in when it was

17   a cross-license of patents, competitor -- competitor

18   litigation where our former employees left Juniper to start

19   PAN -- and that's the kind of litigation it was -- we get a

20   general release that eliminates all kinds of potential legal

21   issues.  We've got an eight-year covenant that they couldn't

22   sue us that potentially covered 2,000 patents.  This

23   agreement doesn't have any place in this case because it's

24   not even part of Dr. Ugone's affirmative opinion.

25          THE COURT:  All right.  Thank you, counsel.

1               Let me hear a response from Plaintiff.

2               MR. HURT:  Christian Hurt for Plaintiff, Implicit.

3       May I approach, Your Honor?

4               THE COURT:  You may.

5               MR. HURT:  I believe the Court had it exactly right

6       when it asked Mr. Jameson:  Isn't all of this grist for the

7       cross-examination mill?

8               All of these points that Palo Alto Networks made

9       are subject for cross-examination.  They're ultimately

10      factual issues about which facts to credit.  None of them

11      are bona fide method -- methodological challenges under

12      Daubert that would warrant exclusion.

13              And critically, PAN doesn't -- didn't show in their

14      brief and they didn't show today what Dr. Almeroth's opinion

15      actually is, what analysis he actually did, what Dr. Ugone's

16      opinion actually is, where any of the doc -- pre-litigation

17      documents from them that -- from PAN that supports all of

18      the conclusions and is reliable to reach those conclusions

19      in this case.

20              And I'd like to briefly go through some of this.  I

21      know we have a short amount of time today, but I do want to

22      respond to these -- these points.

23              The first -- the first point is with regard to

24      services.  Mr. Jameson mentioned that services and support

25      are under a heading called:  Things not implicated by PAN's

1   patents.  But the actual section, and I'll put it on the

2   screen -- it's a little small on No. 6, but it states:  PAN

3   broadly uses App-ID for its services.

4        That's the section of Dr. Almeroth's report -- one

5   of the sections that discusses services.  And the idea that

6   a heading somehow can change an opinion, I also think, is --

7   is -- is circumspect given what Dr. Almeroth's actual

8   opinions were.  And I want to talk about those opinions.

9        So the first is services.  Palo Alto Networks does

10  actually not challenge Dr. Almeroth's opinion about

11  services.  And the ultimate opinion is in Paragraph 354, in

12  which he states:  All of these subscriptions fall within the

13  reach of and expressly depend on or make use of the patented

14  layer-7 architecture of the firewall's application

15  identification.

16        So why -- why is that important?

17        Mr. Jameson didn't describe the services and

18  support that are at issue here.  But what he called support,

19  calling up technical support, it's actually downloading a

20  new image of PAN-OS.  And their corporate witness testified

21  that's the most important part of support is that new PAN-OS

22  image download which has the exact same infringing

23  functionality as the box.

24        Same thing with GlobalProtect.  Well, what's

25  GlobalProtect?  GlobalProtect is a service that all of the

1    traffic on someone's remote computer when I'm not in the

2    office gets routed throughout my company's firewall.

3         Well, what does that do?  That means that that

4    traffic is subject to the same layer-7 inspection that's

5    covered by our claims.

6         Well, what about WildFire?  Well, WildFire, to send

7    a file to sandboxing, you have to do the content inspection

8    and the layer-7 inspection covered by our claims.

9         So all of this is technically connected.  And

10   Mr. Jameson didn't make any points about it not being

11   technically connected, and PAN did not challenge that in

12   their motion in the specific paragraphs in Dr. Almeroth's

13   report.

14        The argument that PAN has made, and there's other

15   services, wild -- I'm sorry, URL Filtering is similar to

16   WildFire in that it uses layer-7 inspection to determine,

17   well, which URL should I be able to go to.  And the reason

18   for that is because -- the reason PAN did not challenge that

19   is because they are connected technically.

20        Well, what about economically?  Well, PAN makes the

21   point, well, these are separate.  People buy them.  It's a

22   la carte.  It's different than -- you know, they're not

23   connected to the box at all.

24        But all of the services we've accused, PAN calls

25   them attached services, and they actually have unattached

1  services, which is call in a technical consultant, customer

2  support.  We haven't included those as convoyed sales.

3       The only things that are included in the base are

4  services attached to the firewall.  Well, what does that

5  mean?  And if you look at an internal document -- and this

6  is cited in the reports -- internally, Palo Alto Networks

7  tracks the value of a sale over how much service and

8  subscription revenue it generates over a period of time.

9       And so Day 1, the customer buys the firewall.  And

10  this is another fact that's not challenged.  Almost a

11  hundred percent, if not a hundred percent of customers that

12  buy the firewall also buy at least one of these support

13  services.  I think a hundred percent of them end up buying

14  support.  It varies with the different subscriptions.  And

15  they're attached to the box, and they renew yearly.

16       Well, how are they linked economically?  They're

17  linked because Palo Alto Networks charges for support and

18  subscriptions a percentage of what you paid for the box.  So

19  it's not, oh, pay another $5.00 and I get WildFire, another

20  $10.00 and I get URL Filtering.  It's a percentage of what I

21  paid for the firewall.  So they're tied that way by price.

22       Well, why does that matter?  The reason that

23  matters is that Palo Alto Networks prices its firewalls by

24  throughput.  And I'll get to that in a little bit.  But

25  there is -- the lower throughput models are cheaper.  The

1    higher throughput models are more expensive.

2         And their own witness, Mr. Bakewell, their damages

3    expert, as well as their corporate representatives who we

4    deposed, testified that, look, we sell one firewall.  It

5    comes in a variety of form factors, depending on throughput

6    and performance.  The low end, you can get less data

7    through.  The high end, you can get more data through.  And

8    that means that they're using our invention more in the

9    higher end models.  The use is higher because the processing

10   is higher.  The number of users is higher.  And the damages

11   statute requires that we account for that use.  And that's

12   why they're all connected into the base.

13        And that's sufficient under the Realtime Data

14   decision that says a jury is already entitled -- a jury is

15   entitled to determine the scope of the royalty base tied

16   sales and convoyed sales.

17        And what Dr. Almeroth's opinion was, was a higher

18   standard of, you know, these are within the economic

19   footprint of the patent.  They're in the footprint of the

20   patent because they all rely on the layer-7 -- our patented

21   layer-7 architecture.  That's sufficient.

22        But even under the test of convoyed sales in the

23   base, there's more than enough evidence for the experts to

24   present this to a jury.  And the points that Mr. Jameson

25   made about these are separate services, they're -- it's

1   calling up a guy at technical support, there's aspects of

2   them that may not infringe, that's not a question for if

3   they're in the base.  And it's not a methodology question.

4   It's ultimately a cross-examination -- cross-examination

5   question on these services.

6          Now, Mr. Jameson put up a supposed disconnect

7   between Dr. Almeroth and Dr. Ugone where Dr. Ugone says:  I

8   understand that these services cause the box to work in an

9   infringing way.  And Dr. Almeroth says that these services

10  fall within the reach of the patent because they either make

11  more and better use of the patented technology, they rely on

12  the technology, or they're based on the technology.  It's

13  that Paragraph 354.

14          There's no real disconnect.  I mean, using each --

15  to use each of the services that Mr. Jameson didn't explain

16  how they work, it does -- the box does.  And using them

17  causes the box to do the patented layer-7 inspection, which

18  is in Dr. Ugone's report.

19          Ultimately, he's not a lawyer.  And ultimately, it

20  doesn't matter because the tests for convoyed sales, it's

21  sufficient that they're included in the base.

22          And -- and this is the evidence that Palo Alto

23  Networks has never addressed about how the services and the

24  support are linked to their products.  They're priced

25  together.  This is a classic razor and blades, printer and

1    ink cartridges.  They charge for use.  The services are tied

2    to use.  It should all be considered the base, especially as

3    a Daubert issue.

4         Unless the Court has any questions on services, I

5    want to move to the apportionment.

6         THE COURT:  Go ahead.

7         MR. HURT:  Okay.  So there's similarly a number of

8    undisputed facts that are -- that are critical to PAN's

9    motion.  And the first is the smallest thing they actually

10   sell is the firewall.  This isn't some component case.  They

11   don't sell PAN-OS separately.  They actually can't as a

12   technical matter.  And they don't charge separately for

13   App-ID.

14        So this idea that it's an entire market value case

15   is incorrect because we're not looking at some smaller-sold

16   thing.  App-ID is five cents a use, 10 cents a use, and

17   blowing it out to the firewall.

18        Instead, both of the experts of Implicit are

19   starting with the smallest thing that's sold that infringes.

20   But that's not where the apportionment -- that's not where

21   it ends.  And for that reason as well, this is not an entire

22   market value case.  And this is the part that Mr. Jameson

23   didn't address, and it's also unchallenged in PAN's motion.

24        There were draw-backs to legacy firewalls.  PAN

25   exists as a company because prior firewalls could not

1    reliably identify applications.  And it's a deep technical

2    detail that I won't get into, but the point is in the past,

3    in the old version of the Internet, you could identify

4    applications by looking at the protocol or the port, but

5    today when I get on my phone and I'm on Facebook, firewall

6    of the old variety wouldn't know what application I was on.

7    You know, the Internet has changed between the late '90s

8    and -- and today.

9         And PAN's entire business proposition is that they

10   moved to what they call next generation.  And this is

11   critical because Dr. Ugone has the specific opinion, un --

12   unchallenged in PAN's motion, that to get to that leap, it's

13   critical for the firewall to operate using the patented

14   invention, and that's what distinguishes it over the legacy

15   products.

16        And the third fact that is critical is that Palo

17   Alto Networks's primary customers, it's Wells Fargo, big

18   banks, big enterprises, they're replacing old stuff.  So the

19   value proposition is I've got an old firewall.  I've got a

20   legacy system.  I need to upgrade to the next generation.

21        And internally -- this is another internal document

22   that Palo Alto Networks has never addressed in the briefs,

23   but they trained their sales engineers on what

24   differentiates us -- what are the things that differentiate

25   us?  And there are four things.  It's SP3, App-ID,

1    Content-ID which is part App-ID, User-ID.

2           So this is the internal document from Palo Alto

3    Networks that Dr. Ugone looked at to say:  Well, why do

4    people buy these firewalls?  You know, it's -- it's not

5    because of -- you know, the -- the things that Mr. Jameson

6    showed Your Honor today are things created by counsel in

7    this lawsuit to challenge the apportionment analysis.

8           The actual evidence shows there are four things.

9    And Dr. Ugone opined that three of these four either rely on

10   or use or fall within the scope of the patented invention.

11   They've challenged -- they've challenged that today for the

12   first time.  They haven't challenged it in their motion.

13          So let's talk about App-ID.  This is further

14   evidence that PAN has never addressed in any of its moving

15   papers.  App-ID isn't some small box drawn on a slide with

16   about 20 other boxes of equal size.  App-ID is the

17   foundational element of their whole security platform.

18          This is a document -- this is a PAN marketing

19   document that they tell the public.  This document uses the

20   word "foundational" or some flavor of that four different

21   times.  They've never addressed it, and it's a powerful and

22   differentiated core capability.

23          This isn't the only one.  There's a blog post from

24   last -- from, I think, about two years ago.  Their

25   marketing -- chief marketing officer testified, you know,

before these go out, we've got a process to make sure

they're accurate.  And this post says that App-ID is

critical, it's foundational, and it's what led to our market

acceptance.

And so this challenge to Dr. Almeroth's opinion of

saying, you know what, virtually all of the importance of

these falls on layer-7 inspection.  They don't show the

Court the actual documents that underlie that opinion, but

all of them show why it's reliable and should go to the

jury.

And this isn't the only one.  I believe last week

Mr. Singer referenced the SEC disclosures where PAN told the

public essentially the same thing.  This is our patent --

this is our core traffic classification mechanism that's

used for other features in the box.  This isn't a small box

on a corner of a PowerPoint slide made for this case.  This

is PAN's own documents.

And so based on these documents, Dr. Almeroth

opined that the patented layer-7 inspection architecture is

so fundamental, that it accounts for virtually all of the

technical importance.

But, again, he didn't stop there.  Everything

that -- we served an interrogatory in this case asking Palo

Alto Networks, tell us what apportionment you think we need

to do.  Tell us what analysis you think we need to do.  And

1    they said:  Hardware, unaccused functioning of PAN-OS,

2    unaccused functioning of supposedly App-ID, and PAN's own

3    patents.

4            And he addresses this in a section of his report

5    and says -- Mr. Jameson said:  This doesn't cover the

6    control plane.  This doesn't cover the legacy port and

7    protocol functionality, and that I inherently accounted for

8    hardware and software that's not implicated by the patented

9    invention by looking at functionality.

10           So why is that important?

11           Mr. Jameson showed the Court or pointed the Court

12   to, well, look at this -- our brief.  We've got the small

13   box that's got a little hardware, and the big box that's got

14   a lot of hardware.  But on -- on PAN's own documents,

15   there's no distinguishment made on -- what differentiates

16   their products based on the bigger boxes having additional

17   features or functionalities.

18           Well, why is that?  It's because these are melded.

19   You can't buy a PAN box and put Microsoft Word on it or new

20   software.  You can't re-purpose the hardware.  The only use

21   of that -- of the hardware is to run PAN-OS.  And the higher

22   boxes run that more, and, in particular, the infringing

23   architecture more.

24           You know, there's no real dispute about this.  And

25   this distinction of we've got to account for commodity

1   hardware versus software, it doesn't match how these things

2   are actually used and how PAN actually sells its products

3   and how PAN describes them in documents created before we

4   got here today.

5          And so at the end, Dr. Almeroth concluded -- this

6   is in Paragraph 355 -- that when I consider why PAN has its

7   core value proposition and that they wouldn't be able to

8   offer it without the patents and the fact is if you pulled

9   the patented functionality out of the box, what they're left

10  with is the legacy firewalls that they say they're better

11  than, that they came to replace, that's what you would be

12  left with if you pulled the patented functionality out of

13  the box.  Given that, I have a range of 67 to 75 percent.

14         This isn't plucked out of thin air.  This isn't

15  made up.  This is from PAN's -- based on Palo Alto

16  Networks's own documents.  They're free to cross-examine

17  Dr. Almeroth on all of this, but this isn't some one-page

18  opinion without a basis with this be not based on facts and

19  data.  This is a reliable apportionment analysis under

20  Daubert.

21         And Dr. Ugone took -- took that range and went to

22  the lowest end of it.  So there's an additional 8 percent

23  that's shaved off of this, which is the ultimate value that

24  he applied to -- to the royalty base or to -- to the

25  sales -- to then get to the apportioned royalty base.

1          So PAN mentions hardware, and the use of a

2   percentage is actually pretty -- pretty critical in this

3   because as the hardware scales up, the amount of money

4   excluded by the apportionment likewise scales up.

5          So Dr. Almeroth didn't opine that we get to $300.00

6   a box and that number changes.  It's a percentage that

7   reflects the use of the functionality, so the higher prized

8   boxes, there's going to be thousands of dollars of hardware

9   that's going to not be covered by that apportionment factor.

10          And so PAN's new argument is -- and this was for

11   the first time in their reply brief -- was, well, there's no

12   relationship -- and this was in Mr. Jameson's slides that --

13   it's demonstratively false that there's a relationship

14   between sales price and throughput.  And here in their reply

15   brief on Page 3, it's even stronger.  Absolutely no

16   correlation.

17          Now, that, I think, is ultimately a factual

18   question that Palo Alto Networks can cross-examine

19   Dr. Almeroth on.  But it's also actually mathematically

20   wrong.  So correlation is a mathematical term.  Two numbers

21   are correlated -- if one goes up, they're a hundred percent

22   correlated, or a correlation of one, if every time one goes

23   up, the other one goes up.  And it's negative one if one

24   goes down, the other one goes down every time.

25          There's no correlation when it's zero, when you

1   can't tell that when one goes up, the other one does, or one

2   going down, the other one does.

3         You can take these numbers, and you can put them

4   into Excel and they have a function that gives you that

5   correlation.  And if you take it for this graph, which PAN

6   selected on the models -- so this isn't, you know, my chart.

7   This is what Palo Alto Networks said:  Well, I want to show

8   you there's no correlation.  Here's no correlation.  If you

9   put that into Excel, they're 81 percent correlated.  And

10  that's average sales price to throughput and one throughput

11  metric.  There's multiple throughput metrics.  And if you

12  actually go apples-to-apples, quarter-to-quarter,

13  sale-to-sale, that number is going to be higher.

14        So this statement that it's demonstratively false

15  that there's a connection between throughput and price is

16  incorrect on -- on their own graph.  Their statement there's

17  absolutely no correlation is incorrect.  And at -- and at

18  most, this is an issue they should be able to cross

19  Dr. Almeroth on and not exclude the opinions in the report.

20        Unless the Court has any questions on the

21  apportionment analysis, I wanted to move on to the royalty

22  rate challenge.

23        THE COURT:  Go ahead.  Address the rate.

24        MR. HURT:  Yes, Your Honor.

25        The use of impacted revenues comes out of three

```
1    licenses that Implicit entered into that actually warrant

2    what the revenue at issue in those cases were, Ericsson,

3    NEC, and Huawei, as well as deposition testimony under oath

4    from Mr. Balassanian about what the impacted revenues were

5    in a certain number of cases, namely Citrix and Cisco.  And

6    in addition to TrendMicro, there's a stipulated royalty base

7    amount in Trend.  So this is all in the record.  This isn't

8    made up.  This isn't out of thin air.  This isn't a

9    methodological issue.

10            And on top of that, Mr. Balassanian testified that

11   when he was entering into a license, he looked at how much

12   revenue is really at issue here to get the royalty payment,

13   and that's exactly what Dr. Ugone did with Palo Alto

14   Networks's products.  They may not like that the number is

15   what it is, but it's a reliable analysis based on Implicit's

16   own evidence.

17            Now, what Mr. Bakewell did was use market share

18   data, and we should be able to present the actual use and

19   indicators of actual use to respond to them.  There's

20   nothing unreliable.  And issues about, well, what's the

21   length of the license and forward versus backward and all

22   these other things, you know, I disagree with Mr. Jameson

23   that a jury couldn't understand the nuance of those issues.

24   I think that's absolutely something a jury can get.  And

25   shouldn't -- and if there's an issue with it, should be
```

1  presented on cross-examination.

2        So unless the Court has any questions on rate, this

3  is the last issue, the -- PAN/Juniper agreement.

4        THE COURT:  Let's touch on this.

5        MR. HURT:  Mr. Jameson didn't mention it, but

6  Dr. Almeroth spends 15 pages in his report going

7  patent-by-patent through the Juniper agreement and

8  explaining what the patents were about in that case and

9  their relationship to the patents in this case.

10        Dr. Ugone took that as an input.

11        Now, Palo Alto Networks says:  Well, hold on, that

12  description of the technical field is too broad.  But it's

13  actually narrower than the one PAN's experts used for

14  invalidity, and the fact -- the breadth of that field is a

15  fact question that the jury can resolve.

16        And I believe the only evidence Palo Alto Networks

17  presented on breadth was, well, if I do a generic Patent

18  Office search for pack -- packet and message and processing,

19  I'd get 50,000 patents.

20        There's no indication that any of those are swept

21  into this field or not into this field other than that basic

22  search.  And that's actually less than .5 percent of all

23  patents that have issued.  So I think it shows, if anything,

24  the narrowness of the field.

25        As to the economics of the agreement, I believe

1    it's now undisputed that Dr. Ugone did take into account all

2    of the points that Mr. Jameson mentioned with regard to the

3    competitor situation, you know, what were the circumstances

4    of the Juniper/PAN litigation, those parties.  He took that

5    into account.

6            What Palo Alto Networks faults him for doing -- is

7    for not doing is that Dr. Ugone supposedly didn't go behind

8    the license to value a release, to value some other

9    provision.  But we were black boxed out of that discovery.

10   We had a motion to compel on it.  They told us it wouldn't

11   be relevant.  They told us it was privileged.

12           And the fact that we're now standing here

13   potentially getting it struck based on information that

14   wasn't produced but was in some SEC form, I think further

15   weighs against granting the motion.

16           As Mr. Jameson said, the PAN/Juniper agreement is

17   not used in a sense of, well, PAN paid X, and if you

18   multiply that times something for this case, that means Y,

19   but it is used to show that they would -- it's a comparable

20   agreement technically on which Palo Alto Networks paid

21   significant value, which responds to its position that it

22   would have only paid $500,000.00 for a license to its -- to

23   key technology for its foundational traffic classification

24   engine in this case.

25           Unless the Court has any specific questions, I will

 1 | sit down.

 2 |       THE COURT:  No, I think I understand your argument.

 3 |       MR. HURT:  Thank you, Your Honor.

 4 |       THE COURT:  Mr. Jameson, I'll give you a brief

 5 | response.

 6 |       MR. JAMESON:  Thank you, Your Honor.  Woody

 7 | Jameson, and I know I'm -- I'm running out of time.

 8 |       Implicit's counsel told you that subscription

 9 | services and support services are, quote, technically

10 | connected, close quote.  He did not say that they infringe.

11 |       And I still don't know the answer to that question.

12 | Is Implicit taking the position that support services and

13 | subscription services infringe these patents?  And if they

14 | don't, they should not be in the royalty base.  They should

15 | be considered as part of the royalty rate under

16 | Georgia-Pacific Factor No. 6.

17 |       He talks about what's involved in support services,

18 | and he mentions the ability to download a new version of

19 | PAN-OS.  Your Honor, the ability to download something,

20 | that's not covered by these patents.  You're -- you're

21 | getting a new -- a new version of PAN-OS that's got the same

22 | accused functionality that dates back to 2007.

23 |       What they're accusing of infringement with respect

24 | to PAN-OS, it dates back to 2007.  That's -- that's --

25 | that's what they're going to put on evidence for at -- at

1   trial.

2          Going to the ELMO.

3          There's one thing that we -- the parties agree on

4   something, which is, is App-ID valuable?  This is the slide

5   that Implicit's counsel put up.  Yeah, App-ID is valuable.

6   We invented App-ID.  We've got patents on App-ID.  There's

7   no -- no question.

8          But they're not accusing App-ID of infringing.

9   They're accusing five software routines within App-ID of

10  infringing, and Dr. Almeroth, in his apportionment analysis,

11  has taken 100 percent credit for the entirety of App-ID in

12  his apportionment analysis.  And that's just

13  mathematically -- that's mathematically incorrect.

14         And the -- I mean, there's so much I want to -- I

15  know I'm out of time.  The -- the final point I want to

16  make, and it goes to the PAN/Juniper issue, opposing counsel

17  has just stood up and said, you're right, we're not relying

18  on this affirmatively in the case.  So if you're not relying

19  on it affirmative in the case, then why does this agreement

20  need to come into evidence under the various circumstances

21  of how that -- that license came into being?

22         He talked about the detailed analysis that

23  Dr. Almeroth did with respect to the 11 patents that were

24  licensed to PAN.  10 of them, he said, are less relevant to

25  this case than the patents being asserted.

1          So he basically was acknowledging technical

2     incomparability, as opposed to technical comparability.

3          And with respect to Dr. Ugone's economic analysis,

4     Dr. Ugone did not address the release issue or the

5     eight-year covenant period that had substantial economic

6     value in that license agreement at all in his report.  And

7     so under those circumstances, that agreement should not be

8     in the case.

9          And, Your Honor, if you have any questions at all,

10    I mean, I -- if you don't, I'll sit down.

11          THE COURT:  I'm not bashful about not asking

12    questions when I have them.

13          MR. JAMESON:  Thank you, Your Honor.

14          THE COURT:  All right.  We're going to take a short

15    recess.  We'll proceed with the remaining pre-trial matters

16    when I come back.  The Court stands in recess.

17          COURT SECURITY OFFICER:  All rise.

18          (Recess.)

19          COURT SECURITY OFFICER:  All rise.

20          THE COURT:  Be seated, please.

21          With regard to the Defendant's motion to exclude --

22    exclude the damages-related testimony of Dr. Ugone and

23    Dr. Almeroth under Rule 702 and Daubert, which is Docket

24    No. 203, and to which the Court's just heard argument on

25    from the parties, the Court always finds it challenging when

1   counsel argue to me for the first time in Court cases they

2   have not cited in their briefing whatsoever, such as the

3   case here with regard to the Realtime Data case cited by

4   Defendants.

5         The Defendants appropriately cite a portion of the

6   case indicating that full disclosure -- or disclosure of the

7   full product revenue cannot but help skew the damages

8   horizon regardless of the contribution.  But the case goes

9   on to say, and Defendants did not argue, what the Court held

10  there ultimately in denying the motion to strike that in

11  order to safe guard against that concern, as well as meet

12  the admissibility standards prescribed by Daubert, an expert

13  who wishes to include convoyed sales in a royalty base must

14  at least present a clear explanation of why and how the

15  purported convoyed sales are tied to the sales of the

16  accused products and what value of the royalty base is

17  attributable to the accused products themselves versus the

18  convoyed sales, which makes it clear that contrary to the

19  argument I heard, convoyed sales are not in and -- in an of

20  themselves always excludable from the royalty base.

21        The Court also finds that the challenged experts'

22  opinions do provide a basis for why the convoyed sales are

23  tied to the sales of the accused products, and the Court is

24  persuaded, as Plaintiff's counsel argued, that this is very

25  close to the razor/razor blades, print/printer cartridge

1   analogy that the services that relate to these firewalls are

2   so inexplicably intertwined and that the updating through

3   those services that's required on an ongoing basis to keep

4   the firewalls viable and operative and effective is such

5   that there is a basis to allow and not strike those convoyed

6   sales from the Plaintiff's damages base.

7          The Court's also considered the other arguments

8   contained within the motion.  I won't go into those in great

9   detail from the bench, but I am not persuaded that these

10  rise to the level of being struck and precluded from the

11  jury's consideration.  And I remain convinced that robust

12  cross-examination provides a fair opportunity for the

13  Defendants to defend against the opinions and assertions of

14  these experts.

15         Consequently, this motion is denied.

16         All right.  Next we'll take up Defendant's motion

17  for summary judgment of non-infringement.  This is Docket

18  No. 201.

19         Let me hear from the moving Defendant on this.

20         MR. GAUDET:  Thank you.  And good morning, Your

21  Honor.  Matt Gaudet for Palo Alto Networks.

22         Your Honor, may we approach?  Ms. Snedeker has some

23  handouts for the Court.

24         THE COURT:  Yes, you may.

25         MR. GAUDET:  Thank you.

1          Thank you, Your Honor.

2          There are -- there are two separate issues that we

3   raise in the summary judgment motion, the first of which

4   relates to the TCP claim elements.  And I will address that

5   first.

6          The -- the overview is that TCP is defined by

7   industry standard, RFC 793.  Everybody agrees to that.

8          The standard is only implemented by end points of a

9   connection.  And all the testimony in this case has agreed

10  to that.  That's the plain meaning, and it's confirmed in

11  the prosecution history.

12         Now, this is the part that's really unusual, to be

13  frank, Your Honor.  The key statement of undisputed material

14  fact was admitted -- namely, whether or not what they're

15  accusing, the firewalls, are end points or not.  We said

16  they are not end points.  They never function as end points.

17  The answer was:  Admitted.

18         Now, of course, you would -- you would ordinarily

19  expect, you know, Plaintiff to present evidence to create

20  some dispute, and that's -- that's what gets resolved for

21  the jury.  This is a rare case.  But because of that, Your

22  Honor, we believe that on this record, we are entitled to

23  judgment of -- of summary judgment.

24         Now, just to back up a little bit, and I'll go

25  through kind of the -- the relevant facts here.  Just a

1   little context about TCP, handshakes, and what it is they're

2   accusing.  I think at the last hearing I did sort of some

3   hand gestures.  This hopefully will be a clearer way.

4        But the punch line with TCP is it's a protocol

5   standard that allows two computers to talk to each other

6   over the Internet.  The computers are the end points.

7        And the -- the first thing that happens is a

8   handshake.  It's called a three-way handshake because the

9   sending computer that's initiating the session sends a

10  signal.  Then there's a response.  And then there's an

11  acknowledgement.  And now you have a session.  So that's

12  called the handshake.

13       Once you do that, each of these end points is

14  called a TCP.  In other words, you've got one TCP on one

15  side and another TCP on another side.  So this on the left

16  will be TCP A -- sorry -- and on the right would be TCP B.

17       TCP has a lot of requirements to ensure that you

18  set up a session, you have an orderly reliable session, and

19  then you can tear down the session.  It includes, you know,

20  fragmenting data into segments, re-sending lost or discarded

21  segments, managing congestion, all kinds of things that are

22  all required by the standard.

23       So one of the many things that the standard

24  requires for the end points is an ability in some

25  circumstances to re-order packets.  And let me tell you what

1    that means.

2            This is, again, the same basic image.  We've got

3    computer on one side.  It would be like an Internet

4    server -- for example, ESPN.com.  Making that up.

5            On the other end is the user's computer.  So TCP

6    A/TCP B.

7            TCP A, the server, is going to send packets in a

8    given order, you know, 1, 2, 3, 4, 5, Packets 1 through 5.

9            Now, the packets travel separately over the

10   Internet, so they might get -- they might arrive in a

11   different order.  And I've made this order up, but let's say

12   that it gets -- it receives 43215.  That's just the order of

13   the packets that happens to come in.  Well, one of the many

14   things that -- that the end point is required to be able to

15   do by the TCP standard is you re-order it as 12345.

16   That's -- that's one of the things that's required of a TCP

17   end point.

18           That's not what they're accusing.  What they're

19   accusing is the action of a firewall.  So we make firewalls.

20   The firewall sits in between the receiving computer and the

21   Internet.  The firewall's job is to decide whether or not to

22   allow messages through or to block messages.  That's it.

23   That's its purpose in life.  And that's what we're selling.

24   Okay?

25           The firewall would, therefore, receive this same

1    unordered or incorrectly ordered stream of packets.  So it

2    would get the 43215, all right?

3          What they're accusing is that one of the things

4    that this firewall would do is it would make a copy of those

5    packets.  It would re-order the copy as 12345 in order to

6    look at the copy and see if that's a safe message or not.

7    And if it is -- if it's not a safe message, it's blocked.

8    That's the end of it.  If it is a safe message, it's -- it

9    doesn't do anything with the copy.  It sends the original

10   packets in the same order they were received, 43215.

11         And there is not another click, or I'm going to do

12   something different on the -- the computer user or receiver,

13   you know, TCP B end because the -- the end point has no idea

14   this has ever happened.  The end point still does everything

15   it would have done even if there wasn't a firewall there.

16   Exactly the same thing that comes in the firewall goes out

17   of the firewall.  The firewall isn't part of a TCP session.

18   It doesn't create anything to do with the TCP session.  It

19   sits in between the two end points.

20         And the -- this is in pictures.  The words to

21   describe this are Statement of Undisputed Fact No. 2 which

22   they, quote, admitted, and then said:  But it's not

23   relevant.  But they admitted it.

24         So I'm -- I'm going to talk a little bit about the

25   prosecution history, but all the prosecution history does is

1  confirm the plain meaning that everyone agreed to -- and

2  I'll walk you through all that -- of what TCP is and what it

3  requires with respect to end points.

4       March 2013, Judge Illston in California issued an

5  order that invalidated the claims of the predecessor '163

6  patent.  That's in the chain of patents that came

7  immediately before the '683 patent.  Invalidated over the

8  DeCasper patents.

9       Three months later, Implicit filed the continuation

10  application that led to the '683 patent.  And on that very

11  same day, Implicit submitted a preliminary amendment to that

12  application with all the original claims and replaced them

13  with new claims that all included these TCP elements in

14  order to distinguish the DeCasper reference.

15       And this is what -- one of the things they said:

16  It is well-known that the transmission control protocol,

17  TCP, is implemented at the end points of a connection.

18       Your Honor, every expert has agreed to that in this

19  case that that is where -- that is the only thing the

20  standard describes is actions at the end points.  And

21  they're stuck with that statement.  I mean, their argument

22  in their briefs is, wait a minute, we distinguished a bunch

23  of other bases, as well.  And that doesn't matter.  It

24  doesn't how many different bases they distinguish, they made

25  that statement, and it's a true statement.  It's

unquestionably a correct statement.  It reflects the plain
meaning.

It wasn't even a disclaimer.  It was it is
well-known that, and it's unquestionably true.

Now, here is the part that I would say, frankly, is
so unusual.  They admitted all the relevant facts for
summary judgment.  This is our Statement of Undisputed Fact
No. 3:  The accused technology in PAN's firewalls does not
act as an end point in any TCP connection, does not
participate in any TCP handshake, or in any TCP session
involving the communication of the packets that are
monitored, copied, and re-ordered in the TCP assembly
module.  The point is, we're not an end point at all.

And their answer, Your Honor, was:  Admitted.  But
not relevant to any issue of infringement.  That's their,
you know, sort of lawyer language.  Admitted.

There's nothing to ask the jury about on the
question of whether or not we're end points.  It is over.
They have admitted it in response to this motion.  We are
not end points.

There's no DOE claim in the case.  The reason
there's not DOE because you can -- you can maybe say, well,
they're sort of mimicking what the end point would do.
There can't be a DOE claim in this case because they added
these -- these elements by amendment in order to get around

1   prosecution -- get around a prior art reference.  And they

2   even made statements about it.

3          So there has never been a DOE claim in the case,

4   and there never could be a DOE claim in the case.

5          And this is a very simple comparison.  The

6   statement in the prosecution history:  It is well-known that

7   the transition control protocol is implemented at the end

8   points of a connection.  What they're admitted -- their

9   admission in this case, the accused technology in PAN's

10  firewalls does not act as an end point in any TCP

11  connection.  They are right on top of each other, and it is

12  admitted.

13         Your Honor, the -- this was -- I referenced

14  Statement of Material Fact No. 2 earlier.  This is just --

15  that's what kind of lays out the background context.  They

16  admitted this one, as well.

17         The next point, Your Honor -- this is, I guess, the

18  next supporting point -- is that that statement in the

19  prosecution history about what everyone understands was 100

20  percent correct.  So our expert explained the TCP

21  specification is RFC 793.  It's a bi-direction

22  connection-oriented protocol that can reliably exchange byte

23  streams point-to-point.  In other words, between two

24  applications.  And the specification defines a set of rules

25  that mandate the behavior required of any TCP

1   implementation.

2          Dr. Almeroth, their expert, says basically the same

3   thing.  He says:  TCP describes, for example, how the two

4   devices on the Internet may establish a connection over

5   which TCP data packets may be communicated between them by

6   way of a negotiation process known as a three-way handshake.

7   It's a connection between two nodes.  It's exactly what I

8   showed you in the opening.

9          And I actually -- when I deposed him on this, it

10  drilled down into the standard, and it frankly it -- it got

11  even better.  He says, answer:  TCP does describe a process.

12  A formal standards-based process for how you establish the

13  connection between end points.

14         Then I put the -- I put the standard in front of

15  him.  And I said:  The first sentence here, RFC Section 3.4

16  says, quote, the three-way handshake is the procedure used

17  to establish a connection.  Do you see that?

18         He says:  I do.

19         Okay.  And that's the connection between the two

20  end points; is that correct?

21         I believe that's what it's referring to here.  It's

22  all about the end points, consistent with the prosecution

23  history.

24         The other point is when I said a TCP, you refer to

25  each of the end points as being a TCP.  And so the bolded

1   language goes on.  I said, okay -- and I say -- I said this

2   because I took his deposition.

3          The question was:  Okay.  And it says:  This

4   procedure normally is initiated by one TCP and responded to

5   by another TCP.  That's the quote from the standard.  Do you

6   see that?

7          Answer:  I do.

8          Question:  Okay.  And the one TCP, that's one of

9   the end points.  And another TCP, that's the other of the

10  two end points; is that correct?

11         Answer:  When it's normally initiated, the one TCP

12  is one host, the other TCP is on the other host.  That's

13  what a TCP is.

14         And the inventor agreed.  You know, I asked him:

15  What does it mean to execute a transmission control

16  protocol?

17         He answered:  The transmission control pro --

18  control protocol is a well-defined specification.  That is

19  what that means.  You implement the spec.

20         And, Your Honor, the -- the title of the slide here

21  references indefiniteness.  We're certainly not saying this

22  claim is indefinite.  The reason that the standard is so

23  important, and they agree to this, is that once you

24  reference a standard in a claim, you are bound by the

25  standard as it existed at the time that the patent

 1  application was filed.  But it is the standard.

 2         And we've cited case law to that, and there's no

 3  dispute on this.  This was their statement in their -- in

 4  their sur-reply.

 5         They say, quote, PAN takes the position that any

 6  reference to TCP in the claims must mean the TCP standard as

 7  it existed at the time of the application.

 8         Again, this is true.  But inapposite.  And they

 9  explain why they've got some legal argument.  But the

10  proposition is everyone agrees this claims is talking about

11  RFC 793.  That is the TCP standard.

12         This is -- this is part of it right here.  The

13  highlighted language at the bottom says:  This document

14  represents a specification of the behavior required of any

15  TCP implementation.  The top of this, if you look at the

16  second sentence of 1.2, it's not highlighted, but it says:

17  The TCP is intended to be a host-to-host product protocol in

18  common use in multiple networks.  Host-to-host, that's the

19  end points.

20         So I asked, again, Dr. Almeroth, Implicit's expert,

21  about his theory that somehow an intermediate firewall could

22  be executing TCP.  And I started with that sentence.

23         I said:  The second sentence there reads, quote,

24  the TCP is intended to be a host-to-host protocol in common

25  use in multiple networks, period, close quote.  Do you see

1    that?

2            I do see that.

3            Again, that's talking about communication between

4    two end points?

5            He says:  Sure.

6            Correct?

7            And he says:  For the communication between two end

8    points, that is -- this is what the document is focused on.

9    It doesn't say anything about when you're going to be -- in

10   his words -- executing TCP in an intermediate point, what

11   that functionality would include.

12           Okay.  And that's their theory.

13           Next question:  Is there any such document that

14   would, as you put it, describe executing TCP on an

15   intermediate device and what that functionality would

16   include?

17           Answer:  Well, there isn't a standard for it.

18           Of course not.  RFC 793 is about TCP on end points,

19   exactly as they said in the prosecution history.  That is

20   the only standard that anyone has suggested the claims

21   reference.  And that standard clearly does not describe any

22   activity on an intermediate point.  And their expert has

23   admitted it.

24           And, again, this is not any more complicated than

25   just what they said in the prosecution history, TCP is

1    implemented on end points, and what they admitted in

2    response to our motion, we are not end points.

3          We then get different sort of formulations in their

4    briefings about what this really means is whatever part of

5    the TCP standard -- you kind of read the whole thing and

6    kind the excerpt whatever teachings and take them out of

7    that context and use whatever is required to do the

8    conversion of one kind of format to another format, that's

9    all that's required, okay?  That's -- that's basically their

10   argument.

11         Well, first of all, the claim requires executing a

12   transmission control protocol, TCP.  They put that in.  It's

13   got other language after it, but you have to execute a TCP.

14   That is the standard.  That is only end points.

15         And so their argument is a non sequitur.  I mean,

16   if you're not an end point, you're not TCP.  That's what

17   they said in the prosecution history.  That's what the

18   standard says.  That's what the expert admitted.

19         The other thing is the -- the standard has all

20   sorts of mandatory requirements.  Again, it said these are

21   the requirements of any TCP implementation.  It includes a

22   handshake.  It includes all the things to create a session.

23   You can't pick and choose out of a standard and say you're

24   complying with the standard.  You're not.

25         And it's not a hard thing to satisfy.  I mean, the

1  vast majority, maybe every end point on the Internet

2  complies with TCP.  They just do so -- and that's what their

3  patent is about.  They just so happen to have admitted they

4  accuse something that does not, because it's not an end

5  point.

6          The other issue is that their formulation would be

7  indefinite.  These were the analogies that they put in their

8  sur-reply, that -- that the specification for TCP, the

9  standard, is like a toolkit, and the claim requires that you

10 leverage the teachings in the TCP specification.  That is

11 meaningless.

12         Again, the standard -- this is about the claim

13 scope.  And the case law, as they agree, is that when you

14 reference a standard and you're defining the scope of your

15 claim based on the content of the standard, you are stuck

16 with that standard.

17         You don't get to leverage the teachings of the

18 standard and literally have the experts, I guess, argue

19 about how much is enough and how much isn't enough, but they

20 would literally be arguing about the scope of the claim.

21 The standard is the standard.  The standard says, A, there's

22 all these requirement; and, B, everyone agrees this standard

23 is only implemented on end points.

24         There was a case on this point, the Vizio versus

25 International Trade Commission case that we cited.  And in

1  there -- it was either their -- I think it was their

2  sur-reply.  They said:  Actually this case helps us -- helps

3  the Plaintiff.  This was -- this was the claim language at

4  issue in the Vizio case.  It was:  Said channel map

5  information replicates information conveyed in said MPEG

6  compatible program map information.

7        All right.  So the claim had channel map

8  information, all right, in a device, and it had to replicate

9  or copy information that was conveyed in an MPEG compatible

10 program map information, okay?

11       So the Federal Circuit said, first of all, that

12 MPEG reference, that's the MPEG-2 standard as it existed,

13 you know, at -- at that time.  You were -- you were stuck

14 with that.

15       This particular claim, this language, talks about

16 replicating or copying.  Okay.  That in this language,

17 you're copying a particular part of the MPEG-2 standard,

18 namely, the MPEG-2 compatible program information.  And so

19 the conclusion was we agree with the commission that the

20 claims require associating the program with all of the

21 identifiers conveyed in the MPEG-2 program map information

22 that are necessary.

23       Our point is once you reference a standard, you are

24 stuck with that standard.

25       The language in our case is, execute a TCP, right?

1    The language in this Vizio case wasn't execute MPEG or have

2    an MPEG, you know, claiming an MPEG device.  That's what the

3    language is in this case, and as confirmed in the

4    prosecution history, it's you have to execute TCP.  And the

5    only place TCP is executed, per the standard, is on an end

6    point.

7            Another argument they make, and this is the first

8    one -- the first time in their sur-reply.  They argue the

9    claim talks about a routine, a routine being executing a

10   TCP.  And TCP is really a bunch of routines.  TCP is a lot

11   of things.  And so surely, therefore, the claim must just

12   mean some subset of TCP, okay?  That would defy all the

13   testimony.  It would defy the prosecution history.  It would

14   also -- and we -- we put in a supplemental on this, Your

15   Honor.  It would defy what their own expert said.

16           This -- this supplement, Your Honor, is -- it's

17   Docket 283.  We asked Dr. Almeroth:  What's an example of a

18   routine?

19           His answer:  Those are all pretty generic terms.

20           Question:  So a routine doesn't have to be a single

21   function?

22           Which is what their argument was in their

23   sur-reply.

24           His answer:  If you mean function in the way I was

25   using it, say, a programming construct, I don't think a

1  routine would limited to a single function.  I mean, you can

2  implement a routine of multiple functions.  My point is,

3  yeah, the fact that it said a routine that executes TCP,

4  that absolutely covers the standard.  And, again, the

5  language says:  Execute TCP.  There's only one way to

6  execute TCP.

7         Just a few more points, Your Honor, and then

8  I'll -- then I'll be done with this one.  There is some

9  arguments in the brief about who would eviscerate claim

10  language, that we're -- we're striking language based on our

11  reading, they're striking language based on their reading.

12         Point No. 1 is the prosecution history trumps this.

13  I mean, the prosecution history is what it is, and they're

14  stuck with it.  But beyond that, they are the ones that are

15  striking language.

16         Their view is so long as you convert one or more

17  packets having a TCP format into a different format, you

18  satisfy the claim.  They're striking to execute a

19  transmission control protocol, TCP.  Their view is so long

20  as you perform this conversion, nothing else matters.  And

21  that would strike to execute a transmission control protocol

22  from the language.

23         But the language it's talking about, it requires

24  two things.  You execute a TCP.  You've now established a

25  session between end points that are compliant with the

1    standard, right?  We're ready to go, and those end points

2    are compliant, meaning they can do all the things that the

3    TCP standard requires.

4            Now data comes.  And now that data comes over it,

5    we've got to convert one or more packets having a TCP format

6    into a different format.  Now that data has come over, we've

7    actually done something with the TCPs that we have

8    established per the TCP standard on the end points.

9            That's what the language actually means.  And,

10   again, the prosecution history is -- is -- is the trump

11   card.

12           In terms of the specification, everything in the

13   specification is end points.  There is no reference to

14   anything intermediate in the specification.  It's about one

15   system, a sender, sending to a receiver.  There's a

16   reference to a TCP session, TCP protocol.  There is never a

17   suggestion of anything in between end points.  There's never

18   a suggestion of some subsection of TCP at all.  This is --

19   what we're describing is a hundred percent consistent with

20   the specification.

21           And there's no disclosure at all -- well, I said --

22   of the invention on devices between end points.

23           Your Honor, the -- they -- they had raised an issue

24   about waiver, that we had somehow waived this issue.  I -- I

25   will -- I will let them present their argument before --

1   before I respond to that.  I know it's in their papers.  I

2   thought it'd probably be appropriate to let them

3   affirmatively make the argument, and then I'll respond to

4   it, unless the Court wants to hear an argument on that now.

5          THE COURT:  That's fine.

6          MR. GAUDET:  That's everything I had on TCP.  I

7   know I've said a mouthful.  It might make sense to have a

8   response on TCP before I move on to the second one, but,

9   obviously, whatever the Court would prefer.

10         THE COURT:  The second one being the sequence of

11  routines?

12         MR. GAUDET:  Yes, Your Honor.

13         THE COURT:  I can keep them straight.  Go ahead and

14  give me your other argument.

15         MR. GAUDET:  I'll do that.  Thank you, Your Honor.

16         Sequence of -- of two or more routines.  The --

17  there's an agreed construction in this case.  It's an

18  ordered arrangement of two or more software routines that

19  was not identified -- i.e., configured -- prior to receiving

20  a first packet of the message.  That was the order from this

21  Court's TrendMicro case, and -- and subsequently identical

22  to the order in the F5 case.

23         This is another very unusual situation.  The

24  opposition brief that that -- I should say we -- we

25  submitted five statements of undisputed material fact

1   supported by evidence.  We -- we -- we cited evidence.  We

2   cited reports.  We cited evidence to -- to -- to put the

3   issues in play.

4         Reading the entirety of their opposition brief,

5   they cite no evidence.  There is no evidence about the

6   operation of our products.  So they purport -- you see all

7   these statements about how we operate, and no citations, no

8   evidence.

9         They purport to dispute our statements of

10  undisputed material fact, but it's nothing but lawyer

11  argument.  And all they're arguing is whatever we say, they

12  basically say, well, that's not configured.  Well, that's

13  not -- you know, they're just debating the meaning of this

14  word "configured."  They never did anything to create a fact

15  issue on any statement we made about the actual operation of

16  the products, other than debate the meaning of the word

17  "configured."  That's it.

18        And so effectively, our statements of undisputed

19  material fact as to the operation of these products, with

20  the caveat of a debate about the meaning of the word

21  "configured," are undisputed.  They haven't done what they

22  needed to do to create a dispute.

23        Now, in the sur-reply, they put in two pieces of

24  deposition testimony, and I will get there.  A, that's too

25  late.  But, B, it doesn't help them.  But I will -- I will

1  talk about that.

2        But in -- in the time they were supposed to create

3  fact disputes, they didn't.  And so that basically what's

4  left is -- you know, based on these undisputed facts, are

5  the accused sequences of routines identified, i.e.,

6  configured, prior to receiving a first packet of the

7  message.

8        And if they are, we're entitled to summary

9  judgment.  So general -- general background, what they're

10  accusing is -- this is that -- probably now a very familiar

11  PAN flow -- PAN-OS packet flow diagram on the right.

12        The way this operates is a packet will come in from

13  the top, and every time that a packet gets to a diamond,

14  there's -- there's a choice to be made.  If the packet has

15  some particular characteristic, you know, header information

16  or whatever else, it will go one direction.  If not, it will

17  go the other.

18        So you're working your way through a graph based on

19  conditional programming, if then.  In other words, if the

20  packet is X, it goes to one direction.  If it's not X, it

21  goes in the other direction.  That is what they're accusing.

22        And this was our statement of undisputed material

23  fact on this.  We said:  All packets traversing PAN's

24  firewalls follow the packet flow in PAN-OS illustrated in

25  the PAN packet flow walkthrough diagram.

 1          The options of paths between any routines are

 2    pre-configured in the PAN-OS code.  In other words, they're

 3    finite.  They're built in.  At any one of these nodes, you

 4    don't have an infinite number of options.  You can't bring

 5    something else new.  You can't create new connectivity to

 6    get somewhere.  You simply have a limited number of one or

 7    two or three options.

 8          That is exactly what Implicit disclaimed from

 9    Mosberger.  When -- when the prosecution history used the

10    word "configured," that is configured.  That is what it

11    means to be configured already.

12          And so the dispute is really the meaning of this

13    phrase not identified, i.e., configured.

14          Now, in the prosecution history, if you see on the

15    right here, this is -- this is Mosberger, the prior art

16    reference, the graph in Mosberger that was highlighted in

17    the prosecution history.  And the -- the flow of this graph

18    starts from the bottom.  All right?  The packet comes in,

19    and it hits the ETH, which is Ethernet.

20          THE COURT:  Let me stop you with a question.

21          MR. GAUDET:  Yes, Your Honor.

22          THE COURT:  You said a minute ago that there was no

23    question here that what we were left with was essentially

24    are the packets configured and you finished the sentence.

25          How is -- how is that not a fact question in and of

1  itself?  Shouldn't the jury answered?  Are they figured that

2  way?

3         MR. GAUDET:  Your Honor, the reason it's not a

4  jury -- a fact question, and I'm going to walk through in

5  the next five slides, is the -- what I described as a matter

6  of law it has to be configured based on the statements in

7  the prosecution history.  In other words, it is not a fact

8  question as to whether or not working -- a packet working

9  its way through using conditional programing, a -- a graph,

10 whether that means that the sequence of routines was or was

11 not pre-configured.  The prosecution history said

12 repeatedly, that is pre-configured.  That is what we are

13 not.  It was expressly disclaimed.

14        So that -- that -- in this circumstance -- and

15 ordinarily, I would absolutely agree.  But there's something

16 very unusual about this prosecution history where over and

17 over and over again -- and I'll -- it will all flesh out in

18 the next four or five slides, Your Honor.

19        THE COURT:  All right.  Four or five slides, let's

20 go.

21        MR. GAUDET:  Okay.  So in this instance, the packet

22 comes into the ETH module, and depending on what the packet

23 header is, it could either go on P1 up to UDP, or it can go

24 to IP, or it can go to ARP.  And iteratively, it's the next

25 one, IP, and it go P4 or P5, depending on the content.  That

1    is exactly what I was showing on the PAN-OS flowchart.

2         And what -- what the prosecution history said is

3    that that arrangement, okay, is pre-configured.  It's

4    already known before the first packet arrives.  And,

5    specifically, in the quote here, it says:  As seen in Figure

6    36 above, there are a number of pathways, P1 through P5, for

7    the data to travel, but the selection of modules for each

8    path is configured before receipt of the message packets.

9    In other words, it's all set already.  If -- if -- if the

10   available sequences and the interconnections are already

11   there, the sequence of routines is already pre-configured.

12        The -- it -- it goes on to say the -- the ETH

13   module employs a classifier to decide whether a packet

14   should be processed using path P1, P2, or P3.  The only

15   variation in Mosberger is which path through the pre-defined

16   sequence will be taken?  In these examples, the ETH module

17   selects the initial pathway, i.e., pathway P1 or P2 or P3

18   based on the protocol header in the first packet of the

19   message.  So if -- based on the packet, it will decide.  It

20   will go P1, P2, or P3, okay?

21        If the protocol -- and then it says if it's one

22   thing, it goes one place; if it's something different, it

23   goes the other place.  Then right before the little break,

24   it says:  If, however, the packet has been fragmented by IP

25   and does not include higher level headers, then the

1  classification process will result in selection of

2  Pre-configured Path 2.  At that point, after the packet has

3  been reassembled, the IP module classifier determines

4  whether it's UDP or TCP, i.e., down pre-configured 4 or

5  pre-configured 5.

6  　　　　　Importantly, these sequences of IP-UDP by a pathway

7  4 and, you know, pathway 5, all these different options, all

8  of these have been identified prior to runtime.  In other

9  words, the P2/P4 path and the P2/P5 path are pre-configured.

10 That's the word.  When you've got these things already set

11 up, and it's just a question of when the -- when the packet

12 arrives, depending on the packet, do I go left or right, and

13 then I -- that whole thing is pre-configured.

14 　　　　　And it says:  Again, the only question resolved at

15 runtime is which pre-configured path with pre-determined

16 sequences of modules should be selected, exactly the same --

17 those -- those are the facts that they can't dispute.

18 　　　　　THE COURT:  Let me ask you this.  Both sides agreed

19 on this construction.

20 　　　　　MR. GAUDET:  Yes.

21 　　　　　THE COURT:  And now you're arguing prosecution

22 history to me, in effect, asking me to provide some type of

23 claim construction to the agreed upon construction

24 previously adopted.  I'm not inclined to at this late, late

25 date in the process, whether you want to wave 02 Micro in

1    front of me or not, enter into claim construction on a

2    construction -- not a term from the claim language, but a

3    construction that both sides have agreed to and adopted by

4    agreement.

5            Tell me why I should.

6            MR. GAUDET:  Your Honor, we thought that with the

7    agreement of that instruction, we weren't going to see an

8    infringement case like this.  And the reason we thought

9    that, Your Honor, was -- and this is -- this is -- this

10   would not go in front of the jury.  This is my answer to

11   your question.  This was the very construction that led them

12   to dismiss the case against F5, against our competitor.

13   Because with this construction, we thought, well, yeah, I

14   mean, it's -- it's that clear.  The case is over.

15           And likewise, they fought tooth and nail in the

16   TrendMicro case to avoid this construction, and it was

17   entered.

18           And so when we got to the Markman hearing, our

19   understanding was that somehow they were going to use

20   something about -- and this was -- there was actually a Q&A

21   on this at the -- at the Markman hearing -- something about

22   establishing the TCP handshake process, and then the

23   interaction of that with the entirety of this chart as being

24   the sequence of routines so that this issue would not have

25   come up.  In other words, we did not understand until later

1  after the Markman hearing that this was their argument.  And

2  the indications we had before that, and it's an unusual case

3  with an unusual history where that -- this construction with

4  the word "configured" was everything that was needed to end

5  the possibility of this -- of this type of an argument, Your

6  Honor.

7          THE COURT:  So you understood, by Plaintiffs

8  agreeing with you to adopt this construction from an earlier

9  case or cases, that the Plaintiffs were agreeing to abandon

10  their infringement case?

11          MR. GAUDET:  No.  We --

12          THE COURT:  Is that what you're telling me?

13          MR. GAUDET:  No, it's not, Your Honor.  It's not.

14          THE COURT:  Okay.

15          MR. GAUDET:  Because it's not that.

16          At the hearing --

17          THE COURT:  That's an optimistic expectation if

18  that's what you had in your mind.

19          MR. GAUDET:  At the hearing, you may recall the

20  first claim term that was argued was about whether or not a

21  single message could include both a TCP handshake and then

22  also one of these routines that came after.  And that, Your

23  Honor, was the theory that they pressed against TrendMicro

24  after this construction.  That was it.  That was the

25  argument they were going to go to the jury with.  It wasn't

```
 1   the argument they're going with today.  It was something
 2   different.  So we understood that's what that case was
 3   about.
 4          And that's why we made that argument.  And -- and I
 5   said on the record:  My understanding is they're accusing
 6   the handshake, and that this is all going to be the way this
 7   works out.  And so it wasn't that they were going to abandon
 8   their entire infringement case.  It was that having lost the
 9   issue in the TrendMicro case, they were then going to use
10   the same infringement theory they pursued in the TrendMicro
11   case, which was some combination of a TCP handshake by
12   itself, plus, in effect, you know, all of App-ID or whatever
13   it would be, but it wasn't the idea of simply working your
14   way through a flowchart.  That was everything we had and
15   frankly everything we said, cards on the table, where that
16   was our understanding of where the case was going, Your
17   Honor.  And -- and today, we're obviously wrong.  That's not
18   where it went.  But -- but that's how we got to where we
19   are, Your Honor.
20          And our -- our point is simply that as a matter of
21   now a prosecution history estoppel, they can't -- they can't
22   say that this word "configured" means something that is at
23   odds with the statements in the prosecution history.
24          They're just --
25          THE COURT:  Outside of the claim construction
```

1    context, how can you assert that the prosecution history is

2    binding on what they can say something means or doesn't

3    mean?  I mean, clearly it can't be the case that at any time

4    from complaint to verdict, along the way somebody wants to

5    jump into a claim construction argument or a construction

6    argument, because this is not claim language.  This is

7    language from an agreed upon construction.

8             MR. GAUDET:  It is.  And, Your Honor, with respect

9    to the orders that led to that construction, there were --

10   there were statements, for example, and I'm -- again, in

11   terms of kind of how we got to where we are, I'm going to

12   show you the statements from Judge Illston's Markman order,

13   and this is certainly not binding on the Court, but this was

14   out there before Your Honor's order.  And Your Honor's order

15   said that you're not bound by it, but that you agreed with

16   her conclusions.  And she went through this prosecution

17   history and said, you know -- I have it underlined -- these

18   systems could not process message packets containing new

19   data formats.  In other words, the Mosberger systems, if you

20   had a new format, they weren't able to process it, but the

21   patent is supposed to be able to do that.  You can have some

22   new module in it.

23           Instead, she says that you can process the

24   packet -- this is the second underline -- from a finite set

25   of pre-configured paths that are based on pre-configured

1    sequence of routines that existed before the first message

2    was received.

3          Instead, what -- again, what she said was that by

4    dynamically identifying a sequence of routines after a first

5    message, it can do it on the fly to process incoming message

6    packets containing new data formats.  In other words,

7    something that there is no module ready to deal with.  And

8    it's not a finite limited number of options.  It's infinite.

9    That comes directly from the prosecution history.

10         So when we read the order, it's not that we're

11   trying -- we read that order and then Your Honor's order

12   likewise cited to the -- the same prosecution history.

13         Our understanding is that, well, language is

14   imperfect.  This is exactly what that word "configured"

15   meant, and the word "configured" meant that -- that the --

16   what would be not configured would be a module that's not on

17   this chart yet, that gets downloaded after you receive the

18   first packet.  That's what the inventor described.  Or new

19   interconnectivity, so new pathways that you can go from one

20   spot to some new spot where the interconnectivity didn't

21   pre-exist.  That's why this -- this notion of being finite

22   or not is so important.

23         What they said in the prosecution history, Your

24   Honor, was that there is this ability to have -- you know,

25   it's significantly different from Mosberger because you get

1    new types of messages requiring new combinations of modules,

2    and that -- that all interconnectivity is pre-determined and

3    compiled into the operating system before it ever receives a

4    single packet of data.  That's the Mosberger system that

5    they're supposed to be different than.

6          And so those -- that's where the notion of -- of it

7    being finite comes into play.  This -- this piece of the

8    prosecution history on Slide 33 references the conditional

9    programming.  And that -- that was -- the dynamic routing,

10   he says, as described in the context of the paths in

11   Mosberger is essentially a series of if/then computer

12   instructions.  You know, you get to a node.  If it's one

13   thing, you go here.  If it's another thing, you go there.

14   By definition, that's a finite set of options.

15         And so when the orders that we were looking at

16   talked about how this system is different because it's not a

17   finite set, it's infinite because you can download something

18   new, you can create new interconnectivities, we thought that

19   was everything that we needed.  And that's where it came

20   from, Your Honor.

21         THE COURT:  All right.

22         MR. GAUDET:  I believe -- let me just do a quick

23   run-through.  I believe --

24         THE COURT:  Do you have anything else for me?

25         MR. GAUDET:  Your Honor, I think that covers all

```
 1   the salient points.

 2           THE COURT:  Let me hear Plaintiff's response.

 3           MR. SINGER:  Benjamin Singer for the Plaintiff.

 4   Your Honor, may I approach?

 5           THE COURT:  You may.

 6           MR. SINGER:  Thank you.

 7           Can we switch to the VGA from the podium, please?

 8           MR. HURT:  It's on.

 9           MR. SINGER:  Okay.  Thank you.

10           THE COURT:  All right, counsel.

11           MR. SINGER:  Thank you, Your Honor.

12           So I think a couple of things.  One, we heard a lot

13   about the prosecution history, and we heard the prosecution

14   history is the trump card.  And we heard use the prosecution

15   history to interpret an existing construction.  And those

16   are hallmarks of -- of performing claim construction on the

17   eve of trial, which is not how our patent local rules

18   contemplate the case progressing in an orderly fashion.  And

19   it shouldn't happen at the pre-trial conference.

20           But -- but more than that, before we get into any

21   individual issue, if PAN is right that they don't infringe

22   because they're not a TCP end point, then we've all wasted a

23   lot of time and a lot of money and a lot of effort.

24           There has never been any conceivable confusion on

25   PAN's part about whether or not their firewall was a TCP end
```

1   point.

2           Surely, at some point, if they believed that that

3   was the scope of the claim, we would have heard that from

4   them sooner.  They have not been bashful about filing early

5   summary judgment motions or challenging our infringement

6   contentions.  We didn't hear anything about this.

7           And we never heard this in any of the past cases.

8   No one has ever asserted that the claims are limited to TCP

9   end points, which would be a remarkable limitation of the

10  claims.  Most of the licensees to this portfolio are not TCP

11  end points.

12          Similarly, if PAN is right, they don't infringe as

13  a matter of law because their operating system is able to be

14  represented in a series of boxes and arrows and that -- -

15  that, therefore, makes the processing paths pre-configured,

16  we've all wasted a lot of time, effort, and money.  We would

17  have heard that earlier if that was right.

18          So two issues, as the Court is now well aware.

19  Let's start with the first.

20          Can we please go to the document camera?  Thank

21  you.

22          Just to set the context a little bit, I have on the

23  document camera a slide from PAN's presentation, and I just

24  want to make sure we understand what's going on here.

25          TCP, and, in particular, the conversion from TCP

1   format to application level format, that is recited in the

2   relevant claim limitation.  What that does is it allows you

3   to get back the level 7 data.  And so this firewall that

4   they're showing here, it has App-ID on it.  And App-ID

5   inspects level 7.  It can't do that without performing the

6   TCP protocol recited in the claims, which is a TCP protocol

7   to convert.

8          So you see that the slide under TCP B says

9   re-orders as 12345.  Well, that reordering is the format

10  conversion of the claims.  And they admit, in the red box in

11  the rectangle -- black rectangle under firewall, that they

12  do that, and they have to do that because otherwise the

13  signature matching at level 7 that lets them identify

14  applications couldn't work.

15         Could we go back to the slides, please?  Thank you.

16         So I do think that this discussion starts with the

17  timing of this being raised.  And this is a slide just to

18  put in context what PAN's argument actually is.  It's an

19  untimely claim construction argument.

20         Now, the motion doesn't identify any term, and it

21  doesn't propose any specific construction.  But what I have

22  on the right-hand side is a statement from Page 4 where they

23  say:  Regarding the claim construction issue, the

24  substantive point is that the claims must be performed by a

25  device that is one of two end points participating in a TCP

1   session and complying with the TCP standard, as set forth in

2   RFC 793.

3         That limitation is not in the claims, and that's

4   why we heard so much about the prosecution history, and the

5   prosecution history is the trump card.  It's a claim

6   construction argument.

7         There's two problems with this.  One is it's

8   untimely.  And, two, even had it been timely, it would fail

9   as a matter of claim construction.

10        So there were pre-suit discussions in this case

11  from 2014 to 2017.  As part of those discussions, PAN did

12  raise non-infringement positions.  As discussed at the last

13  hearing, they told us about being pre-configured.  They

14  never said anything about a belief that the claims are

15  limited to a TCP end point or that they don't infringe

16  because they're not a TCP end point.

17        Case gets filed.  And on October 17th, we serve our

18  infringement contentions.  Now, this is the operative set.

19        Now, the justification for waiver, which

20  Mr. Gaudet -- well, the justification for, I guess, delay

21  and why there shouldn't be waiver that Mr. Gaudet said,

22  well, I'll wait until Mr. Singer speaks.  In the brief what

23  they said is:  Well, we thought we had a meeting of the

24  minds.  We thought that both parties understood that the

25  claims were limited to TCP end points.  And so on that

 1   basis, there was no reason for us to ask the Court for

 2   assistance on resolving a dispute.

 3          There's a common sense problem with that.  First,

 4   as I've said two times already and I'll try to stop

 5   repeating, if they thought -- setting aside what they

 6   thought we thought, if they ever thought that the claims

 7   were limited to TCP end points early in this case, we would

 8   have heard that, we would have seen the motion.  The fact

 9   is, as in most cases, this is a late arising

10   non-infringement position that they now have pushed in front

11   of the Court after claim construction and are trying to

12   position as an 02 Micro issue and as a claim construction

13   issue because that's how you get rid of issues of fact for

14   summary judgment.

15          So -- sorry, I misspoke.  On October 17th, what we

16   served was Interrogatory No. 10, and what that interrogatory

17   sought was their non-infringement positions.

18          They responded on December 18th.  Still no mention

19   at all of any defects based on being a TCP end point or not

20   being a TCP end point, that the claims are limited to TCP

21   end points.  They don't mention that.

22          We do claim construction over the course of early

23   2018.  And in March, the claim construction order issues.

24   No -- no TCP term is addressed.  It's -- they haven't made

25   this argument at any point.

1          Fast forward three months.  June 6, 2018, PAN

2     supplements their response to Interrogatory No. 10.  And for

3     the first time, they assert that the accused products don't

4     infringe because they do not perform TCP.  They do not

5     perform TCP to convert packets from TCP format into a

6     different format.  And so this is important for a few

7     reasons.

8          First, they've said in their brief that, well, we

9     didn't realize that there was any non-infringement issue or

10    claim construction issue until we saw Dr. Almeroth's July 2

11    report.  This was a month before that.  A month before that,

12    they sat down and said, wait a minute, there's another

13    non-infringement position we've never mentioned.  Let's --

14    let's supplement our rog response and tell them about it.

15    It's right here.  It didn't come from Dr. Almeroth.  They --

16    they found this position late.

17         And eight days later, it happens to be the

18    deposition of their senior vice president of engineering,

19    Mr. Ralston.  And Mr. Ralston testified, candidly, in a

20    matter where it was very clear he had been prepped to say

21    it.  It wasn't in response to any question.  He injected a

22    number of times:  We're not a TCP end point.  The

23    termination of TCP is at the client and the server.  We are

24    not terminating.

25         So by this point, weeks before the Almeroth report,

1  they've discovered their late breaking non-infringement

2  position, that they're not a TCP end point and apparently

3  the claims were limited to TCP end points, and they missed

4  it, and everyone else missed it.

5          And so I think this shows the truth of how we got

6  here.

7          Now -- can we go to the document camera, please?

8          Here's Interrogatory No. 10.  We're all -- it's

9  longer than it needs to be, but the relevant portion I have

10  highlighted in yellow.

11         State in detail all factual and legal bases for

12  your contention, if you do so contend, that you do not

13  infringe.

14         Here's the initial response.  With respect to the

15  demultiplexing patents, i.e., the '683, '790, and '104

16  patents, the accused products do not obtain or receive a

17  packet or packets from a message, and in response to the

18  packet or packets, create or identify a path or sequence of

19  routines obtained from information located in the packet or

20  packets.

21         There's nothing in here about the TCP end points,

22  TCP sessions, the TCP claim limitation.  This is the defense

23  that the case had been about, and that's what we understood

24  was their defense.

25         Now, on the next page, they do list out the

1    limitations that they're saying aren't met.  And they

2    include the TCP limitation, but they're doing that because

3    they included every limitation about the sequence, including

4    routines, because they're saying, well, we don't have the

5    claimed sequence.  So then they went and listed every

6    limitation that referenced the claimed sequence.  But they

7    never said anything about the important part we're here to

8    talk about today, about using a TCP to convert to make that

9    special conversion.  And they knew that, which is why in

10   June, as we're getting ready to go testify -- getting ready

11   to go depose Jesse Ralston, and he's planning to testify

12   that they're not a TCP end point and introduce this new

13   issue, they supplement the rog response because they don't

14   want us to say he has to come back.  And they know they

15   haven't disclosed this defense.

16          So here's the supplemental response.  Now, it's

17   very clear, the accused products do not meet these

18   requirements because they do not perform TCP.  They do not

19   perform TCP to convert packets from TCP format into a

20   different format, and/or TCP does not include a conversion

21   routine, as required by the Court's construction, of

22   process/processing packets.

23          Can we go back to the slide show, please?

24          Then in August, we get the Schmidt rebuttal report.

25   Not shown here is on July 2nd was the first Almeroth report.

1    In August, we get the Schmidt report, and he's got this same

2    new non-infringement defense.

3            And then finally, August 23rd, they file this

4    motion.  And I think this is important for a couple of

5    reasons.

6            One, I don't believe that 02 Micro requires the

7    Court to resolve a claim construction dispute in this

8    context.  That's the waiver.  That's the thrust of what

9    we're talking about, and I have a separate slide on that.

10           But more -- or also, I should say, this goes to the

11   merits of the claim construction position they're advancing

12   should the Court want to consider it, because their claim

13   construction position is this is all clear on its face.  The

14   experts have all agreed, the claim language is clear.  It's

15   a specification.  Everyone would know.  The prosecution

16   history is the trump card.  If it was so clear, we -- this

17   wouldn't be the timeline.  We would have heard from them

18   earlier.

19           What this timeline shows, and in my opinion quite

20   clearly, is that the claims aren't so limited, and at some

21   point around early June, as they were getting ready for the

22   deposition of Mr. Ralston, said, ah-ha, maybe we can have an

23   argument that the claims are limiting.  Let's create a claim

24   construction dispute and see if we can raise it on the eve

25   of trial.

```
 1              So to distract from -- from what -- the timeline I
 2    just showed, PAN says in their motion that the reason
 3    they're coming to the Court now is because Implicit had a
 4    new theory set forth for the first time in its expert
 5    report, is that the TCP claim elements are satisfied by an
 6    intermediary device that is not one of the two devices that
 7    establish and participate in a TCP session.
 8              So what they're saying is we thought we all agreed
 9    it was end points.  We had no idea that they would accuse us
10    of being an intermediary device, which first point, they are
11    only an intermediary device.  There is no rational way they
12    could have thought they were an end point or that we thought
13    they were an end point.  That's why that fact is undisputed
14    here today.  It couldn't be.
15              But more, in the October contentions in the figure
16    I have on the left of the screen, the firewall is shown as
17    an intermediary device that is not one of the two devices
18    that establish and participate in a TCP session.  It's not a
19    new theory.  It's verifiably not new.
20              So with respect to the effect of the 02 Micro
21    decision, the facts of this case are very different than the
22    facts of the SEVEN Networks versus Google case that this
23    Court handled earlier this year.  And I am not suggesting
24    that the cases themselves or the fact patterns are
25    analogous.
```

1          That being said, in that opinion, the Court

2     undertook an analysis of the Federal Circuit precedent and

3     what it says about when it is and is not error to decline in

4     the Court's discretion to take up claim construction

5     disputes.

6          And my point is that same analysis was not

7     dependent on the fact of any one case, and it applies here.

8          And in this case, this is not a case where

9     subsequent development of the case revealed a new

10    disagreement as to claim scope.  The Court afforded PAN both

11    notice and opportunity to present their claim construction

12    arguments.  PAN elected not to do so.  I don't know whether

13    it's because they didn't realize there was a

14    non-infringement position based on this or they thought it

15    was better for some reason to sit on their hands.  It

16    doesn't matter.  They had a chance.  We did claim

17    construction.  That was the appropriate time to make this

18    argument.

19         And the third point is, again, it's very

20    problematic to do claim construction on the eve of trial.

21    Patent rules are essentially a series of case management

22    orders, and there's an important fair and orderly

23    progression to how a case should proceed.  And this is not

24    that.

25         Turning to the substance of the argument, this

```
 1    slide just shows where in Claim 1 we're talking about.  So

 2    the limitation itself actually says:  A routine that is used

 3    to execute a transmission control protocol to convert one or

 4    more packets having a TCP format into a different format.

 5    And, again, it's that conversion from TCP format to a

 6    different format that's required for any type of level 7

 7    inspection, including the level 7 inspection that App-ID

 8    does.  You have to put the payloads back in order so you can

 9    see the level 7 data in a meaningful way to inspect and

10    understand it.

11            This just reminds us of what it is that PAN's

12    advocating.

13            Now, because we are apparently at a belated Markman

14    hearing, yes, both sides are arguing that the other side is

15    making mincemeat of the claims -- classic claim construction

16    cliches.

17            And so our position is that our interpretation of

18    the claim, which is that it's not just any conversion, it

19    has to be the conversion from the transmission control

20    specification.  It has to be that specification has in it

21    teachings and conversions that you can use to do this exact

22    thing, to convert one or more packets having a TCP format

23    into a different format.

24            And so we're accounting for all of the words of the

25    claim.  And it's not just that we're accounting for all the
```

110

1   words of this limitation, we're accounting for the full

2   context of the claim.  That is the only interpretation that

3   does so.

4        And so the dispute here is really, well, PAN says

5   it's not -- it's not execute as much of the spec as

6   necessary to perform the recited conversion.  You have to

7   recite the entire specification.  And that is not how this

8   reads in plain English.  TCP has tons of routines in it.

9   And as Mr. Gaudet showed in our brief, we did analogize it

10  to a toolkit.

11       Some of those routines have something to do with

12  this conversion from TCP to level 7, and some of them have

13  nothing to do with it.  And the way this claim reads on its

14  face is that you're going to execute a TCP protocol to

15  convert.  So you have to do the part of the spec necessary

16  to perform the rest of the claim.

17       Here's what PAN does.  So first, it would have been

18  very easy for the patentee to limit this claim to TCP end

19  points.  We wouldn't be -- if that was the intent, we

20  wouldn't be talking about how to decipher, in view of one

21  statement in a footnote in the prosecution history, the --

22  the last limitation.

23       But they didn't.  They didn't say TCP end point.

24  They didn't say TCP session.  They didn't say TCP handshake.

25  They didn't say full TCP specification.  None of those

111

1  things are here, and that's because that's not what this

2  claim was about.

3        When you take PAN's interpretation, you have

4  several other issues, which is if the claim meant to

5  implement the entire specification -- as I've shown here,

6  complies with the TCP standard -- there would be no reason

7  to recite the conversion.  Every TCP end point performs the

8  conversion.  That language would be completely redundant.

9        Moreover, where it says to convert one or more

10  packets, that wouldn't just be redundant, that would be

11  nonsensical.  TCP doesn't selectively choose packets to

12  perform this recited conversion on.  It does it on all of

13  the packets.

14        What this claim was meant to say very clearly is

15  I'm talking about systems that -- that aren't TCP end

16  points, that don't convert every single packet.  But if you

17  are doing this conversion at all, one or more times, you

18  infringe.

19        The Vizio case, front and center again, we just

20  disagree.  The Court has the case.  But the way we read that

21  case is -- and this is almost the same stuff Mr. Gaudet

22  showed you.

23        In that case, it was undisputed that MPEG

24  compatible meant the MPEG-2 standard.  And the issue, as we

25  see it, was, well, what exactly has to be replicated.  And

1   the holding didn't say you have to replicate all of the

2   program map information in the MPEG-2 standard.  That would

3   be analogous to PAN's position.  Once you say -- once you

4   invoke the standard, you have to do all of it.  But that's

5   not what the Court said.

6          The claim specified how the program map is used.

7   Our claim says:  Execute a TCP in order to.  This claim

8   says:  Do something with the standard that is used.  And

9   then that qualifies the use of the standard, and that

10  qualification made it into the Court's construction.  The

11  holding was that it's only the program map information that

12  are necessary to constitute a program.  And they have

13  several other cases.  They all stand for the sort of -- the

14  proposition of which standard it is and how do we deal with

15  the fact that standards change over time.  None of that is

16  an issue here.

17         THE COURT:  Let's see if we can't wrap this up,

18  Mr. Singer.

19         MR. SINGER:  Yes, Your Honor.

20         The last point on this term is DeCasper, which is

21  the DeCasper 1 reference.  And they say:  Well, you're stuck

22  with what you said in the prosecution history.  It doesn't

23  matter that you disclaimed on other grounds.

24         Here's what was actually said.  This is eight

25  pages, right?  And DeCasper was distinguished, as you can

1    see in yellow, on the basis that DeCasper operates -- I'm

2    reading from the last yellow sentence to save time --

3    DeCasper operates on IP packets only, and thus executes the

4    IP protocol but not other protocols.  DeCasper had nothing

5    to do with TCP.  That was the basis for distinguishing it.

6         This is the end of the eight pages.  The conclusion

7    that DeCasper contemplates processing only IP packets is

8    consistent with DeCasper's implementation of an IP router

9    using an IP core that executes an IP protocol.  DeCasper was

10   IP only.  That was the basis for distinguishing it.

11        And may I have the document camera, please?

12        We're not going to read this, but here's the

13   section in which DeCasper was distinguished.  One, two,

14   three, four, five, six, seven.  Okay.  This Footnote 4 at

15   the bottom, out of eight pages, this one footnote is what

16   Mr. Gaudet called the trump card.

17        First of all, it's not -- it's not the substance.

18   It's an ancillary point.  It's in a footnote in eight pages.

19        But second of all, the substance of this footnote,

20   the point of this was that DeCasper has disclosed a plug-in

21   called TCP congestion backoff.  It monitors that.  And the

22   applicant is making the point that monitoring TCP congestion

23   doesn't require doing anything with TCP.  It's consistent

24   with the fact that DeCasper is IP only.  It's the only thing

25   that the applicant was doing, and this is certainly not a

1  prosecution history disclaimer.

2          So for all these reasons, we'd request that this

3  portion of the motion be denied, and as is going to be an

4  issue in the motions to strike, we don't think it's

5  appropriate that PAN be permitted to make this argument to

6  the jury either.

7          THE COURT:  What else?

8          MR. SINGER:  Sequence of routines.

9          So here, again, we're going back to the prosecution

10  history in order to do claim construction.  This slide shows

11  the parties' positions.

12          Our position is they infringe because the ordered

13  arrangement is dynamically created after receipt of the

14  first message.  Their position is they can't infringe

15  because the individual routines were pre-identified, the

16  dynamic decisions are made by -- made by pre-configured

17  software, which is all a proxy for PAN works like Mosberger.

18          So two problems, again, here.  Your Honor asked

19  some questions about this.  This is an agreed construction.

20  We can't be re-arguing it on the eve of trial.

21          And, two, when you look at the lengthy history from

22  which this agreed construction came, it's very clear that

23  everyone considered the disclaimer, the conclusion was

24  always the same.  What was disclaimed was only

25  pre-configured complete sentences [sic].

1          So --

2          THE COURT:  Did you say complete sentences or

3    complete sequences?

4          MR. SINGER:  Sorry, sequences.  I think I did say

5    sentences.

6          THE COURT:  I think you did.

7          MR. SINGER:  My mouth is getting dry.

8          THE COURT:  It's lunchtime.

9          MR. SINGER:  So I'm going to go quickly.

10         So the -- if what we're really trying to do is

11   understand how that construction should be applied, we would

12   be looking at the orders from which it came, not going back

13   to the disclaimer and trying to say what it does and doesn't

14   say.

15         And so I'm just going to fill this all the way in.

16   The conclusion is through all these orders, what was

17   perfectly consistent was that the scope of the disclaimer

18   was the use of pre-configured paths and only the use of

19   pre-configured paths.  That was the holding in F5 Networks

20   I, F5 Networks II, this Court's order in Implicit versus

21   Trend.

22         Now, the F5 Networks II order is particularly

23   instructive because it considers the scope of the disclaimer

24   in both directions, what was disclaimed and also what

25   wasn't.  And central in that analysis is an embodiment in

116

1  the '683 patent that Judge Illston said:  Here's a thing

2  that's not disclaimed.  And she -- she went through it in

3  significant detail.

4       And the reason it wasn't disclaimed is because it

5  does not identify the complete sequence of routines needed

6  to fully process the message until after we get the packet.

7       This is not from her order, but I wanted the Court

8  to see where she's discussing it in the patent.  She

9  cites -- we're going to see that to Columns 4, 1 through 44,

10 and that discusses Figure 1.  And she discusses this

11 embodiment extensively.

12      And what's happening here is you call some software

13 routines demux and label map yet once.  They identify the

14 first three routines from a pre-configured set that make up

15 the path.  Then, because you're not done processing, you

16 call the software routines again, and they find two more

17 using pre-configured logic from a pre-configured pool of

18 routines, but what they've done by being called twice is

19 created this sequence of five that didn't exist.  The

20 sequence wasn't pre-configured.  Pre-configured software

21 picking routines from a pre-configured pool, but the

22 ultimate sequence that the software and logic derived at,

23 not pre-configured.

24      And this was so important to her analysis that she

25 went through it in two different places.  One here -- I

1    won't read it to you because it's lunchtime -- and then,

2    again, later.  And this one, I think, just the middle

3    paragraph verifies what I just described.  The embodiment

4    dynamically identifies a sequence of routines by using the

5    Label Map Get module -- that's software -- to select the

6    first three software routines that were identified and

7    existed before the system received a first message packet.

8    Then the Label Map Get module dynamically identifies the

9    final two routines that are necessary to complete the

10   sequence of routines and fully process the packet.

11           So this is an example of what's not disclaimed,

12   what's not pre-configured.

13           I think -- I was concerned that it was unclear what

14   exactly PAN was saying, but Mr. Gaudet basically

15   acknowledged this.  He said:  Well, our view is that you

16   can't even know the pool of routines that you're going to

17   make the sequence from until after the packet of the message

18   arrives.

19           And my point on this is that's the construction

20   that F5 advocated for in F5 Networks II and Judge Illston

21   explicitly rejected.  She said:  F5's proposed construction

22   is no more helpful.  It attempts to limit the term more

23   narrowly than warranted by Implicit's prosecution history

24   disavowal.  And -- and you can see what their construction

25   was.

118

1          Pre-configured software.  This is Schmidt, but,

2    again, we've already been over that.

3          The last point I want to make is this idea that PAN

4    is like Mosberger.  Here's how Judge Illston described

5    Mosberger.  Mosberger describes one such prior art system

6    that was pre-built with a finite set of pre-configured

7    sequences.  And she -- she makes very clear that Mosberger

8    is fully pre-configured, right?

9          PAN's dynamic.  Here's what Dr. Almeroth said about

10   PAN.  App-ID's session-based architecture also allows the

11   NGFW to dynamically update the processing steps.  And he

12   goes on.  These two systems are completely different, and if

13   there's any disagreement about that, that's an issue of

14   fact.

15         Finally, the idea that the Mosberger router graph

16   and the plan flowchart are the same is just not correct.

17   Here's what the inventor said when Mr. Gaudet asked him to

18   compare these two.

19         I honestly don't see any similarities, other than

20   they are boxes with lines connecting them.  That's the only

21   similarity I see.

22         Of course, the inventor is a party, but that's --

23   that's the technically accurate issue.  These two boxes just

24   happen to both have arrows.  The flowchart doesn't even show

25   the modules.  It doesn't show the paths.  It doesn't show

1    the interconnections.

2          That's all I have, Your Honor.

3          THE COURT:  All right.  Mr. Gaudet.

4          MR. GAUDET:  Thank you, Your Honor.

5          THE COURT:  Brief rebuttal.  It is 12:35.  I'd like

6    to give you about 5 or 10 minutes at the most and bring this

7    argument to a conclusion.

8          MR. GAUDET:  Thank you, Your Honor.  And that

9    should be plenty.

10         If I could get the overhead board.

11         Your Honor, I'm going to start with the waiver

12   issues with respect to TCP.

13         THE COURT:  That's fine.

14         MR. GAUDET:  And Mr. Singer left out a couple of

15   facts that are so crucially important, it answers every one

16   of the questions that he asked, okay?

17         Predicate Fact No. 1, and I've said this over and

18   over again.  The firewalls do -- they are capable of acting

19   as end points in other unaccused context.  So it's not as if

20   our firewalls cannot be TCP end points.  It's that they're

21   never accusing them of acting as TCP end points because when

22   they do it, they're not processing the relevant traffic.

23         Now, this isn't something that I'm making up or

24   that they didn't know about, Your Honor.  And this -- my

25   handwriting is awful, but this is the best I could do to

1    mark up their -- their -- their slide -- their slide here.

2          They left out perhaps the most telling data point.

3    On December 14th, 2017, they served their attempted 3-1(g)

4    infringement contentions.

5          Now, these are the ones that were later struck by

6    the Court.  But in December 14th, 2017, before the Markman

7    hearing, when they were saying how in the world could PAN

8    have thought that we were talking about end points, the only

9    code they cited for TCP for any of these elements was a full

10   end point-to-end point configuration via the Linux code.

11   That is at Page 7 of our reply, and the specific modules

12   they cited are at Footnote 4 of that reply.  They had in

13   their possession the stuff they're accusing today -- namely,

14   TCP reassembly.  It was not anywhere in those contentions.

15         The only thing those contentions cited was the full

16   end point-to-end point accusation.  That's why we thought

17   that's what the case was about because it was the only thing

18   they told us the case was about.

19         And as a matter of fact, Your Honor, that's

20   consistent with their October contentions.  In their October

21   contentions, Your Honor, on this TCP element -- I'll jump to

22   get to the relevant pages.  This is now Page 26 of their

23   contentions.  So these are -- these are the October

24   contentions.  The first thing they say is they've got this

25   language about the transport layer sessions.  And it's

1   describing TCP overall.

2        The next thing they cite is -- is this paragraph

3   that TCP RFC 793, one of the main protocols in the Internet

4   Protocol IP suite:  TCP performs a handshake during session

5   setup.  It is the entirety of TCP.

6        Now, they had then this next page that showed, all

7   right, well, you've got client server, there's a file on --

8   a bunch of stuff going back and forth, all right?  Those are

9   the three pages we get.  And so we're going:  We still don't

10  get it.  A month and a half later we get this 3-1(g)

11  contentions, and the only thing in the 3-1(g) contentions

12  are end point-to-end point.  That is it.

13       So when you now look back at -- at his -- at his

14  timeline with -- with my awful handwriting, the relevant

15  point filled in, every one of his questions is answered.

16  Why didn't we believe this at the Markman hearing?  Because

17  it's the only thing they told us.  Why -- you know, why --

18  why was it that people started focusing on TCP reassembly,

19  because in June 19th, they had a meet and confer with us

20  where for the first time they said:  Guys, where are your

21  TCP reassembly documents?  And we said:  What are you

22  talking about?  You haven't accused TCP reassembly.  And

23  that then led to the motion to strike that the Court

24  considered last week and -- and denied, and we certainly

25  understand that.

1          But our point is, even if you can read the October
2   contentions as including TCP reassembly, you can't read them
3   as being only TCP reassembly.  And any doubt was absolutely
4   eliminated when come mid-December, and they've never
5   disputed this, the only thing they cited was a TCP-to-TCP
6   configuration.
7          And so -- and, again, let me go -- if we go to the
8   slide show, this is not revisionist history.
9          At the Markman hearing -- if we could get.  Thank
10  you very much.
11         This was me at the Markman hearing.  I alluded to
12  the fact that we're trying to understand their infringement
13  contention, and there was -- and there was this first theory
14  where we're saying it's something about a TCP handshake,
15  plus the rest of it.  This is what I said to the Court.
16  That's our read of what they're doing in the infringement
17  contentions.  The TCP/IP handshake is in their infringement
18  contentions.  By definition, that's end point-to-end point.
19  They told us exactly that.  I repeated exactly back to them
20  in open court.
21         There is -- there is nothing more than we could
22  have done, Your Honor.  He made a reference to the fact that
23  hold on, all of your early licensees, none of those -- no
24  licensees -- none of our licensees do end points, so how
25  could this possibly be true?

1          Well, that's a little too cute because almost all

2   of their licensees signed their licenses before the '683

3   patent even existed.  It was the '163 patent and the other

4   patents before that that did not have the TCP elements in

5   them.

6          So, of course, all of those licensees weren't end

7   points.  They didn't have to be.  The cli -- the patent that

8   had that requirement didn't even exist yet.  The patent that

9   they did take licenses based on got invalidated.  That was

10  the '163 patent.  And the way to overcome that was to add

11  TCP requirements into it that specifically has this -- this

12  effect to it.

13         And the last point I'll make on this, Your Honor,

14  is just even if you -- you would say, all right, this is

15  plain meaning.  Okay.  Even if you accept everything they've

16  said, this is just a recent decision out of the Federal

17  Circuit from last week, and you may well have heard about

18  this one already.  The Court says just because something has

19  plain and ordinary meaning doesn't mean it's meaningless.

20         And in this -- on this record, Your Honor, every

21  single expert, every document, everybody agrees that TCP is

22  defined by a standard.  The standard is RFC 793.  When you

23  evoke a standard, you're stuck with it, and there literally

24  is no standard for anything that would be an intermediate

25  device.  They have absolutely no answer to that.

1          And beyond that, of course, is the prosecution

2    history -- I mean, the statement is:  TCP is implemented on

3    end points.  And that's consistent with what every person in

4    the record has said, Your Honor.

5          The -- with respect to -- I -- I think I've -- I've

6    handled the arguments about actually looking at the claim

7    and the claim language.

8          Two requirements.  You execute a TCP, which, by

9    definition, means you now -- you have a session, and each

10   end point, each TCP -- a TCP here, a TCP here is standard

11   compliant.  All you've got now is a handshake, okay?  And

12   then you use that session -- all right.  At that point, you

13   do -- you have executed a TCP.  You haven't done anything

14   with it yet.  And then you use that session to do this

15   conversion, and so there's no conversion of anything until

16   actual substantive data starts going through.  That's what

17   the second part of the language is talking about.

18         Now that you've got a session, you send the

19   substantive data.  That, A, of course, gives meaning to all

20   the elements of the claim.  It's exactly what they said in

21   the prosecution history, and it's what every single witness

22   in this case has said.  They have not come forward with any

23   evidence.

24         So however you look at this, whether it's claim

25   construction, whether it's summary judgment on admitted

```
 1   facts, there is nothing in this record that there is any
 2   standard for activity that relates to TCP that is on
 3   anything other than an end point.  And with that, we're
 4   entitled to summary judgment, Your Honor.
 5           THE COURT:  All right.
 6           MR. GAUDET:  And, Your Honor, with respect to the
 7   sequence of routines, I think I've handled that
 8   sufficiently, and we'll rest where we are.
 9           THE COURT:  All right.  Counsel, it's a quarter
10   until 1:00 p.m.  I will see you back here at 1:30, and we
11   will continue.  The Court stands in recess until 1:30.
12           COURT SECURITY OFFICER:  All rise.
13           (Recess.)
14           COURT SECURITY OFFICER:  All rise.
15           THE COURT:  Be seated, please.
16           With regard to the Defendant's motion for summary
17   judgment of non-infringement, Docket No. 201, being the
18   matter the Court heard argument on just before we broke for
19   lunch, I've considered your arguments over the lunch break,
20   and in the final analysis, the Court is persuaded that there
21   are still factual disputes that exist as to how the accused
22   products function.
23           With regard to the sequence of routines, that was
24   an agreed-upon construction that the parties accepted.  It
25   will be given its plain and ordinary meaning.  I'm not going
```

 1  to open the door to further construction there.

 2          I'm persuaded that the motion in its entirety

 3  should be and it is denied.

 4          That next brings us to Plaintiff's motion to strike

 5  the rebuttal expert report regarding Dr. Douglas Schmidt.

 6          And I'll hear from the moving Plaintiff on this.

 7          MR. HURT:  Thank you, Your Honor.  Christian Hurt

 8  for the Plaintiff, Implicit.

 9          If you'll give me one moment to re-hook up our

10  technology.

11          May I approach, Your Honor?  We have slides.

12          THE COURT:  You may.

13          MR. HURT:  Thank you.  There are four -- yes, Your

14  Honor?

15          THE COURT:  Just go ahead.

16          MR. HURT:  Okay.  Again, Christian Hurt on behalf

17  of the Plaintiff.

18          There are four issues that are live with regard

19  to -- to this motion.  On the screen it lists the issues.

20  There's a -- a fifth bullet, No. 5, on the new produced

21  documents that we agreed to last night, so that's no longer

22  at issue.  We're taking that part of this motion down.

23          If the Court would prefer, we can sort of ping pong

24  this like we did with Mr. Bakewell's motion, or I can go

25  through all the -- the bases that remain for production.

 1          THE COURT:  Well, given that you've got four

 2   constituent parts, as opposed to two, we probably would be

 3   better served to do it item-by-item.  So let me hear from

 4   you on improper claim construction opinions first, your

 5   first item.

 6          MR. HURT:  Sure.  And the first two are a little

 7   related.  The claim construction issue in Dr. Schmidt's

 8   report has to do with the sequence of routines limitation

 9   that the Court just considered before lunch in the context

10   of the summary judgment motion.

11          And Dr. Schmidt reproduces the Court's construction

12   in part of his report, and this is Paragraph 102, but then

13   when -- further in the report when it's considered how he is

14   applying that construction, he references the Mosberger

15   reference that Your Honor heard about a number of times and

16   says:  Well, to determine what this language really means, I

17   need to go look in Mosberger to see what pre-configured

18   means.

19          And in Mosberger, in the prosecution history, the

20   applicant said X about Mosberger.  The applicant said Y

21   about Mosberger.  Mosberger discloses Z.  And, therefore, my

22   understanding is that those aspects cannot be covered by the

23   Court's construction.

24          And that, in our view, is an improper read --

25   argument and read analysis of an agreed term on which the

1    Court has already provided a construction.

2         The proper analysis is for Dr. Schmidt to take the

3    Court's construction, as agreed to, and take that and

4    compare it to the products without putting some gloss on it

5    about how to interpret that construction in view of -- of

6    the file history.

7         And this is not just some academic issue, and I'll

8    go to the second point because it's completely related

9    and -- and it's really just one -- one slide is

10   Dr. Schmidt's infringement comparison is to Mosberger.  It's

11   not to the claim language.

12        And so this is from Paragraph 125:  In contrast to

13   the accused -- I'm sorry, in contrast to the demux patents,

14   the accused technology in PAN's firewalls, like Mosberger,

15   is pre-configured, and that approach -- then there's a

16   discussion here of -- of how Dr. Schmidt opines PAN's

17   systems work, that approach is equivalent to how the

18   applicant described Mosberger.  And so this is a classic we

19   don't infringe because we work like the prior art defense,

20   and in some ways it's actually worse because Mosberger is

21   not even a prior art reference.

22        But the whole point of this analysis in

23   Dr. Schmidt's report is to give the jury the wrong legal

24   standard to take, as Mr. Gaudet did earlier, the flowchart

25   from PAN's system, put it next to Mosberger, and tell

1   that -- and tell the jury that's the question they have to

2   answer in this case.  And that's not the question is how do

3   you read the construed language, and does the accused -- I'm

4   sorry, do the accused products read on the language that the

5   Court has construed that claim term to mean.  There's a jury

6   instruction on what the claims mean.  We don't need

7   Dr. Schmidt putting in an opinion on that, a gloss on that,

8   or getting into that -- into the file history to do an

9   improper infringement analysis.

10          So that's the basis of that motion, Your Honor.

11          And unless the Court has questions, I'll -- I'll

12   sit down and let the Defendant --

13          THE COURT:  No.  Let me hear a response from the

14   Defendant.

15          MR. DOTSON:  David Dotson, Your Honor -- excuse me,

16   for Palo Alto Networks.

17          THE COURT:  Proceed, please.

18          MR. DOTSON:  Dr. Schmidt's analysis is responding

19   to, as we've already talked about, an apparent dispute among

20   the experts about how the Court's construction applies to

21   the products.

22          Dr. Schmidt, make no mistake about it, in his

23   infringement or non-infringement analysis applies the

24   Court's construction.

25          Now, the discussion of Mosberger is -- is simply a

1    way for Dr. Schmidt to discuss what configured -- what it

2    means in the context of -- of these patents, what the

3    Court's construction -- in the Court's construction -- I'm

4    sorry.

5           So what we have is a situation where Dr. Almeroth

6    provides no explanation.  And when he was asked about it at

7    his deposition, he was asked:  What does configured mean?

8           And he couldn't provide an answer.

9           He said:  The best I can say is when it comes to

10   infringement, I've applied the Court's construction.

11          What's the ordinary meaning of configured that you

12   applied?

13          He said:  Configured.

14          So he just repeated the word.

15          He said:  The only thing I can do -- the best I can

16   do is point you to the accused products.

17          Well, that's not helpful.  That doesn't help the

18   jury understand what this means.

19          So what Dr. Schmidt has done is -- is consistent

20   with what -- what happened in the Packet Intelligence versus

21   Sandvine case where there was some -- some dispute about how

22   one party was applying the Court's construction, and the

23   prosecution history was -- was used to -- to provide a

24   factual basis in line with the Court's construction.

25          So you've got examples that the applicant stated in

1   the prosecution history about -- about what this configured

2   term means and --

3          THE COURT:  You don't want to have Mr. Gillam argue

4   the Sandvine case to me?  He probably knows it better than

5   you do.

6          MR. DOTSON:  Mr. Gillam?

7          THE COURT:  That's okay.  Go ahead.

8          MR. DOTSON:  So that's what's -- that's what's

9   going on here.  It's not a -- it's not a -- a claim

10  construction argument.  We're not re-arguing the claim

11  construction or construing the Court's construction.  It's

12  here are the examples of what this configured term means.

13  This is -- this is perfectly in line with the Court's prior

14  orders on this issue and the Court's construction.

15         Now, with respect to this practicing a prior art

16  defense, in the 01 Communique Labs case, the Federal Circuit

17  case from 2018, talked about this defense.  It says that

18  this occurs -- this practicing the prior art defense occurs

19  when the party conflates the infringement and invalidity

20  inquiries and forsakes any comparison between the accused

21  claims and the -- excuse me, the asserted claims in the

22  accused product.

23         So an accused infringer can't defeat a claim of

24  infringement or establish invalidity merely by pointing to

25  similarities between the accused products and the prior art.

1        Now, the reasoning for that is that we don't want

2  to flout the burden of proof requirements for invalidity

3  versus non-infringement.

4        That is not a risk here because, as Plaintiff

5  acknowledged, Mosberger, first of all, is not even a prior

6  art reference that's at issue.  So there's no risk of

7  confusing the jury into a lower burden on invalidity when

8  Mosberger is not at issue in the invalidity case.

9        And, of course, Dr. Schmidt is not opining on

10  invalidity at all, so his testimony doesn't relate to

11  invalidity issues.

12        And the -- the -- I think the -- the kind of --

13  when you look at 01 Communique, the -- what was going on

14  there was -- was much more of a -- a risk than what is going

15  on here.  But the Court -- the Federal Circuit said that it

16  was proper.

17        In that case, the Federal Circuit allowed the

18  Defendant to make comparisons to its own prior art product

19  that was at issue in the invalidity case and said that that

20  was proper because it did not rest on an improper practicing

21  the prior art defense, but instead, correctly recognized

22  that claim terms must be construed the same way for both

23  invalidity and -- and infringement.

24        So most of the paragraphs that Plaintiff cites and

25  asks the Court to strike, they don't even mention Mosberger.

1   There's only a few -- obviously, there's background

2   discussion about the patent and the prosecution history, and

3   there are only a couple that even reference Mosberger.  And

4   the point of those paragraphs, as I've described, is to

5   provide examples that are in line with the Court's

6   construction.

7            THE COURT:  All right.  Let's go on to the next

8   item, Mr. Hurt.

9            MR. HURT:  The next item, Your Honor, is PAN's own

10  patents, and we -- we discussed this last week in connection

11  with Mr. Bakewell and the motion in limine.  And Dr. Schmidt

12  includes opinions on PAN's patents that are not the type of

13  targeted analysis about functionalities and features that

14  the Court indicated would be allowable for -- for

15  Mr. Bakewell.

16           And Palo Alto Networks had dropped some paragraphs

17  from Dr. Schmidt's report, so I'll go through those.  And

18  there's really only two kind of sets of items remaining.

19           So this paragraph on the screen, 394, that mentions

20  68 issued U.S. patents, Palo Alto Networks has agreed to

21  drop that paragraph.

22           And then Paragraph 271, which says -- talks about a

23  patent that PAN bought from HP as pre-dating the demux

24  patents, which PAN doesn't even actually practice this

25  patent, this has been dropped, as well.

1          So there's -- there's really two issues left, and

2     it's two with Paragraphs 396 and 369, and I'll take them in

3     that order.

4          Neither of these paragraphs discuss what

5     functionality these patents cover, and there's no disclosure

6     in Dr. Schmidt's report about here's the functionality you

7     should have apportioned for and here's the patent that

8     covers it.  So we don't have that.

9          What we have here in 396 is that PAN owns a patent

10    that it practices, and here's what that patent relates to in

11    the patent.  And there's no indication of what thing in the

12    box or what piece of the box or pieces in the box actually

13    use this patent.  And it's listed on the patent marking page

14    that was discussed last week, but just as something the

15    accused products practice, nothing that's specific on any

16    analysis.

17         So because there's no opinion on it, Dr. Schmidt

18    can't get up on the stand and explain, here's the '566

19    patent.  Here's what it covers.  Here's how PAN uses it.

20    Here's what it does in PAN's products.  This is the sole

21    opinion on that is in this Paragraph 396.  And so this is

22    just a -- a statement that PAN has a patent that somehow

23    should have been accounted for, with any real tie -- without

24    any real tie to, well, what functionality are we even

25    talking about inside of the PAN box?

1          And so that's -- that would be the basis for this.

2     It's not a re-tread of what we talked about last week, but

3     this is a specific paragraph that lacks that -- that

4     apportionment tie, and really shouldn't be in front of the

5     jury for -- for some of the reasons that were discussed last

6     week about relevance and prejudice.

7          And so this is 396.

8          The second one is a little closer to, I think, what

9     the Court was discussing, which is 369.  But it still has

10    that -- lacks that tie.  So there's the sentence I've

11    highlighted that just mentions PAN has several patents

12    relating to App-ID, including these three patents.  And

13    there isn't a discussion of what these patents cover, what

14    parts of the box they cover, what parts they don't, why

15    they're not -- why those parts aren't implicated by the

16    patents in this case, or, why they, you know, are different.

17         And the real concern, I think, with this, even

18    though it's tied to App-ID, is something that Mr. Jameson

19    said in connection with the motion to strike before lunch.

20    On rebuttal, he said:  We agree App-ID's important.  We

21    invented App-ID.  And the purpose that I can see of this

22    paragraph is to have Dr. Schmidt tell the jury that PAN has

23    three patents that relate to App-ID, throw in other

24    testimony about how App-ID is PAN's proprietary stuff, and

25    have Mr. Jameson or another attorney argue in closing that

1    we invented App-ID.  And then it's a fight about they've got

2    patents, we've got patents.  Not a question of how would you

3    apportion?  If there's an argument of, well, hey, your

4    patent, Plaintiff -- it doesn't cover App-ID at all, or all

5    of it.  It only covers this small slice.  Well, if they're

6    going to divide App-ID into these different slices, and say

7    we've got patents on the other slides, they've got to tell

8    us what those are.  And that's not in Dr. Schmidt's report.

9    It's not in Paragraph 369.  It's not anywhere else.  The

10   sole opinion he would be giving is right here in 369.

11        And because there's that lack of tie between the

12   components that PAN argues we should apportion and the

13   patents on those components, we think that these paragraphs

14   should -- should fall out of the report.

15        So unless the Court has any questions, that's the

16   argument.

17        THE COURT:  Let me hear from Defendant.

18        MR. DOTSON:  David Dotson, again, for Palo Alto

19   Networks, Your Honor.

20        I guess I'm a little perhaps confused by some of

21   the arguments that Plaintiff was making because I -- I think

22   our impression of Your Honor's order from last week was

23   that, in fact, we weren't to go into details about specific

24   aspects of PAN's patents and what they -- they do or do not

25   disclose and things of that nature.

1              So I'm not -- I'm not certain that -- that that's

2    what the Court would expect given the prior ruling.

3              Nonetheless, it seems like we've lost sight of the

4    fact that -- that these paragraphs go to damages issues in

5    this case, and that the apportionment analysis was Dr. Ugone

6    and Dr. Almeroth's burden, and that PAN should be entitled

7    to rebut that analysis by a showing.  And we've tied

8    these -- these patents to specific features that are

9    accused, per the Court's guidance, that PAN has some -- some

10   patents on some additional features that were not accurately

11   or -- or adequately accounted for in Dr. Ugone and

12   Dr. Almeroth's analyses.

13             And it sounds -- it sounds like what's really going

14   on here is that Implicit is trying to strike testimony that

15   has not happened yet based on some supposition about

16   arguments that either Dr. Schmidt or -- or PAN's counsel

17   will make.  It sounds like that is something that -- that

18   should be objected to at trial in the event an improper

19   argument is made, and that it's not a reason to strike

20   Dr. Schmidt's report on these issues.

21             So, again, if you take Paragraph 396 -- for

22   example, we've talked a lot about how App-ID is accused.

23   These are patents that are squarely tied to App-ID in this

24   paragraph.  That's consistent with the Court's order.  And

25   our understanding is that is fair game for Dr. Schmidt to

138

1    raise those points in connection with the damages-related

2    issues in the case.

3            THE COURT:  All right.  Thank you.

4            What's next, Mr. Hurt?

5            MR. HURT:  Last issue, Your Honor, is -- is F5.

6            So another agreement that -- that the parties came

7    to in the last couple nights was the discussion of Juniper,

8    and Dr. Schmidt's report is not going to be presented.  And

9    so the reason is it's in the same paragraph highlighted

10   here, 291.  And the point that Dr. Schmidt makes is that

11   what was accused in this case is fairly standard

12   functionality that also existed in products manufactured by

13   Juniper and F5.

14           And I understand that Implicit previously sued both

15   of them and was ultimately unsuccessful.  That's what

16   Dr. Schmidt's testimony is going to be with regard to F5.

17           And this is obviously problematic for, I think,

18   similar reasons as the Mosberger comparison because

19   infringement is not do we work like F5 or not?  The question

20   is does PAN -- Palo Alto Networks's products meet the claim

21   limitations.  And the only implication I can see from this

22   paragraph is to tell the jury that PAN does not infringe

23   because F -- the case against F5 was unsuccessful.  And

24   that's not relevant to damages.  That is not relevant to

25   infringement.  That's not relevant to anything.  And so

1   that's the paragraph -- yes, Your Honor?

2        THE COURT:  Why -- why is this even an issue in

3   light of the Court's prior order in limine on Plaintiff's

4   MIL No. 18 and 19?

5        MR. HURT:  So Palo Alto Networks told us that F5 is

6   still a live issue in light of those rulings.

7        THE COURT:  It's still -- it's still subject to the

8   grant on that limine order.

9        MR. HURT:  Their argument and my understanding is

10  that when you go to the next series, there's a discussion of

11  this introduction to the F5 -- an introduction to F5

12  Networks's LTM iRules.  And what Palo Alto Networks is going

13  to argue to Your Honor is, well, in Dr. Almeroth's report,

14  he looked at, well, what products were at issue in the Cisco

15  case, the Citrix case, and other cases to determine, well,

16  how close are those different licenses to the Implicit

17  license.  And we should be able to do the same thing with

18  F5.

19       The problem is none of that analysis is actually in

20  Dr. Schmidt's report for starters.  There's only that

21  paragraph I showed Your Honor, and then a discussion of some

22  things in this book.  There isn't an issue of here's what

23  Implicit -- here's what F5 sells, and this is similar to our

24  products, therefore, the F5 agreement is similar or not.

25       The second thing --

140

1          THE COURT:  Well, I've made it about as clear as I

2     know how to make that the expert witnesses in this case are

3     not going to go beyond the scope of their reports.

4          MR. HURT:  Right.

5          THE COURT:  And there will be serious ramifications

6     if they do.  Just like there will be serious ramifications

7     if they're alleged to when they haven't.  I mean --

8          MR. HURT:  Correct.  And I understand.  And I'm --

9     I'm repeating what Palo Alto Networks told me on the phone

10    last night.  And if I'm characterizing it wrong, I am.  But

11    I agree with Your Honor that that's not something they

12    should get into.

13         And even this F5 document, in particular, is

14    problematic because it's not even much made by F5.  It's a

15    third-party book that someone purchased off Amazon by a

16    completely independent author who has a disclaimer that says

17    this book is in no way endorsed or affiliated with F5.  And

18    the discussion in Dr. Schmidt's report about how F5 systems

19    actually work isn't even what was accused in the F5 lawsuit.

20    It's not the same functionality.

21         And they could have pointed to that functionality

22    because the F5 infringement contentions were produced to

23    them a year ago.  So what they want to do with this is not

24    in Dr. Schmidt's report.  It's not proper anyway.  And what

25    they did opine on is we don't infringe because F5 doesn't

1   infringe.

2          And -- and that's the basis of the motion, and --

3   and I'll -- and unless the Court has any further questions,

4   I'll allow Palo Alto Networks to address it.

5          THE COURT:  No, I don't have any other questions.

6          Let me hear from Defendant.

7          MR. DOTSON:  David Dotson again for Palo Alto

8   Networks.

9          I think we're on the same page, Your Honor, with

10  respect to the prior orders.  And -- and I don't know if

11  there was a miscommunication on the phone, but Palo Alto

12  Networks does not intend to raise the F5-related information

13  here unless Implicit opens the door to that information

14  coming in.

15         So if Implicit is going to try and distinguish the

16  F5 agreement and say, well, F5 was doing X or Y or Z, and

17  that's so much different from -- from the extent to which

18  Palo Alto Networks infringes, then we should be entitled to

19  rebut that with the information that is in Dr. Schmidt's

20  report.

21         So outside of that, there should be no discussion

22  of -- of this information.

23         THE COURT:  Well, I certainly can't anticipate who,

24  when, and how somebody might open the door to something the

25  Court's already addressed.  If that happens, the other side

142

```
 1    is going to get to walk through that open door, whichever

 2    way it goes.  But I can't sit here and rule on pre-trial

 3    motions based on what might or might not be opened in the

 4    course of a trial that's presented at a later date in front

 5    of a jury that hasn't even been selected yet.

 6           So I honestly don't see why, given the protections

 7    of Limine Order 18 and 19, as raised by the Plaintiff, and

 8    my clear instructions to the party about the defined scope

 9    of the experts' testimony being limited to their reports, I

10    really don't see why the Plaintiff is worried about this.

11           Unless -- unless you get up there and take the door

12    off the hinges, and if you do, then the other side is going

13    to get to walk through it.  Just like if they open the door,

14    you're going to get to walk through it.  And everybody

15    better be careful, because if the door gets opened, it's

16    probably not going to get shut.  And it's going to open

17    throughout the whole trial for whoever wants to use it,

18    however they want to use it, so it's a serious thing.

19           But you all are experienced trial lawyers, and I

20    know you understand that.  But that's no basis for me to

21    strike something in a pre-trial motion.

22           So -- especially when the argument about striking

23    something is in a motion that's been on file for weeks, and

24    the argument is this is because of a conversation we had

25    last night.
```

1          Anyway, do you have anything else for me?

2          MR. DOTSON:  No, Your Honor.

3          THE COURT:  Mr. Hurt, do you have anything else?

4          MR. HURT:  Yes.  We believe that the paragraph as

5    stated should be stricken for the reasons in our brief.  I

6    mean, this has -- discussion of F5 and Juniper have nothing

7    to do with the case, and that's what's in those paragraphs.

8    And that's why we have that motion.

9          THE COURT:  Well, struck or not struck, the expert

10   who authored this report is subject to the Court's limine

11   order.

12         MR. HURT:  Understood.

13         THE COURT:  So, I mean, I don't know how many pairs

14   of belts and suspenders you want to put on this issue.

15         MR. HURT:  Well, that was our exact position.  We

16   filed this motion.  That's what we told them, and they

17   wouldn't take it down.  And that's why we're here and not

18   taking it down.

19         THE COURT:  All right.  I understood.

20         Anything else on Plaintiff's motion to strike?

21         MR. HURT:  That's it, Your Honor.  The only thing I

22   didn't address was the 01 Communique case on PAN's patents.

23   I don't know if Your Honor has any questions about that.

24   Mr. Dotson referenced it at length.  But barring that,

25   there's nothing else on this motion.

```
 1          THE COURT:  All right.  Thank you.

 2          With regard to Plaintiff's motion to strike the

 3  expert rebuttal report of Dr. Douglas Schmidt regarding

 4  non-infringement, having heard the argument relating to the

 5  constituent parts and acknowledging that one portion of this

 6  motion has been withdrawn by agreement of the parties, as to

 7  the portions of the motion that have not been withdrawn and

 8  are live before the Court, the motion is denied.

 9          I'm certainly not going to let one side's experts

10  testify to something and tie the other hands -- the other

11  experts' hands.  If we're going to have a battle of the

12  experts, we're going to have a battle of the experts.

13          So the same -- same latitude going one direction is

14  something you should expect going the other direction.

15          All right.  Let's move to the next pending motion,

16  and I have it in my notes, counsel, that based on the

17  request of both sides at the previous pre-trial hearing,

18  that the motion to strike with regard to Dr. Russ would be

19  decided on the papers.  And I assume nobody's changed their

20  position on that.  So it's my intention to review the

21  briefing again and rule on this based on the -- on the

22  papers.

23          Anybody want to withdraw their previous statement

24  in that regard?

25          MR. HURT:  Yes, Your Honor.  There were -- well,
```

1   I'll go to the podium.

2           THE COURT:  I'm not saying I'm going to let you,

3   but I'm just asking.

4           MR. HURT:  Given that, I'm not sure I want to.

5           There were two motions to strike Dr. Russ.  There

6   was a motion based on new 112 theories.  That was submitted

7   on the papers.

8           And then the other motion, which is Docket 187, is

9   the motion to strike Dr. Russ for different reasons, which I

10  believe is -- is a live issue.

11          THE COURT:  Well, I have Document No. 180, motion

12  to strike --

13          MR. HURT:  Correct.

14          THE COURT:  -- the Russ report or portions of it as

15  exceeding the scope of the Defendant's invalidity

16  contentions.  And then I have Document 187, motion to strike

17  the rebuttal expert report of Dr. Samuel Russ regarding

18  invalidity.

19          MR. HURT:  That -- that is correct.  The former,

20  the parties agree to submit on the papers.  The latter, I

21  believe, is the last pending motion that -- that the

22  parties --

23          THE COURT:  Right.

24          MR. HURT:  Yeah.

25          THE COURT:  Okay.  When I raised this topic, I was

1    talking about 180.

2           MR. HURT:  Oh, my -- my apologies, Your Honor.

3    That -- that's correct.

4           THE COURT:  180 will be decided on the papers.

5    I'll hear argument on 187 because it's not been previously

6    presented as an agreement of the parties that the Court

7    should rule on this without argument.

8           So this is Plaintiff's motion to strike the

9    rebuttal report of Dr. Samuel Russ regarding invalidity --

10   again, Document 187.

11          Let me hear from Plaintiff on this.

12          And while counsel is going to the podium, it's my

13   understanding that the motion for partial summary judgment

14   regarding Implicit's claims for damages on products sold

15   outside the United States, Document 177, that that is being

16   withdrawn; is that correct?

17          MR. GAUDET:  Your Honor, Matt Gaudet.  Yes, that is

18   correct.

19          THE COURT:  You agree with that, Mr. Hurt?

20          MR. HURT:  Yes.

21          THE COURT:  Okay.  Then that motion is withdrawn.

22          Let's go back to 187 regarding Dr. Russ's

23   invalidity.

24          MR. HURT:  May I approach, Your Honor?

25          THE COURT:  Yes.

```
 1          MR. HURT:  This is the last slide deck, I promise.
 2          There's two issues with this motion.  They're both
 3  relating to claim construction.  The first is -- is similar
 4  to what the Court addressed in -- in Dr. Schmidt's report.
 5  Dr. Russ, likewise, does an analysis of the claims comparing
 6  them to what was allegedly disclaimed in -- in Mosberger.
 7  There's a similar section.
 8          I'm not going to belabor the point, assuming the
 9  Court's going to have the same ruling, I just wanted to --
10  to make -- to make that position known.
11          THE COURT:  All right.  Defendant?
12          MR. DOTSON:  David Dotson, Your Honor.  With that,
13  I don't think we have anything else to say.
14          THE COURT:  All right.  Well, I've reviewed the
15  motion and the briefing both from Plaintiff and Defendant,
16  and without anything further by way of argument, it's the
17  Court's conclusion that the motion should be and it is
18  denied.
19          MR. HURT:  Okay.  There -- there was a second part
20  of the motion.  If the Court was talking about both pieces,
21  I won't -- won't talk about it.
22          THE COURT:  Let's go on to any remaining portion.
23          MR. HURT:  Sure.  So the second part of the motion
24  is this processing packets limitation.  So this wasn't
25  subject to the summary judgment order.  It's not -- it was a
```

1  term, however, that was construed in the case.  And the

2  Court construed it as -- actually, let me skip ahead.  I'm

3  at the wrong place.  There we go.

4       The Court construed it as applying one or more

5  routines to a packet, where at least one such routine is a

6  conversion routine.  And in Dr. Russ's report, he opines,

7  well, if the Plaintiff's functionality he's -- that the

8  Plaintiff points to meets this limitation, then other --

9  then functionally in the prior art also meets this same

10  limitation.

11       And that is not -- those paragraphs are not what

12  we're challenging.  But what we are challenging is at

13  deposition, Dr. Russ testified that he limited perform

14  conversion routine to format conversion.  So one type of

15  conversion.  And so, well, why is it is this relevant is

16  what I expect Palo Alto Networks to raise since it wasn't in

17  his report as the prior art analysis.  Well, it's relevant

18  actually to two things.

19       One is it's not consistent with the Court's

20  construction, and I don't expect Dr. Russ to mention this on

21  the stand since it's not in his report.  But it's also

22  relevant to the written description challenge.  And that's a

23  separate basis that we think, in particular, should be

24  struck.  And the main -- main part of that is there's a

25  paragraph that says that the specification does not disclose

1   anything broader than a format conversion for this

2   limitation, and that's an opinion that Dr. Russ gives.

3          And let me find the slide.  And that's an opinion

4   that Dr. Russ gives at Paragraph 836.

5          The problem with this, confirmed by the

6   construction that Dr. Russ testified to at his deposition,

7   is that this issue was actually resolved in the TrendMicro

8   case.  And so the format conversion construction that

9   Dr. Russ opines on is what the Defendants in Trend wanted

10  for the term "conversion routine."

11         So limited to a converting data from one format to

12  another.  And the Court rejected that construction.  And in

13  doing so said -- stated that a conversion routine is one

14  that changes the form of data.

15         So it's not limited to a format conversion.  And

16  more specifically, the opinion mentions that data may be

17  transmitted -- I'm sorry, data to be transmitted may first

18  be converted to a compressed and -- and encrypted form.

19         Well, why does that matter for written description?

20  It matters because Dr. Russ's opinion, it's informed by his

21  narrow view of the patent, is that compression and

22  encryption, they're not format conversions.  There isn't a

23  conversion -- format conversion is, like, you know, JPEG to

24  bitmap or text to Word.  Just taking something and

25  compressing it or encrypting it is not a format conversion.

1              And this statement right here contradicts

2    Dr. Russ's written description opinion in Paragraphs 836,

3    that really were fleshed out at the deposition when he

4    confirmed that he was reading conversion routine to be

5    format conversion, despite, one, that not being the

6    construction in this case; and, two, the Court in the Trend

7    case taking the opposite view.

8              So that's the basis for that motion.

9              THE COURT:  Why -- why is this something that the

10   Court should strike at the pre-trial stage, as opposed to

11   letting it be raised after all the evidence is presented

12   under Rule 50(a)?  It seems to me the Court would be in a

13   much better position to either agree or disagree with what

14   you're saying here after -- after the trial is complete as

15   far as evidence is concerned.

16             MR. HURT:  I understand that.  I think there --

17   there are two reasons.  One is to cross-examine Dr. Russ,

18   we'd have to get into potentially the TrendMicro opinion,

19   and putting a Markman opinion in front of a witness is

20   something that I'm not prepared to do, especially one from

21   another case, because that's really --

22             THE COURT:  I would hope you're not prepared to do

23   that.

24             MR. HURT:  Yeah, right.

25             And so that's -- that's the first issue is in the

 1    course of the trial, this opinion would -- would come in,

 2    and the ability to -- to test Dr. Russ on it would be

 3    limited.

 4             But secondly --

 5             THE COURT:  Well, I understand that you might not

 6    have a perfect vehicle as if this were a separate issue

 7    before the Court only and you could argue it and examine the

 8    witness on it.

 9             But how is the Court worse off having heard the

10    evidence, whatever it is, than I am here without having

11    heard anything?

12             MR. HURT:  Well, I think the difference is -- well,

13    I think, one, is Dr. Schmidt's opinions will be limited to

14    his report, so he -- he has to give the opinion that's in

15    836.  And our position that -- that position has already

16    been rejected as a legal issue, so there would be no fact

17    for the jury -- jury to resolve.

18             And so it's sort of either the -- it gets dealt

19    with now or later, but it's ultimately a legal -- an opinion

20    that conflicts with a legal determination.  There's no

21    factual issue for the jury to return a finding on.  And

22    waiting to see what happens at the jury is not going to

23    really affect this outcome one way or the other.

24             THE COURT:  All right.  Let me hear from the

25    Defendant, please, in response.

1          MR. DOTSON:  David Dotson, again, Your Honor.

2          I think the first issue I wanted to raise is

3    they've just confirmed what I think has been PAN's position

4    all along, that there is no infirmity in Dr. Russ's actual

5    report where he's walking through his prior art analysis.

6          But it's -- that was the focus of their motion, and

7    now we're hearing that the focus of their motion is not that

8    but it's the written description issue.

9          But if we look -- if I could have the document

10   camera, please.

11         If we look at what Implicit actually asks the Court

12   to strike, the written description section of Dr. Russ's

13   report, which, as they mentioned, begins at Paragraph 836,

14   they didn't ask the Court to strike that.  So this issue

15   really hasn't even been briefed by the parties, and so I

16   think that's --

17         THE COURT:  I've heard a lot of things today that

18   haven't been briefed by the parties on both sides.

19         MR. DOTSON:  So -- so setting that issue aside,

20   it's not clear why Implicit believes they'd have to bring in

21   a -- a Markman order from a prior case on a written

22   description issue.  You know, the Court's construction is

23   what it is, and the written description issue and the claim

24   construction issue, those are two different an analyses.

25   And the written description analysis, we're considering

1  whether the claim, as construed by the Court, is supported

2  by the written description.

3        So why they think they need to dig back in to

4  underpinnings of claim constructions for purposes of written

5  description issues is -- is a bit confusing, and

6  particularly in the case in which PAN was not even involved.

7        Now, although Implicit didn't address head-on the

8  prior art analysis issues, I -- I just want to point out

9  quickly for the record that the analysis that Dr. Russ

10  undertook with respect to this conversion routine

11  requirement in the process/processing packets construction,

12  he is not -- what he did was to say there is a requirement

13  in the claims that we are going to execute the transmission

14  control protocol to convert a TCP packet from -- a TCP

15  format to a different format.  There's conversion -- I've

16  already got to show you that conversion.  That's one of my

17  routines.  That's all he's saying.  He's not saying that a

18  conversion routine is -- is limited to a format conversion

19  or not.  He's just saying here's one of them.  All I need is

20  one.  That's a conversion routine.

21        And I'll note that Dr. Almeroth in his infringement

22  report, he did the exact same thing.  He said:  This TCP

23  reassembly module -- and I'll make sure I get the language

24  right here.  This is at Paragraph 90 of Dr. Almeroth's

25  report.  He says:  At least the following may be -- and as a

1    matter of fact, if I can get organized here.  The only copy

2    I have, unfortunately, is a small copy, so I'll read it.

3    Paragraph 190 of Dr. Almeroth's infringement report, he

4    says:  At least the following may be conversion routines.

5    TCP reassembly module, in parentheses, this module converts

6    the packets from an input format of a single TCP packets to

7    an output format of a layer-7 datastream.

8           So he's saying a conversion routine is this TCP

9    stuff that I was -- that I'm talking about later on in the

10   claim.  Same exact thing that Dr. Russ is doing.  And

11   there's nothing improper about that.

12          And furthermore, the -- the 01 Communique case,

13   again, there is nothing improper about a litigant arguing

14   that if a claim term must be broadly interpreted to read on

15   an accused device -- device, that same broad construction

16   will read on the prior art.  That's an appropriate defense,

17   and that's from 01 Communique, a Federal Circuit case.

18          THE COURT:  All right.  Thank you, Mr. Dotson.

19          This portion of the motion is also denied, and the

20   motion in total is denied.

21          All right.  Based on what I have before me,

22   counsel, it appears I've taken up and dealt with the pending

23   substantive motions.  I've previously addressed the motions

24   in limine.

25          It's clear that the Court has yet to take up with

1   the Court -- or take up with the parties, rather, proposed

2   pre-admitted exhibits which have been challenged as to their

3   admissibility.

4          Before we get to the issue of exhibits and exhibit

5   objections, are there any other matters that either side is

6   aware of that the Court has not taken up that I should?

7          MR. DAVIS:  Nothing from the Plaintiff, Your Honor.

8          MR. GAUDET:  Your Honor, just a few hopefully quick

9   issues, if I may.

10         THE COURT:  Well, right now I want to know if

11  you're aware of something substantive, Mr. Gaudet, that I've

12  not dealt with.  If you have a housekeeping question, I'll

13  certainly entertain it.  But I'm trying to make sure I

14  haven't overlooked anything.

15         MR. GAUDET:  Thank you, Your Honor.

16         There -- there is -- there are two issues, and

17  you've not overlooked them.  They're just follow-ons from

18  things you'd addressed previously.

19         One is you'd instructed us last week to confer on

20  Implicit's Motion in Limine 18 and 19 to see if we could

21  come up with a condensed --

22         THE COURT:  I said if you could come up with a

23  proposal, I'd -- I'd consider it.

24         MR. GAUDET:  Yes, Your Honor.  And we submitted a

25  proposal -- it was this morning.  The Court may not have had

1    an opportunity to look at it.  It was by email this morning.

2            THE COURT:  I have your email somewhere.

3            MR. GAUDET:  Okay.

4            THE COURT:  All right.  I have the email in front

5    of me, Mr. Gaudet.

6            MR. GAUDET:  Okay.  Your Honor, the -- the first

7    few bullet points in the email get to issues about which the

8    parties have agreed.  And then after that, there is language

9    that says:  PAN, we have a proposal about what the facts

10   will be permitted into evidence.  And there's a series of

11   one, two, three, four, five bullet points there.

12           THE COURT:  I see that, but according to the email,

13   that had not been agreed to by Implicit.

14           MR. GAUDET:  It has not, and that's why I wanted to

15   give you an update, which is that we're continuing to meet

16   and confer.  We think that there is one particular

17   disagreement that if the Court would give us guidance on, we

18   might be able to bridge the rest of the gap, so to speak.

19           And that -- to be more particular, the second to

20   last bullet point says:  By June of 2015, Implicit via

21   Resolution Strategies, informed PAN that there had been a

22   ruling in that case that was unfavorable for Implicit, and

23   Implicit had thus determined that F5 did not infringe the

24   '683 patent.

25           Now, different parts of this we're still sort of

1    discussing, but the -- for lack of a better word, sort of

2    impasse at the moment is just that word "unfavorable."  In

3    other words, whether or not we should be able to tell the

4    jury as part of this, simply that without getting into any

5    details about what the ruling was, what it related to, just

6    that -- and this is a direct quote from what Implicit said

7    to PAN, that the ruling was unfavorable.

8           We believe that in order to defend ourselves from

9    willfulness, that's really the -- the key point, that they

10   told us to follow a case.  They then told us that it was

11   relevant, and then that case turned out unfavorably.  And

12   then we didn't hear from them again basically.

13          And so that's why we think that word is so

14   important, and it is a direct quote from them.

15          Implicit -- I'll let them speak, obviously, but

16   they oppose that.  We think that if the Court could give us

17   guidance on that, we might well be able to then -- except

18   we've got other disagreements on this language, be able to

19   submit the rest by agreement, Your Honor.

20          THE COURT:  All right.  Does Plaintiff have

21   something to add to this discussion?

22          MR. DAVIS:  Bo Davis for the Plaintiff, Your Honor.

23          I believe that part of what Mr. Gaudet has said is

24   accurate, but there's a lot --

25          THE COURT:  Well, that's a start.

1          MR. DAVIS:  Yes.  We do have a fundamental

2    disagreement about this -- this language.  And I think the

3    status of the discussions is that we put off discussing many

4    other issues that we think present problems with this

5    proposal because there was fundamental disagreement about

6    this one point, and the impasse we reached was, well,

7    there's no point in discussing all the other problems if

8    we've got this problem here.

9          So certainly if -- if the Court is inclined to give

10   us -- give us guidance on that, that -- that will be one

11   hurdle.  But there are many other hurdles, as well.  And we

12   do think that -- that this is a point -- this is the -- the

13   heart of the whole matter.  And if they get to say

14   "unfavorable ruling," that is the bell being rung, and

15   there's no way that -- that we can explain what an

16   unfavorable ruling means without getting into the context of

17   unfavorable with respect to F5.

18         THE COURT:  Well, here's what my response is to

19   what you -- you and Mr. Gaudet have just told me.  I am

20   willing to give you precise guidance on one crucial issue if

21   it resolves everything.  What I don't want to do is give you

22   guidance on that one issue and then, well, that's good,

23   Judge, thank you, but now we have another problem and

24   another problem and another problem.

25         What is usually effective in this scenario between

 1   opposing counsel is to say Plaintiff wants this one issue to

 2   go this way, Defendant wants this same issue to go another

 3   way.  If Plaintiff gets their way, then how do all the rest

 4   of the pieces fall?  And if Defendant gets their way, how do

 5   all the rest of the pieces fall?  And then if you both can

 6   come to me and say we've got everything agreed to, it's not

 7   the same result, but we have an agreed result if it goes

 8   this way, and we have another agreed result if it goes that

 9   way, and the only thing left is this one point, then I'll

10   happily opine on it.  But I'm not prepared to do that until

11   you're prepared, both sides, to tell me that's the posture

12   you're in.

13        MR. DAVIS:  Yes, Your Honor.

14        THE COURT:  Is that clear?

15        MR. DAVIS:  I understand.  Very clear.

16        THE COURT:  Otherwise, the current ruling from the

17   Court on the motions in limine applicable to this stand.

18        MR. DAVIS:  Understand.  Thank you, Your Honor.

19        THE COURT:  All right.  I take it, Mr. Gaudet,

20   you're not aware of anything else substantively the Court's

21   not taken up so far in pre-trial?

22        MR. GAUDET:  Your Honor, if I may consult for a

23   moment.

24        THE COURT:  You may.

25        MR. GAUDET:  We -- the parties have exchanged

1    proposals with respect to a possible further deposition of

2    Mr. Balassanian.  We don't have anything firm on that yet,

3    so maybe we'll take that up after the next break.

4         THE COURT:  If and when you get something firm, I'm

5    happy to hear it.

6         MR. GAUDET:  And then there was one last -- that

7    was just a housekeeping issue, if you will, which I can

8    raise now or later, Your Honor.

9         THE COURT:  What's your housekeeping issue?

10        MR. GAUDET:  It relates -- and we've already

11   discussed this with opposing counsel.  It relates to the --

12   and this is really by way of a head's up, the availability

13   of one of our witnesses on a single day.  Dr. Almeroth is

14   our -- not -- I'm sorry, Dr. Almeroth is not our expert.

15   Dr. Schmidt, who is our -- our non-infringement and damages

16   expert, had a long pre-existing conflict on the -- the

17   new -- the Monday of trial, which is one of the new days, so

18   we will do everything in our power to get him up and down on

19   Thursday.  But, obviously, there are some things we can't

20   control.  It might mean that he would wind up bumping into

21   Wednesday which wouldn't necessarily be ideal, but it should

22   all be within our time.  And this is just so that, you know,

23   if -- if we have to raise is some issue --

24        THE COURT:  You're telling me his conflict is

25   October 29th?

```
 1              MR. GAUDET:  That's correct.

 2              THE COURT:  That Monday?

 3              MR. GAUDET:  That Monday, Your Honor.

 4              THE COURT:  Okay.  Well, as I've explained to both

 5     sides, the Court has some challenges with its calendar, and

 6     I've shared that with you so that you can take it into

 7     account.  To the extent the Court needs to reciprocate with

 8     flexibility between the parties as to the true availability

 9     of their witnesses, I expect both sides to work together and

10     if you can't, I'll certainly resolve it.  But we're all

11     going to have to be somewhat flexible to make everything fit

12     within the specified dates the Court has available for trial

13     and the time limits that I've given you.

14              So I would simply say continue to talk.  If you

15     reach an impasse that you think needs to be raised with me,

16     let me know, okay?

17              MR. GAUDET:  Thank you, Your Honor.

18              THE COURT:  All right.  Before we turn to disputed

19     exhibits, it's 35 minutes after 2:00.

20              I understand there's been some progress made in

21     bucketizing the possible disputes.  I don't know if that's a

22     real word or not.  Doesn't look like it is.  But anyway,

23     I'll use it nonetheless.

24              I'm going to give you some additional time in hopes

25     that taking into account what I've previously ruled on after
```

1    lunch will let you further narrow and streamline the exhibit

2    disputes.

3            So that said, it's 2:35.  I'm going to recess until

4    3:00 o'clock.  At 3:00 o'clock, I'll see where you are on

5    exhibits.  I would encourage you to make as much progress as

6    you can.  I do not -- I hope that we're not up here the rest

7    of the day and the afternoon and the evening.  You should

8    have adequate guidance by this point to know what in

9    likelihood is going to go left and going to go right on the

10   exhibits, and I'll expect you to be reasonable with each

11   other while you continue to meet and confer.  But I'll

12   afford you that additional time in hopes that it will pay

13   dividends later.

14           The Court stands in recess until 3:00 o'clock.

15           COURT SECURITY OFFICER:  All rise.

16           (Recess.)

17           COURT SECURITY OFFICER:  All rise.

18           THE COURT:  Be seated, please.

19           All right.  Counsel, it's 3:15.  Tell me where we

20   are with regard to exhibits.

21           MS. SNEDEKER:  Your Honor, Alice Snedeker for Palo

22   Alto Networks.

23           I believe we have one outstanding bucket of

24   objections to Implicit's exhibits, with confirmation from

25   Mr. Chin, that we've reached agreement on the Microsoft

1   exhibit.

2          MR. CHIN:  Yes, we have.

3          MS. SNEDEKER:  Okay.  Yes.  So we have one

4   remaining bucket on our end, Your Honor.  And Mr. Dotson

5   will handle that argument as soon as you're ready for it.

6          THE COURT:  Let me find my copies.  Just a minute.

7          MS. SNEDEKER:  Okay.

8          THE COURT:  All right.  Where are we?  Do I

9   understand there's one area that if I gave you some

10  guidance, might resolve all the exhibit disputes, or am I

11  overly optimistic on this afternoon after a long day?

12         MR. DOTSON:  With guidance from my colleague, I

13  think this is with respect to PAN's objections to Implicit's

14  exhibits; is that right?  They may have additional

15  objections that PAN's exhibits that will need to be

16  resolved.

17         THE COURT:  Okay.

18         MR. DOTSON:  And, I'm sorry, David Dotson for Palo

19  Alto Networks.

20         I think the lone remaining objection that PAN has

21  to Implicit's exhibits is with respect to PTX-460 which is

22  Implicit's source code and related files relating to I think

23  a purported actual reduction to practice of the claimed

24  inventions.

25         And the -- the -- I guess the object -- the reason

1    for the objection here, Your Honor, is that it's prejudicial

2    for the jury to hear about dates going back to '97 or

3    however early they're saying this source code goes back to

4    when the only relevant issue for an actual reduction to

5    practice would be one year prior to the application date on

6    the face of the patents, pursuant to 35 U.S.C. 102(b).

7            THE COURT:  Is the -- is the date reflected on the

8    document substantive or relevant, or is it just there, and

9    the substance of the document is otherwise presented such

10   that the date could be redacted or some accommodation could

11   be made to alleviate your concern?

12           MR. DOTSON:  Your Honor, when you say the date, you

13   mean the date on the source code materials?

14           THE COURT:  What -- whatever date you're concerned

15   about being inappropriate and being disclosed to the jury.

16           MR. DOTSON:  That is a question that I don't know

17   that I can answer for you sitting here, but I think if --

18           THE COURT:  What I hear you telling me is that

19   there's a document, it may have some relevance, but you're

20   concerned there's a date on it that might either be

21   confusing or misconstrued.  And if the date's not the

22   critical piece, that's why I asked the question, could we

23   simply redact the date, use it otherwise, and solve the

24   problem?

25           MR. DOTSON:  Well, I think that this actual

1    reduction to practice issue, I don't think is any longer

2    relevant in light of the fact that the DeCasper references

3    will not be at issue in the invalidity case per Your Honor's

4    summary judgment ruling.

5         So that -- the reason they would need to use an

6    actual reduction to practice would be to get an earlier

7    priority date.  And the only reference that they need to

8    pre-date would have been DeCasper because all the other

9    prior art references are greater than one year prior to the

10   earliest priority date.

11        THE COURT:  Okay.  But to -- to return to the issue

12   at hand, we're talking about source code, are we not?

13        MR. DOTSON:  We are talking about Implicit source

14   code, yes.

15        THE COURT:  Okay.  And is the date reflected on

16   that source code that you indicated you have a concern

17   about, is that necessary to be shown on the source code, or

18   could the source code be offered with that date redacted and

19   still serve the purpose intended by the offering party?  It

20   may not cure the problem.  I'm just asking the question.  In

21   other words, could the parties agree to the admission of the

22   source code with the date redacted?

23        MR. DOTSON:  I think that --

24        THE COURT:  Could Defendant do that?

25        MR. DOTSON:  I think Defendant could agree.

 1          THE COURT:  Could Plaintiff do that?

 2          MR. SINGER:  The -- we don't need the date on the

 3  document itself, but we do intend to discuss the timing of

 4  when the source code was developed, as that is one of the

 5  purposes for offering it.  It shows the development work.

 6  It's the traditional invention story.  What was the problem?

 7  How did you solve it?  What you do you do to solve it?  Who

 8  was on the team?  Part of this trial appears to be that they

 9  want to say that Plaintiff never made anything, and all we

10  do is sue people.  And we believe that this is important,

11  proper, and relevant.

12          MR. DOTSON:  And, Your Honor --

13          THE COURT:  That sounds like a qualified yes to me,

14  Mr. Singer.

15          MR. SINGER:  Then it is.

16          THE COURT:  I mean, I'm not going to out of hand

17  say you can't attempt to use this for the purpose you've

18  outlined, and if there are valid objections as to why you

19  shouldn't, I'll take those up in the course of the trial.

20  But the question is:  Does the document with the source code

21  need to reflect a specific date on it?  And if it doesn't,

22  then I'll hear other objections to its potential use if and

23  when they arise in the course of the trial.

24          But for admission of the exhibit, we can take the

25  date off and solve the problem, then I'm interested in doing

1 that.  If we can't, then let's -- let's go further, because

2 we're going to resolve it one way or the other.

3        MR. SINGER:  We'll agree to -- subject to what I

4 said, we'll agree that the date does not need to be on the

5 admitted document.

6        THE COURT:  All right.  So if the document with the

7 date redacted is agreed for admission, then its proper use

8 and argument made about it, I'll defer that until the trial,

9 okay?

10        MR. DOTSON:  Understood.  Thank you.

11        THE COURT:  So that -- and that is -- did you say

12 460?

13        MR. DOTSON:  PTX-460.

14        THE COURT:  Okay.  So with the date being redacted,

15 the objection to PTX-460 is withdrawn, and Defendants are

16 representing to me that with that guidance, they do not have

17 other live objections to the remainder of Plaintiff's

18 pre-admitted exhibits as -- as offered and as disclosed; is

19 that correct?

20        MR. DOTSON:  That's correct, Your Honor.

21        THE COURT:  Okay.  Where are we from the other side

22 as far as objections from Plaintiff as to Defendant's

23 proposed pre-admitted exhibits?

24        MS. COLEMAN:  Good morning, Your Honor.  Deb

25 Coleman for Implicit.

```
 1           Your Honor, we're -- we -- I'm -- I confess that I
 2   wasn't quite in sync with my team as to -- there were a lot
 3   of discussions taking place, and I'm not exactly sure where
 4   we stand.  I do know that there are three very
 5   evidentiary-type buckets left.
 6           The first -- and they all overlap to an extent.
 7   They have to do with hearsay objections, objections under
 8   Federal Rules 26 and 37 because documents were produced
 9   after the close of discovery, and documents that we
10   understand that Palo Alto Networks only intends to use for
11   impeachment purposes.
12           Most of the -- the --
13           THE COURT:  Well, let me -- let me take the last
14   piece first.
15           Documents used for impeachment are not admitted
16   exhibits.  The use of those documents and the transcript of
17   the testimony through the impeachment process are part of
18   the record.  But the document is not a pre -- is not an
19   admitted exhibit.
20           So if there's a prior inconsistent statement of a
21   witness, it does not have to come from the list of
22   pre-admitted exhibits.
23           MS. COLEMAN:  That's my understanding, as well,
24   Your Honor, and thank you for that clarification.
25           The -- the other arguments are very similar, Your
```

1   Honor.  With respect to hearsay documents, late-produced

2   documents, there is --

3           THE COURT:  Now, let me stop you one more -- one

4   more time.

5           It should also not be a surprise or an ambush to

6   the other side.  Typically, these kinds of impeachments come

7   from deposition testimony where both sides are there.  If

8   there's some kind of a declaration that a witness filed in

9   another case that the side putting the witness up doesn't

10  know about and hasn't had disclosed, then it may still be

11  proper impeachment, but we're not going to try the case by

12  ambush, even for purposes of impeachment.  So what I just

13  told you is premised on the understanding that there's no

14  undue surprise here.

15          MS. COLEMAN:  I understand, Your Honor.

16          THE COURT:  Okay.  Then that's the Court's position

17  on that issue.

18          MS. COLEMAN:  Okay.  So as to the hearsay and

19  late-produced documents, we have partial agreement here.

20  Implicit has agreed to withdraw its objections to publicly

21  available documents like through Palo Alto Networks's

22  websites, things of that nature.

23          The remaining buckets, some of -- the subbuckets,

24  if you will, some of them -- the vast majority of them are

25  industry reports, such as Gartner reports and IDC reports

 1   and things of that -- of that type.

 2          There are also some textbook-type things on the

 3   implementation of TCP/IP, source code that was late produced

 4   that was publicly available, third-party source code,

 5   documents having to do with F5 products and how they work.

 6   So that third-party hearsay, late-produced bucket is still

 7   live.

 8          We're -- Your Honor has ruled as to what the

 9   experts can and can't testify on.  This doesn't go --

10   similar to the impeachment exhibits, this doesn't go as to

11   whether Palo Alto Networks can use it during trial.  It only

12   goes as to whether these documents get published to the

13   jury.

14          THE COURT:  Okay.  Is the basis of -- is the

15   overriding basis of the objection late production, or is the

16   overriding basis of the objection hearsay?

17          MS. COLEMAN:  Both, Your Honor.

18          THE COURT:  Okay.  We're going to have to get a

19   little more specific then.  You're going to have to identify

20   the proposed pre-admitted exhibits from Defendants that fall

21   into these buckets, and then if you can give me a

22   representative or an exemplar of the actual dispute, and I

23   can react to it and give you guidance, perhaps that can then

24   be applied to that bucket, or as you said, subbucket of

25   whatever the exhibits are.

1          MS. COLEMAN:  Yes, Your Honor.  If I may have just

2     a moment.

3          With apologies to the court reporter, would Your

4     Honor like for me to read in the exhibits and whether we've

5     got hearsay, late produced, or both?

6          THE COURT:  I want you to identify specifically a

7     group of proposed Defendant's exhibits that you believe can

8     be dealt with and dispositive guidance can be given

9     collectively.  And then if the Defendants concur, then I

10    want to hear the argument, and I'll give you a ruling, and

11    then we'll move on to the next group.  That's how I envision

12    proceeding.

13         MS. COLEMAN:  I'm sorry.  Give me just a moment,

14    Your Honor.

15         MS. SNEDEKER:  Your Honor, Alice Snedeker for Palo

16    Alto Networks.

17         The hearsay and late-produced documents seem to

18    fall into three categories, the industry reports, technical

19    textbooks, and then publicly available documents about

20    licensees with Implicit.  And so we have already divided

21    them up into the subbuckets and can give you those numbers,

22    and have the Plaintiff pick the representative sample if

23    that works.

24         THE COURT:  That's fine.

25         MS. SNEDEKER:  Okay.

172

1          THE COURT:  So what are the applicable exhibit

2     numbers for the industry reports, and then we'll hear

3     argument on that.  And then we'll go to the textbooks, and

4     then we'll go to the publicly available documents.

5          MS. SNEDEKER:  Okay.  So the industry reports are

6     DTX-60 to 69, 75, 77, 78, 81, 82, 87, 88, 89, 192, 208, 234,

7     and 293.

8          One clarification.  We had broken these up by the

9     type of reports, so some of these are not going to be in

10    sequential numbers.  Those were the Gartner docs, so --

11         THE COURT:  As long as we get all the numbers --

12         MS. SNEDEKER:  Okay.

13         THE COURT:  -- they don't have to be sequential as

14    long as they're accurate.

15         MS. SNEDEKER:  All right.  That sounds good.  The

16    IDC docs are 229, 231, and 242.

17         And Infonetics docs are 277, 278, 302, and 504.

18    And that is all we have for the industry reports.

19         THE COURT:  Okay.  Then with regard to those

20    industry reports, what's the basis of Plaintiff's objection,

21    and then I'll hear a response from Defendant?

22         MS. COLEMAN:  Your Honor, if I could get PTX-60

23    on -- from the Plaintiff's table?

24         Your Honor, this is -- was -- Your Honor, this is

25    an example of the type of industry document.  This is a

1    smaller document -- some of them are much larger -- that

2    have to do with reports of market share.  The -- again, the

3    dispute is not whether they can be used.  They can -- the

4    dispute is whether they are published into evidence.

5           The -- the document itself -- if you can please

6    scroll through, Mr. Davis.  That's great.  Thank you.

7           The documents itself generally refer to market

8    share, revenue, spending worldwide, things of that nature

9    that are cumulative evidence and -- and prejudicial because

10   they're -- they're coming from a -- a third party,

11   presumably authoritatively.

12          I'm not sure what else Your Honor would --

13          THE COURT:  Well, your objection to these is that

14   they are hearsay?

15          MS. COLEMAN:  Yes, Your Honor, we --

16          THE COURT:  Do you have other substantive

17   objections besides hearsay?

18          MS. COLEMAN:  Your Honor, there's the -- the Rule

19   26 and 37 late-produced -- late-produced objections, as

20   well.  This one was chosen because it fits into both

21   buckets.

22          THE COURT:  Okay.

23          MS. COLEMAN:  Unless Your Honor has any questions,

24   I'll turn the podium over.

25          THE COURT:  No, let me ask the Defendants to

1    respond to those objections.  And if there are applicable

2    exceptions, let me hear those specified.

3            MS. SNEDEKER:  Understood, Your Honor.  Alice

4    Snedeker for Palo Alto Networks.

5            As far as the late-produced objection, Your Honor,

6    we believe that you resolved this last week when you denied

7    Implicit's motion to strike Mr. Bakewell's testimony and

8    said that he could provide opinion testimony that relied

9    upon these late-produced documents.

10           Our understanding is that these documents were the

11   documents our experts searched for and relied upon in

12   generating their reports.  And so we feel like in light of

13   the ruling last week and your rulings earlier today about

14   development of the damages case in cross-examination, that

15   these documents can come in or that the late-produced

16   objection does not have merit at this point in the case.

17           THE COURT:  Let me ask you this.  Are you -- are

18   you trying to offer the admission of documents that are

19   referenced in your expert's -- in this case, Mr. Bakewell's

20   report simply because they're referenced in the report, or

21   do you intend to affirmatively present them and publish them

22   and offer them and discuss them before the jury with -- with

23   live witnesses?  I mean --

24           MS. SNEDEKER:  The latter.

25           THE COURT:  The latter, okay.  Because, quite

175

1    honestly, I sometimes have counsel who want to move the

2    formal admission of documents that are referenced in an

3    expert's report that are not going to be raised in the

4    testimony offered before the jury.  And I -- I generally

5    don't do that and don't see a need to do that.  So I just

6    want to make sure that's not where you're headed.

7        MS. SNEDEKER:  Understood, Your Honor, and that's

8    not where we're headed.  Mr. Bakewell will affirmatively

9    opine that we rely on these documents to form the

10   hypothetical negotiation opinion.

11       THE COURT:  Well, given that -- given that they

12   would be offered through an expert, and experts are entitled

13   to rely on hearsay, why is the -- I guess I'll -- I'll

14   direct this to Ms. Coleman.  Why is the hearsay objection

15   really valid in this circumstance?

16       MS. COLEMAN:  Your Honor, under Rule 703, the --

17   even if the -- if I can find the rule, Your Honor.  I just

18   had it on my screen.

19       THE COURT:  I've got it.

20       MS. COLEMAN:  But if the facts or data would

21   otherwise be inadmissible -- for example, if they're

22   hearsay -- the proponent of the opinion may disclose them to

23   the jury only if their probative value in helping the jury

24   evaluate the opinion substantially outweighs their

25   prejudicial effect.

1          What I understood Ms. Snedeker to just say is that

2     Mr. Bakewell will affirmatively testify that he relied on

3     these documents.

4          What I don't hear Ms. Snedeker saying is that these

5     documents go toward -- to prove any disputed fact in -- in

6     the case, rather, that just this is something that Dr.

7     Bakewell relied on in forming his opinion.

8          THE COURT:  All right.  In light of that,

9     Ms. Snedeker, what's the probative value here?  And other

10    than the fact that the expert says he relied on them, what

11    other justification do you have for discussing them with the

12    witness before the jury?

13         MS. SNEDEKER:  We believe there's a factual dispute

14    as to the -- the damages value in the case, and that's what

15    we would offer Mr. Bakewell's testimony on in using these

16    documents.

17         Mr. Bonvanie, PAN's CMO, affirmatively testified in

18    his deposition that he would look to third-party industry

19    reports in evaluating a license offer, and so consistent

20    with that testimony, Mr. Bakewell pulled similar reports in

21    determining how PAN would approach the hypothetical

22    negotiation in this case.

23         THE COURT:  Why don't you put this document -- what

24    is it, DX-60, back up on the screen?  Why don't you show me

25    with this as an example, Ms. Snedeker, how you anticipate

1   Defendants would purport to use this with the witness.  I

2   think that might be informative.

3          MS. SNEDEKER:  If you could scroll down, please.

4          So these tables here, Your Honor, Table 3-1 and

5   3-2, would be informative to Palo Alto Networks as to the

6   market share.  And you'll see that several of the parties

7   listed here have already been raised in this case, so F5,

8   Cisco, and Citrix.  And so Palo Alto Networks would have

9   taken into account their revenue and their market share,

10  evaluated how much they paid Implicit for the license, and

11  then determined what they would have been willing to pay at

12  the hypothetical negotiation.

13         THE COURT:  Okay.  What's your response,

14  Ms. Coleman?

15         MS. COLEMAN:  Your Honor, what I hear Ms. Snedeker

16  saying, and I'm sure she'll correct me if I'm wrong, is that

17  the disputed issue of fact is what the hypothetical

18  negotiation would have come up with.  We certainly don't

19  dispute that that's a disputed fact.  But these particular

20  facts that are set forth in this report don't necessarily go

21  toward that.  They -- or -- or go toward any dispute toward

22  that, if -- if that's at all clear.  And if it's not, I'll

23  try again.  But I still don't see where the document -- the

24  underlying documents themselves are -- have any probative

25  value as to the resolution of any disputed fact.

1          THE COURT:  All right.  And if I'm correct,

2    Ms. Snedeker, your anticipated use of this would be with the

3    expert who references it in -- in his or her report, and you

4    would use it to show an example of how the expert arrived at

5    the conclusions in that report?

6          MS. SNEDEKER:  That's correct, Your Honor.

7          THE COURT:  Okay.

8          MS. SNEDEKER:  And we also understand rule --

9    Federal Rule of Evidence 703 to allow us to use these

10   documents in redirect should Implicit raise them and

11   challenge Mr. Bakewell's opinion during cross.

12         THE COURT:  I'm going to pre-admit these exhibits.

13         MS. SNEDEKER:  Thank you, Your Honor.

14         THE COURT:  I'll overrule Plaintiff's objection.

15         What's our next category?  Textbooks?

16         MS. SNEDEKER:  Yes, sir, that's right.

17         THE COURT:  And are these just another category of

18   data that are going to be used by experts in the same way,

19   or is this something different?

20         MS. SNEDEKER:  That's correct.  These are slightly

21   more technical so these would be for Dr. Schmidt.  For

22   example, we have two TCP textbooks that he relied upon and

23   would testify about during his examination.  And those are

24   DTX-72 and 92.

25         THE COURT:  All right.  Ms. Coleman, other than

1   what we've already -- what the Court's already heard

2   argument on, how would these be different and why would the

3   result be different?

4            MS. COLEMAN:  Your Honor, these are more

5   prejudicial than the -- than the industry reports because

6   they are textbooks, which is a learned treatise that carries

7   significant weight of authority.  And, again, to -- to make

8   the -- the position entirely clear, we're not saying that

9   they can't use them.  The question is whether they are

10  pre-admitted into evidence and taken back and published to

11  the -- in the jury room.

12           THE COURT:  Well, let me -- let me clarify one

13  point that I can say with confidence.  I know Mr. Davis and

14  Mr. Gillam understand.  This Court's practice is not to send

15  every admitted exhibit back to the jury when they

16  deliberate, but to tell them if they want to view, during

17  their deliberations, any of the exhibits I've admitted into

18  evidence, to send me a note specifying specific exhibits and

19  I'll send them to them.  But they're not going to get a

20  wheelbarrow full of paper pushed back into the jury when

21  they retire to deliberate.

22           MS. COLEMAN:  Your Honor, I understand that.  But

23  there's -- there's a significant difference between coming

24  back and asking to look at a slide again and taking --

25  asking for a textbook to take back into the jury room and --

 1   and flip through and -- and manipulate in -- in the jury

 2   room.

 3          THE COURT:  Well, I do -- I do see some merit into

 4   not pre-admitting a textbook that talks about 25 different

 5   topics for simply the purpose of one of those topics.  I can

 6   see some potential confusion on the part of the jury if they

 7   are presented with a 400-page textbook for the purpose of

 8   showing them two or three pages.

 9          Do Defendants have a way to specify the sections of

10   the textbook and narrow their requests to those operative

11   sections, as opposed to the entirety of the text?

12          MS. SNEDEKER:  Yes, Your Honor.  We can agree to

13   admit only those portions of the textbook that Dr. Schmidt

14   testifies about.

15          THE COURT:  And at this point, these exhibits are

16   designated as the entire textbook; is that correct?

17          MS. SNEDEKER:  That's correct, Your Honor.  We

18   would just point out that Ms. Coleman did characterize them

19   as a learned treatise, which we believe is an exception to

20   the hearsay rule.  But we would still agree to limit

21   admission to the portions used by Dr. Schmidt.

22          THE COURT:  If we can designate in advance those

23   portions, because I'm not going to let you use the entire

24   book, and then whatever he talks about is admitted after the

25   fact.  We're going to have to designate what's going to be

1   shown to him and what's referenced in his report.  And if we

2   can do that discreetly and with specificity now and re-cast

3   your exhibit numbers not by an entire book but by the actual

4   sections and pages that are going to be used, then I'm

5   inclined to overrule the objection, admit it on that basis,

6   but I have real concern about sending a several hundred page

7   textbook either to the jury or if it's only used in the

8   courtroom.

9           MS. SNEDEKER:  Understood, Your Honor.  And you'll

10  hear later that we have reached a similar agreement with

11  voluminous exhibits to narrow -- for Palo Alto Networks to

12  narrow the pages and sections that will actually be used and

13  submitted as the exhibit in advance of trial.

14          THE COURT:  And with that in mind, and by way of

15  mitigating the Plaintiff's concern about the prejudicial

16  effect, if we're talking about, for example, a 300-page

17  textbook and there are five pages of it that the witness is

18  going to actually testify about, then the exhibit should be

19  the front page of the textbook with the title and the

20  author's name and then those five pages --

21          MS. SNEDEKER:  Understood.

22          THE COURT:  -- and that way if it's actually shown

23  or published to the jury, we're not going to waive around a

24  300-page textbook in front of the jury, when only five pages

25  of it are pre-admitted.

```
 1            MS. SNEDEKER:  Understood.

 2            THE COURT:  Okay?

 3            MS. SNEDEKER:  Thank you, Your Honor.

 4            THE COURT:  In that case and with -- with the

 5    understanding on the part of the Court that the parties can

 6    agree as to those specified pages or sections and the doc --

 7    the exhibits will be limited and re-cast as those specific

 8    pages or sections and not the entirety of the textbook, then

 9    I'll pre-admit them and overrule the Plaintiff's objection.

10            MS. SNEDEKER:  Thank you, Your Honor.  The third

11    subbucket in the hearsay and late-produced documents are the

12    publicly available documents of licensees of Implicit.  And

13    they are DTX-83, 84, 85, 91, 209, 210, 211, 212, 213, 214,

14    240, 289, 458, 501.  Going back down the list, 116, 119,

15    121, 122, 123, 124, and 210.

16            THE COURT:  All right.  Show me a representative

17    exemplar from this list, and then let me hear your

18    arguments.

19            MS. COLEMAN:  Your Honor, recognizing that I'm

20    shooting in the dark a bit, shall we try PTX-83 -- I'm

21    sorry, DTX-83?

22            So, Your Honor, this is a third-party document

23    clearly offered for the truth of the matter asserted in many

24    cases, not produced until after the close of discovery

25    with -- and the prejudice here is that Implicit had no
```

```
 1   notice that it was coming and no opportunity to chase down
 2   and find rebuttal evidence, if necessary.
 3         THE COURT:  Well, are you telling me it's not
 4   referenced in the expert's report that's going to rely on
 5   it?
 6         MS. COLEMAN:  No, Your Honor.  It is -- it is
 7   referenced in the expert's report, but, again, going back to
 8   Rule 703, the fact that the expert can rely on it does not
 9   make it admissible -- does not make the --
10         THE COURT:  I understand it's Rule 703, but
11   you've -- at least as I understood your comment, you
12   basically said we were ambushed with this, and we've just
13   seen it and we didn't have a chance to go find anything
14   else.  You've known about it since you saw the expert's
15   report.
16         MS. COLEMAN:  Your Honor, we -- we moved to strike
17   the -- the -- the expert report to the extent that they
18   relied on late-produced documents and -- and --
19         THE COURT:  So, in other words, instead of
20   preparing for it against the prospect that your motion would
21   not be granted, you just assumed it was going to be granted
22   and you didn't have to prepare for it; is that right?
23         MS. COLEMAN:  No, Your Honor.  I think that
24   we've -- we've made other arrangements, as well, but --
25         THE COURT:  You've known or should have known of
```

 1   these since the expert's reports were tendered?

 2          MS. COLEMAN:  That's correct, Your Honor.

 3          THE COURT:  Okay.  And is this fairly

 4   representative, what I'm seeing, some type of an industry

 5   press release or published notice?

 6          MS. COLEMAN:  Your Honor, there's -- there are also

 7   some SEC filings.  If I may --

 8          THE COURT:  Why don't you show me the ones you

 9   think are the worst in the group that Defendants have put

10   up?

11          And, again, Ms. Snedeker -- I hope I'm saying that

12   right.

13          MS. SNEDEKER:  Snedeker.

14          THE COURT:  Snedeker.  Okay.  Thank you.  You're

15   telling me that the expert who relied on these are going to

16   talk about them in front of the jury, because this is a long

17   list?

18          MS. SNEDEKER:  Yes, Your Honor.  These go to

19   damages.  These are publicly available documents about the

20   licensees that Dr. Ugone has discussed and analyzed the

21   licenses of.

22          THE COURT:  You're telling me Dr. Ugone is going to

23   talk about each one of these exhibits?

24          MS. SNEDEKER:  It's going to be a combination of

25   Mr. Ugone will talk about these exhibits or Mr. Bakewell

1   will in rebuttal.  Or we may use them to cross Dr. Ugone as

2   to his conclusions of the comparability of the licenses he

3   relies upon.

4           THE COURT:  Well, Dr. Ugone is the Plaintiff's

5   expert, correct?

6           MS. SNEDEKER:  Yes, sir.

7           THE COURT:  So you're -- are you proposing the

8   affirmative admission -- admission of documents referenced

9   within and relied upon the Plaintiff's experts' reports or

10  just on your expert -- the Defendant's experts' rebuttal

11  reports.

12          MS. SNEDEKER:  It's just the rebuttal report.

13   Well, it's documents from our experts' reports, and we will

14  cross Dr. Ugone on them, as well.

15          So, for example, Your Honor, the Intel/McAfee deal.

16  Dr. Ugone opines on that license, and Intel acquired McAfee

17  and was able to add its products to the license for zero

18  dollars.  So we would ask Dr. Ugone about that and challenge

19  his conclusions about that license.

20          THE COURT:  Well, you don't really control or know

21  what Dr. Ugone is going to testify about.  You can control

22  your witness, and you can control what's going to be asked

23  of your witness on direct.  And I have no problem if your

24  witness is going to talk about their documents that are

25  referenced in their report admitting them, but just to say

1    the other side's expert might talk about a document that's

2    in their report and, therefore, we want it admitted as an

3    exhibit in the case, I don't see a basis for that.

4            MS. SNEDEKER:  Understood.

5            THE COURT:  Now, if the Defendant -- excuse me, if

6    the Plaintiffs put that document on and discuss it through

7    their witness on direct, you certainly can cross, and it

8    will be before the Court.  But we may -- I'm -- I'm not

9    persuaded that you ought to have a blank check to just admit

10   anything that you think the opposing expert might talk about

11   because it's referenced in the report when you really don't

12   have any way of controlling or knowing where that expert's

13   going to go with their testimony.

14           MS. SNEDEKER:  Understood, Your Honor.  So this

15   would be limited to the documents Mr. Bakewell relies upon

16   in his report, as you've ruled earlier.

17           THE COURT:  All right.  Then to the extent they're

18   limited to what the Defendant's experts relied upon and

19   they're offered with the representation that the Defendants

20   intend to question their witness about those documents, then

21   they'll be pre-admitted for that -- for that purpose and

22   within that scope.

23           MS. SNEDEKER:  Understood.  Thank you, Your Honor.

24           THE COURT:  Otherwise not.

25           All right.  Having covered those, where are we on

1  any remaining objections from Plaintiff to Defendant's

2  proposed pre-admitted exhibits?

3          MS. COLEMAN:  Your Honor, the -- the next bucket, I

4  think, is readily rulable on.  They concern DTX-142, 143,

5  and 144, which are the offer letters that were subject to

6  the motion in limine before.

7          We recognize that the Court has already considered

8  this issue.  We would just ask for a formal ruling

9  sustaining or objecting -- or overruling the objection.

10         THE COURT:  Well, could you be a little more

11 specific, Ms. Coleman?

12         MS. COLEMAN:  Sure.

13         THE COURT:  You know what these are, but I'm not

14 seeing them.  So I'm just having to listen to your generic

15 characterization.

16         MS. COLEMAN:  I'm sorry, Your Honor.

17         Your Honor, these are the -- the emails that were

18 subject to Implicit's motion in limine concerning the 408

19 communication -- the Rule 408 communications.

20         THE COURT:  Okay.  And I've overruled your 408

21 objections to those.

22         MS. COLEMAN:  Yes, Your Honor.

23         THE COURT:  So to be consistent with that, I'll

24 overrule your objections on the same basis on the

25 pre-admission of these exhibits.

1          MS. COLEMAN:  Thank you, Your Honor.

2          THE COURT:  And they'll be pre-admitted.

3          What's next?

4          MS. COLEMAN:  Your Honor, if I may have just a

5     moment to consult with my table?

6          THE COURT:  You may.

7          MR. SINGER:  Benjamin Singer for the Plaintiff,

8     Your Honor.

9          THE COURT:  Yes.

10         MR. SINGER:  This group of exhibits are file

11    histories and re-exams.  Plaintiff's Exhibit 29 is the file

12    history for the '683 patent.  PTX-30 [sic] is the file

13    history for the '790 patent.

14         THE COURT:  Just a minute.  These are Plaintiff's

15    exhibits?

16         MR. SINGER:  Sorry.  DTX.  I apologize, Your Honor.

17         THE COURT:  Okay.

18         MR. SINGER:  DTX-187 is also the file history for

19    the '790 patent, but apparently a subset or some different

20    portion.  And so with respect to these, I think we have two

21    primary objections, and they're similar to what Ms. Coleman

22    just argued about, which is we understand from the rulings

23    from the experts, to the extent that they have proper things

24    on these things, will be allowed to discuss them.  That is

25    limited to a very small portion of what's tens of thousands

1    of pages.

2          In discussion leading up to this, I think it's

3    possible the parties will work out a compromise on --

4    similar to your prior order about creating an exhibit that

5    matches what the expert report allows them to speak to.

6          That being said, these documents -- we feel that

7    the risk of prejudice or the jury potentially performing

8    their own claim construction in the back from having file

9    histories with them, we just don't see that there's actual

10   added value that would warrant that risk.

11         So the experts can get up, they can talk about

12   snippets subject to all the other objections, but our

13   request would be that if the jury says, well, may I see that

14   portion of the '683 file history, the risk of something

15   improper happening outweighs any potential value of them

16   seeing that.

17         THE COURT:  All right.  What's the Defendant's

18   response?

19         MS. SNEDEKER:  Alice Snedeker, Your Honor.

20         We were under the impression that we had an

21   agreement similar to the TCP exhibit, that we would narrow

22   the pages relied upon in these documents and would identify

23   those as the exhibits, and that was what would be used, so

24   it would be narrowed to the portions relied upon.  We feel

25   like the objections themselves were mooted by your rulings

1   earlier today on the motions to strike.

2          THE COURT:  So, in other words, you're anticipating

3   that something on the order of what the Court directed with

4   regard to the textbooks would be accomplished in this case?

5          MS. SNEDEKER:  Yes, sir.

6          THE COURT:  Where does that leave you with your

7   objection, Mr. Singer?

8          MR. SINGER:  Again, Your Honor, that is one of our

9   concerns because the file histories are full of a lot of

10  very prejudicial stuff.  But our view is even appreciating

11  the Court's order with respect to textbooks, this is

12  different than that.  If the jury were to ask, may we have

13  DTX-30, even if it's a chunk of the file history with

14  respect to the '790 patent, it's a legal document.  There's

15  back and forth with the Patent Office.  It's confusing out

16  of context.  And there's a very high risk that the jury will

17  get confused and either perform their own claim

18  construction, observe something else that deters from proper

19  resolution of the questions the Court poses to them in the

20  verdict form, and that risk is just way too great compared

21  to the probative extra value of them having it in front of

22  them.  And so our request would be that they not be

23  pre-admitted, and that if the jury -- if during the trial

24  somehow it becomes clear that there is an important proper

25  purpose for the jury to be able to request to have this in

1   front of them, that the Court could resolve that then.

2        MS. SNEDEKER:  Your Honor, I think similar to

3   Implicit's concerns they raised in their motions to strike

4   you heard this afternoon, that they're worried about

5   something that hasn't happened yet.  And that if and when it

6   does, Your Honor could address the issue and -- and a

7   curative instruction could be given to the jury on how they

8   can use the documents.

9        THE COURT:  All right.  Well, here's what I'm going

10  to do.  I'm going to pre-admit the file histories.  But I'm

11  going to require that before any portion of the file history

12  is used before the jury, that counsel who intends to use it

13  approach the bench, show me the precise section of the file

14  history, and explain to me the basis for it.  And I'll

15  determine at that point whether or not I'm going to grant

16  you leave to continue with the publication and use of it

17  with the witness.

18       That's the Court's best gatekeeping posture to make

19  sure that what the Plaintiff raises as a legitimate concern

20  doesn't prohibit the proper and targeted use of it by the

21  Defendant.

22       MS. SNEDEKER:  Understood.  Thank you.

23       THE COURT:  That will be the ruling.

24       Do we have other exhibit objections?

25       MS. COLEMAN:  Yes, Your Honor.  Very similar to the

 1   settlement emails, Defendant's Exhibit 221, which is the --

 2   the covenant not to sue and release agreement between F5 and

 3   Implicit, we understand that Your Honor has already

 4   understood this issue and -- and ruled on it.

 5        We would just ask for a formal objection or

 6   sustaining of our -- of the pre-admission of the agreement

 7   itself into evidence.

 8        THE COURT:  You lost me.  The sustaining of the

 9   pre-admission of the agreement itself.  I'm not sure what

10   you're talking about.

11        MS. COLEMAN:  Your Honor, I'm -- I'm sorry.

12        So Implicit objects to the introduction into

13   evidence of the -- the F5 agreement with Implicit.  Your

14   Honor heard arguments on this, has -- has ruled on it.

15        We would just ask for an extension of that ruling

16   to formally either sustain or overrule the objection to the

17   exhibit itself.

18        THE COURT:  All right.  I've just gotten a message

19   that a long distance call I've been waiting on is on hold.

20   I'm going to recess for about five minutes, take this call.

21        Talk with opposing counsel, see if you can't

22   clarify this, and see if you can't otherwise bring us to a

23   conclusion on exhibits.

24        I'll be back in five minutes.  The Court stands in

25   recess.

```
 1            COURT SECURITY OFFICER:  All rise.

 2            (Recess.)

 3            COURT SECURITY OFFICER:  All rise.

 4            THE COURT:  Be seated, please.

 5            All right.  Counsel, where are we since I abruptly

 6   left to take a phone call?  You got it all worked out?

 7            MS. COLEMAN:  Your Honor, respectfully, we were

 8   sort of in the middle of a sentence, and I don't know where

 9   we landed.  If I may have a minute.

10            THE COURT:  Well, let's go back to the beginning of

11   the sentence and pick up, unless -- unless there's no need

12   to.  I assume that we're where we were.  There hasn't been

13   further progress made?

14            MS. SNEDEKER:  Your Honor, Alice Snedeker.  I think

15   we have made further progress, and we've almost resolved all

16   of Implicit's outstanding objections to Palo Alto Networks's

17   exhibits.

18            Did we resolve the pleadings and infringement

19   contentions?

20            MS. COLEMAN:  No.

21            MS. SNEDEKER:  Oh, no, we didn't reach an

22   agreement, so then we have two outstanding objections to

23   resolve.

24            THE COURT:  Okay.  Well, let's get them done.

25            MS. COLEMAN:  All right.
```

1          THE COURT:  Ms. Coleman, what's Plaintiff's

2     position?

3          MS. COLEMAN:  Your Honor, this next bucket has to

4     do with prior pleadings and contentions.

5          THE COURT:  Okay.  Did we complete what we were in

6     the middle of when I left, or do we need to go back to that

7     and finish it?

8          MS. COLEMAN:  I don't remember.  Oh, we were

9     waiting for an objection -- for a ruling on the objection to

10    the introduction into evidence of the F5/Implicit agreement.

11         THE COURT:  Okay.  Well, my exhibit objections,

12    which I assume everybody in the room understands this, are

13    intended to be and to the extent I can make them that way,

14    they're going to be consistent with my rulings on the prior

15    motions and motions in limine and so forth and so on.

16         So to the extent you're simply asking me to confirm

17    the same position I've with previously, then, yes, that's

18    where the Court is.  To the extent you're asking me

19    something different, then you need to make that question

20    clearer to me.

21         MS. COLEMAN:  No, Your Honor, we're asking you --

22         THE COURT:  My ruling -- my ruling with these

23    exhibits, to the extent possible, is to conform to and be

24    consistent with the rulings on the pre-trial motions, the

25    Daubert motions, the summary judgment motions, all the

1  pre-trial motions and the limine matters that we've

2  previously taken up, argued, and the Court's ruled on over

3  today and the preceding day's pre-trial.

4          MS. COLEMAN:  I understand, Your Honor.  So I

5  under -- as I understand it, that means that you're

6  overruling the objection to DTX-221?

7          THE COURT:  Yes.

8          MS. COLEMAN:  Your Honor, the next bucket has to do

9  with pleadings and contentions that were from prior Implicit

10  cases.  Your Honor, the -- the prejudicial effect of, again,

11  not the use of but rather the introduction into evidence of,

12  these pleadings and infringement contentions from prior

13  cases, first of all, is unnecessary.

14          And, secondly, is -- is highly prejudicial.

15          The -- as I understand Palo Alto Networks intended

16  use of these exhibits, they are -- they would be to show the

17  nature of the -- and the identity of the accused products in

18  the prior cases for -- for example, the purpose of rebutting

19  what the -- the -- the revenue of those accused products in

20  the prior cases were.

21          THE COURT:  First of all, give me the exhibit

22  numbers we're talking about.

23          MS. COLEMAN:  193, 217, 236, 237, 262, 267, 275,

24  276, 311, 312, 313, 314, 448, 449, 535, 536, 537, 538, 539,

25  and 540.

1          THE COURT:  All right.  Defendant, why don't you

2   tell me exactly how you intend to use this before the jury,

3   if it's pre-admitted?

4          MS. SNEDEKER:  Alice Snedeker, Your Honor, for Palo

5   Alto Networks.

6          One of the examples is we asked Mr. Balassanian

7   about the products at issue in, for example, the Cisco case

8   and the nature of those products and the revenue that was at

9   issue.  And he did not think that routers were at issue in

10  the Cisco case, when, in fact, on the face of the complaint

11  that Implicit filed against Cisco routers are identified.

12  So we would use Mr. Bakewell to introduce these documents to

13  show the nature of the products at issue and to challenge

14  the impacted revenues and the nature of the license

15  agreements.

16         THE COURT:  So, again, your representation is these

17  exhibits are not only referenced and discussed in one or

18  more of your experts' reports, but you intend to

19  affirmatively use these with your experts in their testimony

20  to be presented during the trial?

21         MS. SNEDEKER:  That's correct, Your Honor.  We do

22  have one clarification.

23         DTX-262 is actually an attachment that Implicit

24  provided to an email to Mr. Ritter, and so we do not believe

25  it belongs in this bucket.

```
 1          THE COURT:  Well, these are your exhibits, so if
 2   262 needs to come out --
 3          MS. SNEDEKER:  It does, Your Honor.
 4          THE COURT:  -- you're in charge.  You can take it
 5   out.
 6          MS. SNEDEKER:  We would take that --
 7          THE COURT:  It's out.
 8          MS. SNEDEKER:  Sorry.  It's out of this bucket,
 9   it's not out of the case, just to clarify.
10          THE COURT:  That's correct.
11          MS. SNEDEKER:  Okay.
12          THE COURT:  It's not before the Court right now.
13          MS. SNEDEKER:  Correct.
14          THE COURT:  Well, let me see if I can give you some
15   high-level guidance.  I don't intend to hamstring anybody's
16   experts by using what they have relied upon, discussed, and
17   set forth in their reports.  I do not want to admit
18   wholesale everything that's been referenced in the report,
19   only those things the expert's going to actually talk about
20   with the jury.
21          Also, I don't intend, by these admissions, to
22   obviate the guidance I've previously given you, such as,
23   we're not going to try this lawsuit by trying other lawsuits
24   that already happened in the past.
25          So to the extent the guidance that you've
```

1    previously given remains in tact, but to the extent a

2    portion of your expert's report has survived a Daubert

3    challenge and that portion of the report relies on this

4    document and you're intending to question your expert about

5    this document as a part of their direct testimony, within

6    that context, I'll pre-admit and overrule the objections to

7    the exhibits.

8           But I want it clearly understood this is not a

9    wholesale admission, because you're rattling off lots of

10   numbers --

11          MS. SNEDEKER:  I understand.

12          THE COURT:  -- and I don't have in front of me what

13   those numbers are.  So to make sure there's no confusion and

14   to make sure you don't have an upset Judge who later finds

15   out that based on these representations of a global nature,

16   something has been pre-admitted that I didn't intend to be,

17   I want everybody to be on the same page.  And that same page

18   is just what I've told you, that it should exist within an

19   either unchallenged or challenged and surviving portion of

20   an expert's report, the expert is going to affirmatively use

21   it in their direct testimony, and such does not in and of

22   itself set aside or obviate the prior guidance I've given

23   you about areas of inquiry that are not proper.

24          MS. SNEDEKER:  Understood, Your Honor.

25          THE COURT:  Okay.

1    MS. SNEDEKER:  Thank you.

2    THE COURT:  Then with those ground rules, I'll

3 overrule those objections as to these specified exhibits.

4    What do we have left, Ms. Coleman?

5    MS. COLEMAN:  The last exhibit, Your Honor.  Your

6 Honor, DTX-70 is an approximately hundred-page article,

7 novella, I'm not sure what you would call it, written by

8 Dr. Almeroth who is one of Implicit's witnesses -- expert

9 witnesses in this case.  I -- I -- I'm still not clear --

10 perhaps through miscommunication, I'm still not sure what

11 the use of this would be other than as impeachment evidence

12 based on what Dr. Almeroth may or may not say.  I understand

13 that there's --

14    THE COURT:  You're not intending to put it on

15 through Dr. Almeroth in his direct testimony when you call

16 him?

17    MS. COLEMAN:  No, Your Honor.

18    THE COURT:  Okay.  Well, let me hear from

19 Defendants as to what the intended use of this or some

20 portion of it might be.

21    MR. GAUDET:  Thank you, Your Honor.  Matt Gaudet

22 for Palo Alto Networks.

23    We would only use a very small portion -- I think

24 there was about five or six pages of this book that we would

25 narrow this down to.  It discusses TCP.  And on the one

1    hand, it would be at least impeachment, and we understand

2    that that's all it is.  It would not need to be on the list.

3    But beyond that, because he is the author and it is a

4    learned treatise, there are elements in that book that we do

5    think would properly come in as evidence.  Even though he

6    didn't rely on it in his report, we would simply establish

7    through him that he's the author, it was -- you know, he

8    wrote a truthful book, it's a learned treatise.  And so

9    those five or six pages that relate to TCP should, we

10   believe, be beyond just impeachment but actually also be

11   affirmative evidence.  That's the only issue there.

12          THE COURT:  Well, do -- does the Plaintiff know

13   what those five or so pages are?  And have they had a chance

14   to look at them so they can respond intelligently as to your

15   request that these be pre-admitted?  Or are these an

16   undesignated five or six pages in a hundred plus page work

17   that Plaintiff really doesn't know what you're talking

18   about?

19          MR. GAUDET:  Your Honor, I actually asked him in

20   his deposition about each one of these pages, so they at

21   least saw that.  But it's not been part -- like these other

22   sort of agreements about narrowing the scope of what we'd

23   use, we've not formally said, for the purposes of resolving

24   this objection, these are the five or six pages, but I can

25   represent to the Court we certainly would do that.

1    THE COURT:  I can't see any reason that Defendants

2  would affirmatively attempt to introduce evidence through

3  the Plaintiff's expert witness.  Certainly I can see that

4  they may be a reasonable source for impeachment, and that

5  may be the classic prior inconsistent statement from

6  something he's written.  And I -- I don't intend to tie your

7  hands on possible impeachment.

8    But I don't see an affirmative probative basis for

9  admission affirmatively from you as the Defendants through a

10  Plaintiff's expert witness.

11    So for purposes of pre-admission as an exhibit, I'm

12  going to -- I'm going to sustain the objection,

13  understanding that it may well be a source of impeachment.

14    MR. GAUDET:  Thank you, Your Honor.

15    THE COURT:  All right.  Does that complete all the

16  remaining objections from Plaintiff to Defendant's proposed

17  exhibits?

18    MS. COLEMAN:  Your Honor, there have been many

19  agreements made, and I think that in light of those

20  agreements, we're -- all of the objections have been

21  resolved.

22    THE COURT:  All right.  Well, in light of your

23  agreements and in light of the specific objections the

24  Court's taken up and ruled on, I'm directing that both

25  Plaintiff and Defendant prepare, generate, share with each

1  other, and then deliver to the courtroom deputy a composite

2  finite list of pre-admitted exhibits so there will be no

3  questions of where the universe of these exhibits are when

4  we get to October the 22nd.  And that needs to happen over

5  the next, say, three days, unless there's some reason it

6  should take longer than that.

7       MS. COLEMAN:  Your Honor, three days should be

8  acceptable.

9       THE COURT:  Okay.  Then you are so instructed.

10      Are there any other matters related to pre-trial

11  issues, having now completed the exhibit disputes, that need

12  to be taken up with the Court that either Plaintiff or

13  Defendant is aware of?

14      Anything from the Plaintiff's side?

15      MR. DAVIS:  Nothing from the Plaintiff, Your Honor.

16      THE COURT:  Anything from the Defendant's side?

17      MR. GAUDET:  Yes, Your Honor.  One final issue.

18  This is with respect to the discussion earlier about a

19  possible deposition of Mr. Balassanian.

20      THE COURT:  Have the parties reached some

21  agreement?

22      MR. GAUDET:  We have not reached an agreement, Your

23  Honor, and so we will -- we -- we will -- Palo Alto Networks

24  is moving for a very short deposition of an hour and a half

25  in duration at whatever location is convenient for Mr.

1   Balassanian at any time before -- before he takes the stand,

2   limited very tightly in scope, which would be -- if I could

3   have the document camera.

4        They -- they would not produce -- they would need

5   to produce any documents to us.  This is only with respect

6   to the documents that the Court heard argument about

7   earlier, which were these -- the documents here on the

8   left-hand side relating to the loan agreements and then the

9   various default notices and extensions.  Those were the

10  agreements that have been produced at the -- at the end of

11  discovery.  And then we'd ask about those documents and

12  simply about in which -- the essence now or the theory that

13  they laid out in the expert report, the proposition that Mr.

14  Balassanian did not have resources other than the Implicit

15  patents themselves that were the security on these loans in

16  order to cover these loans, which is they're saying was

17  driving -- the -- the activity in this 2015 period.  That's

18  it.  All we could ask about are his -- that proposition that

19  there were no other resources to -- to cover what was coming

20  due on -- on these loans.

21       Now, we are very mindful of the Court's ruling that

22  we should have done this earlier.  And I think had we sought

23  to do this earlier, it would have sought a lot more.  We

24  would have sought a lot of other documents and a longer

25  deposition.  We understand it's too late for that.  But we

1   would ask for really the bare minimum to avoid us sort of

2   learning for the first time when he takes the stand his

3   testimony about exactly how he squares all these things up

4   in view of the discussion that Dr. Ugone says he had with

5   Mr. Balassanian about these very subject matters.

6        THE COURT:  Mr. Davis, what's the Plaintiff's --

7   or, Mr. Singer, whoever wants to respond to this, what's the

8   Plaintiff's response?  And tell me where Mr. Balassanian is

9   between now and October the 22nd.  I really don't have any

10  knowledge of his personal circumstances.

11       MR. DAVIS:  Austin, Texas, is my -- my best

12  understanding, Your Honor.

13       The deposition that Mr. Gaudet is discussing, what

14  I heard him say is he wants it limited to -- or he's willing

15  to agree to limit it to the documents.

16       Now, if I misunderstood that, he can correct me.

17  But our proposal in the course of our discussions was that

18  we would limit it to a very short deposition based on the

19  documents, the four corners of the documents that were

20  produced at the -- towards the end of the discovery period.

21       The dispute and the impasse, I believe, is that

22  Mr. Gaudet wants to question him generally, broadly about

23  his financial condition from 2013 to 2014 to 2015.  And so

24  we believe that's beyond the scope.  It's not -- was not the

25  basis for their motion.  And so we -- we think that that's

1    too broad.

2            But we are willing to give him a short deposition.

3    We had proposed 30, 45 minutes.  But, I mean, we can figure

4    out an hour, an hour 15 minutes, that's not -- hour and a

5    half, whatever the proposal was.  That's not really the --

6            THE COURT:  The sticking point is it goes beyond

7    the documents.

8            MR. DAVIS:  Yes, Your Honor, that's the sticking

9    point.  And, you know, obviously, we -- we don't feel like

10   we should have to do this in the first place, but we are

11   trying to work with -- work with the other side to try to

12   get some resolution.

13           THE COURT:  Have you all discussed an in-person

14   deposition?  Have you discussed a telephonic deposition?

15   Have you talked about particulars?

16           MR. DAVIS:  We have not discussed the details of

17   in-person versus telephone.

18           THE COURT:  Okay.  All right.

19           MR. GAUDET:  Your Honor, if I may make one

20   clarifying point.

21           THE COURT:  Make it quick.

22           MR. GAUDET:  We don't want an open-ended discussion

23   to talk about his finances.  It's literally the point that

24   he apparently said to Dr. Ugone that he did not have

25   resources to cover the possible default, and thus to

 1   understand that, we need to know what resources did he have

 2   that were available in the 2013 to 2015 time frame when this

 3   is happening.  It will -- and, obviously, in the hour and a

 4   half we've got, we're not going to venture anywhere out

 5   beyond just that absolutely core issue that they're saying

 6   he's going to testify about.

 7          That's all I've got, Your Honor.

 8          THE COURT:  All right.  Well, here's what the Court

 9   is going to authorize.

10          In one respect, Defendants really shouldn't get any

11   relief here.  They have mishandled this.  I won't say

12   intentionally, but clearly, it's been mishandled, as I've

13   previously expressed earlier today.

14          I'll authorize up to a one-hour deposition of Mr.

15   Balassanian in Austin, Texas, at a place convenient to him

16   at Defendant's cost, including the cost of Plaintiff's

17   counsel to attend.  And the deposition will be limited to

18   only the four corners of the documents that have previously

19   been produced, and those being the documents identified

20   before the Court today and globally understood to be those

21   produced at the latter part of the discovery period that

22   were argued about and discussed in the motions that have

23   been raised and presented to the Court as a part of the

24   pre-trial.  I think everyone in the room knows the universe

25   of those documents.

1          And that will be the Court's order, all right?  And

2   if you choose not to do it, Mr. Gaudet, that's fine.  But if

3   you choose to do it, it will be with those parameters.

4          MR. GAUDET:  Thank you, Your Honor.

5          THE COURT:  All right.  That should complete all

6   the pre-trial matters before the Court.  Barring something

7   unforeseen, I will see you on the 22nd in Tyler, Texas, for

8   jury selection.

9          The Court stands in recess.

10          COURT SECURITY OFFICER:  All rise.

11          (Hearing concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes                        10/16/2018
      SHELLY HOLMES, CSR-TCRR                   Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/18

12

13

14

15

16

17

18

19

20

21

22

23

24

25